ACCEPTED
12-15-00121-CV
TWELFTH COURT OF APPEALS
TYLER, TEXAS
10/15/2015 9:45:20 PM
Pam Estes
CLERK

No. 12-15-00121-CV

FILED IN
12th COURT OF APPEALS
TYLER, TEXAS
10/15/2015 9:45:20 PM
PAM ESTES
Clerk

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
TYLER, TEXAS

GARRY L. ROLLINS AND CARLA D. ROLLINS,
Appellants

V.

TEXAS COLLEGE AND
MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL,"
Appellees

Appeal from Cause No. 13-3353-A
In the 7th District Court of Smith County, Texas

BRIEF of APPELLANTS
GARRY L. ROLLINS AND CARLA D. ROLLINS

Sigmon Law, PLLC

Ernesto D. Sigmon
State Bar No. 24010397
2929 Allen Parkway, Suite 200
Houston, Texas 77019
214/395-1546 (Telephone)
713/485-6056 (Facsimile)
esigmon@esigmon.com

ORAL ARGUMENT REQUESTED

No. 12-15-00121-CV

_____

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
TYLER, TEXAS

_____

GARRY L. ROLLINS AND CARLA D. ROLLINS,
Appellants

V.

TEXAS COLLEGE AND
MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL,"
Appellees

_____

IDENTITY OF THE PARTIES AND COUNSEL

_____

APPELLANTS:

Garry L. Rollins

Carla D. Rollins

ATTORNEYS FOR APPELLANTS:

Trial Counsel

Ernesto D. Sigmon
State Bar No. 24010397
SIGMON LAW, PLLC
2929 Allen Parkway, Suite 200
Houston, Texas 77019
214/395-1546 (Telephone)

713/485-6056 (Facsimile)
esigmon@esigmon.com


Appellate Counsel

Ernesto D. Sigmon
State Bar No. 24010397
SIGMON LAW, PLLC
416 West Saulnier Street
2929 Allen Parkway, Suite 200
Houston, Texas 77019
214/395-1546 (Telephone)
713/485-6056 (Facsimile)
esigmon@esigmon.com


FIRST APPELLEE:

Texas College

ATTORNEYS FOR APPELLEE, TEXAS COLLEGE

Trial Counsel:

Mr. Trey Yarbrough
YARBROUGH WILCOX GUNTER, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
Telephone: (903) 595-3111
Facsimile: (903) 595-0191

Lead Appellate Counsel:

Greg Smith
Texas Bar No. 18600600
Nolan D. Smith

Texas Bar No. 24075632
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, Texas 75702
Telephone: 903-597-3301
Facsimile: 903-597-2413

Associate Appellate Counsel:

Mr. Trey Yarbrough
YARBROUGH WILCOX GUNTER, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
Fax: 903.595.0191

SECOND APPELLEE:

MPF Investments, LLC, d/b/a "A-1 Rent All"

ATTORNEYS FOR APPELLEE, MPF INVESTMENTS

Trial Counsel:

Todd M. Lonergan
Texas Bar No. 12513700
lonergan@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Ryan K. Geddie
Texas Bar No. 24055541
geddie@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.
Tollway Plaza One

16000 N. Dallas Parkway, Suite 800
Dallas, Texas 75248
(214) 420-5500 – Telephone
(214) 420-5501 – Facsimile

Lead Appellate Counsel:

Levon G. Hovnatanian
Texas Bar No. 10059825
hovnatanian@mdjwlaw.com
lonergan@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Associate Appellate Counsel:

Todd M. Lonergan
Texas Bar No. 12513700
lonergan@mdjwlaw.com
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Ryan K. Geddie
Texas Bar No. 24055541
geddie@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
Tollway Plaza One
16000 N. Dallas Parkway, Suite 800
Dallas, Texas 75248
(214) 420-5500 – Telephone
(214) 420-5501 – Facsimile

TRIAL COURT:

Cause No. 13-3353-A
7th District Court of Smith County, Texas

Honorable Kerry L. Russell, Presiding

# CONTENTS

INDEX OF AUTHORITIES ...............................................VII

STATEMENT OF THE CASE............................................. 1

1. STATEMENT OF PROCEDURAL HISTORY ................ 1

    A. SUMMARY JUDGMENT .............................................. 1

    B. MOTIONS TO STRIKE ............................................... 2

    C. THE FEBRUARY 19 ORDERS ................................... 3

    D. RECONSIDERATION ................................................. 4

2. STATEMENT OF JURISDICTION ............................... 5

STATEMENT REGARDING ORAL ARGUMENT .................. 6

ISSUES PRESENTED .................................................... 7

1. Whether the Trial Court Erred in Granting the Motion for Summary Judgment of Texas College and Its Underlying Objections to Evidence. .......................... 7

i

2. Whether the Trial Court Erred in Granting the Motion for Summary Judgment of MPF and Its Underlying Objections to Evidence. ..............................7

3. Whether the Trial Court Abused Its Discretion in Refusing to Re-Open the Evidence. .........................7

STATEMENT OF FACTS ...............................................8

1. SUMMARY.............................................................8

2. LITIGATION FACTS. ...........................................8

3. CASE FACTS ........................................................ 10

A. GARY ROLLINS, TEXAS COLLEGE, AND MPF ................ 10

B. THE FIRST "BLACK OUT" INCIDENT.......................... 11

C. ROLLINS IS DIAGNOSED WITH SYNCOPE ...................... 12

D. NOTICE OF SYNCOPE DIAGNOSIS AND REMOVAL FROM DRIVING DUTY...................................................... 13

E. THE GROWING ANTAGONISM ................................... 14

F. THE WORK ON OCTOBER 21, 2013 .......................... 15

ii

G. The Confrontation on the Afternoon of October 21st ........................................................ 17

H. The Work on October 22nd ................................. 20

I. The Final "Black Out" and the "Fall" .................. 23

J. The Attempt to Manufacture Evidence of "Consciousness" ................................................. 25

K. The Condition of the Lift and Training ................. 27

L. The Injury ......................................................... 29

SUMMARY OF THE ARGUMENT ....................................... 31

ARGUMENT ........................................................... 32

1. STANDARD OF REVIEW .......................................... 32

A. Traditional Motion Standard ............................. 32

B. No Evidence Motion Standard ............................ 34

C. Order of Consideration .................................... 35

D. Motion to Re-open Evidence .............................. 36

E. Scope of Evidence .......................................... 36

iii

**2. THE TRIAL COURT ERRED IN GRANTING TEXAS COLLEGE'S TRADITIONAL AND NO EVIDENCE MOTION FOR SUMMARY JUDGMENT**...................... 39

A. NATURE OF CLAIMS INVOLVED.................................... 39

B. THE ELEMENTS AND THE EVIDENCE............................ 41

    1. Duty and Breach of Duty ................................ 41

        a) Ordinary Care .............................................. 44

        b) Duty to provide assistance.......................... 44

        c) No Duty to Warn ........................................ 45

        d) Negligent Supervision, Negligent Training... 47

        e) No Duty to Provide Unnecessary Assistance 48

        f) No evidence that the work is unusually precarious ................................................. 49

        g) No evidence that the job required specialized training ....................................................... 50

        h) No evidence that additional personnel were necessary ................................................... 50

        i) No obligation to dissuade ............................ 51

    2. Proximate Cause............................................ 52

a) Generally......................................................... 52

b) Medical Causation ....................................... 54

C. ADDITIONAL EVIDENCE WAS IMPROPERLY STRICKEN ....... 57

1. Bracken's Deposition Excerpts ....................... 58

2. Owner's Manual............................................ 58

3. Rollins Affidavit ........................................... 59

4. Barnett Letter .............................................. 60

D. THE TRIAL COURT SHOULD HAVE REOPENED THE EVIDENCE
..................................................................... 61

3. THE TRIAL COURT ERRED IN GRANTING MPF'S
MOTION FOR SUMMARY JUDGMENT..................... 64

A. THE ELEMENTS AND THE EVIDENCE .......................... 65

1. Duty............................................................ 65

2. Breach of duty.............................................. 67

3. Proximate Cause........................................... 68

B. ADDITIONAL EVIDENCE WAS IMPROPERLY STRICKEN ....... 69

1. Owner's Manual............................................ 69

2. Rollins Affidavit ........................................... 71

v

    3. Thorpe Affidavit ............................................ 72

    4. The ANSI Standard and "Statement of Best

    Practices" ....................................................... 75

C. The Trial Court Should Have Reopened the Evidence

.................................................................. 76

CONCLUSION AND PRAYER ........................................... 76

CERTIFICATE OF COMPLIANCE...................................... 78

CERTIFICATE OF SERVICE........................................... 79

vi

# INDEX OF AUTHORITIES

**CASES**

*Austin v. Kroger Texas, L.P.,* 465 S.W.3d 193 (Tex. 2015)........ 46, 48

*City of Dallas v. Furgason,* 05-06-00875-CV, 2007 WL 2703134
(Tex. App.—Dallas Sept. 18, 2007, no pet.)............................... 55

*City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671
(Tex.1979) .............................................................................. 32

*Cotton Patch Cafe v. McCarty,* 2-05-082-CV, 2006 WL 563307 (Tex.
App.—Fort Worth Mar. 9, 2006, no pet.)................................... 55

*Cunningham v. Columbia/St. David's Healthcare System, L.P.,*
185S.W.3d 7 (Tex.App.-Austin 2005)................................... 73, 74

*Daugherty v. S. Pac. Transp. Co.,* 772 S.W.2d 81 (Tex. 1989) ........ 75

*Dawson v. Briggs,* 107 S.W.3d 739 (Tex. App.—Fort Worth 2003, no
pet.) ....................................................................................... 55

*Desiga v. Scheffey,* 874 S.W.2d 244 (Tex.App.—Houston [14th Dist.]
1994, n.w.h.)..................................................................... 37, 38

*Figueroa v. Davis,* 318 S.W.3d 53 (Tex. App.—Houston [1st Dist.]
2010, no pet.)......................................................................... 55

*Goodwin v. Bluffton Coll.*, 2004-Ohio-2223 ................................... 65

*Grey Wolf Drilling Co., L.P. v. Boutte*, 154 S.W.3d 725 (Tex. App.—
Houston [14th Dist.] 2004) ...................................................... 55

*Gutierrez v. Gutierrez,* 86 S.W.3d 729 (Tex.App. -El Paso 2002) .... 74

*Halliburton Oil Well Cementing Co. v. Groves*, 308 S.W.2d 919 (Tex.
Civ. App. 1957) ...................................................................... 54

*Hernandez v. Brinker Int'l, Inc.,* 285 S.W.3d 152 (Tex. App. 2009) . 33

*Hill v. Melton,* 311 S. W.2d 496 (Tex.Civ.App.--Dallas 1958, writ
dism'd.) .................................................................................. 64

*Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172
(Tex. 2004) ............................................................................. 60

*In re Hawk,* 5 S.W.3d 874 (Tex.App.-Houston [14 Dist.] 1999) ...... 64

*In re Prot. of H.W.*, 85 S.W.3d 348 (Tex. App. Tyler 2002) .............. 36

*Kroger Co. v. Elwood,* 197 S.W.3d 793 (Tex. 2006.) ....................... 42

*Kroger Co. v. Keng,* 23 S.W.3d 347 (Tex. 2000) ............................. 41

*Kroger Co. v. Milanes,* No. 14-13-00873-CV, 2015 WL 4594098 (Tex.
App. July 30, 2015) .......................................................... 52, 53

*Lawrence v. Coastal Marine Serv. of Texas, Inc.*, 983 S.W.2d 757
(Tex. App. 1997) .................................................................... 65

viii

*Lifestyle Mobile Homes v. Ricks,* 653 S.W.2d 602 (Tex. App.-Beaumont 1983, writ ref'd n.r.e.)) .............................................. 36

*McEachern v. Glenview Hosp., Inc.,* 505 S.W.2d 386 (Tex. Civ. App. 1974), *writ refused NRE* (June 12, 1974) .................................. 49

*McKee v. Patterson,* 153 Tex. 517, 271 S.W.2d 391 (1954) *abrogated by Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex. 1978)) ... 51

*McRoy v. Riverlake Country Club, Inc.,* 426 S.W.2d 299 (Tex.Civ.App. -Dallas 1968) ....................................................................... 63

*Morgan v. Compugraphic Corp.,* 675 S.W.2d 729 (Tex. 1984) ......... 55

*Nixon v. Mr. Property Management,* 690 S.W.2d 546 (Tex.1985) .... 34

*Rea v. Cofer,* 879 S.W.2d 224 (Tex. App. 1994) ............................ 37

*Swilley v. Hughes,* 488 S.W.2d 64 (Tex.1972) .............................. 32

*Wal-Mart Stores, Inc. v. Seale,* 904 S.W.2d 718 (Tex.App. -San Antonio 1995) .............................................................. 67, 76

*Word of Faith World Outreach v. Oechsner,* 669 S.W.2d 364 (Tex.App.-Dallas 1984, no writ) .............................................. 63

*Wylie v. Hide-A-Way Lake Club, Inc.,* No. 12-12-00290-CV, 2013 WL 6797871 (Tex. App. Tyler, Dec. 20, 2013), *review denied* (Aug. 22, 2014) ............................................................. 32, 35

ix

## STATUTES

Tex. Gov't Code Ann. § 22.220......................................................... 5

Tex. Labor Code Ann. § 406.033.................................................... 41

## OTHER AUTHORITIES

ANSI's STATEMENT OF BEST PRACTICES OF GENERAL TRAINING AND FAMILIARIZATION FOR AERIAL WORK PLATFORM EQUIPMENT, February 2010 ...................................................................................... 75

## RULES

Tex. R. Civ. P. 1 ............................................................................. 64

Tex. R. Civ. P. 193.6(b) .................................................................. 72

Tex. R. Civ. P. 270........................................................................... 62

Tex. R. Ev. 201 ............................................................................... 76

Tex. R. Ev. 803(4) ........................................................................... 59

Tex. R. Ev. 901 ............................................................................... 60

## REGULATIONS

A92.6, AMERICAN NATIONAL STANDARD FOR SELF-PROPELLED ELEVATING WORK PLATFORMS...................................................... 66, 67, 75

x

## CONSTITUTIONAL PROVISIONS

Tex. Const. art. V, § 6.................................................................. 5

**STATEMENT OF THE CASE**

**1. STATEMENT OF PROCEDURAL HISTORY**

This is a non-subscriber suit for a work related injury. Plaintiffs/Appellants, Gary Rollins and Carla Rollins filed suit on December 20, 2013. (CCR 1: 1-5.)[1] Appellants shall be referred to as "Rollins" and "Mrs. Rollins" respectively, and "Mr. and Mrs. Rollins," "plaintiffs" or "appellants" collectively).

A. **SUMMARY JUDGMENT**

Defendant/Appellee, MPF Investments, LLC, d/b/a "A-1 Rent All" (hereinafter "MPF") filed a motion for summary judgment on January 15, 2015. (CCR 2:104–248.) On the very same day defendant Texas College (hereinafter "TC") filed a motion for summary

---

[1] The original clerk's record (herein cited as "CR") was missing bookmarks and was not text searchable. It was also missing certain designated records. As a result of requests for supplementation and a motion to correct the record, the trial clerk filed a supplemental record (herein cited as "SR") and a "corrected" clerk's record (herein cited as "CCR"). The "corrected" record was filed with volumes 2 and 3 containing the same pages, volume 12 completely missing, certain missing pages and several pages out of order. As a result, it is necessary to refer to the original record (CR) at times. Since the page numbers in the CR and the CCR are the same, the court can consult the CCR unless it finds a necessary page missing, in which case it will have to consult the non-searchable CR.

1

judgment. (CCR 4:249-5:497.)   Mr. and Mrs. Rollins filed a response to TC's summary judgment motion on February 4, 2015 (CR 6:815-22:3234) and a response to MPF's summary judgment motion on February 6, 2015. (CR 22:3241 -24:3474.)

TC filed a summary judgment reply on February 12, 2015 (CCR 21: 3512–3645) and MPF filed a summary judgment reply on February 13, 2015 (CCR 22:3701–3736).   MPF's reply included a series of objections and request to strike plaintiffs' summary judgment evidence.

B. **MOTIONS TO STRIKE**

During the pendency of the summary judgment motions, MFP and TC filed a joint motion to strike Rollins' designation of Burt Thorpe, a safety expert, on January 23, 2015. (CCR 5:508 – 567.) Appellants filed a response on February 3, 2015. (CCR 6:700 – 746.) MFP filed a reply on February 9, 2015. (CCR 21: 3475-3484.)  Rollins filed a sur-reply (erroneously titled "reply") on the same day (CCR 21:3485-3495.)

On January 26, 2015, MPF and TC also filed a joint motion requesting that "the reports and any opinions" of Gilbert Martinez, Joe G. Gonzales, and Thomas M. Roney - a neuropsychologist,

2

medical doctor, and economist, respectively. (CCR 6:568-699.) Rollins filed a response on February 3, 2015. (CCR 6:747 -7:813.) A joint reply was filed on February 6, 2015 (CCR 20:3235-3239.)

On February 13, 2014 TC filed objections and a motion to strike evidence and references in Rollins' responses to TC's motion for summary judgment. (CCR 22:3666 – 3700.) Rollins filed a response on February 13, 2015. (CCR 22:3737 – 23:3922.)

## C. THE FEBRUARY 19 ORDERS

On February 19, 2015, the trial court issued a series of orders relating to the summary judgments and the evidence. The court granted the joint motion to strike the designation of Rollins' liability expert, Burt Thorpe, (CCR 24:3923). The court also granted nearly all of the requests to strike portions of Rollins' affidavit. (CCR 24:3925-3934.) The court also sustained the objections to summary judgment evidence set forth in MPF's summary judgment reply. (CCR 24:3936-3937.) However, the court **denied** the joint motion to strike the reports and opinions of Gilbert Martinez, Joe G. Gonzales, and Thomas M. Roney. (CCR 24:3924.) Finally, the court granted TC's motion for summary judgment (CCR 24:3935), and granted MPF's motion for summary judgment (CCR 24:3938).

3

## D. **RECONSIDERATION**

On February 24, 2015 Mr. and Mrs. Rollins filed an emergency motion to reopen the evidence. (CCR 24:3939 – 4027.) On the same day Mr. and Mrs. Rollins also filed a motion to reconsider regarding TCs motion for summary judgment. (CCR 24:4028 – 4136) On March 2, 2015 they also filed a motion to reconsider MPF's motion for summary judgment. (SR 10-23).

On March 9, 2015, TC filed a response to the emergency motion to reopen the evidence. (CCR 25:4151-4163.) On March 11, 2015, TC filed a response to the motion to reconsider. (CCR 25: 4164 – 4170.) On March 12, 2015, MPF filed its response to the emergency motion to reopen the evidence. (CCR 25:4171 – 4176).

On March 17, 2015, the court below, denied Mr. & Mrs. Rollins' motion for reconsideration of the TC summary judgment (SR 7), and also denied their motion to reopen the evidence (SR 8).

On April 10, the Court below denied Rollins' motion for reconsideration of the MPF summary judgment. (CCR 25:4180.)

A notice of appeal was filed on May 8, 2015. (CCR 25:4181-4183) The clerk's record was filed (incorrectly) on June 9, 2015. A supplemental record was filed on September 2, 2015. A "corrected"

4

record (with significant omissions) was filed on September 15, 2015. Due to the fact that the trial court held no oral hearings before ruling to strike the evidence and grant summary judgment, there is no reporter's record.

## 2. STATEMENT OF JURISDICTION

This Court has jurisdiction under Tex. Const. art. V, § 6 and Tex. Gov't Code Ann. § 22.220.

## STATEMENT REGARDING ORAL ARGUMENT

No oral argument was had in the court below. Appellants believe the lack of oral argument contributed to the erroneous rulings of the lower court. The orders of dismissal contain no discussion of the testimony as they relate to the elements of the claims. Also, the court below has stricken factual statements made in the affidavit of an unsophisticated lay witness, plaintiff/appellant, Garry Rollins. They were stricken because the lower court believed they were either inconsistent with his deposition testimony, or simply beyond his competence.

Oral questioning of counsel will be the most effective way for this Court to extract a detailed and accurate presentation of the parties' arguments on consistency (or inconsistency) of the evidence. Oral argument will thus emphasize and clarify the written arguments, significantly aiding the decisional process of this Court.

**ISSUES PRESENTED**

1.  Whether the Trial Court Erred in Granting the Motion for Summary Judgment of Texas College and Its Underlying Objections to Evidence.

2.  Whether the Trial Court Erred in Granting the Motion for Summary Judgment of MPF and Its Underlying Objections to Evidence.

3.  Whether the Trial Court Abused Its Discretion in Refusing to Re-Open the Evidence.

# STATEMENT OF FACTS

## 1. SUMMARY

Gary Rollins was injured when he "blacked out" and fell during an attempt to dismount from the platform of a "scissor lift." Over his own protest, he had been ordered to "get up there" and patch the high ceiling of a gymnasium. Defying all common sense, his direct supervisors ordered him "up there" **knowing that he suffered from a fear of heights and "syncope," a condition which causes frequent and unpredictable loss of consciousness**. Moreover, he had not received training or instruction on the use of the lift.

## 2. LITIGATION FACTS.

Despite its simplicity, the case below was hotly contested by Texas College, a non-subscriber to the workers compensation system, and TC's co-defendant. From the beginning the case was burdened with numerous aggressive filings -- special exceptions, motions to compel, motions to strike evidence, and motions for summary judgment. (CCR passim).

Eventually, the case reduced to two (2) summary judgment motions and a number of supporting motions to strike evidence. On February 19, 2015 the trial court simultaneously issued orders on all of the pending motions.

The court sustained numerous objections to many parts of the summary judgment evidence (CCR 24:3936-3937.), expert designations (CCR 24:3923), and certain parts of Mr. Rollins' affidavit (CCR 24:3925-3934.) – which required redaction. **However, as will be shown below, the striking of the various parts of the evidence was truly inconsequential. What survived, was ample summary judgment evidence.**

Preserving some significant evidence, the trial court denied defendants' request to strike expert reports of certain doctors (CCR 24:3924). These reports had been incorporated by reference into appellants' responses to requests for disclosures. The disclosure responses were specifically used as summary judgment evidence. (CCR 2:109) (See reference to Exhibit "H").

Without oral hearing, the trial court granted the motions for summary judgment.

An attempt was made here to draft this statement using only information from materials on file and documents referenced by the parties *which were not stricken at the time of the February 19 orders.*[2] These facts do not contain materials submitted on reconsideration or on the request to re-open the evidence. These facts were not stricken and were specifically allowed by trial court when it granted the summary judgments:

## 3. CASE FACTS

### A. GARY ROLLINS, TEXAS COLLEGE, AND MPF

Gary Rollins worked "at Texas College as a maintenance Tech and Supervisor for about six years." (CCR 25:4131). He is 55 years old. (CCR 3:234). He supervised a small group of three workers. (CCR 4:322). He was an "excellent" supervisor, according to one co-

---

[2] *See* Chance v. Elliot & Lillian, LLC, 462 S.W.3d 276, 282 (Tex. App. 2015) ("we may consider all summary judgment evidence not otherwise excluded from the trial court's consideration."); Schronk v. City of Burleson, 387 S.W.3d 692 (Tex. App. 2009) ("Objections to the form of summary-judgment evidence are preserved for appellate review only if those objections are made and ruled on in writing by the trial court");Wrenn v. G.A.T.X. Logistics, Inc., 73 S.W.3d 489, 497-98 (Tex. App. 2002) (court will not imply exclusion of summary judgment evidence, absent clear evidence in order). It is understood however, that this Court is in control and may choose not to consider any matter it deems appropriate. See, e.g. B.M.L. Through Jones v. Cooper, 919 S.W.2d 855, 858 (Tex. App. 1996)

worker. (CCR 4:430). Roland Brackens ("Brackens") was his immediate "supervisor" at the college. (CR 4:292). Brackens had evaluated Rollins as "honest" "responsible," and rated him "good" in "willingness to do work." (CCR 4:359).

Bracken's direct supervisor was James Harris, Vice President of Business and Finance. (CCR 7:930, 21:3513). Dwight Fennel was the College President (CCR 7:931).

MPF Investments, LLC d/b/a A-1 Rent All ("MPF"), is the company from whom Texas College rented one of the two scissor lifts that were in the gym where Mr. Rollins was working on October 22, 2013. (CCR 2:104).

## B. THE FIRST "BLACK OUT" INCIDENT

Rollins first experienced "syncope and associated symptoms" during a September 2013 physical plant work assignment. (CCR 3:234). On September 8, 2013, Rollins "briefly passed out" after coughing and sneezing while he was trying to lift a heavy slab of marble. ROLLIN'S AFFIDAVIT (CCR 25:4132). The next day, September 9. 2013, he "went to the doctor." *Id* "He was eventually told he had an episode of 'syncope.'" REPORT OF JOE G. GONZALEZ, MD (CCR 6:651).

11

C. **ROLLINS IS DIAGNOSED WITH SYNCOPE**

In his expert report to the trial court, Dr. Joe G. Gonzales,[3] summarized his medical history of Rollins:

On September 9, 2013, Mr. Rollins was seen at the Emergency Department of Baylor University Medical Center for **syncope**. It was indicated Mr. Rollins had multiple episodes and each spell was "ppt" by **generalized paresthesia, and some lightheadedness.** It was also indicated Mr. Rollins had episodes at work, while driving and had several spells that day. It was also noted Mr. Rollins **lost consciousness** that day and Mr. Rollins had a GCS score of 15.

On September 10, 2013, Mr. Rollins was discharged home in stable condition and was provided a **diagnosis of syncope**. It was indicated Mr. Rollins was provided discharge instructions for syncope (fainting episode). It was noted Mr. Rollins was **provided a work release** form which allowed Mr. Rollins to be able to return to work in 2 days with no restrictions.

On October 14, 2013, Mr. Rollins was seen by William J. Hwang, M.D. for **blackout spell** during exertion, pain in neck and back, and numbness from the neck down. It was noted Mr. Rollins was lifting a heavy object on September 4, 2013, sneezed during the episode and developed weakness and numbness from the neck down. It was indicated Mr. Rollins passed out twice that day and had felt **dizzy and lightheaded** prior to **blackout spells.** .... Dr. Hwang provided assessments of 1 episode of blackout spell, and noted **differential diagnoses included syncope versus seizures, stroke and TIA.** .... Dr. Hwang advised to follow up with primary care doctor for chest

---

[3] Dr. Joe G. Gonzales is a Physical Medicine & Rehabilitation, Pain Medicine, and Occupational & Environmental Medicine specialist who has practiced Medicine in Texas since 1985. He is the President of the Texas Physical Medicine & Rehabilitation Institute, and the Founder and Medical Director of Physician Life Care Planning, LLC. Dr. Gonzales is a licensed physician in the State of Texas.

pain and possible syncope episode such as a cardiogenic syncope and **instructed Mr. Rollins <u>NOT TO DRIVE</u> until free from blackout spells for 6 months**.

REPORT OF JOE G. GONZALES, MD (CCR 6:646-647) (emphasis added).

D. **NOTICE OF SYNCOPE DIAGNOSIS AND REMOVAL FROM DRIVING DUTY**

Importantly, Rollins informed both Harris and Brackens that he "was now having dizziness and blackout spells." ROLLINS AFFIDAVIT (CCR 25:4132). Brackens admitted to hearing about the problem: "...I left out on the 9th of September and I think I returned on the 17th. I think that's when I -- the day I returned back from vacation. There was a incident that I heard that he had had a light stroke or a heart attack or something --..." (CCR 4:382). In addition, on at least one prior occasion Rollins told Brackens that he was afraid of heights. (CR 4:294)

In his affidavit, Rollins indicated that he "produced a Doctor note to prove that [he] had been to the hospital. Mr. Harris and Mr. Brackens then removed [him] from a driving duty [he] had been performing for some time at Texas College where [he] would drive students from Dallas to Tyler to attend classes." (CCR 25:4132). In his sworn interrogatory answers Rollins stated that he was "restricted from driving" in September of 2013. (CCR 3:236).

13

Rollins had been asked to drive TC students on Tuesday and Thursday mornings. (CCR. 4:306). Brackens testified that he "knew" about the "park-and-rides" Rollins was "doing" on Tuesdays and Thursdays. (CCR 4:362). Confirming Rollins' version of events, Brackens also testified that he suspected that Harris was responsible for the suspension:

> Q. Who is it -- who is it that likely took him off of the driving detail?
> A. **Mr. Harris**.
> Q. And do you know why Mr. Harris took him off the driving detail?
> A. No, sir, I do not.
> Q**. Did it have anything to do with Garry having some issues behind the wheel, passing out**, that sort of thing?
> A. That I do not know. I know that he had been in and out sick all the time. **That could have been the issue**.

(CCR 7:883-883).

### E. THE GROWING ANTAGONISM

During this time, Rollins began "to experience problems getting along with Mr. Brackens." (CCR 25:4132). "At times" he questioned Bracken's "leadership ability and competence." *Id.* Brackens was having Rollins "perform maintenance and repair jobs that were at times degrading and a little frightening." *Id.* Rollins began to question the schools attitude toward their safety. (CCR 25:4133).

14

Although he was Rollins' superior, Brackens admitted that he resigned because he had "leadership problems" and that employees were "not listening" to him. (CCR 4:343). A colloquy with counsel shows that Brackens had an issue with people not taking his orders:

> Q. Meaning that **people were not respecting your leadership and authority and your position**?
> A. **Correct**.
> Q. And why do you think that there was a lack of respect for your authority and leadership at Texas College?
> A. Don't know. Don't know. That's -- the employees, that's the problems that I had. **You cannot make grown folks work**, **and all I could do was ask them to do jobs and they it wasn't getting done.**

(CCR 4:344) (emphasis added).

### F. THE WORK ON OCTOBER 21, 2013

On October 21, 2013 Roland Brackens told Rollins, that "Dr. Fennel wanted the ceiling in the gym fixed...." and that a "scissor lift would be out" and to "go in" the gym. (CCR 4:297). Mr. Rollins described his response: "I expressed to him then **I didn't know how to use** it and I didn't want to get up on it because I done got too old **and I'm afraid of the height."** (CCR. 4:297). Nevertheless Brackens told Rollins to get with another employee "Michael Jones" who

15

Brackens claimed knew "how to use it." (CCR 4:297). Rollins complied. *Id.*

After some difficulty with the lift, as Mr. Rollins described: "We finally got it crunk up, and we went up and patched the roof, the ceiling. **I stayed up there about five minutes** on the 21st showing him what needed to be done, and him and a community service finished off." (CCR 4:297) (emphasis added). Although, Rollins had no "trouble getting off the lift" (CCR 4:299), he was "nervous the entire time" he was "up there." (CCR 25:4133). They did not finish the work that day. (CCR 25:4133).

Bracken's judgment was not good. Earlier that day **he had instructed the men to put a ladder on top of the scissor lift platform to reach even higher.** (CR. 4:303-304). He admitted to it. (CCR 4:342). His order was universally rejected by his subordinates **and** his superiors. (CCR 4:304). The deposition testimony describes this crazy suggestion, as well as Rollins' response in rejecting the idea:

Q. What other conversation took place?
A. I discussed with Mr. Harris Roland told them guys to set a ladder up on top of the lift and get up there because it wouldn't reach a certain height that they had to get to and he told them to set a ladder up on top of the lift and **I told**

16

**them not to set no ladder up on there because they be done fell out and kill theirself.** And I told Ms. Bowie and Mr. Harris that. Well, Mr. Harris started laughing about it and said that that was stupid of Roland to even suggest that being in the position that he's in.

Q. And you were standing there when Mr. Brackens told this to Stevie?

A. No. They came and told me, and **I confronted Mr. Bracket about it.**

Q. Stevie was one of them, was the other one --

A. Mike and Alex.

Q. All three.

A. Yes.

Q. And they told you and then you went --

A. And then **I went and talked to Roland about it first, asked him why would he tell them to set a ladder up on that lift.**

Q. And what did he say?

A. He said that Dr. Fennell want this done, he want it done by Friday, so **whatever it takes to get it done**, that's what we need to do.

(CCR 24:4041-4042) (emphasis added).

### G. THE CONFRONTATION ON THE AFTERNOON OF OCTOBER 21ST

Rollins' refusal to obey Mr. Brackens had consequences. Later that evening Rollins "was called to the office by Mr. Harris and Ms. Bowie...." (CCR 4:297-298). As Mr. Rollins put it: "...Mr. Bracket had told them that I said I wasn't going to get up there and do it...." (CCR. 4:298). Harris told Rollins that Brackens had "complained"

that Rollins was an "ongoing discipline problem" and that Rollins "didn't want to do as told." (CCR 25:4133). **"Mr. Harris informed [Rollins] that in order to keep [his] job [he] needed to get the ceiling fixed as directed."** *Id.* (emphasis added).

In his deposition, Rollins described the pressure to be on the lift due to the presence of a camera in the gym:

> Q. Now, I do want to ask you about this conversation. Tell me, just describe in your own words as best you can what you said to them and what they said to you.
>
> A. Well, when I walked in the office, I asked Mr. Harris what was going on, and I saw Ms. Bowie. And normally if something is going on that Mr. Harris want me to take care of, he usually calls me up there and I do the job. When I saw Ms. Bowie, I asked them what was going on.
>
> They said, **"Mr. Bracket said that you won't do nothing he said."**
>
> **And I told them he was a liar.** I say, "I done been in the gym this morning and started Mike and them in there patching the roof." **We got cameras in there in the gym, and I was seen on the cameras up there on the lift**.
>
> Q. How do you know that? Was that part of this conversation?
>
> A. Was it part of who conversation?
>
> Q. The conversation with Mr. Harris and Ms. Bowie?
>
> A. Yes. I told them I was seen by Dr. Fennell and Ms. Marshall.
>
> Q. On the camera.
>
> A. Yes.
>
> Q. How do you find out about that?
>
> A. Ms. Marshall told me.
>
> Q. When did she tell you that?

18

A. That evening on the way home. **She said, "I was sitting up here wondering why did you get up on the lift feeling the way you feel."**

**AND I TOLD HER I DIDN'T HAVE NO CHOICE** and I got to finish it up tomorrow.

Q. But you were discussing that with Mr. Harris and Ms. Bowie?

A. Yes.

Q. But you weren't aware that you were seen on the camera until after you left the campus to go home.

A. No, no, no. When we got in the car, Ms. Marshall automatically started talking with me about **why would you get up on that lift.**

…

Q. So, tell me -- all right. So, tell me about this discussion then about being on the camera with – I mean, the discussion you had with Ms. Bowie and Mr. Harris about being on the camera.

A. It wasn't a long discussion, it was just when I was called in the office that evening, I was already in Ms. Marshall's office sitting in her office. **And she sit up there and ask me, "Why would you get up on the lift like that and you know how you're feeling?"**

So, I told her at that time, **"Well, Roland told me that I had to <u>GET UP THERE</u> and get it done."** And then in the next two or three minutes, Mr. Harris called my phone and had me come around to his office, we're in the same building. I went around to his office, and he immediately told me that Mr. Bracket said that I wouldn't do nothing he told me to do and I was supposed to been in there fixing that gym and I wasn't even doing that.

And I told him that Mr. Bracket is telling a lie, I say Ms. Marshall and Dr. Fennell saw me on there.

Q. So, Ms. Marshall told you that she and Dr. Fennell saw you.

A. Yes.

(CCR 4:300 - 303) (emphasis added).  Rollins continued to describe the specific directive he received that afternoon from Mr. Harris:

> Q. Did you have any further conversation with Ms. Bowie and Mr. Harris?
>
> A. No. As far as on that evening, Mr. Harris just told me that first thing in the morning go in there and get that done, he say, because Dr. Fennell been telling Roland that he wanted to get it done and Roland come up here and say you say you ain't going to do it, but we need to get that done before Friday. I told Mr. Harris, "Mr. Harris, I'm going to tell you like I told Roland, **I'm afraid of the height**, but I'm going to get in there and I'm going to get it done." And at that time, I was also angry. But when Tuesday came, I went in there and I got it done.

(CCR 4:304-305).

Interestingly, Mr. Brackens testied repeatedly that Rollins was not at work on the 21st.  (CCR 20:3289).  But Michael Johnson, a co-worker indicated that Rollins **was** there and had instructed him to disregard the crazy ladder instruction made by Brackens earlier on that day.  (CCR 20:3269).

H. **THE WORK ON OCTOBER 22ND**

Rollins testified that he showed up for work at about 7:15 am on the morning of the 22nd and after a short "McDonalds" breakfast the crew got to work.  (CCR 4:307).  He continued:

20

And by that time, the guys would be through picking up trash out through the campus, and we all get started to work. So, on that Tuesday, **I knew I didn't have a choice, I feel like my job was in jeopardy** and I was still mad and angry. But I went in the gym, me, Steve Alex, Mike hadn't showed up yet, and we try to get the lift started. We couldn't get it started; so, it was another lift on the other end, we went down there and we managed to get that one crunk up. **And I went up there and start patching the holes**. Maybe five minutes Mike came in, and he told me that he would go ahead and finish it. And I told him, nah, I said, no, Roland done called me in the -- I mean, **Mr. Harris done called me in the office yesterday evening because of Roland telling him that I wouldn't do it.** He said, "Well, Roland is just lying, we was in here." I said, "Well, I know it" I said, "but I'm not worried about that," I say, "I just need to get this done because I don't need them saying nothing else to me about this gym."

*Id.* In another exchange, Rollins testified about the situation with more detail:

> Q. And how long were you up on the lift up there by yourself before Mike came in?
>
> A. Maybe 5 or 8 minutes. When he came in, I let it down and he got on. And he told me that, **"Well, you go ahead and get off, man, because you look like you're scared." I said, "Well, I don't want to be up here anyway, but your uncle went and lied yesterday; so, I got to get this done."**
>
> Q. So, he and Mike initiated the comment that you go ahead and get down because you look like you're scared.
>
> A. Yes.
>
> Q. And then you told him no because your uncle --
>
> A. I had to get it done.
>
> Q. Because your uncle lied yesterday.

21

A. Yes. I was directed by Mr. Harris to get it done Tuesday.

Q. That wasn't T-uesday, was it?

A. That was on a Monday when **Mr. Harris direct me Tuesday morning GET UP THERE and get it done.**

(CCR 309)(emphasis added).

Rollins was "afraid" of working on the scissor lift at that time "because [he] didn't know how to operate it, hadn't been trained, and was fearful because of [his] injury and blackouts." (CCR 25:4134).

Harris testified that Rollins was duty bound to get on the lift if Mr. Brackens told him to – even if Brackens knew about the syncope!

Q. So, you're now going to testify -- or are you testifying now that **if a manager knows that an employee is suffering from seizures, the employee should get on the scissor lift if the manager says get up there and do it**, is that what you're telling me?

**A. Yes.**

(CCR 868). This is the type of evidence which supports a finding of gross negligence. Brackens has completely denied the events and stated that he told Mr. Rollins not to "be in the Gym" on Oct. 22d. (CCR 4:354).

Rollins "would not have gotten on the lift if [he] had not been specifically instructed to do so by Mr. Brackens and later by Mr. Harris." (CCR 25:4134). **"The only reason [he] got on the lift is**

22

**because [he] was told to do so and was made to feel as though**

**[his] job depended on it."** (CCR 25:4134-4135) (emphasis added).

Rollins "didn't want to do it." (CCR 25:4135).

> If Mr. Brackens had looked at the owner's manual and informed [Rollins] that a person with blackouts shouldn't be on a lift, [Rollins] would not have gotten on. Mr. Brackens however did not do this. He did not look at a safety manual, and if he did, he certainly did not inform or warn [Rollins] that a person in [Rollins'] condition shouldn't be on a scissor lift.

*Id.*

## I. THE FINAL "BLACK OUT" AND THE "FALL"

Once Mike "brought the lift down" Rollins "went to exit and fell from the top of the platform flat on [his] back onto the gym floor." (CCR 25:4134). "The top of the lift platform is still a good three feet off the ground when its all the way down and [he] fell straight back with nothing breaking his fall." *Id.* Rollins does not "remember taking the first step down." *Id.*

Insinuating that Rollins' prior ordeal (of multiple hospital visits, medical tests, and ultimate syncope diagnosis) was the first part of some elaborate fraud, Michael Johnson who is apparently Bracken's nephew (CCR 4:309) and was still on the payroll (CCR 4:400) testified that Rollins looked like he just "let go." (CCR 4:410). Johnson also claimed Rollins offered to "take care of" him "when this is over." (CCR

23

4:413).  In a move completely inconsistent with fraud, after the fall, Rollins said something like "Yea, I'm fine or okay."  (CCR 4:458.)  He told Stevie Barron "that he was just embarrassed."  *Id.*  Rollins was, in fact, embarrassed and thought he was alright.  (CCR 25:4134).  He "tried to get up fast because [he] was more embarrassed knowing that Dr. Fennell was looking at the cameras."  (CCR 21:3620).  "Of course, [he] later ended up having to have major surgery."  *Id.*

Regardless, the "stress of the work at that height had [him] disoriented and dizzy.  *Id.*  He was already "nervous being that high in the air."  *Id.*  All Rollins remembered was "turning around on the platform, gripping the handrails, and then being on [his] back."  *Id.*

> Q. So, you had a right hand on one handrail and a left hand on the other.
> A. Yes.
> Q. While you were still standing on the platform, the floor.
> A. Right.
> Q. And then you proceeded to step down --
> A. Yes.
> Q. -- the first step? With your right foot or left foot?
> A. I don't know was it my right or left, I can't recall.
> Q. Were you able to step down on that step?
> A. I stepped down, and when I stepped, I fell.
> Q. How did you fall?

A. I just fell flat on my back, **I don't know what happened, I just fell.**

(CCR. 21:3619-3620).

J. **THE ATTEMPT TO MANUFACTURE EVIDENCE OF "CONSCIOUSNESS"**

In deposition, Texas College's counsel repeatedly asked Rollins questions which could be misconstrued. When Rollins said he remembered "falling," counsel attempted to make it seem as though the witness was saying that he was conscious, but Rollins had to correct the effort of misdirection:

Q. Don't remember if you slipped.

A. No.

Q. Don't remember if you stumbled?

A. No.

Q. **But you do remember falling down on the floor.**

A. **Yes.**

Q. **So, you were conscious the whole time.**

A. **I don't know if I was conscious or not.** When I hit the floor -- right at this time, I don't know what happened.

Q. But do you -- **you recall falling down, right?**

A. Yes.

Q. You don't recall -- I mean, **you recall holding on** and then you fell down.

A. And that's all I remember.

(CCR 4:313-314).

The testimony above makes it clear that Mr. Rollins lost consciousness or most likely lost consciousness. Despite counsels' continued attempt to get Mr. Rollins to admit to consciousness during the fall, the witness simply stated: that he remembered falling (as in being standing, then being on the ground) – not that he remembered the entire sequence of the fall.

This testimony was not clearly presented to the trial court, but instead paraphrased: "Rollins has no explanation as to how he fell; just that he fell." *See* TC'S MOTION FOR SUMMARY JUDGMENT, p. 2. (CCR 4:250).

**Ironically, when cross examined by counsel for MPF, the syncope explanation becomes more likely:**

Q. All right, Mr. Rollins. You testified that before the October 22nd incident you had an issue where you were driving home and you started to black out; is that correct?

A. Yes.

Q. Okay. Is it a possibility that the day that you fell off the lift that you blacked out and fell on it?

A. I really don't know how to answer that because I really don't know what happened that day.

Q. (BY MR. GEDDIE) Okay. So you agree with me that that's a possibility that you blacked out that day.

A. Again, my response is I don't know exactly what happened.

Q. **Can you think of any reason why it could not be an explanation for your fall that you blacked out?**

26

A. **No.**

(CCR 2:155-156) (emphasis added). Rollins explanation might be simple, but it makes sense: "I shouldn't have been on it." (CCR 4:317).

## K. THE CONDITION OF THE LIFT AND TRAINING

The lift had been rented by Texas College from MPF. (CCR 5:469). According to Brackens, who signed off on the lift, there was no owner's manual on board the lift. (CCR 2:162). Mr. Bracken's testified that although he was given instruction on "how to operate" the lift, he did not pass that training onto his subordinates:

> Q. But you didn't' turn around and show or train your
> subordinates how to operate it?
> A. My subordinates had already been trained, because that is
> not the first time that we had a scissor lift on the premises
> and was used.
> Q. And is proof of training kept in their personnel files?
> A. No.
> Q. Why?
> A. That I can't answer.

(CCR 2:162). **Rollins swore that MFP (A-1) "did not offer us training" or "familiarize us with the lift."** (CCR 25:4133) (emphasis added). Mr. Harris, agreed that "untrained employees shouldn't be on scissor lifts." (CCR 7:863).

27

Rollins "hadn't been trained" and "didn't know how to operate it.") (CCR 25:4134). Rollins was "present outside the gym when A·1 Rent All delivered the scissor lift to Texas College." (CCR 25:4143). He "asked the delivery person if A·1 would bring the lift inside the gym and who was going to show [them] how to use it." *Id.* "The A·1 person informed [Rollins] that he couldn't bring the lift indoors and that the folks at Texas College knew how to use the lift." *Id.* Rollins stated that "A-1 did not offer us training nor did it familiarize us with the lift. The person from A·1 just came and delivered the machine and left." *Id.*

When asked about what training could have made a difference, Mr. Rollins testified as follows:

> Q. Here's my question, and I'm trying to make sure that I'm clear about it: What training could you have been given, if any, if you know, that would have enabled you to get on the lift or get off of it onto the floor any better than you did?
>
> A. Any proper training that someone that already knew how to use the lift or someone that already was licensed to use the lift.
>
> Q. (BY MR. YARBROUGH) Is that your answer?
>
> A. Yes.
>
> Q. **And how would that specifically have helped you do anything different**?
>
> A. Then I would have been trained to know how to use it and to get on and off the proper way, operate it the proper way.

28

**But it still -- I was still afraid to get on it, period; so, I shouldn't have been on it.**

(CCR 4:316-317) (emphasis added).

## L. THE INJURY

Mr. Rollins testified that as soon as he fell, he was "hurting" in the "back of my neck." (CCR 4:314). He had no prior complaints about neck pain:

> Q. Yeah. What I'm asking is after you recovered from the first surgery to your neck, two months after that before the incident at Texas College on October 22, 2013, had you complained of pain in your neck"?
>
> A. No, I had not complained about pain in my neck.

(CCR 4:318).

In his report to the trial court, Dr. Gilbert Martinez, noted the link between the fall and Rollins' neck injury:

> Correspondence on July 18, 2014, by Dr. Barnett includes the opinion that there was **reasonable medical probability that Mr. Rollins suffered an acute herniated disc at C4-C5 and spinal cord contusion caused by the fall on October 22, 2013**, and that he would have chronic pain in his neck and spinal cord dysfunction as a result of the injury.

REPORT OF GILBERT MARTINEZ PHD (CCR 6:611). The photos are telling:

29



REPORT OF JOE G. GONZALES, MD (CCR 6:674). Dr. Martinez' Report

continues:

> 3. Mr. Rollins will benefit from a comprehensive pain management program with a focus on interventions designed to reduce the effects of **acute and chronic and pain**. This should include evaluation by a medical pain specialist who can evaluate Mr. Rollins' potential for benefiting from medical procedures designed to alleviating chronic pain, as well as participation in various therapies designed to improve physical and behavioral adjustment of individuals with chronic pain. Such programs typically include a brief inpatient hospitalization for initial evaluation, medication management, and intensive therapy, followed by a more extended course of outpatient therapy.

> 4. In addition to the effects of his physical problems, Mr. Rollins' chronic reactive depression will contribute to his **functional disability** and will have a negative impact on his long-term vocational adjustment. Life care planning should account for Mr. Rollins' **significantly diminished occupational potential**.

REPORT OF GILBERT MARTINEZ, PHD (CCR 6:620). The prognosis if poor

for Gary Rollins:

> Based on the known medical conditions, Mr. Gary L. Rollins will have **lifelong, progressive symptoms**, physical impairment and subsequent disability which will require long-term medical care.

REPORT OF JOE G GONZALES, MD (CCR 6:628).

## SUMMARY OF THE ARGUMENT

When one seeks to win by excluding key evidence on the basis of strategic, technical grounds, one must live and die by the technical and strategic failures of one's own motions. Rather than argue the merits of this case, Texas College and MPF launched a technical war and jointly attempted to eliminate all relevant testimony, affidavits, expert reports, operating manuals, and relevant medical records from the record. Instead, they failed to convince the court to strike key parts of Rollins' Affidavit, they lost a key battle over Doctor Reports which they introduced and referenced without objection, and they actually introduced the majority of the testimony which proves their own liability.

31

Moreover, many of the evidentiary objections were simply without merit. If revisited by this Court, even more summary judgment evidence supporting appellants' claims will surface.

Finally, even on the remote chance more evidence is needed, this Court should reverse the trial courts denial of the motion to re-open the evidence.

## ARGUMENT

## 1. STANDARD OF REVIEW

The function of summary judgment is to eliminate patently unmeritorious claims and defenses, not to deprive litigants of the right to a jury trial. *City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678 n. 5 (Tex.1979); *Swilley v. Hughes,* 488 S.W.2d 64, 68 (Tex.1972).

Recently in *Wylie v. Hide-A-Way Lake Club, Inc.,* No. 12-12-00290-CV, 2013 WL 6797871, at *7-8 (Tex. App. Tyler, Dec. 20, 2013), *review denied* (Aug. 22, 2014) this Honorable Court summarized the standard of review for a case similar to this, which involved both traditional and no-evidence summary judgments.

A. TRADITIONAL MOTION STANDARD

32

In *Wylie*, this Court cited the authority and set forth the standard:

> The **movant** for traditional summary judgment **has the burden of showing that there is no genuine issue of material fact** and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *Nixon,* 690 S.W.2d at 548. When the movant seeks summary judgment on a claim in which the nonmovant bears the burden of proof, the **movant must either negate at least one essential element of the nonmovant's cause of action** or prove all essential elements of an affirmative defense. *See Randall's Food Mkt., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). When the movant seeks summary judgment on a claim in which the movant bears the burden of proof, the movant must prove all essential elements of the claim. *Winchek v. Am. Express Travel Related Servs. Co.,* 232 S.W.3d 197, 201 (Tex.App.-Houston [1st Dist.] 2007, no pet.). **Once the movant has established a right to summary judgment, the burden shifts to the nonmovant to respond to the motion and present to the trial court any issues that would preclude summary judgment**. *See City of Houston v. Clear Creek Basin Auth.,* 589 S.W.2d 671, 678–79 (Tex.1979).

*Id.* at \*7 (emphasis added). "In determining whether there is a genuine fact issue precluding summary judgment, **evidence favorable to the non-movant is taken as true** and we make all reasonable inferences in his favor." *Hernandez v. Brinker Int'l, Inc.,* 285 S.W.3d 152, 163 (Tex. App. 2009) (emphasis added). Elements of the action **must be "conclusively" negated** in order for the defendants to prevail. *Id.* (emphasis added). Any doubts are to be

33

resolved in the non-movant's favor. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548–49 (Tex.1985).

As will be shown here, even if one removes from consideration all of the stricken evidence, there is still a genuine issue of material fact as to Duty, Breach of Duty and Causation against each defendant.

## B. NO EVIDENCE MOTION STANDARD

In *Wylie,* this Court's explanation of the no-evidence standard was equally complete:

> Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged evidence. *See Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 600 (Tex.2004). We review a no evidence motion for summary judgment under **the same legal sufficiency standards as a directed verdict.** *King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 750–51 (Tex.2003). A no evidence motion is properly granted if the nonmovant fails to bring forth **more than a scintilla** of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *Id.* at 751. If the evidence supporting a finding rises to a level **that would enable reasonable, fair minded persons to differ in their conclusions**, then more than a scintilla of evidence exists. *Id.* Less than a scintilla of evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact, and the legal effect is that there is no evidence. *Id.*

34

*Id.* These facts do "more than create a mere surmise of suspicion" of a negligence claim.

## C. ORDER OF CONSIDERATION

This Court continued in *Wylie* to explain the proper order of consideration of the issues:

> In **both traditional and no evidence** summary judgment motions, **we review the entire record de novo and in the light most favorable to the nonmovant, INDULGING EVERY REASONABLE INFERENCE AND RESOLVING ANY DOUBTS AGAINST THE MOTION.** *See Sudan v. Sudan,* 199 S.W.3d 291, 292 (Tex.2006); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *See* Tex.R. Civ. P. 166a(c). If the trial court's order does not specify the grounds on which it granted summary judgment, we affirm the trial court's ruling if any of the theories advanced in the motion is meritorious. *State Farm Fire & Cas. Co. v. S.S.,* 858 S.W.2d 374, 380 (Tex.1993).
>
> Moreover, when a party moves for both a traditional and a no evidence summary judgment, generally, **we first review** the trial court's summary judgment under **the no evidence** standards of Rule 166a(i). *Ridgway,* 135 S.W.3d at 600. If the no evidence summary judgment was properly granted, we do not reach arguments made under the traditional motion for summary judgment. *See id.* at 602.

*Id.* at *8 (emphasis added). Here, appellant will show that under the current law there is substantial evidence of the elements of the claims. In doing so, the showing will also defeat any summary judgment on traditional grounds.

35

### D. **MOTION TO RE-OPEN EVIDENCE**

A motion to re-open the evidence is reviewed under an abuse of discretion standard. *In re Prot. of H.W.*, 85 S.W.3d 348, 358 (Tex. App. Tyler 2002). In the case of *In re Prot. of H.W.*, this Court indicated a primary consideration when it stated: "...**the trial judge should liberally exercise his discretion to permit both sides to fully develop their case**. *Id.* (citing *Lifestyle Mobile Homes v. Ricks,* 653 S.W.2d 602, 604 (Tex. App.-Beaumont 1983, writ ref'd n.r.e.)) (emphasis added).

As will be shown, the trial court here did the opposite. It struck evidence on dubious technical grounds and refused to allow correction of the "alleged" defects. This precluded the parties from fully developing the case.

### E. **SCOPE OF EVIDENCE**

On February 19, 2015 the trial court issued 6 orders on six intertwined matters: Texas College's two motions for summary judgment, appellees *joint motion* to strike the designations and reports of Dr. Martinez (psychologist), Dr. Gonzales (medical doctor) and Thomas Roney (economist); MPF's motion to strike the designation and testimony of Burt Thorpe (aerial lift equipment

36

expert); Texas College's motion to strike evidence; and MPF's objections to evidence.

When a trial court sets a single hearing for multiple intertwined motions, the court is free to consider the evidence together. It may consider evidence advanced by one party in one motion, to support a motion or response by another party. In *Rea v. Cofer*, 879 S.W.2d 224 (Tex. App. 1994) the appellant had asserted the discovery rule. Appellees' motion for summary judgment, failed to even address the issue. Nevertheless the Court of Appeals determined that the omission was not fatal, "because the proof necessary to negate the discovery rule was contained in [another party's] motion for summary judgment on file with the court." *Id*. at 228. The *Rea* court cited *Desiga v. Scheffey,* 874 S.W.2d 244 (Tex.App.—Houston [14th Dist.] 1994, n.w.h.) in which the court held that when a trial court sets a single hearing for multiple motions for summary judgment, the court may look to other proof on file with the court to determine any of the motions. In a particularly instructive passage, the *Desiga* court stated:

> However, in view of the unique circumstances of this case, we find this omission to be not fatal as to Dr. Guerrero's summary judgment for the following reasons. Only one hearing

37

was set for the judge to rule on all of the motions. **All of the motions were heard at the same time**, January 22, 1993 at 9 a.m. At the same hearing, the trial court heard all of the arguments in support of the various motions. The trial court granted summary judgment for all appellees the same day. In the unique facts and circumstances of this case, **to find otherwise would place the trial court in a position of having to engage in the ARTIFICE OF IGNORING Mr. Desiga's deposition testimony which was otherwise on file with the court** in the form of the other appellees' motions for summary judgment.

*Id*. at 253 (emphasis added). The *Desiga* court noted the Texas Supreme Court's increasing leniency with regard to summary judgment evidence:

> We find support for this holding in the Texas Supreme Court's recent demonstrations of increasing leniency in the areas of both summary judgment proceedings in general and summary judgment evidence specifically. *See McConathy v. McConathy,* 869 S.W.2d 341, 341 (Tex.1994) (holding deposition excerpts used as summary judgment evidence need not be authenticated to be considered competent summary judgment proof); *Mafrige v. Ross,* 866 S.W.2d 590, 590 (Tex.1993) (holding parties may make otherwise unappealable order final simply by adding "Mother Hubbard" language in the order). Such a holding with regard to Dr. Guerrero is in effect **acknowledging the trial court's capacity to take judicial notice of those documents on file with it at the time of a hearing** on a motion for summary judgment. The other parties' motions for summary judgment having been duly filed with the trial court for its consideration constituted part of the record before it.

*Id.*

38

In addition, both orders of summary judgment contained language expanding the scope of evidence far beyond the confines of rule 166a to **"any additional briefing accepted by the court."** (CCR 24:3935 and 24:3938). Thus, this Court need not engage in the "artifice of ignoring" the evidence that was before the trial court at the time of the February 19th rulings. It may consider all of the evidence presented by all the parties together, when deciding the fate of any particular motion.

**2. THE TRIAL COURT ERRED IN GRANTING TEXAS COLLEGE'S TRADITIONAL AND NO EVIDENCE MOTION FOR SUMMARY JUDGMENT**

Because the trial court did not hold oral argument and because its orders are silent as to any reasoning, this brief will examine the rationale behind appellees' motions.

A. **NATURE OF CLAIMS INVOLVED**

Texas College's motion is chock full of inapplicable premises liability cases, as well as cases in which there was no evidence of unusual danger. **Here, there is a singular sterling difference between the facts of this case and the facts of any case cited in support of Texas College's motion. It is the truly insane and spiteful order for Rollins to "get up there" and finish the work.**

The order was given despite both Brackens and Harris knowing that Rollins was "unfit" for the job due to his "black-out" spells. Appellee's motions would have this court adopt the standard of liability provided by Harris in his deposition:

Q. So, you're now going to testify -- or are you testifying now that **if a manager knows that an employee is suffering from seizures, the employee should get on the scissor lift if the manager says get up there and do it**, is that what you're telling me?

**B. Yes.**

(CCR 7:868). This is not the law. It should not be the law. **None of the cases cited in the motions involve the commanding of an employee to do a knowingly unsafe act** – an act which is not unsafe because of a premises condition – but is unsafe because the plaintiff was physically "unfit" for the job – he had fainting spells.

This is not a premises liability case. The only place in appellants' pleadings which the word "premises" appears is the prayer: "WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray…." (CCR 498-505, 8th Amended) (CCR 92-101, 7th Amended) (CCR 83-91, 6th Amended). This case involves active and grossly negligent supervision. As to Texas College, Rollins plead:

Defendant's **failure to**: 1) provide a reasonably safe workplace; 2) furnish reasonably safe machinery or reasonably

40

safe personal protective equipment for use with the Lift and for use in lifting the marble slab counter top; 3) **provide adequate help** in the performance of work; 4) **train and/or properly supervise** Plaintiff Garry Rollins while using the Lift and lifting the marble slab counter top; and 5) **to ensure that Plaintiff Garry Rollins was fit to perform work on a scissor lift.**

7TH AMENDED PETITION (CCR 1:96) (emphasis added).

B. **THE ELEMENTS AND THE EVIDENCE**

1. **Duty and Breach of Duty**

Tex. Labor Code Ann. § 406.033 eliminates significant defenses in nonsubscriber cases such as this. The provision reads in pertinent part:

"… it is not a defense that:

(1) **the employee was guilty of contributory negligence;**

(2) **the employee assumed the risk of injury or death;** or

(3) the injury or death was caused by the negligence of a fellow employee.

*Id.* (emphasis added). The Texas Supreme Court also reaffirmed that comparative negligence may not be submitted in a nonsubscriber case. *See Kroger Co. v. Keng*, 23 S.W.3d 347, 352-53 (Tex. 2000) ("We therefore hold that a nonsubscribing employer is not entitled to a jury question on its employee's alleged comparative responsibility.)

Texas College's motion focused primarily on the lack of duty to warn of dangers which an employee already appreciates. This theory

41

might have been applicable had Rollins plead "failure to warn." He did not.

Texas College made extensive use of *Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex. 2006.) *See* TEXAS COLLEGE MOTION FOR SUMMARY JUDGMENT (CCR 4:249-271). *Elwood* was a near frivolous case, with little in common to the instant case:

> Billy Elwood, a courtesy clerk at a Kroger grocery store, was injured **when a customer shut her vehicle door on his hand** while he was transferring items from a grocery cart to the vehicle. **Elwood had placed one hand in the vehicle's doorjamb, and one foot on the cart**, to keep the cart from rolling down a slope in Kroger's parking lot.

*Elwood,* 197 S.W.3d at 794 (emphasis added). But even in *Elwood* the Court acknowledge the concept of "duty." Albeit lengthy, the following passage from *Elwood* and its highlighted language shows why its holding and the holdings of similar cases do not apply here:

> **An employer has a DUTY TO USE ORDINARY CARE in providing a safe workplace.** *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 754 (Tex.1975). **IT MUST, for example**, warn an employee of the hazards of employment and **PROVIDE NEEDED safety equipment or ASSISTANCE.** *Id.* However, an employer is not an insurer of its employees' safety. *Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996); *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex.1993). **It owes <u>NO DUTY to WARN</u> of hazards that are commonly known or already appreciated by the employee.** *See Nat'l Convenience *795 Stores, Inc. v. Matherne,* 987 S.W.2d 145, 149 (Tex.App.—Houston [14th Dist.] 1999, no pet.). **It has NO DUTY to provide equipment or ASSISTANCE**

**THAT IS UNNECESSARY** to the job's safe performance. *See Allsup's Convenience Stores, Inc. v. Warren,* 934 S.W.2d 433, 438 (Tex.App.—Amarillo 1996, writ denied). And, when an employee's injury results from performing the same character of work that employees in that position have always done, an employer is not liable if there is **NO EVIDENCE THAT THE WORK IS UNUSUALLY PRECARIOUS.** *Werner,* 909 S.W.2d at 869 (citing *Great Atl. & Pac. Tea Co. v. Evans,* 142 Tex. 1, 175 S.W.2d 249, 251 (1943)).

In this case, there is no evidence that loading groceries on the sloped portion of Kroger's parking lot is an unusually dangerous job, nor is there evidence that other courtesy clerks sustained similar injuries while loading groceries on the sloped lot. Indeed**, loading purchases into vehicles is a task performed regularly—without any special training or assistance—by customers** throughout the grocery and retail industry. While there is evidence that grocery carts had rolled into vehicles due to the parking lot's slope and may have posed a foreseeable risk of damage to customers' vehicles, this is no evidence that the slope posed a foreseeable risk of injury to Kroger's employees. **Elwood presented NO EVIDENCE that his JOB REQUIRED SPECIALIZED TRAINING.** *See Nat'l Convenience Stores,* 987 S.W.2d at 149. Elwood testified that, prior to working at Kroger, he knew it was dangerous to place his hand in a vehicle's doorjamb. Moreover, **there is NO EVIDENCE** that carts with wheel locks or **ADDITIONAL PERSONNEL WERE NECESSARY** to safely load groceries. *See Allsup's Convenience Stores,* 934 S.W.2d at 438.

Kroger had no duty to warn Elwood of a danger known to all and **NO OBLIGATION TO** provide training or equipment **to DISSUADE an employee from using a vehicle doorjamb** for leverage. Employers are not insurers of their employees. *See Leitch,* 935 S.W.2d at 117; *Exxon Corp.,* 867 S.W.2d at 21. Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and render judgment for Kroger. *See* TEX. R. APP. P. 59.1, 60.2(c).

*Id.* at 794-95 (Tex. 2006) (emphasis added). The highlighted matters are discussed below:

### a) Ordinary Care

First and foremost: **Is there really any doubt that a supervisor who knows his employee is having "black outs" is not exercising "ordinary care" when he instructs that employee to "get up there" in a scissor lift and patch the gym ceiling?** Mr. *Elwood's* supervisors did not tell him to "get over there and put your hand in the door jamb."

### b) Duty to provide assistance

Second, the facts here show that Texas College breached the duty to provide assistance. Recall that on October 21st Brackens told Rollins that he "**had to GET UP THERE and get it done.**" (CCR 4:303) (emphasis added). But Rollins had safely gotten off the lift and directed his assistants do the work. He "…stayed up there about five minutes on the 21st showing him what needed to be done, and him and a community service finished off." (CCR 4:297). Mr. Brackens had been apparently upset by that fact. So later that afternoon "…Mr. Bracket [sic] had told them that [Rollins] said [he] wasn't going to get up there and do it…." (CCR 4:298). So, once

44

again, Rollins was ordered to get up there. "That was on a Monday when **Mr. Harris direct me Tuesday morning GET UP THERE and get it done."** (CCR 4:309) (emphasis added). Rather than let Rollins use the assistance of his subordinates to do the patching, as he was attempting to do on the 21st, Brackens and Harris got mad about it, and ordered him personally to "get up there" on the 22nd. They made the order, knowing he had been having "black outs." **The evidence shows without a doubt that Texas College breached the duty to provide needed assistance as set forth in *Elwood*.**

### c) No Duty to Warn

Here, Rollins is not complaining that Texas College should have warned him of something he already knew (that it was dangerous for him to get on the lift in his condition). He certainly knew that. He is complaining that despite the fact that his employer also knew it, the employer ordered him to take the risk he did not want to take. **This is not a "failure to warn" case. It is an "ordered to do it" case – involving active and gross negligence.**

Very recently, the Texas Supreme Court answered questions which had been certified to it by the United States Court of Appeal for the Fifth Circuit. In the case of *Austin v. Kroger Texas, L.P.,* 465

45

S.W.3d 193 (Tex. 2015), the Texas Supreme Court surveyed the landscape of cases relating to employer duty in non-subscriber cases. Although most of the opinion deals with questions of liability relating to premises defects, the Court mentioned an exception to the "no-duty" rule in premises cases, which has at least some logical bearing here:

> Instead, the Court's abolition of the no-duty rule should play a role only when an exception to the general rule applies— that is, when **the nonsubscribing employer owes a duty despite the obviousness or employee's appreciation of a danger** because, despite the awareness of the danger, it is necessary that the employee use the dangerous premises and **the employer should anticipate that THE EMPLOYEE IS UNABLE TO TAKE MEASURES TO AVOID THE RISK. In such cases, the employer cannot rely on the fact that the risk was obvious and known to the employee to argue that the employee bears some portion of the responsibility for his own injuries, because the TWCA waives those defenses.** *Compare Del Lago,* 307 S.W.3d at 772–73; *Parker,* 565 S.W.2d at 520, with Tex. Lab. Code § 406.033(a); *Keng,* 23 S.W.3d at 352.

*Id.* at 210 (emphasis added). Here there is active negligence, but even if it were a premises case, it would be excepted from the no-duty to warn rule, because Rollins, being ordered to "get up there," was "unable to take measures to avoid the risk." Once he obeys the

46

master's orders, the risk is unavoidable. He is up high, in harm's way, subject to "blacking out."

### d) Negligent Supervision, Negligent Training

In addition, as the Texas Supreme Court noted in *Austin*:

> Thus, when a claim does not result from contemporaneous activity, the invitee has no negligent-activity claim, and his claim sounds exclusively in premises-liability. *See Shumake,* 199 S.W.3d at 284; *Keetch,* 845 S.W.2d at 265.
>
> **But when the landowner is also an employer and the invitee is also its employee, this additional relationship may give rise to additional duties, such as a DUTY TO PROVIDE NECESSARY EQUIPMENT, TRAINING, OR SUPERVISION.** *.....*
>
> When an injury arises from a premises condition, it is often the case that any resulting claim sounds exclusively in premises liability, but that is not necessarily the case. An injury can have more than one proximate cause. *Del Lago,* 307 S.W.3d at 774; *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 784 (Tex.2001). **The fact that Austin alleged that a condition of the premises proximately caused his injury does not preclude his allegation that Kroger's negligent failure to provide the Spill Magic system also caused his injury.** If the only relationship between Austin and Kroger were that of landowner–invitee, the alleged facts could only give rise to a premises-liability claim. .....
>
> **AS AUSTIN'S EMPLOYER, KROGER OWED AUSTIN duties in addition to its premises-liability duty and ITS DUTY NOT TO ENGAGE IN NEGLIGENT ACTIVITIES,** including the duty to provide Austin with necessary instrumentalities.

47

*Id.* at 215-16 (emphasis added). Here, there is not even an allegation of premises liability, such as in *Austin*. But it is clear that the Texas Supreme Court acknowledges the duties owed in this case.

The evidence of negligent supervision is glaring. Not only did Harris and Brackens give Rollins a foolish order to "get up there" (CCR 4:303, 4:309), Brackens admitted that he had "leadership and authority" problems (CCR 4:344). He had even suggested they put a ladder on the platform to reach even higher. (CCR 4:303-304). This is a textbook "reasonable person" failure.

As far as negligent training, Brackens admitted that he did not pass the training he received on to his subordinates. (CCR 3:162). (CCR 25:4133). Rollins "hadn't been trained" and "didn't know how to operate it.) (CCR 25:4134) Mr. Harris, agreed that "untrained employees shouldn't be on scissor lifts." (CCR 7:863).

### e) No Duty to Provide Unnecessary Assistance

This statement in *Elwood* is a non-sequitur. Who needs "unnecessary" assistance? Here, to avoid undue risk, the assistance Rollins wanted **was necessary**. It is not outlandish to require a supervisor with knowledge of the risk that one of his employees may suddenly fall, to provide assistance and prevent it. *See e.g.*

48

*McEachern v. Glenview Hosp., Inc.,* 505 S.W.2d 386 (Tex. Civ. App. 1974), *writ refused NRE* (June 12, 1974). In *McEachern,* the Court of Appeals reversed and rendered a verdict for the plaintiff because it was **reasonably foreseeable that a patient who was on table in emergency room of hospital might faint** as result of psychogenic shock, or some similar event, and that the hospital was under duty to have someone in attendance with patient and keep proper lookout for his safety.)

### f) <u>No evidence that the work is unusually precarious</u>

This statement in *Elwood* distinguishes the case quickly. *Elwood,* involved loading groceries on the sloped portion of Kroger's parking lot – "**a task performed regularly—without any special training or assistance—by customers.**" *Elwood,* 197 S.W.3d at 795. Here, there is no indication that untrained students were using the scissor lift regularly. It goes without saying that elevating one's self to the top of a gymnasium ceiling on a "scissor lift" is precarious.



Figure 2 - Illustration of Horizontal Load Tests
(See paragraph 4.8.1 on page 17)

(CCR 21:3467)

### g) No evidence that the job required specialized training

Here, again the case facts are opposite *Elwood*. Even Mr. Harris said that that "untrained employees shouldn't be on scissor lifts." (CCR 7:863).

### h) No evidence that additional personnel were necessary

Once again, this case is different from *Elwood*. Here, Rollins used additional personnel on the 21st without incident, and let them finish the work. (CCR 4:297). But on the 22d, the order of "get up

50

there" forced him upon the lift, when using his subordinates would be the safer choice.

### i) <u>No obligation to dissuade</u>

Finally, this case is different from *Elwood* and its companions in that Rollins' superiors were commanding him to take the dangerous action. They were not watching him do it on his own and failing to "dissuade" him. They were "persuading" him to do it under threat of insubordination and possible termination. As the Texas Supreme Court Stated in *Austin:* "an employee always has the option to decline to perform an assigned task and incur the consequences of that decision." 465 S.W.3d at 214 (citing in jest, the long abrogated *McKee v. Patterson*, 153 Tex. 517, 525, 271 S.W.2d 391 (1954) *abrogated by Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex. 1978)). Even *McKee* recognized that its "no duty" rule had limits:

> This extreme common law view, which traded on the economic necessity of the workman to earn a living, resulted in the adoption of Liability and Compensation Acts to offer a measure of certain protection to the workman. The plaintiff here collected benefits under the Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq. **In cases where legislation has not abolished the defense of assumed risk, the common law rule still prevails** in this country in master and servant relationships.

*Id.* at 396 (emphasis added).

51

In sum, the trial court either misread or misapplied the law and facts on the concept of "duty." There are several duties which apply here: 1) the exercise of ordinary care; 2) the duty to provide assistance; 3) the duty to provide adequate supervision; and 4) the duty to provide proper training. Texas College commanded Rollins to "get up there" without any training, and more importantly, while knowing he had been suffering "black-outs." This simple act breached all of these duties.

## 2. Proximate Cause

### a) Generally

In *Kroger Co. v. Milanes,* No. 14-13-00873-CV, 2015 WL 4594098 (Tex. App. July 30, 2015) the Court affirmed a lower court judgment against the employer and summarized the requirements of causation in a non-subscriber case:

> Proximate cause consists of two elements: cause in fact and foreseeability. *Del Lago Partners, Inc.,* 307 S.W.3d at 774. **Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred.** *Western Investments, Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). Cause in fact is not shown if the defendant's conduct did no more than furnish a condition that made the injury possible. *Id.* The second element of proximate cause, **foreseeability, requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or**

52

**omission.** *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995). These elements cannot be established by mere conjecture, guess, or speculation. *Id.* at 477. **Proximate cause may, however, be established by direct or circumstantial evidence and the reasonable inferences drawn from that evidence.** *Pilgrim's Pride Corp. v. Smoak,* 134 S.W.3d 880, 889 (Tex.App.–Texarkana 2004, pet. denied) (citing *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980)).

*Id.* at \*11 (emphasis added).

The negligent order was the cause in fact of the fall. Here it was more than a substantial factor in causing Mr. Rollins to fall. Mr. Rollins swore that he "would not have gotten on the lift" but for the order by Brackens and Harris. (CCR 25:4134). By simple logic, the fall would not have occurred had he not been ordered to "get up there."

The accident was foreseeable here. It simply defies logic to believe that Brackens should not have foreseen the possibility of Rollins falling. Rollins informed both Harris and Brackens that he "was now having dizziness and blackout spells." ROLLINS AFFIDAVIT (CCR 25:4132). They had removed him from driving duty (CCR 25:4132), presumably to prevent an accident.

Certainly an order to engage in a negligent activity can be the proximate cause of an accident. In *Halliburton Oil Well Cementing*

53

*Co. v. Groves,* 308 S.W.2d 919 (Tex. Civ. App. 1957), writ refused NRE, the court found that a supervisor's negligent direction to an employee to apply an excessive "pull" on some tubing was a "proximate cause" of the crown block breaking – an event which killed the employee. *Id.* at 933. Similarly, an order to "get up there" knowing the possibility of a black out, can be the proximate cause of a fall.

### b) <u>Medical Causation</u>

It is assumed that Appellees worked so hard at the trial court level to exclude the doctor's reports because they knew they needed to defeat Rollins on the issue of medical causation. They tried mightily to eliminate proof that the fall caused Rollins' neck injury. But they succeeded only in excluding the letter from Rollins' treating physician Samuel Barnett, MD. They did this by convincing the lower court that the letter had not been properly authenticated. However, it was properly authenticated as will be shown below in the next argument. Nonetheless, there are two reasons why excluding Dr. Barnett's letter is irrelevant.

**First, in a personal injury and fall case, lay testimony on injury causation is sufficient:**

...non-expert evidence may be sufficient to support a finding of causation in cases where both the occurrence and the medical conditions complained of are such that the general experience and common sense of lay persons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence.

*City of Dallas v. Furgason,* 05-06-00875-CV, 2007 WL 2703134, at *1 (Tex. App.—Dallas Sept. 18, 2007, no pet.). Texas law is replete with cases on the topic. *See e.g. Morgan v. Compugraphic Corp.,* 675 S.W.2d 729, 733 (Tex. 1984) (temporal connection to time of exposure and physical proximity to fumes per testimony of plaintiff was competent evidence that her alleged injuries were caused by the release of chemicals.); *Figueroa v. Davis,* 318 S.W.3d 53, 61 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (plaintiff's testimony about broken teeth after car accident sufficient); *Cotton Patch Cafe v. McCarty,* 2-05-082-CV, 2006 WL 563307, at *3 (Tex. App.—Fort Worth Mar. 9, 2006, no pet.) (trip and fall case with plaintiff testimony about injuries and doctor visits sufficient); *Dawson v. Briggs,* 107 S.W.3d 739, 754 (Tex. App.—Fort Worth 2003, no pet.) (plaintiff's lay testimony about jaw problems after wreck was sufficient).

In *Grey Wolf Drilling Co., L.P. v. Boutte,* 154 S.W.3d 725, 744 (Tex. App.—Houston [14th Dist.] 2004), review granted, judgment

55

vacated, and remanded by agreement (Mar. 4, 2005) the court stated that lay testimony which establishes a **sequence of events providing a "strong, logically traceable connection between the event and the condition is sufficient proof of causation."**

Here, Rollins' affidavit indicated that as a result of the accident he "ended up having to have major surgery." (CCR 25:4134). Rollins' affidavit also indicates that immediately after the fall, he "could not move at first" and "eventually" rolled over onto his feet. (CCR 25:4134). Rollins described the fall as "I just fell flat on my back and my neck." (CCR 4:311). Dr. Barnett's surgery discharge summary in the medical records filed by Texas College shows that his major neck surgery happened on October 26, just a few days after the October 22nd fall. (CCR 8:1050). The records also indicate a primary diagnoses of "syncope and collapse." (CCR 8:983). Certainly this is a strong, logically traceable connection between the event and the condition.

Second, the attempt at excluding the Dr. Reports failed. The trial court denied the motion to strike them, and they contained the very same information appellees were seeking to exclude by keeping out the Barnett letter. The disclosure responses which incorporated

56

the reports, were specifically used as summary judgment evidence. (CCR 2:109) (See reference to summary judgment exhibit "H" - Plaintiffs' Fifth Supplemental Responses to Requests for Disclosure.). The language of the reports leaves little doubt as to medical causation:

> Correspondence on July 18, 2014, by Dr. Barnett includes the opinion that there was **reasonable medical probability that Mr. Rollins suffered an acute herniated disc at C4-C5 and spinal cord contusion caused by the fall on October 22, 2013**, and that he would have chronic pain in his neck and spinal cord dysfunction as a result of the injury.

REPORT OF GILBERT MARTINEZ PHD (CCR 6:611).

In summary, there is ample evidence of duty, breach of duty, and causation. It was all still before the court after the onslaught of exclusionary rulings. The summary judgment granted in favor of Texas College should be reversed.

## C. ADDITIONAL EVIDENCE WAS IMPROPERLY STRICKEN

Even if one assumes that somehow more evidence is needed to defeat Texas College's summary judgment motion, more evidence can be considered (*see* argument, *infra*). The trial court made numerous basic errors when it granted Texas College's Motion to Strike Evidence (and related references in appellants' response). Since the

order itself contains most of the text of what was stricken, it serves as an easy guide to follow with the argument.  It is contained in the appendix as "FEB 9 ORDER ON TC EVIDENCE OBJECTIONS."

### 1. Bracken's Deposition Excerpts

A brief review of page 2 of the order indicates that the court struck evidence to which Mr. Brackens was qualified to speak.  He indicated that he had received "scissor lift" training in his deposition. (CCR 2:162).  Moreover, he is simply reading the conditions prescribed by a regulation and then stating (with his personal knowledge) that the conditions required "did not take place."  (CCR 24: 3926).

### 2. Owner's Manual

This was excluded on page 3 of the order.  Perhaps it was not noticed, but the manual was authenticated during Mike Frazier's Deposition:

Q. (BY MR. SIGMON) Have you ever seen this document before?
A. sure.
Q. Okay. What is this?
A. This is the operation and safety manual that's inside the scissor lift.

58

(CCR 20:3319). It is certainly relevant and Mr. Frazier is certainly qualified. He is the "Manager of A-1 Rent All." (CCR 2:172). It should not have been excluded.

### 3. **Rollins Affidavit**

Parts of the Rollins affidavit were redacted based upon the order of the Court. Although the redacted version was plenty to support the statement of facts set forth in this brief, some additional relevant material should not have been taken from the affidavit.

The objection labelled "D-3" on page 4-5 of the order should not have been sustained. Mr. Rollins is perfectly qualified to authenticate the excuses given to him by his Doctors.

The objection labelled "D-6" on page 5 of the order should not have been sustained. Mr. Rollins is qualified to testify as to what his doctor told him, and it is clearly **admissible hearsay**, because it is a statement made for the purpose of **medical diagnoses** and is admissible pursuant to 803(4) of the Texas Rules of Evidence.

The objection labelled "D-7" on page 5 of the order should not have been sustained. It is not hearsay. He is simply stating what he was directed to do. Moreover, he is qualified to authenticate a note given to him by his doctor.

## 4. **Barnett Letter**

The objection labelled "D-15" on page 7 of the order should not have been sustained. This is Mr. Rollins' authentication of the letter from Dr. Barnett, the non-paid, treating physician who performed the surgery on Rollins. In its motion to exclude, Texas College did not object to the effort of Mr. Rollins to authenticate it. That is no doubt because they were aware of the significant body of law allowing lay witnesses to identify and authenticate correspondence. *See, e.g. Hubenak v. San Jacinto Gas Transmission Co.*, 141 S.W.3d 172, 177 (Tex. 2004) (Dunwoody's affidavit also authenticates correspondence that passed between the condemnors and the landowners). Moreover, the bar on authentication is very low. Rule 901 of the Texas Rules of Evidence merely requires that a witness with knowledge testify "that an item is what it is claimed to be." Tex. R. Ev. 901. Rollins' affidavit clearly does that with respect to the letter:

> My surgeon's letter to my lawyer describing my injury is attached to my affidavit as Exhibit D. I have reviewed this document with my lawyer and I am familiar with my surgeon's opinion. He provided the letter in connection with this case.

ROLLINS AFFIDAVIT (CCR 7:888).

60

Texas College's only objection to the Barnett Letter is a stock objection that does not apply. The objection in its entirety is as follows:

> This portion within Section 6 of Mr. Rollins' affidavit should be stricken and not considered by the Court because the information is hearsay. **The letter attached to Rollins' affidavit as Exhibit D is incompetent hearsay for which no exception applies.** Mr. Rollins' sole purpose for including such records is to prove the truth of the matter asserted by Mr. Rollins. Therefore, Texas College's objection to this portion of Mr. Rollins' affidavit and the exhibit referenced should be sustained, and this portion and the exhibit stricken and disregarded by the Court.

(CCR 22:3678) (emphasis added). The objection is simply erroneous and inapplicable. Rule 803(4) specifically reads as follows:

> (4) Statement Made for Medical Diagnosis or Treatment. A statement that:
>> (A) is made for--and is reasonably pertinent to--medical diagnosis or treatment; and
>> (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

TX R EVID Rule 803. A simple review of the letter indicates that it is precisely what the rule applies to. *See* BARNETT LETTER (in Appendix). The Barnett letter should not have been excluded.

### D. THE TRIAL COURT SHOULD HAVE REOPENED THE EVIDENCE

Appellants sought leave to introduce two pieces of evidence in its motion to re-open the evidence. However, they now complain only

61

about the trial court's refusal to consider the Barnett Affidavit. *See* BARNET AFFIDAVIT (in Appendix). Dr. Barnett's sworn affidavit offers nearly the exact same information that is contained in the Barnett Letter. *See* BARNETT LETTER (in Appendix). Thus, this appellate request is superfluous in the event that this Court agrees that the letter was properly authenticated. Moreover, since the opinions of Dr. Barnett were also summarized by Dr. Gonzales in his report, this argument is, in reality, a fourth tier of insurance. For this issue to be decisive, this Court would first have to: (1) reject Rollins' lay testimony combined with the medical records already in evidence, (2) reject the use of Dr. Gonzales report, and (3) rule that Rollins was unqualified to authenticate correspondence about his own treatment from his treating physician. Nevertheless, in the event of such a slim possibility, this Court should then concern itself with fairness - not technicalities.

A trial court may permit a party to offer other additional evidence when it "clearly appears to be necessary to the due administration of justice." Tex. R. Civ. P. 270. In determining whether to grant a motion to reopen, the trial court considers whether: (1) the moving party showed due diligence in obtaining the evidence, (2) the

proffered evidence is decisive, (3) reception of such evidence will cause undue delay, and (4) the Court's refusal will cause an injustice. *Word of Faith World Outreach v. Oechsner,* 669 S.W.2d 364, 366-67 (Tex.App.-Dallas 1984, no writ). The trial court should exercise its discretion liberally "in the interest of permitting both sides to fully develop the case in the interest of justice." *Id.* at 367.

The subject matter of the Barnett letter/affidavit is highly relevant, material, and (as noted above) potentially decisive. There was no lack of diligence in securing this evidence, rather, the evidence was offered as a narrative opinion letter early on. It was properly attached to, and authenticated by Rollins' summary judgment affidavit.

It was shortly after the letter was stricken that Rollins' counsel sought to cure the alleged (but non-existent) defect by reformulating it as an affidavit and obtaining the Doctor's oath. It was provided to the court in a motion for reconsideration, and as a motion to reopen.

Reopening a case for the reception of additional evidence is discretionary. *See McRoy v. Riverlake Country Club, Inc.,* 426 S.W.2d 299 (Tex.Civ.App. -Dallas 1968). The discretion is to be liberally exercised, particularly if doing so is in the interest of justice. *Id. See*

*also, Hill v. Melton,* 311 S. W.2d 496 (Tex.Civ.App.--Dallas 1958, writ dism'd.) (Court stating there are occasions where it may be the court's duty to grant the motion to reopen). Appellees would not have been prejudiced if the trial court had granted appellants' request. Dr. Barnett's opinion was known to Texas College. The affidavit format is virtually identical in substance to the letter disclosed to defense counsel during discovery.

Appellants have meritorious claims in this non-subscriber case that should have survived summary judgment. If there was a defect, the affidavit cured it. The trial court should have exercised its discretion flexibly "to obtain a just, fair, equitable and impartial adjudication of the rights of litigants under established principles of substantive law." Tex. R. Civ. P. 1. *See also In re Hawk,* 5 S.W.3d 874 (Tex.App.-Houston [14 Dist.] 1999).

## 3. THE TRIAL COURT ERRED IN GRANTING MPF'S MOTION FOR SUMMARY JUDGMENT

The rental company should not "get a pass" for renting dangerous construction equipment without including operator safety manuals.

A. **THE ELEMENTS AND THE EVIDENCE**

## 1. **Duty**

In *Lawrence v. Coastal Marine Serv. of Texas, Inc.*, 983 S.W.2d 757 (Tex. App. 1997) the Court of Appeals reversed a directed defense verdict in a case involving a death due to improper operation of a crane. Among the significant facts of the case, the court described the following:

> …there was **no operator's manual** present, and, that the operator's manual that should have been in the crane contained specific instructions to avoid moving the crane until all personnel are clear. Wiethorn further testified that there was no load chart to comply with the American National Standards Institute (ANSI) within the crane. **The operator's manual was required by OSHA and ANSI to be kept in the cab at all times**. According to Wiethorn, OSHA and ANSI standards applied to this particular crane and Coastal could have easily provided the people who worked with the crane with the pertinent OSHA standards regarding its operation. He testified that proper operation of a crane calls for the operator to be thoroughly conversant with the crane's operating manual, which the crane operator could not have done in this case because it was not present in the cab.

*Id.* at 760-61 (emphasis added). The court indicated that even though the general contractor [Coastal] did not control the crane, "Coastal had a responsibility to ensure a safe and suitable crane…" *Id.* at 761. *See also Goodwin v. Bluffton Coll.*, 2004-Ohio-2223 (material issue of fact as to whether company's breach of duty to

65

provide college with safety instruction manuals and safety components necessary for proper erection of scaffolding was proximate cause of student's death precluded summary judgment.).

Here the situation is similar: although A-1 (MPF) did not control the situation in the gymnasium on the day Rollins was injured, they had a duty to provide a "safe and suitable" scissor lift.

A scissor lift is a piece of heavy machinery governed by CFR 1926.454 of the Occupational Health and Safety Act ("OSHA") as a "mobile scaffold". The American National Standards Institute ("ANSI") safety standard A92.6, AMERICAN NATIONAL STANDARD FOR SELF-PROPELLED ELEVATING WORK PLATFORMS, (CCR 21:3430-3573) also addresses scissor lifts and the care they require. In Texas:

> The relevance of an OSHA standard is that it, **and the ANSI standards which form the basis for most OSHA standards**, are the cumulative wisdom of the industry on what is safe and what is unsafe. While OSHA was written to protect employees, an unsafe practice for an employee applies equally well to a customer who legitimately finds himself in the same geographic space as the employee. Safety principles don't change depending on whether the victim is an employee, a customer, or a passerby. Therefore it has relevance to the standard of care. It doesn't establish negligence per se, and it does not create a separate cause of action. *Melerine v. Avondale Shipyards, Inc.,* 659 F.2d 706 (5th Cir.1981); *Jeter v. St. Regis Paper* Co., 507 F.2d 973 (5th Cir.1975). But it may be relevant evidence. .... All of appellants' authorities deal with causes of action brought for violations of those OSHA regulations. In the case at bar, no such

66

> recovery was sought by appellee. Rather, the evidence was introduced for the purpose of establishing a standard of conduct to serve as a basis for a negligence cause of action … the testimony concerning the OSHA regulations only provided statutory reinforcement of the obvious common-law standard.

*Wal-Mart Stores, Inc. v. Seale,* 904 S.W.2d 718 (Tex.App. -San Antonio 1995).

**ANSI A92.6 part 6.3.1 requires the owner to provide the "operating manual" with each "rental" delivery.** (CCR 21:3454). (emphasis added). The manual begins by reminding us that the manual itself is a very important "tool" and **"keep it with the machine at all times".** JLG OWNER'S MANUAL "FOREWORD." (CCR 23:3766) (emphasis added). Nothing more need be said. There is a duty.

## 2. <u>Breach of duty</u>

Here, there was no owner's manual on board the lift. (CCR 2:162). **Rollins swore that MFP (A-1) "did not offer us training" or "familiarize us with the lift."** (CCR 25:4133) (emphasis added). The MPF [A-1] delivery crew did not bother to come in and train Rollins, even though he inquired. They told him that Texas College already "knew how to use the lift." *Id.* (CCR 25:4143). Rollins stated that "A-1 did not offer us training nor did it

67

familiarize us with the lift.  The person from A·1 just came and delivered the machine and left." *Id.*  Of course the "machine" had no manual.  The duty was breached.

### 3. **Proximate Cause**

Rollins "hadn't been trained" and "didn't know how to operate it.)  (CCR 25:4134)  Mr. Harris, agreed that "untrained employees shouldn't be on scissor lifts."  (CCR 7:863). When asked about what training could have made a difference, Mr. Rollins testified that he "would have been trained to know how to use it and to get on and off the proper way…"  (CCR 4:316-317).

Most importantly, section 2.1 of the manual reads:

> The aerial platform is a personnel handling device; so it is necessary that it be **operated and maintained only by trained personnel.**
>
> Persons under the influence of drugs or alcohol or who are subject to **seizures, dizziness or loss of physical control must not operate this machine.**

JLG OWNER'S MANUAL at 2-1 (CR 23:3341) (uncorrected record).  Mr. Rollins indicated that "If Mr. Brackens had looked at the owner's manual and informed me that a person with blackouts shouldn't be on a lift, I would not have gotten on."  (CCR 25:4135).  This is certainly more than a scintilla of evidence on proximate cause.

B. **ADDITIONAL EVIDENCE WAS IMPROPERLY STRICKEN**

## 1. **Owner's Manual**

The objections to the admission of the owner's manual is ludicrous. First and foremost, it is part of the equipment that they admittedly rented. Second, a copy (as asserted by MPF) was already in their possession. It was produced at Mike Frazier's Deposition and properly authenticated:

> (Plaintiff's Exhibit 4 marked.)
> MR. SIGMON: Let me hand you what' a being marked as Plaintiff's 4.
> THE WITNESS: I'm sorry. Closing these so I have some room. Okay, sir.
> Q. (BY MR. SIGMON) Have you ever seen this document before?
> A. sure.
> Q. Okay. **What is this?**
> A. **This is the operation and safety manual that's inside the scissor lift.**
> Q. Okay. So this is an operation and safety manual from JLG, correct?
> A. Yes.
> Q. JLG is the manufacturer of the model 1930es right?
> A. Yes.
> Q, Which is the same model that you rented to Texas College that is involved in this lawsuit, right?
> A. Yes.
> Q, Now, on the front page down in the left-hand portion of the page, you see four letters? You see those four letters?
> A. The AN -- the ANI -- ANSI?
> Q. Yes,
> A. Yes.
> Q, Do you see that? And you've already identified what ANSI stands for, right?

A. Yes.
Q. And what is it again?
A. American National Safety Institute.
Q. So you'd agree with me that the American National Safety Institute has put its logo on the front of this owner's manual, right?
MR. GEDDIE: Objection, form.
A. It's yes, it's on there.

(CCR 20:3318-3319). As one can see, the objection that "plaintiffs have failed to establish its authenticity or relevance, or lay any proper predicate for the admissibility of same, either through a qualified witness or otherwise," as set forth in MPF's filing (CCR 22:3720) is baseless.

Moreover, one can look at the objections filed by MPF (CCR 22:3718-3725) and discern that they are (in large part) stock objections, edited and filed without any supporting evidence, and in many cases lacking detail. MPF objected to the manual on the basis that it was not produced timely in violation of Texas Rule of Civil Procedure 193.6(a). (CCR 22:3719-3720). But the objection is a "stock objection," taken off the shelf and pressed without any supporting evidence or explanation. Bare stock objections filed in writing - with no oral hearing, no evidence, or explanation - should

70

be given short shrift by this Court.   As shown in the argument above, the manual is probative.  It was authenticated.  It is admissible.

## 2. **Rollins Affidavit**

MPF objected to the Rollins affidavit on the grounds that it was a sham and should "be stricken in its entirety. (CCR 22:3720). However the trial court did not exclude the entire affidavit, but rather painstakingly edited it in response to Texas College's objections.

MPF alternatively asked the court to, at a minimum, exclude "the statements that directly contradict" his testimony.  *Id.*  Because MPF sought an alternative form of relief, the objection is multifarious. Compounding the confusion, the order is vague.  It is simply a check line with a check mark in it, placed in the "sustained" column.  *See* FEB 9 ORDER ON MPF EVIDENCE OBJECTIONS p. 2 (CCR 24:3937) (also in appendix).  There is no way for this Court to discern which one of the alternative forms of relief was granted by looking solely at the order.   However, because the trial court did edit the affidavit to exclude the testimony referenced in the alternative plea (CCR 24:3930-3931) (Texas College objection 13 sustained), one can discern that the trial court did not strike the affidavit entirely, but

71

granted the lesser relief. Thus, this Court should consider the entire affidavit (subject to Texas College objection 13) as to MPF.

### 3. <u>Thorpe Affidavit</u>

Appellees filed a joint motion to strike the affidavit of appellants' aerial lift safety expert, Burt Thorpe. *See* THORPE AFFIDAVIT (CR 23:3402-3409) (original record) (also in appendix). Tellingly, the motion to strike the affidavit did not emphasize unfair surprise or prejudice. That is because there was none.

The issues presented in the Motion were: whether Plaintiffs timely disclosed Burt Thorpe; whether the disclosure was sufficient; and whether Plaintiffs' supplemental designations passed muster of the discovery rules and in no way constitute unfair surprise, prejudice or trial by ambush. *See* Tex. R. Civ. P. 193.6(b).

It was undisputed that the trial court's scheduling order required Plaintiffs' to designate all experts by October 16, 2014. Plaintiffs met the deadline with their October 13, 2014 Fourth Supplemental Disclosure adding Burt Thorpe as a safety expert. (CCR 6:710-718) Appellees argued that the supplemental October 13 disclosure was inadequate and therefore untimely per Rule 194.2(f).

Appellees cited *Cunningham v. Columbia/St. David's Healthcare System, L.P.,* 185S.W.3d 7 (Tex.App.-Austin 2005) for support. In *Cunningham,* the plaintiff was required to designate all experts by June 29, 2004. *Id. at* 11. Plaintiff responded to a December 2003 request for disclosure that she had not yet determined "any testifying expert witnesses" and would supplement. *Id.* The June disclosure deadline passed without plaintiff supplementing her response (i.e. she provided no information about her expert). *Id.* On September 7, 2004 (i.e. 90 days later) plaintiff attached her expert's affidavit for the first time, attempting to rely upon it as proof that her claims should survive summary judgment. *Id.* at 11. The appeals court affirmed defendant's motion to strike on the grounds that plaintiff had herself conceded the designation was untimely and that she failed to satisfy her burden of showing either good cause or a lack of unfair surprise or prejudice. *Id.* at 13.

The facts here are distinguishable: at the time Rollins disclosed Burt Thorpe in October, he provided to appellees all of the requirements of 194.2(f) including: his name, address and telephone number; the subject matter on which he was to testify; the general substance of his mental impressions and opinions; and his current

73

resume. *See* PLAINTIFFS' FOURTH SUPPLEMENTAL DISCLOSURE at 6-7 (CCR 6:710-718). At the time of the disclosure, Plaintiffs expert had not been provided any "documents, tangible things, reports, models or data compilations" per 194.2(f)(A). In fact, he had only been retained recently to testify about issues pertaining to safety and the lack thereof - not on medical or damages issues. The difference between the substance of Plaintiffs' disclosure of Burt Thorpe in this matter, (timely per the scheduling order) and the complete lack of response by the plaintiff in *Cunningham* is clear. The court in *Cunningham* was absolutely correct in its judgment that the plaintiff had not met her burden. There was no evidence of her expert's utter existence prior to her summary judgment response, which is the epitome of "unfair surprise"- particularly in the context of a dispositive proceeding. *Id.* at 14. Here, Rollins met the initial requirement of a timely disclosure per the rules and the Court's Scheduling Order when he designated Mr. Thorpe on October 13.

Defendants received fair notice of Mr. Thorpe's participation as an expert; and were given the subject matter of his testimony, thus refuting any claim of unfair surprise. *See Gutierrez v. Gutierrez,* 86 S.W.3d 729 (Tex.App. -El Paso 2002).

74

## 4. **The ANSI Standard and "Statement of Best Practices"**

During the course of the proceedings, appellants introduced the American National Standards Institute ("ANSI") safety standard A92.6, AMERICAN NATIONAL STANDARD FOR SELF-PROPELLED ELEVATING WORK PLATFORMS, (CCR 21:3430-3573) and ANSI's STATEMENT OF BEST PRACTICES OF GENERAL TRAINING AND FAMILIARIZATION FOR AERIAL WORK PLATFORM EQUIPMENT, February 2010 (CCR 20:3215-3234).

MPF objected to these documents claiming that they were not authenticated, not timely disclosed, and irrelevant. Ironically, with respect to ANSI 92.6, MPF itself produced the same text on 6/26/14 in response to Plaintiffs' written request for production. (SR 13).

Both standards are discussed in the Thorpe affidavit. They are referenced in response to requests for disclosure regarding Mr. Thorpe's testimony. They are relevant. Although the trial court sustained the objections, it should not have. Appellant submitted the matters requesting "judicial notice of the Code of Federal Regulations, OSHA and ANSI provisions cited" therein, and gave "notice of their intent to rely" on them. (CCR 20:3264). *See, Daugherty v. S. Pac. Transp. Co.*, 772 S.W.2d 81 (Tex. 1989) wherein the Texas Supreme Court held that: (1) a court may take judicial

75

notice of OSHA regulations without such regulations being included in the pleadings, and (2) that the trial court committed reversible error by not considering the OSHA regulation. *See also* Tex. R. Evid. 201. It bears repeating that ANSI standards "form the basis for most OSHA standards." *Seale*, 904 S.W.2d at 720. Since OSHA adopts ANSI standards as its standards, the court was duty bound under Rule 201 to take notice.

## C. **THE TRIAL COURT SHOULD HAVE REOPENED THE EVIDENCE**

Appellants incorporate by reference the same argument made as to Texas College.

## CONCLUSION AND PRAYER

Wherefore, Appellants pray that this Court: (1) reverse the trial court's order granting summary judgment in favor of Texas College; (2) reverse the trial court's order granting summary judgment in favor of MPF Investments, LLC; and (3) remand the case for further proceedings. Also in the interest of justice and clarity: (4) reverse the orders (a) denying the motion to reopen the evidence, (b) striking the expert designation of Burt Thorpe, and to the extent argued in this

brief, granting (c) Texas College's evidentiary objections and (d) MPF's evidentiary objections.

Respectfully submitted,

/s/ Ernesto D. Sigmon

Ernesto D. Sigmon
State Bar No. 24010397
LAW OFFICES OF ERNESTO D. SIGMON
WALKER SIGMON LAW
416 West Saulnier Street
Houston, Texas 77019
214/395-1546 (Telephone)
713/485-6056 (Facsimile)
esigmon@esigmon.com

ATTORNEY FOR APPELLANTS,
GARRY L. ROLLINS AND CARLA D. ROLLINS

## CERTIFICATE OF COMPLIANCE

I certify that this document was produced on a computer using Microsoft Word 2013 and contains 14,980 words, as determined by the computer software's word-count function, excluding the sections of the document listed in Texas Rule of Appellate Procedure 9.4(i)(l).

/s/ Ernesto D. Sigmon

Ernesto D. Sigmon

State Bar No. 24010397

LAW OFFICES OF ERNESTO D. SIGMON

WALKER SIGMON LAW

416 West Saulnier Street

Houston, Texas 77019

214/395-1546 (Telephone)

713/485-6056 (Facsimile)

esigmon@esigmon.com

ATTORNEY FOR APPELLANTS,

GARRY L. ROLLINS AND CARLA D. ROLLINS

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 15, 2015 I served a copy of Appellants'
Brief and Appendix on the parties listed below by electronic service
and that he electronic transmission was reported as complete.  My e-
mail address is esigmon@esigmon.com.

/s/ Ernesto D. Sigmon

Ernesto D. Sigmon
State Bar No. 24010397
SIGMON LAW, PLLC
2929 Allen Parkway, Suite 200
Houston, Texas 77019
214/395-1546 (Telephone)
713/485-6056 (Facsimile)
esigmon@esigmon.com

ATTORNEY FOR APPELLANTS,
GARRY L. ROLLINS AND CARLA D. ROLLINS

Greg Smith
Texas Bar No. 18600600
Nolan D. Smith
Texas Bar No. 24075632
RAMEY & FLOCK, P.C.
100 E. Ferguson, Suite 500
Tyler, Texas 75702
Telephone: 903-597-3301
Facsimile: 903-597-2413

Mr. Trey Yarbrough
YARBROUGH WILCOX GUNTER, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702

Fax: 903.595.0191

Levon G. Hovnatanian
Texas Bar No. 10059825
hovnatanian@mdjwlaw.com
lonergan@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Todd M. Lonergan
Texas Bar No. 12513700
lonergan@mdjwlaw.com
808 Travis, 20th Floor
Houston, Texas 77002
(713) 632-1700 – Telephone
(713) 222-0101 – Facsimile

Ryan K. Geddie
Texas Bar No. 24055541
geddie@mdjwlaw.com
MARTIN, DISIERE, JEFFERSON &
WISDOM, L.L.P.
Tollway Plaza One
16000 N. Dallas Parkway, Suite 800
Dallas, Texas 75248
(214) 420-5500 – Telephone
(214) 420-5501 – Facsimile

## No. 12-15-00121-CV

---

IN THE COURT OF APPEALS
FOR THE TWELFTH DISTRICT OF TEXAS
TYLER, TEXAS

---

## GARRY L. ROLLINS AND CARLA D. ROLLINS,
*Appellants*

## V.

## TEXAS COLLEGE AND
## MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL,"
*Appellees*

---

## APPELLANTS' APPENDIX

---

**Trial Court Orders**

February 19 Order Denying Motion to Strike Doctor Reports........... 3
February 19 Order Striking Thorpe Testimony............................. 4
February 19 Order on MPF Evidence Objections........................... 5
February 19 Order on TC Evidence Objections............................ 6
February 19 Order Granting MPF Summary Judgment................... 7
February 10 Order Granting TC Summary Judgment.................... 8
Order Clarifying Objections............................................ 9
Order Denying Reconsideration of TC Summary Judgment............. 12
Order Denying Reconsideration of MPG Summary Judgement........ 13
Order Denying Motion to Reopen Evidence................................. 14

Pleadings

6th Amended Petition................................................... 15
7th Amended Petition................................................... 24
8th Amended Petition................................................... 34

(contents continued on next page)

## Key Documents

Full Rollins Affidavit.............................................................................42
Redacted Rollins Affidavit....................................................................47
Barnett Letter.......................................................................................52
Barnett Affidavit.................................................................................. 54
Thorpe Affidavit................................................................................... 56

## Objections to Evidence

Texas College's Objections to Evidence.......................................... 64
MPF's Objections to Evidence.......................................................... 83

## Cases

Austin v. Kroger...................................................................................96
Kroger v. Elwood................................................................................117
Kroger v. Milanes...............................................................................120
Lawrence v Coastal Marine Service..................................................140

FILED
DISTRICT CLERK
2015 FEB 19 AM 10: 42
BY _____ TEXAS

CAUSE NO.13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS and CARLA D. ROLLINS | ¦ | IN THE DISTRICT COURT |
| Plaintiffs, | ¦ | |
| Vs. | ¦ | SMITH COUNTY, TEXAS |
| TEXAS COLLEGE and MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL" | ¦ | |
| Defendants, | ¦ | 7th JUDICIAL DISTRICT |

---

## ORDER ON DEFENDANTS MPF INVESTMENTS, LLC D/B/A A-1 RENT ALL AND TEXAS COLLEGE'S MOTION TO STRIKE EXPERT DESIGNATIONS OF GILBERT MARTINEZ, JOE G. GONZALES, AND THOMAS M. RONEY

---

THE COURT has considered Defendant's Motion to Strike the Expert Designations of Gilbert Martinez, Joe G. Gonzalez and Thomas M. Roney, the applicable law, and the response from Plaintiffs and supporting exhibits *and Replies.* Having done so, the Court is of the opinion that the Defendant is not entitled to the relief sought in its Motion. It is therefore,

ORDERED, ADJUDGED, and DECREED that the motion is DENIED.

It is so ORDERED.

SIGNED this the ___19th___ day of ___February___, 2015.

_____
JUDGE PRESIDING

ORDER                                                                 Solo Page

APPENDIX 3

FILED
LOIS ...
DISTR... ...
2015 FEB 19 AM 10: 41
S...
...TY TEXAS
BY...
DE...TY

CAUSE NO. 13-3353-A

| | |
|---|---|
| GARRY L. ROLLINS AND<br>CARLA D. ROLLINS,<br>Plaintiffs, | IN THE DISTRICT COURT |
| v. | SMITH COUNTY, TEXAS |
| TEXAS COLLEGE, CHRISTIAN<br>METHODIST EPISCOPAL CHURCH<br>AND MPF INVESTMENTS, LLC<br>D/B/A "A-1 RENT ALL",<br>Defendants. | 7TH DISTRICT COURT |

## ORDER GRANTING MPF INVESTMENTS, LLC D/B/A A-1 RENT ALL'S MOTION TO STRIKE EXPERT DESIGNATION OF BURT THORPE

The Court has considered Defendant MPF Investments, LLC d/b/a A-1 Rent All's Motion to Strike Expert Designation of Burt Thorpe, Plaintiffs' Response, the pleadings on file, any additional briefing accepted by the Court, and the applicable law. Having done so, the Court is of the opinion that Defendant, MPF Investments, LLC d/b/a A-1 Rent All, is entitled to the relief requested. It is therefore,

ORDERED, ADJUDGED and DECREED that Burt Thorpe shall not testify at trial in this matter and no opinion testimony from Burt Thorpe will be admitted into evidence in this matter for any purpose.

It is so ORDERED.

Signed this 19TH day of February, 2015.

PRESIDING JUDGE

CAUSE NO. 13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS AND | § | IN THE DISTRICT COURT |
| CARLA D. ROLLINS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE, CHRISTIAN | § | |
| METHODIST EPISCOPAL CHURCH | § | |
| AND MPF INVESTMENTS, LLC | § | |
| D/B/A "A-1 RENT ALL", | § | |
| Defendants. | § | 7TH DISTRICT COURT |

## ORDER ON MPF INVESTMENTS, LLC D/B/A A-1 RENT ALL'S OBJECTIONS TO PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE

The Court has considered Defendant MPF Investments, LLC d/b/a A-1 Rent All's Motion to considered Defendant MPF Investments, LLC d/b/a A-1 Rent All's Objections to Plaintiffs' Summary Judgment Evidence, Plaintiffs' Response to MPF's Summary Judgment and any responses and replies thereto, the pleadings on file, any additional briefing accepted by the Court, and the applicable law. Having done so, the Court makes the following rulings on A-1's objections:

| Evidence | Sustained | Denied |
|---|---|---|
| **1. Excerpts from the deposition of Mike Frazier** | | |
| Question at 59:10 | ✓ | ___ |
| Questions beginning at 60:21 | ✓ | ___ |
| Questions beginning at 61:4 - 14 | ✓ | ___ |
| Questions beginning at 62:4 | ✓ | ___ |
| **6. The JLG Owner's Manual Model 1930-ES (excerpts).** | ✓ | ___ |

ORDER ON MPF INVESTMENTS, LLC D/B/A A-1 RENT
ALL'S OBJECTIONS TO PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE          PAGE 1

APPENDIX 5

GARRY L. ROLLINS and §        IN THE DISTRICT COURT OF ~~~~~

CARLA D. ROLLINS §

        **Plaintiffs** §

§

§

VS. §        SMITH COUNTY, TEXAS

§

TEXAS COLLEGE and §

CHRISTIAN METHODIST §

EPISCOPAL CHURCH §

§

        **Defendants.** §        **7th JUDICIAL DISTRICT**

## ORDER ON DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS COLLEGE'S MOTION FOR SUMMARY JUDGMENT

ON THIS DAY, the Court considered Texas College's Objections/Motion to Strike Evidence and References in Plaintiffs' Response to Texas College's Motion for Summary Judgment. After reviewing the pleadings on file, hearing any arguments of counsel, and the applicable law, the Court hereby makes the following rulings on Texas College's objections:

A. Texas College's objection to Plaintiffs' references to and use of Plaintiffs' Seventh and Eighth Amended Petition as summary-judgment proof are hereby:

Sustained: ___✔___        Overruled: _____

B. Texas College's objections to the following excerpts from the deposition of Roland Brackens and the references in Plaintiffs' response to such are hereby:

Sustained: ___✔___        Overruled: _____

| Mr. Brackens' Deposition Testimony |
|---|
| Deposition Testimony: 18:4 – 18:25; 22:15 – 23:14; 24:8 – 24:11; 24:23 – 25:6 |

APPENDIX 6

FILED
LOIS ROGERS
DISTRICT CLERK

2015 FEB 19 AM 10: 41

SMITH COUNTY TEXAS
BY_____
CLERK DTY

| | |
|---|---|
| GARRY L. ROLLINS AND | § |
| CARLA D. ROLLINS, | § |
| **Plaintiffs,** | § |
| | § |
| v. | § |
| | § |
| TEXAS COLLEGE, CHRISTIAN | § |
| METHODIST EPISCOPAL CHURCH | § |
| AND MPF INVESTMENTS, LLC | § |
| D/B/A "A-1 RENT ALL", | § |
| **Defendants.** | § |

IN THE DISTRICT COURT

SMITH COUNTY, TEXAS

7TH DISTRICT COURT

### ORDER GRANTING MPF INVESTMENTS, LLC D/B/A A-1 RENT ALL'S TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

The Court has considered Defendant MPF Investments, LLC d/b/a A-1 Rent All's Traditional and No-Evidence Motion for Summary Judgment, Plaintiffs' Response, the pleadings on file, the summary judgment evidence, any additional briefing accepted by the Court, and the applicable law. Having done so, the Court is of the opinion that Defendant, MPF Investments, LLC d/b/a A-1 Rent All, is entitled to summary judgment as to all of Plaintiffs' claims. It is therefore,

ORDERED, ADJUDGED and DECREED that Plaintiffs' claims and causes of action against Defendant MPF Investments, LLC d/b/a A-1 Rent All are dismissed with prejudice, and said Defendant's taxable costs are assessed against Plaintiffs.

It is so ORDERED.

Signed this 19th day of February, 2015.

_____
PRESIDING JUDGE

ORDER GRANTING DEFENDANT MPF INVESTMENT, LLC'S
MOTION FOR SUMMARY JUDGMENT

PAGE 1

APPENDIX 7

CAUSE NO. 13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS and | § | IN THE DISTRICT COURT OF |
| CARLA D. ROLLINS | § | |
| Plaintiffs | § | |
| | § | |
| | § | |
| VS. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE and | § | |
| CHRISTIAN METHODIST | § | |
| EPISCOPAL CHURCH | § | |
| | § | |
| Defendants. | § | 7th JUDICIAL DISTRICT |

## ORDER GRANTING TEXAS COLLEGE'S MOTION FOR SUMMARY JUDGMENT

The Court has considered Defendant, Texas College's, Motion for Summary Judgment, Plaintiffs' Response, the pleadings on file, the summary judgment evidence, any additional briefing accepted by the Court, and the applicable law. Having done so, the Court is of the opinion that Defendant, Texas College, is entitled to summary judgment as to all of Plaintiffs' claims. It is, therefore,

ORDERED, ADJUDGED, and DECREED that Plaintiffs' claims and causes of action against Defendant Texas College are dismissed with prejudice, and said Defendant's taxable costs are assessed against Plaintiffs.

It is so ORDERED.

SIGNED this the 19th day of February, 2015.

JUDGE PRESIDING

APPENDIX 8

Page 3935

| GARRY L. ROLLINS AND | § | IN THE DISTRICT COURT |
| CARLA D. ROLLINS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE, CHRISTIAN | § | |
| METHODIST EPISCOPAL CHURCH | § | |
| AND MPF INVESTMENTS, LLC | § | |
| D/B/A "A-1 RENT ALL", | § | |
| Defendants. | § | 7TH DISTRICT COURT |

## AGREED ORDER CLARIFYING EARLIER ORDER ON TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

On this day the Court considered Texas College's unopposed motion for entry of an order clarifying an earlier February 19, 2015 order of this Court on Texas College's objections and motion to strike evidence and references in Plaintiffs' Response to Texas College's Motion for Summary Judgment. After considering the motion, the Court finds that there is the possibility of some confusion as to the sequence of rulings in Section D of the prior order and is of the opinion that the motion should be granted.

The Court, therefore, enters the following Order clarifying certain rulings in its February 19, 2015 Order on Defendant Texas College's Objections/Motion to Strike Evidence and References in Plaintiffs' Response to Texas College's Motion for Summary Judgment (hereinafter sometimes "Prior Order"), and specifically, the rulings contained in Section D of the Prior Order:

1. In Section D, at page 4, the Court overruled Defendant Texas College's objection to the particular excerpt from Mr. Rollins' affidavit which reads "(at least 150 lbs.)," finding that the quoted language is a personal estimate only.

2. In Section D, at page 5, with respect to the excerpt from Mr. Rollins' affidavit which

ORDER ON DEFENDANT TEXAS COLLEGE'S MOTION FOR ENTRY OF ORDER CLARIFYING
EARLIER ORDER ON OBJECTIONS/MOTION TO STRIKE EVIDENCE AND REFERENCES
IN PLAINTIFFS' RESPONSE TO TEXAS COLLEGE'S MOTION FOR SUMMARY JUDGMENT       PAGE 1 OF 3

APPENDIX 9

reads, "We were not trained or instructed on proper lifting techniques or given any direction for performing a safe lift of the size," the Court sustained Texas College's objection as to "We," but otherwise overruled the objection.

3. In Section D, at page 6, the Court sustained Texas College's objection to that portion of an excerpt from Mr. Rollins' affidavit which reads, "Under Mr. Brackens authority at Texas College there was never an emphasis on safety or training for any of the work we were assigned. While under his supervision and leadership at Texas College, none of the employees were ever sent to any kind of safety training sessions or OSHA workshops." With respect to the sentence in the same excerpt which reads, "This kind of thing made me and other employees question the school's attitude toward our safety," the Court sustained Texas College's objection as to the words "and other employees" but overruled the objection as to the remainder of that sentence. The Court redacted the portions to which the objections were sustained.

4. In Section D, at page 7, with respect to the excerpt from Mr. Rollins' affidavit which reads, "Of course, I later ended up having to have major surgery because of my injury," the Court sustained Texas College's objection to the extent of the words "because of my injury," but overruled the objection to the remainder of the excerpt.

5. Other than the objections, or parts thereof, which were overruled by the Court as identified in numbers 1 through 4 above, the Court sustained in their entirety Texas College's objections to the remaining excerpts from Plaintiffs' summary-judgment evidence and response contained in Section D of the Court's order dated February 19, 2015.

It is further Ordered that Sections A, B, C and E of the Prior Order do not require any

APPENDIX 10

clarification and are not addressed in this Order.

This Order in no way changes the rulings memorialized in the Court's February 19, 2015 Order but is entered for purposes of clarification only.

IT IS SO ORDERED.

SIGNED this 17 day of March, 2015.

JUDGE PRESIDING

Approved:

/s/ Ernesto Sigmon
Ernesto Sigmon
Bar No. 24010397
Attorney for Plaintiffs

/s/ Trey Yarbrough
Trey Yarbrough
Bar No. 22133500
Attorney for Defendant Texas College

ORDER ON DEFENDANT TEXAS COLLEGE'S MOTION FOR ENTRY OF ORDER CLARIFYING
EARLIER ORDER ON OBJECTIONS/MOTION TO STRIKE EVIDENCE AND REFERENCES
IN PLAINTIFFS' RESPONSE TO TEXAS COLLEGE'S MOTION FOR SUMMARY JUDGMENT         PAGE 3 OF 3

APPENDIX 11

Page 4179

CAUSE NO. 13-3353-A

FILED
LOIS ROGERS
DISTRICT CLERK
2015 MAR 17 AM 11: 41
SMITH
BY_____
DEPUTY

| | | |
|---|---|---|
| GARRY L. ROLLINS AND | § | IN THE DISTRICT COURT |
| CARLA D. ROLLINS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE, CHRISTIAN | § | |
| METHODIST EPISCOPAL CHURCH | § | |
| AND MPF INVESTMENTS, LLC | § | |
| D/B/A A-1 RENT ALL, | § | |
| Defendants. | § | 7TH DISTRICT COURT |

### ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER THE COURT'S RULING ON DEFENDANT'S TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

The Court has considered Plaintiffs' Motion to Reconsider the Court's Ruling on Defendant's Traditional and No-Evidence Motion for Summary Judgment, Defendant Texas College's Response, and any related briefing. Having done so, the Court finds that the motion should be denied.

It is, therefore, Ordered that Plaintiffs' Motion to Reconsider the Court's Ruling on Defendant's Traditional and No-Evidence Motion for Summary Judgment is denied.

Signed this 17 day of March 2015

_____
Judge Presiding

PAGE 1 OF 1

APPENDIX 12



FILED
LOIS ROGERS
DISTRICT CLERK

2015 APR 10 AM 8: 35

BY_____
DEPUTY

| | | |
|---|---|---|
| GARRY L. ROLLINS AND | § | IN THE DISTRICT COURT |
| CARLA D. ROLLINS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE, CHRISTIAN | § | |
| METHODIST EPISCOPAL CHURCH | § | |
| AND MPF INVESTMENTS, LLC | § | |
| D/B/A "A-1 RENT ALL", | § | |
| Defendants. | § | 7TH DISTRICT COURT |

## ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER THE COURT'S RULING ON DEFENDANT'S TRADITIONAL AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT

The Court has considered Plaintiffs' Motion to Reconsider the Court's Ruling on Defendant's Traditional and No-Evidence Motion for Summary Judgment, Defendant MPF Investments, LLC's Response, and any related briefing. Having done so, the Court finds that the motion should be in all things denied.

It is, therefore, Ordered that Plaintiffs' Motion to Reconsider the Court's Ruling on Defendant's Traditional and No-Evidence Motion for Summary Judgment is denied.

Signed this 10th day of April 2015.

_____
PRESIDING JUDGE

ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER
THE COURT'S RULING ON DEFENDANT'S TRADITIONAL
AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT    SOLO PAGE

APPENDIX 13

Page 4180

FILED
LOIS ROGERS
DISTRICT CLERK

2015 MAR 17 AM 11: 41

SMITH COUNTY, TEXAS

BY _____
DEPUTY

CAUSE NO. 13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS AND | § | IN THE DISTRICT COURT |
| CARLA D. ROLLINS, | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE, CHRISTIAN | § | |
| METHODIST EPISCOPAL CHURCH | § | |
| AND MPF INVESTMENTS, LLC | § | |
| D/B/A "A-1 RENT ALL", | § | |
| Defendants. | § | 7TH DISTRICT COURT |

### ORDER DENYING PLAINTIFFS' EMERGENCY MOTION TO REOPEN SUMMARY JUDGMENT RECORD AND REQUEST FOR LEAVE TO SUPPLEMENT EVIDENCE

The Court has considered Plaintiffs' Emergency Motion to Reopen Summary Judgment Record and Request for Leave to Supplement Evidence, Defendant's response in opposition to the motion, and any additional briefing related to same. Having done so, the Court finds that the motion should be denied.

It is, therefore, Ordered that Plaintiffs' Emergency Motion to Reopen Summary Judgment Record and Request for Leave to Supplement Evidence is hereby denied.

Signed this the 17th day of March 2015.

_____
Judge Presiding

PAGE 1 OF 1

APPENDIX 14

Electronically Filed
11/10/2014 7 07 17 PM
Lois Rogers, Smith County District Clerk
Reviewed By Lana Fields

## CAUSE NO.13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS and<br>CARLA D. ROLLINS | ¦ | IN THE DISTRICT COURT |
| | ¦ | |
| Plaintiffs, | ¦ | |
| | ¦ | |
| Vs. | ¦ | SMITH COUNTY, TEXAS |
| | ¦ | |
| TEXAS COLLEGE;<br>CHRISTIAN METHODIST EPISCOPAL<br>CHURCH and<br>MPF INVESTMENTS, LLC D/B/A<br>"A-1 RENT ALL" | ¦ | |
| Defendants, | ¦ | 7th JUDICIAL DISTRICT |

## PLAINTIFFS' SIXTH AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW PLAINTIFFS, Garry L. Rollins and Carla D. Rollins ("Plaintiffs"), complaining of Texas College ("TC"); Christian Methodist Episcopal Church ("CME") and MPF Investments, LLC d/b/a A-1 Rent All ("A-1") (collectively "Defendants") and file this Sixth Amended Original Petition:

### DISCOVERY CONTROL PLAN LEVEL

1. Discovery is being conducted under Level 2 of the Discovery Control Plan pursuant to Texas Rule of Civil Procedure 190.3.

### PARTIES AND SERVICE

2. Plaintiffs Garry L. Rollins and Carla D. Rollins are individuals residing in Dallas County, Texas.

---

**PLAINTIFFS' SIXTH AMENDED PETITION** 1
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx

<span style="color:red">APPENDIX 15</span>

3. Defendant TC is a Texas Nonprofit corporation with its principal office in Smith County, Texas and has been served with process through its registered agent Dwight J. Fennell Sr. at 2404 North Grand Avenue Tyler, Texas 75702-1962. TC has answered in this matter through its attorney of record.

4. Defendant CME is a foreign nonprofit corporation organized under the laws of the state of Tennessee and was served with process at its principal place of business at 4466 Elvis Presley Blvd, Suite 300 Memphis, Tennessee 38116-7181. CME has answered in this matter through its attorney of record.

5. Defendant MPF Investments, LLC d/b/a A-1 Rent All ("A-1") is a Texas limited liability company with its principal office at 2505 S Southeast Loop 323 Tyler, Texas 75701. A-1 has answered in this matter through its attorney of record.

## CLAIM FOR RELIEF

6. Plaintiffs seek monetary relief over $1,000,000. Tex.R.Civ.P. 47(c)(5).

## VENUE

7. Smith County, Texas is a county of proper venue for this suit in accordance with Texas Civil Practice and Remedies Code Sections 15.001 and 15.002 et. seq. All or a substantial part of the events or omissions giving rise to this cause of action occurred in Smith County, Texas.

## AGENCY

8. At all times material hereto, Defendants acted by and through actual, apparent, ostensible, or by estoppel agents, acting within the course and scope of such agency.

## FACTS

9. Garry L. Rollins (hereinafter "Rollins") is a maintenance worker employed by Texas College in the capacity of maintenance technician. Texas College itself operates

APPENDIX 16

under the "supervision, care and ownership" of CME and has rented heavy equipment "aerial work platforms" from A-1 on various occasions.

10.     Rollins' formal work title was "Maintenance Technician". His office was in the TC Physical Plant (the "Plant"). Rollins reported to Roland Brackens, the Plant Superintendent, and to James Harris, Vice President of Business and Finance at TC. Rollins also supervised a three to four person maintenance crew. Rollins' overall responsibility at TC included general maintenance, light construction, driving detail and essentially anything else the school required. He was hired to work at TC in 2008.

11.     During September 2013, Rollins was asked by his supervisor to help move some marble counter tops that were to be installed in the school's Science building. The slabs of marble themselves weighed anywhere from 150-185 pounds. TC asked Mr. Rollins and one other worker to perform the task with no other assistance—man nor machine. While moving the slab, Mr. Rollins sneezed/coughed, dropped the object and suffered a momentary loss of consciousness. On or around September 9, 2013 Rollins sought emergency medical care because of the incident and was advised not to drive. Rollins informed agents and employees of TC of his restriction and was subsequently removed from a TC driving task that he had been performing on Tuesdays and Thursdays. Upon information and belief, Mr. Brackens or Mr. Harris removed Rollins from the task.

12.     A few weeks later, sometime during October 2013, the gymnasium ceiling at TC needed repair. TC rented a hydraulic "scissor lift" (the "Lift") from defendant A-1 for Plaintiff Rollins and others to use while doing the repairs.

13.     The Lift is capable of reaching upwards of approximately 20 feet from the ground and is often accompanied by a safety harness to prevent worker injury. TC did not rent

**PLAINTIFFS' SIXTH AMENDED PETITION**                                                                                          3
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx

APPENDIX 17

Page 85

or purchase a harness for use with the Lift, nor did it purchase or rent any other personal protective equipment needed to ensure worker safety. Upon information and belief, A-1 did not offer or suggest that TC purchase or rent personal protective equipment for use with the Lift nor did it adequately confirm whether TC or its agents were "qualified personnel" with the training and experience needed to safely operate the Lift. Upon information and belief, A-1 did not familiarize Rollins with the Lift and its operation nor did they offer to train Rollins. Rollins' immediate supervisor, Mr. Brackens did not check or confirm whether A-1 Rent All included an owner/operator manual with the Lift as required by its manufacturer, JLG.

14. On or around October 22, 2013 TC directed Rollins and others to use the Lift "as is" to make the repairs—minus training or supervision. After completing the work, Rollins fell from the Lift as he was attempting to exit to safety. He immediately reported the incident to the TC human resources department as required. At the time, Rollins assumed his fall had been relatively inconsequential as he was able to walk away unassisted.

15. Three days later, on or around October 25, 2013, Rollins lost sensation in his legs and toes and was subsequently admitted to Zale Lipshy University Hospital in Dallas Texas where he underwent invasive neck surgery.

16. Rollins is now convalescing at home, unable to walk unassisted and requires intensive at home physical therapy and care three times a week. He is no longer able to perform many of the household tasks he once did to assist his wife Carla with the maintenance and care of their home.

17. On or around December 6, 2013 Rollins received correspondence from TC advising him that he would be terminated if he does not return to work within 3 months.

---

**PLAINTIFFS' SIXTH AMENDED PETITION** 4
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx

APPENDIX 18

Page 86

## CAUSES OF ACTION

### TEXAS COLLEGE - NEGLIGENCE AND GROSS NEGLIGENCE

18.     Texas College was Rollins' employer at the time of his avoidable injury and owed him a special duty of care at law. Texas College is a non-subscriber to Texas Worker's Compensation and does not carry any sort of insurance for work related injury. Defendant Texas College breached its duty of care to Rollins. Its breach includes and is not limited to Defendant's failure to: 1) provide a reasonably safe workplace; 2) furnish reasonably safe machinery or reasonably safe personal protective equipment for use with the Lift and for use in lifting the marble slab counter top; 3) provide adequate help in the performance of work; 4) train and/or properly supervise Plaintiff Garry Rollins while using the Lift and lifting the marble slab counter top; and 5) to ensure that Plaintiff Garry Rollins was fit to perform work on a scissor lift. The foregoing acts and omissions by TC constitute negligence and gross negligence.

### CHRISTIAN METHODIST EPISCOPAL CHURCH – VICARIOUS LIABILITY, ALTER EGO, NEGLIGENCE AND GROSS NEGLIGENCE

19.     During the time of Plaintiff Rollins' avoidable injury, Defendant CME represented to the public through documents on file with the Texas Secretary of State that TC operates under the "supervision, care and ownership" of CME. CME has and continues to represent to the general public that TC is one of its "affiliate" educational institutions, of which there are several. CME makes extensive reference to TC throughout its internal documentation and by-laws, and the role it plays in establishing TC policies and procedures. CME also has a significant "financial relationship" with TC that has been reported to the IRS.

APPENDIX 19

20. TC acted as CME's agent at all times relevant to the facts made the basis of this lawsuit. CME is therefore liable for the torts of its agent as alleged and described herein and above and as recognized by the laws of Texas and the Restatement (2d) of Torts.

21. Plaintiffs further allege that CME exercises a measure of control over TC so as to qualify it as CME's "alter-ego" functioning as CME's mere tool or business conduit.

22. CME owed Plaintiffs a duty to exercise reasonable care to avoid a foreseeable risk of injury to others. CME also owed Plaintiffs a duty to exercise reasonable care in performing services, whether gratuitously or for consideration that CME should recognize as necessary for the protection of other persons or things.

23. CME breached its duties by failing to exercise reasonable care to secure Mr. Rollins' safety while employed at TC and in doing so significantly increased his risk of harm. This breach makes CME liable to Plaintiffs vicariously and directly. The foregoing acts and omissions by CME constitute negligence and gross negligence.

## MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL" – NEGLIGENCE, NEGLIGENT ENTRUSTMENT AND GROSS NEGLIGENCE

24. MPF owed Plaintiffs a duty to exercise reasonable care to avoid a foreseeable risk of injury to others as well as a duty to take affirmative action to avoid increasing the danger from a condition created by its conduct. Defendant MPF breached its duty of care to Plaintiffs. MPF's breach includes and is not limited to its failure to ensure that the Lift was being rented and used by competent and authorized persons; and to act reasonably and prudently in all manners regarding its rental transaction with TC and the steps it should have taken to prevent the readily foreseeable harm that the Lift could cause subsequent users who were either unfit, untrained or incompetent to operate it.

**PLAINTIFFS' SIXTH AMENDED PETITION**      6
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx

APPENDIX 20

Page 88

The foregoing acts and omissions by MPF constitute negligence, negligent entrustment and gross negligence.

## DAMAGES TO PLAINTIFFS

25.     Defendants' combined negligence has proximately caused damage to Plaintiffs in an amount that exceeds the jurisdictional limits of this Court for which Plaintiffs pray judgment.

26.     As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff Garry L. Rollins has sustained damages in an amount in excess of the minimum jurisdictional limits of this Court.  Such damages include, but are not limited to: physical pain (past and future), physical impairment (past and future), medical expenses (past and future), loss of earning capacity (past and future), disfigurement (present and future), loss of income (past and future), emotional distress (past and future), and mental anguish (past and future).

27.     As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff Carla D. Rollins (Garry's spouse) has sustained special damages in an amount in excess of the minimum jurisdictional limits of this Court.  Carla's special damages include, but are not limited to: loss of consortium (past and future) and loss of household services (past and future).

## EXEMPLARY DAMAGES

28.     Plaintiffs further allege that Defendants' acts and omissions, whether taken singularly or in combination, were aggravated by the kind of malice and reckless disregard for which the law allows the imposition of exemplary damages.  TC's conduct amounts to gross negligence as defined by the laws of Texas.  CME's conduct amounts

**PLAINTIFFS' SIXTH AMENDED PETITION**                                                                7
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx
APPENDIX 21

Page 89

to gross negligence as by the laws of Texas. CME is either directly liable for exemplary damages because of its conduct or liable because of its agent's acts. MPF's conduct amounts to gross negligence as defined by the laws of Texas. In light of the foregoing, Plaintiffs seek such exemplary damages against each defendant named herein in an amount that exceeds the minimum jurisdictional threshold of the Court.

## JURY DEMAND

29. Plaintiffs request that a jury be convened to try the fact issues in this action. A jury fee has been tendered and accepted by the Smith County District Clerk.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final jury trial, that Plaintiffs be awarded damages which are set forth above and which are in the sum in excess of the minimum jurisdictional limits of this Court, costs of court, prejudgment interest at the highest rate permitted by law, post-judgment interest from the date of judgment until paid at the highest rate permitted by law, attorney fees, and for such other and further relief, both at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,
**THE LAW OFFICES OF ERNESTO D. SIGMON**

**/s/ Ernesto D. Sigmon**
**ERNESTO D. SIGMON**
State Bar No. 24010397
5872 Old Jacksonville Highway Suite 624
Tyler, Texas 75703
214/395-1546 (Telephone)
903/944-7496 (Facsimile)

**ATTORNEY FOR PLAINTIFFS**

**PLAINTIFFS' SIXTH AMENDED PETITION** 8
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx

APPENDIX 22

Page 90

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record on the 11th day of November 2014 as follows:

**VIA EMAIL**
Mr. Trey Yarbrough
Yarbrough Wilcox, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
FAX: 903.595.0191

**ATTORNEYS FOR DEFENDANT**
**TEXAS COLLEGE**

**VIA EMAIL**
Wesson H. Tribble
Dan McManus
Tribble, Ross & Wagner
3355 West Alabama Street, Suite 1200
Houston, Texas 77098

**ATTORNEYS FOR DEFENDANT**
**CHRISTIAN METHODIST EPISCOPAL CHURCH**

**VIA EMAIL**
Ryan K. Geddie
Martin, Disiere, Jefferson & Wisdom, LLP
Tollway Plaza One
16000 N. Dallas Parkway, Suite 800
Dallas, Texas | 75248
Phone: (214) 420-5500 | Fax: (214) 420-5501

**ATTORNEYS FOR DEFENDANT**
**MPF INVESTMENTS LLC D/B/A "A1 – RENT ALL"**

/s/ **Ernesto D. Sigmon**
Ernesto D. Sigmon

**PLAINTIFFS' SIXTH AMENDED PETITION**                                      9
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Sixth Amended Petition .docx

APPENDIX 23

Page 91

Electronically Filed
12/2/2014 4 08 24 PM
Lois Rogers, Smith County District Clerk
Reviewed By Lana Fields

## CAUSE NO.13-3353-A

| | | |
|---|---|---|
| **GARRY L. ROLLINS and** | ' | **IN THE DISTRICT COURT** |
| **CARLA D. ROLLINS** | ' | |
| | ' | |
| **Plaintiffs,** | ' | |
| | ' | |
| **Vs.** | ' | **SMITH COUNTY, TEXAS** |
| | ' | |
| **TEXAS COLLEGE;** | ' | |
| **CHRISTIAN METHODIST EPISCOPAL** | ' | |
| **CHURCH and** | ' | |
| **MPF INVESTMENTS, LLC D/B/A** | ' | |
| **"A-1 RENT ALL"** | ' | |
| **Defendants,** | ' | **7th JUDICIAL DISTRICT** |

---

## PLAINTIFFS' SEVENTH AMENDED ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW PLAINTIFFS, Garry L. Rollins and Carla D. Rollins ("Plaintiffs"), complaining of Texas College ("TC"); Christian Methodist Episcopal Church ("CME") and MPF Investments, LLC d/b/a A-1 Rent All ("A-1") (collectively "Defendants") and file this Seventh Amended Original Petition:

### DISCOVERY CONTROL PLAN LEVEL

1. Discovery is being conducted under Level 2 of the Discovery Control Plan pursuant to Texas Rule of Civil Procedure 190.3.

### PARTIES AND SERVICE

2. Plaintiffs Garry L. Rollins and Carla D. Rollins are individuals residing in Dallas County, Texas.

---

**PLAINTIFFS' SEVENTH AMENDED PETITION** 1

Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx

APPENDIX 24

3. Defendant TC is a Texas Nonprofit corporation with its principal office in Smith County, Texas and has been served with process through its registered agent Dwight J. Fennell Sr. at 2404 North Grand Avenue Tyler, Texas 75702-1962. TC has answered in this matter through its attorney of record.

4. Defendant CME is a foreign nonprofit corporation organized under the laws of the state of Tennessee and was served with process at its principal place of business at 4466 Elvis Presley Blvd, Suite 300 Memphis, Tennessee 38116-7181. CME has answered in this matter through its attorney of record.

5. Defendant MPF Investments, LLC d/b/a A-1 Rent All ("A-1" or "MPF") is a Texas limited liability company with its principal office at 2505 S Southeast Loop 323 Tyler, Texas 75701. A-1 has answered in this matter through its attorney of record.

## CLAIM FOR RELIEF

6. Plaintiffs seek monetary relief in an amount over $1,000,000 but not to exceed $25,000,000. Plaintiffs also demand judgment for all other relief to which they may be entitled as a result of the harms and losses made the basis of this lawsuit. *See* Tex.R.Civ.P. 47(d).

## VENUE

7. Smith County, Texas is a county of proper venue for this suit in accordance with Texas Civil Practice and Remedies Code Sections 15.001 and 15.002 et. seq. All or a substantial part of the events or omissions giving rise to this cause of action occurred in Smith County, Texas.

## AGENCY

8. At all times material hereto, Defendants acted by and through actual, apparent, ostensible, or by estoppel agents, acting within the course and scope of such agency.

**PLAINTIFFS' SEVENTH AMENDED PETITION** 2
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx
APPENDIX 25

Page 93

**FACTS**

9.     Garry L. Rollins (hereinafter "Rollins") is a maintenance worker employed by Texas College in the capacity of maintenance technician.  Texas College itself operates under the "supervision, care and ownership" of CME and has rented heavy equipment "aerial work platforms" from A-1 on various occasions.

10.     Rollins' formal work title was "Maintenance Technician".  His office was in the TC Physical Plant (the "Plant").     Rollins reported to Roland Brackens, the Plant Superintendent, and to James Harris, Vice President of Business and Finance at TC. Rollins also supervised a three to four person maintenance crew.  Rollins' overall responsibility at TC included general maintenance, light construction, driving detail and essentially anything else the school required.  He was hired to work at TC in 2008.

11.     During September 2013, Rollins was asked by his supervisor to help move some marble counter tops that were to be installed in the school's Science building.  The slabs of marble themselves weighed anywhere from 150-185 pounds.  TC asked Mr. Rollins and one other worker to perform the task with no other assistance—man nor machine.  While moving the slab, Mr. Rollins sneezed/coughed, dropped the object and suffered a momentary loss of consciousness.  On or around September 9, 2013 Rollins sought emergency medical care because of the incident and was advised not to drive. Rollins informed agents and employees of TC of his restriction and was subsequently removed from a TC driving task that he had been performing on Tuesdays and Thursdays.  Upon information and belief, Mr. Brackens or Mr. Harris removed Rollins from the task.

PLAINTIFFS' SEVENTH AMENDED PETITION                                                                                    3
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx
APPENDIX 26

Page 94

12. A few weeks later, sometime during October 2013, the gymnasium ceiling at TC needed repair. TC rented a hydraulic "scissor lift" (the "Lift") from defendant A-1 for Plaintiff Rollins and others to use while doing the repairs.

13. The Lift is capable of reaching upwards of approximately 20 feet from the ground and is often accompanied by a safety harness to prevent worker injury. TC did not rent or purchase a harness for use with the Lift, nor did it purchase or rent any other personal protective equipment needed to ensure worker safety. Upon information and belief, A-1 did not offer or suggest that TC purchase or rent personal protective equipment for use with the Lift nor did it adequately confirm whether TC or its agents were "qualified personnel" with the training and experience needed to safely operate the Lift. Upon information and belief, A-1 did not familiarize Rollins with the Lift and its operation nor did they offer to train Rollins. Rollins' immediate supervisor, Mr. Brackens did not check or confirm whether A-1 Rent All included an owner/operator manual with the Lift as required by its manufacturer, JLG.

14. On or around October 22, 2013 TC directed Rollins and others to use the Lift "as is" to make the repairs—minus training or supervision. After completing the work, Rollins fell from the Lift as he was attempting to exit to safety. He immediately reported the incident to the TC human resources department as required. At the time, Rollins assumed his fall had been relatively inconsequential as he was able to walk away unassisted.

15. Three days later, on or around October 25, 2013, Rollins lost sensation in his legs and toes and was subsequently admitted to Zale Lipshy University Hospital in Dallas Texas where he underwent invasive neck surgery.

**PLAINTIFFS' SEVENTH AMENDED PETITION**                                                                 4
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx
APPENDIX 27

Page 95

16. Rollins is now convalescing at home, unable to walk unassisted and requires intensive at home physical therapy and care three times a week. He is no longer able to perform many of the household tasks he once did to assist his wife Carla with the maintenance and care of their home.

17. On or around December 6, 2013 Rollins received correspondence from TC advising him that he would be terminated if he does not return to work within 3 months.

## CAUSES OF ACTION

### TEXAS COLLEGE - NEGLIGENCE AND GROSS NEGLIGENCE

18. Texas College was Rollins' employer at the time of his avoidable injury and owed him a special duty of care at law. Texas College is a non-subscriber to Texas Worker's Compensation and does not carry any sort of insurance for work related injury. Defendant Texas College breached its duty of care to Rollins. Its breach includes and is not limited to Defendant's failure to: 1) provide a reasonably safe workplace; 2) furnish reasonably safe machinery or reasonably safe personal protective equipment for use with the Lift and for use in lifting the marble slab counter top; 3) provide adequate help in the performance of work; 4) train and/or properly supervise Plaintiff Garry Rollins while using the Lift and lifting the marble slab counter top; and 5) to ensure that Plaintiff Garry Rollins was fit to perform work on a scissor lift. The foregoing acts and omissions by TC constitute negligence and gross negligence.

### CHRISTIAN METHODIST EPISCOPAL CHURCH – VICARIOUS LIABILITY, ALTER EGO, NEGLIGENCE AND GROSS NEGLIGENCE

19. During the time of Plaintiff Rollins' avoidable injury, Defendant CME represented to the public through documents on file with the Texas Secretary of State that TC operates under the "supervision, care and ownership" of CME. CME has and continues

**PLAINTIFFS' SEVENTH AMENDED PETITION** 5
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx

APPENDIX 28

Page 96

to represent to the general public that TC is one of its "affiliate" educational institutions, of which there are several. CME makes extensive reference to TC throughout its internal documentation and by-laws, and the role it plays in establishing TC policies and procedures. CME also has a significant "financial relationship" with TC that has been reported to the IRS.

20. TC acted as CME's agent at all times relevant to the facts made the basis of this lawsuit. CME is therefore liable for the torts of its agent as alleged and described herein and above and as recognized by the laws of Texas and the Restatement (2d) of Torts.

21. Plaintiffs further allege that CME exercises a measure of control over TC so as to qualify it as CME's "alter-ego" functioning as CME's mere tool or business conduit. CME has engaged in financial transactions pledging and leveraging Texas College assets; and controls the school through an elected body of officials composed predominately of CME officers and bishops acting on behalf of the CME—retaining for itself the power to merge, consolidate, convey, or terminate Texas College as it deems fit. The official bylaws of Texas College mandate that upon dissolution, the school's assets will revert back to CME. The elected body of officials (referenced *supra)* acts through various "committees", one of which established policies and procedures at the Texas College physical plant where Garry Rollins was employed for several years. These policies and procedures impacted employee training and employee safety at Texas College.

22. CME owed Plaintiffs a duty to exercise reasonable care to avoid a foreseeable risk of injury to others. CME also owed Plaintiffs a duty to exercise reasonable care in performing services, whether gratuitously or for consideration that CME should recognize as necessary for the protection of other persons or things.

**PLAINTIFFS' SEVENTH AMENDED PETITION** 6
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx
APPENDIX 29

Page 97

23. CME breached its duties by failing to exercise reasonable care to secure Mr. Rollins' safety while employed at TC and in doing so significantly increased his risk of harm. This breach makes CME liable to Plaintiffs vicariously and directly. The foregoing acts and omissions by CME constitute negligence and gross negligence.

## MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL" – NEGLIGENCE, NEGLIGENT ENTRUSTMENT AND GROSS NEGLIGENCE

24. MPF owed Plaintiffs a duty to exercise reasonable care to avoid a foreseeable risk of injury to others as well as a duty to take affirmative action to avoid increasing the danger from a condition created by its conduct. Defendant MPF breached its duty of care to Plaintiffs. MPF's breach includes and is not limited to its failure to ensure that the Lift was being rented and used by competent and authorized persons; and to act reasonably and prudently in all manners regarding its rental transaction with TC and the steps it should have taken to prevent the readily foreseeable harm that the Lift could cause subsequent users who were either unfit, untrained or incompetent to operate it. The foregoing acts and omissions by MPF constitute negligence, negligent entrustment and gross negligence.

## DAMAGES TO PLAINTIFFS

25. Defendants' combined negligence has proximately caused damage to Plaintiffs in an amount that exceeds the jurisdictional limits of this Court for which Plaintiffs pray judgment.

26. As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff Garry L. Rollins has sustained damages in an amount in excess of the minimum jurisdictional limits of this Court. Such damages include, but are not limited to: physical pain (past and future), physical impairment (past and future), medical expenses (past

APPENDIX 30

and future), loss of earning capacity (past and future), disfigurement (present and future), loss of income (past and future), emotional distress (past and future), and mental anguish (past and future).

27.    As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff Carla D. Rollins (Garry's spouse) has sustained special damages in an amount in excess of the minimum jurisdictional limits of this Court. Carla's special damages include, but are not limited to: loss of consortium (past and future) and loss of household services (past and future).

## EXEMPLARY DAMAGES[1]

28.    Plaintiffs further allege that Defendants' acts and omissions, whether taken singularly or in combination, were aggravated by the kind of malice and reckless disregard for which the law allows the imposition of exemplary damages. TC's conduct amounts to gross negligence as defined by the laws of Texas. CME's conduct amounts to gross negligence as by the laws of Texas. CME is either directly liable for exemplary damages because of its conduct or liable because of its agent's acts. MPF's conduct amounts to gross negligence as defined by the laws of Texas. In light of the foregoing, Plaintiffs seek such exemplary damages against each defendant named herein in an amount that exceeds the minimum jurisdictional threshold of the Court.

---

[1] Exemplary damages are considered special damages and must be specially pleaded (as they are here in Plaintiffs' Seventh Amended Petition). *See Al Parker Buick Co. v. Touchy*, 788 S.W.2d 129, 130 (Tex.App.—Houston [1ˢᵗ Dist.] 1990, orig. proceeding); *Wright v. Rosenbaum*, 344 S.W.2d 228, 231 (TexApp.—Houston 1961, no writ)(issue on exemplary damages properly excluded because P did not plead for exemplary damages). The proportionate responsibility chapter of the Texas Civil Practice & Remedies Code does not apply to claims for exemplary damages and in cases with multiple defendants, the defendants cannot be held jointly and severally liable for exemplary damages. *See* Tex.Civ.Prac. & Rem. Code sec.41.006. The fact-finder must specify the amount of exemplary damages assessed against each defendant. *See Fairfield Ins. V. Stephens Martin Paving, LP*, 246 S.W.3d 653, 667 (Tex. 2008). Nowhere in CME's Special Exceptions to P's Sixth Amended Petition does it state legal authority supporting its objection to the manner in which Plaintiffs' have specially pled for exemplary damages.

**PLAINTIFFS' SEVENTH AMENDED PETITION**                                                                                8
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx

APPENDIX 31

Page 99

## JURY DEMAND

29.     Plaintiffs request that a jury be convened to try the fact issues in this action. A jury fee has been tendered and accepted by the Smith County District Clerk.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final jury trial, that Plaintiffs be awarded damages which are set forth above and which are in the sum in excess of the minimum jurisdictional limits of this Court, costs of court, prejudgment interest at the highest rate permitted by law, post-judgment interest from the date of judgment until paid at the highest rate permitted by law, attorney fees, and for such other and further relief, both at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,
**THE LAW OFFICES OF ERNESTO D. SIGMON**

**/s/ Ernesto D. Sigmon**
**ERNESTO D. SIGMON**
State Bar No. 24010397
5872 Old Jacksonville Highway Suite 624
Tyler, Texas 75703
214/395-1546 (Telephone)
903/944-7496 (Facsimile)

**ATTORNEY FOR PLAINTIFFS**

APPENDIX 32

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record on the 2nd day of December 2014 as follows:

**VIA EMAIL**
Mr. Trey Yarbrough
Yarbrough Wilcox, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
FAX: 903.595.0191

**ATTORNEYS FOR DEFENDANT**
**TEXAS COLLEGE**

**VIA EMAIL**
Wesson H. Tribble
Dan McManus
Tribble, Ross & Wagner
3355 West Alabama Street, Suite 1200
Houston, Texas 77098

**ATTORNEYS FOR DEFENDANT**
**CHRISTIAN METHODIST EPISCOPAL CHURCH**

**VIA EMAIL**
Ryan K. Geddie
Martin, Disiere, Jefferson & Wisdom, LLP
Tollway Plaza One
16000 N. Dallas Parkway, Suite 800
Dallas, Texas | 75248
Phone: (214) 420-5500 | Fax: (214) 420-5501

**ATTORNEYS FOR DEFENDANT**
**MPF INVESTMENTS LLC D/B/A "A1 – RENT ALL"**

/s/ **Ernesto D. Sigmon**
Ernesto D. Sigmon

**PLAINTIFFS' SEVENTH AMENDED PETITION**                                    10
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Seventh Amended Petition .docx

APPENDIX 33

Page 101

Electronically Filed
1/19/2015 10 03 49 AM
Lois Rogers, Smith County District Clerk
Reviewed By Lana Fields

## CAUSE NO.13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS and<br>CARLA D. ROLLINS | ' | IN THE DISTRICT COURT |
| | ' | |
| Plaintiffs, | ' | |
| | ' | |
| Vs. | ' | SMITH COUNTY, TEXAS |
| | ' | |
| TEXAS COLLEGE and<br>MPF INVESTMENTS, LLC D/B/A<br>"A-1 RENT ALL" | ' | |
| | ' | |
| Defendants, | ' | 7th JUDICIAL DISTRICT |

## PLAINTIFFS' EIGHTH AMENDED ORIGINAL PETITION

TO THE HONORABLE JUDGE OF THE COURT:

COMES NOW PLAINTIFFS, Garry L. Rollins and Carla D. Rollins ("Plaintiffs"), complaining of Texas College ("TC") and MPF Investments, LLC d/b/a A-1 Rent All ("A-1") (collectively "Defendants") and file this Eighth Amended Original Petition:

### DISCOVERY CONTROL PLAN LEVEL

1. Discovery is being conducted under Level 2 of the Discovery Control Plan pursuant to Texas Rule of Civil Procedure 190.3.

### PARTIES AND SERVICE

2. Plaintiffs Garry L. Rollins and Carla D. Rollins are individuals residing in Dallas County, Texas.

3. Defendant TC is a Texas Nonprofit corporation with its principal office in Smith County, Texas and has been served with process through its registered agent Dwight J.

**PLAINTIFFS' EIGHTH AMENDED PETITION** 1
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 34

Page 498

Fennell Sr. at 2404 North Grand Avenue Tyler, Texas 75702-1962. TC has answered in this matter through its attorney of record.

4. Defendant MPF Investments, LLC d/b/a A-1 Rent All ("A-1" or "MPF") is a Texas limited liability company with its principal office at 2505 S Southeast Loop 323 Tyler, Texas 75701. A-1 has answered in this matter through its attorney of record.

## CLAIM FOR RELIEF

5. Plaintiffs seek monetary relief in an amount over $1,000,000. Plaintiffs also demand judgment for all other relief to which they may be entitled as a result of the harms and losses made the basis of this lawsuit. *See* Tex.R.Civ.P. 47(d).

## VENUE

6. Smith County, Texas is a county of proper venue for this suit in accordance with Texas Civil Practice and Remedies Code Sections 15.001 and 15.002 et. seq. All or a substantial part of the events or omissions giving rise to this cause of action occurred in Smith County, Texas.

## AGENCY

7. At all times material hereto, Defendants acted by and through actual, apparent, ostensible, or by estoppel agents, acting within the course and scope of such agency.

## FACTS

8. Garry L. Rollins (hereinafter "Rollins") is a maintenance worker employed by Texas College in the capacity of maintenance technician. Texas College has rented heavy equipment "aerial work platforms" from A-1 on various occasions.

9. Rollins' formal work title was "Maintenance Technician". His office was in the TC Physical Plant (the "Plant"). Rollins reported to Roland Brackens, the Plant Superintendent, and to James Harris, Vice President of Business and Finance at TC.

**PLAINTIFFS' EIGHTH AMENDED PETITION** 2
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 35

Page 499

Rollins also supervised a three to four person maintenance crew. Rollins' overall responsibility at TC included general maintenance, light construction, driving detail and essentially anything else the school required. He was hired to work at TC in 2008.

10. During September 2013, Rollins was asked by his supervisor to help move some marble counter tops that were to be installed in the school's Science building. The slabs of marble themselves weighed anywhere from 150-185 pounds. TC asked Mr. Rollins and one other worker to perform the task with no other assistance—man nor machine. While moving the slab, Mr. Rollins sneezed/coughed, dropped the object and suffered a momentary loss of consciousness. On or around September 9, 2013 Rollins sought emergency medical care because of the incident and was advised not to drive. Rollins informed agents and employees of TC of his restriction and was subsequently removed from a TC driving task that he had been performing on Tuesdays and Thursdays. Upon information and belief, Mr. Brackens or Mr. Harris removed Rollins from the task.

11. A few weeks later, sometime during October 2013, the gymnasium ceiling at TC needed repair. TC rented a hydraulic "scissor lift" (the "Lift") from defendant A-1 for Plaintiff Rollins and others to use while doing the repairs.

12. The Lift is capable of reaching upwards of approximately 20 feet from the ground and is often accompanied by a safety harness to prevent worker injury. TC did not rent or purchase a harness for use with the Lift, nor did it purchase or rent any other personal protective equipment needed to ensure worker safety. A-1 did not offer or suggest that TC purchase or rent personal protective equipment for use with the Lift nor did it adequately confirm whether TC or its agents were "qualified personnel" with the training and experience needed to safely operate the Lift. A-1 did not familiarize Rollins

**PLAINTIFFS' EIGHTH AMENDED PETITION** 3
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 36

Page 500

with the Lift and its operation nor did it offer to train Rollins. A-1 Rent All did not include an owner/operator manual with the Lift as required by the manufacturer, JLG.

13. On or around October 22, 2013 TC directed Rollins and others to use the Lift "as is" to make the repairs—minus training or supervision. After completing the work, Rollins fell from the Lift as he was attempting to exit to safety. He immediately reported the incident to the TC human resources department as required. TC did not formally investigate the incident nor did it report Mr. Rollins' workplace fall to OSHA. At the time, Rollins assumed his fall had been relatively inconsequential as he was able to walk away unassisted.

14. Three days later, on or around October 25, 2013, Rollins lost sensation in his legs and toes and was subsequently admitted to Zale Lipshy University Hospital in Dallas Texas where he underwent invasive neck surgery.

15. Rollins is now convalescing at home, unable to walk unassisted and requires intensive at home physical therapy and care three times a week. He is no longer able to perform many of the household tasks he once did to assist his wife Carla with the maintenance and care of their home.

16. On or around December 6, 2013 Rollins received correspondence from TC advising him that he would be terminated if he does not return to work within 3 months.

## CAUSES OF ACTION

### TEXAS COLLEGE - NEGLIGENCE AND GROSS NEGLIGENCE

17. Texas College was Rollins' employer at the time of his avoidable injury and owed him a special duty of care at law. Texas College is a non-subscriber to Texas Worker's Compensation and does not carry any sort of insurance for work related injury. Defendant Texas College breached its duty of care to Rollins. Its breach includes and

**PLAINTIFFS' EIGHTH AMENDED PETITION** 4
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 37

Page 501

is not limited to Defendant's failure to: 1) provide a reasonably safe workplace; 2) furnish reasonably safe machinery or reasonably safe personal protective equipment for use with the Lift and for use in lifting the marble slab counter top; 3) provide adequate help in the performance of work; 4) train and/or properly supervise Plaintiff Garry Rollins while using the Lift and lifting the marble slab counter top; and 5) to ensure that Plaintiff Garry Rollins was fit to perform work on a scissor lift. The foregoing acts and omissions by TC are violations of the Texas Labor Code (Chapter 411 et. seq.), the common laws of Texas, and various other rules and regulations pertaining to worker safety. As such, TC's conduct with respect to Garry Rollins constitutes negligence and gross negligence.

## MPF INVESTMENTS, LLC D/B/A "A-1 RENT ALL" – NEGLIGENCE AND GROSS NEGLIGENCE

18.     MPF owed Plaintiffs a duty to exercise reasonable care to avoid a foreseeable risk of injury to others as well as a duty to take affirmative action to avoid increasing the danger from a condition created by its conduct. Defendant MPF breached its duty of care to Plaintiffs. MPF's breach includes and is not limited to its failure to: 1) ensure that the Lift was being rented and used by competent and authorized persons; 2) deliver the Lift in "fit for service" condition prior to use; 3) offer training or familiarization with the Lift; and 4) to act as a reasonable and prudent renter of heavy machinery under the circumstances in all manners pertaining to the transaction with TC and the steps it should have taken to prevent the readily foreseeable harm that could result from unfit, untrained or incompetent operators using the Lift. The foregoing acts and omissions by MPF constitute negligence and gross negligence.

**PLAINTIFFS' EIGHTH AMENDED PETITION**                                                          5
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 38

Page 502

## DAMAGES TO PLAINTIFFS

19.     Defendants' combined negligence has proximately caused damage to Plaintiffs in an amount that exceeds the jurisdictional limits of this Court for which Plaintiffs pray judgment.

20.     As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff Garry L. Rollins has sustained damages in an amount in excess of the minimum jurisdictional limits of this Court.  Such damages include, but are not limited to: physical pain (past and future), physical impairment (past and future), medical expenses (past and future), loss of earning capacity (past and future), disfigurement (present and future), loss of income (past and future), emotional distress (past and future), and mental anguish (past and future).

21.     As a direct and proximate result of the occurrence made the basis of this lawsuit, Plaintiff Carla D. Rollins (Garry's spouse) has sustained special damages in an amount in excess of the minimum jurisdictional limits of this Court.  Carla's special damages include, but are not limited to: loss of consortium (past and future) and loss of household services (past and future).

## EXEMPLARY DAMAGES[1]

22.     Plaintiffs further allege that Defendants' acts and omissions, whether taken singularly or in combination, were aggravated by the kind of malice and reckless

---

[1] Exemplary damages are considered special damages and must be specially pleaded (as they are here in Plaintiffs' Eighth Amended Petition).  *See Al Parker Buick Co. v. Touchy*, 788 S.W.2d 129, 130 (Tex.App.—Houston [1st Dist.] 1990, orig. proceeding); *Wright v. Rosenbaum*, 344 S.W.2d 228, 231 (TexApp.—Houston 1961, no writ)(issue on exemplary damages properly excluded because P did not plead for exemplary damages).  The proportionate responsibility chapter of the Texas Civil Practice & Remedies Code does not apply to claims for exemplary damages and in cases with multiple defendants, the defendants cannot be held jointly and severally liable for exemplary damages. *See* Tex.Civ.Prac. & Rem. Code sec.41.006. The fact-finder must specify the amount of exemplary damages assessed against each defendant. *See Fairfield Ins. V. Stephens Martin Paving, LP*, 246 S.W.3d 653, 667 (Tex. 2008).

APPENDIX 39

disregard for which the law allows the imposition of exemplary damages. TC's conduct amounts to gross negligence as defined by the laws of Texas. MPF's conduct amounts to gross negligence as defined by the laws of Texas. In light of the foregoing, Plaintiffs seek such exemplary damages against each defendant named herein in an amount that exceeds the minimum jurisdictional threshold of the Court.

## JURY DEMAND

23.    Plaintiffs request that a jury be convened to try the fact issues in this action. A jury fee has been tendered and accepted by the Smith County District Clerk.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein, and that upon final jury trial, that Plaintiffs be awarded damages which are set forth above and which are in the sum in excess of the minimum jurisdictional limits of this Court, costs of court, prejudgment interest at the highest rate permitted by law, post-judgment interest from the date of judgment until paid at the highest rate permitted by law, attorney fees, and for such other and further relief, both at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,
**THE LAW OFFICES OF ERNESTO D. SIGMON**

**/s/ Ernesto D. Sigmon**
**ERNESTO D. SIGMON**
State Bar No. 24010397
416 West Saulnier Street
Houston, Texas 77019
214/395-1546 (Telephone)
713/485-6056 (Facsimile)

**ATTORNEY FOR PLAINTIFFS**

**PLAINTIFFS' EIGHTH AMENDED PETITION**                                                                 7
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 40

Page 504

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record on the 19th day of January 2015 as follows:

**VIA EMAIL**
Mr. Trey Yarbrough
Yarbrough Wilcox, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702
FAX: 903.595.0191

**ATTORNEYS FOR DEFENDANT**
**TEXAS COLLEGE**

**VIA EMAIL**
Ryan K. Geddie
Martin, Disiere, Jefferson & Wisdom, LLP
Tollway Plaza One
16000 N. Dallas Parkway, Suite 800
Dallas, Texas 75248
Phone: (214) 420-5500 | Fax: (214) 420-5501

**ATTORNEYS FOR DEFENDANT**
**MPF INVESTMENTS LLC D/B/A "A1 – RENT ALL"**

/s/ Ernesto D. Sigmon
Ernesto D. Sigmon

**PLAINTIFFS' EIGHTH AMENDED PETITION** 8
Macintosh HD:Users:esigmon:Documents:CASES:Rollins-001:Pleadings:Rollins Eighth Amended Petition .docx

APPENDIX 41

Page 505

<u>AFFIDAVIT OF GARRY L. ROLLINS</u>

STATE OF TEXAS        §
DALLAS COUNTY      §

Before me, the undersigned notary, on this day personally appeared **Garry L. Rollins**, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

1. "My name is Garry L. Rollins. I am over 18 years of age, of sound mind, and capable of making this affidavit. The entire facts stated in this affidavit are within my personal knowledge and personal experience and are true and correct."

2. "I gave sworn testimony in this case at my deposition on July 7, 2014. I am a former employee of Texas College in Tyler, Texas. I worked at Texas College as a Maintenance Tech and Supervisor for about six years. I was injured on the job at Texas College on two occasions: During early September 2013 and on October 22, 2013. Roland Brackens was my immediate supervisor during the times I was injured at Texas College. Mr. Brackens owns a company by the name of RBHR that does contract work for Texas College. Mr. Brackens' company did work for Texas College while he was also employed there as Superintendent of the Physical Plant even though it violates the school's Conflict of Interest policy. Mr. Brackens, through RBHR, attempted to get a contract from the school to move several large marble slab counter tops in the Science Building but was unsuccessful and did not get the work because of the price he was quoting. As a result, the work went undone for a time. The school administration became frustrated with Mr. Brackens that the work had not been completed. On the day I got hurt, Mr. Brackens instructed me and another employee to move the counter tops. I informed Mr. Brackens that these counters were pure marble and extremely heavy (at least 150 lbs.) and asked if he would be providing back braces to make the work safer. I am in my mid fifties, and am not as strong as I was when younger, and have suffered previous work related injuries to my hand, knees and neck. Texas College and Mr. Brackens were aware of these injuries as I have been to the doctor on several occasions and given the Human Resources department my medical excuses over the years. The medical excuses attached to my affidavit as "Exhibit A" are the excuses that I received personally from my doctors and that I gave to Texas College. Mr. Brackens indicated that he would provide this

<span style="color:red">APPENDIX 42</span>

help but never did so. Myself and other Plant employees had requested equipment necessary for safer work conditions before like hard hats and boots, but Texas College never provided any. Moving marble slabs like this was not part of my normal work duties. We were not trained or instructed on proper lifting techniques or given any direction for performing a safe lift of this size. Mr. Brackens left for vacation instructing us that the counters should be moved by the time he returned. I struggled with the weight during the move; the marble slabs were awkward to handle and I had difficulty positioning myself under the weight. I coughed/sneezed while lifting the marble, dropped it and briefly passed out. I injured my back and begin experiencing pain and tingling from the neck down. The next day, September 9, 2013, I went to the doctor and was diagnosed with experiencing blackouts in addition to full body pain. I was also instructed by the doctor to avoid driving. The doctor's note and record attached to my affidavit as Exhibit B was the note that I received from the doctor at Baylor. I informed Mr. Harris, Roland Brackens' boss, and later Mr. Brackens himself that I had injured myself, and was now having dizziness and blackout spells. I also produced a Doctor note to prove that I had been to the hospital. Mr. Harris and Mr. Brackens then removed me from a driving duty I had been performing for some time at Texas College where I would drive students from Dallas to Tyler to attend classes. Mr. Harris and Mr. Brackens removed me from the driving job because they didn't want to endanger students if I was to blackout while behind the wheel.

3. During this time, I also began to experience problems getting along with Mr. Brackens. At times I questioned Mr. Brackens leadership ability and competence. He did not like that. Over the course of the next several weeks in September and into October, Mr. Brackens began having me perform maintenance and repair jobs that were at times degrading and a little frightening. For example, on one occasion he insisted that I crawl underneath several buildings on campus to take photographs of the different buildings' foundation. I wasn't given a flashlight or anything to assist with crawling around hundreds of yards in the dark underneath buildings. Instead, I had to use my cell phone. After I completed the assignment, Mr. Brackens had me to go back under the buildings because he didn't like the quality of the photos I took. I refused to go a second time on account that I felt the work was

dangerous not being able to see in the dark and it made me very uncomfortable crawling around in tight spaces. Under Mr. Brackens authority at Texas College there was never an emphasis on safety or training for any of the work we were assigned. While under his supervision and leadership at Texas College, none of the employees were ever sent to any kind of safety training sessions or OSHA workshops. This kind of thing made me and other employees question the school's attitude toward our safety.

4. During October 2013, Mr. Brackens assigned me and my crew the job of fixing the gym ceiling in preparation for the Texas College homecoming celebration. Texas College rented a scissor lift from "A-1 Rent All" in Tyler, Texas for us to do the work at about 19-20 feet in the air. Dr. Fennell wanted the ceiling repaired and wanted it done immediately. Over the course of my professional career, I have done work on roofs and at heights but I have never operated a scissor lift (which is different from say a "boom" lift) and I have become leery of heights in my older age for fear of falling. I explained to Mr. Brackens that I did not know how to operate a scissor lift and that I was afraid of the height. Later that day, Mr. Harris called me to his office along with Ms. Bowie and informed me that Mr. Brackens had complained that I was an ongoing discipline problem and that I didn't want to do as told. Mr. Harris informed me that in order to keep my job I needed to get the ceiling fixed as directed.

5. I was present outside the gym when A-1 Rent All delivered the scissor lift to Texas College. I asked the delivery person if A-1 would bring the lift inside the gym and who was going to show us how to use it. The A-1 person informed me that he couldn't bring the lift indoors and that the folks at Texas College knew how to use the lift. A-1 did not offer us training nor did it familiarize us with the lift. The person from A-1 just came and delivered the machine and left.

6. I began doing the gym ceiling work with Michael Johnson on October 21, 2013 as directed by Mr. Brackens and Mr. Harris. We were not trained to be on the lift and we were not supervised. I was nervous the entire time I was up there. We also did not finish that day. I left a bit early that afternoon to attend a Doctor's appointment. The next morning, I arrived at work before Mr. Johnson and began

APPENDIX 44

trying to operate the lift to complete the repairs as instructed. When Mr. Johnson arrived I lowered the lift and brought him up. While in the air, Michael Johnson told me I didn't look good. He also testified to this fact in his deposition. I was present at his deposition. He was correct: I didn't feel right being that high up. Michael suggested that we come down and that I get off the lift. Once he brought the lift down, I went to exit and fell from the top of the platform flat on my back onto the gym floor. The top of the lift platform is still a good three feet off the ground when its all the way down, and I fell straight back with nothing breaking the fall. I don't remember taking the first step down. I wasn't wearing any safety harness and had not been given a hard hat. Michael Johnson was present and witnessed my fall and Steve Barron was also present in the gym when I fell. Michael Johnson has given a statement that it looked like I just "let go". His statement was provided to my lawyer in connection with this case and is attached to my affidavit as Exhibit C. I blacked out when trying to get off the lift. I lost consciousness momentarily and fell from the lift. When I opened my eyes I was on the floor. The stress of the work at that height had me disoriented and dizzy and I was already nervous being that high in the air. All I remember is turning around on the platform, gripping the handrails, and then being on my back. After my fall, I could not move at first and just lay still on the gym floor because I was a little embarrassed. Eventually, I rolled over and rose to my feet. Michael and Steve asked me if I was ok and I just kind of waved them off thinking that I was all right. Of course, I later ended up having to have major surgery because of my injury. My surgeon's letter to my lawyer describing my injury is attached to my affidavit as Exhibit D. I have reviewed this document with my lawyer and I am familiar with my surgeon's opinion. He provided the letter in connection with this case.

7. "I was afraid of working on that scissor lift in October because I didn't know how to operate it, hadn't been trained, and was fearful because of my injury and blackouts. I know personally that workers have been injured and killed because of scissor lifts. I would not have gotten on the lift if I had not been specifically instructed to do so by Mr. Brackens and later by Mr. Harris—both of whom had knowledge of my blackouts and medical history. The only reason I got on the lift is because I was told

to do so and was made to feel as though my job depended on it. I didn't want to do it. If Mr. Brackens had looked at the owner's manual and informed me that a person with blackouts shouldn't be on a lift, I would not have gotten on. Mr. Brackens however did not do this. He did not look at a safety manual, and if he did, he certainly did not inform or warn me that a person in my condition shouldn't be on a scissor lift. There was another instance at Texas College that I am personally familiar with where another employee was asked to do work that he was not trained to do and got hurt. That employee was later fired. I had never had any problems at Texas College in terms of my work and performance evaluations and only began having some difficulty when Mr. Brackens became Superintendent of the Physical Plant. Even then my work evaluations ranked me as either outstanding or very good."

_____
GARRY L. ROLLINS

Sworn to and subscribed before me by **Garry Rollins** on _____, 2015.

_____
Notary Public in and for
the State of Texas
My commission expires: 6/23/15

Lora Lee Averhart
Notary Public,
State of Texas
Comm. Exp. 06-23-15

## AFFIDAVIT OF GARRY L. ROLLINS

STATE OF TEXAS          §
DALLAS COUNTY          §

Before me, the undersigned notary, on this day personally appeared **Garry L. Rollins**, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

1. "My name is Garry L. Rollins. I am over 18 years of age, of sound mind, and capable of making this affidavit. The entire facts stated in this affidavit are within my personal knowledge and personal experience and are true and correct."

2. "I gave sworn testimony in this case at my deposition on July 7, 2014. I am a former employee of Texas College in Tyler, Texas. I worked at Texas College as a Maintenance Tech and Supervisor for about six years. I was injured on the job at Texas College on two occasions: During early September 2013 and on October 22, 2013. Roland Brackens was my immediate supervisor during the times I was injured at Texas College. ~~Mr. Brackens owns a company by the name of RDHR that does contract work for Texas College. Mr. Brackens' company did work for Texas College while he was also employed there as Superintendent of the Physical Plant even though it violates the school's Conflict of Interest policy. Mr. Brackens, through RDHR, attempted to get a contract from the school to move several large marble slab counter-tops in the Science Building but was unsuccessful and did not get the work because of the price he was quoting. As a result, the work went undone for a time. The school administration became frustrated with Mr. Brackens that the work had not been complete~~d. On the day I got hurt, Mr. Brackens instructed me and another employee to move the counter tops. I informed Mr. Brackens that these counters were pure marble and extremely heavy (at least 150 lbs.) and asked if he would be providing back braces to make the work safer. I am in my mid fifties, and am not as strong as I was when younger, and have suffered previous work related injuries to my hand, knees and neck. Texas College and Mr. Brackens were aware of these injuries as I have been to the doctor on several occasions and given the Human Resources department my medical excuses over the years. ~~The medical excuses attached to my affidavit as "Exhibit A" are the excuses that I received personally from my doctors and that I gave to Texas College~~. Mr. Brackens indicated that he would provide this

APPENDIX 47

help but never did so. Myself and other Plant employees had requested equipment necessary for safer work conditions before like hard hats and boots, but Texas College never provided any. Moving marble slabs like this was not part of my normal work duties. We were not trained or instructed on proper lifting techniques or given any direction for performing a safe lift of this size. Mr. Brackens left for vacation instructing us that the counters should be moved by the time he returned. I struggled with the weight during the move; the marble slabs were awkward to handle and I had difficulty positioning myself under the weight. I coughed/sneezed while lifting the marble, dropped it and briefly passed out. I injured my back and begin experiencing pain and tingling from the neck down. The next day, September 9, 2013, I went to the doctor ~~and was diagnosed with experiencing blackouts in addition to full body pain. I was also instructed by the doctor to avoid driving. The doctor's note and record attached to my affidavit as Exhibit B was the note that I received from the doctor at Baylor.~~ I informed Mr. Harris, Roland Brackens' boss, and later Mr. Brackens himself that I had injured myself, and was now having dizziness and blackout spells. I also produced a Doctor note to prove that I had been to the hospital. ~~Mr. Harris and Mr. Brackens then removed me from a driving duty~~ I had been performing for some time at Texas College where I would drive students from Dallas to Tyler to attend classes. ~~Mr. Harris and Mr. Brackens removed me from the driving job because they didn't want to endanger students if I was to blackout while behind the wheel.~~

3. During this time, I also began to experience problems getting along with Mr. Brackens. At times I questioned Mr. Brackens leadership ability and competence. He did not like that. Over the course of the next several weeks in September and into October, Mr. Brackens began having me perform maintenance and repair jobs that were at times degrading and a little frightening. For example, on one occasion he insisted that I crawl underneath several buildings on campus to take photographs of the different buildings' foundation. I wasn't given a flashlight or anything to assist with crawling around hundreds of yards in the dark underneath buildings. Instead, I had to use my cell phone. After I completed the assignment, Mr. Brackens had me to go back under the buildings because he didn't like the quality of the photos I took. I refused to go a second time on account that I felt the work was

APPENDIX 48

dangerous not being able to see in the dark and it made me very uncomfortable crawling around in tight spaces. ~~Under Mr. Brackens authority at Texas College there was never an emphasis on safety or training for any of the work we were assigned. While under his supervision and leadership at Texas College, none of the employees were ever sent to any kind of safety training sessions or OSHA workshops.~~ This kind of thing made me and other employees question the school's attitude toward our safety.

4. During October 2013, Mr. Brackens assigned me and my crew the job of fixing the gym ceiling in preparation for the Texas College homecoming celebration. Texas College rented a scissor lift from "A-1 Rent All" in Tyler, Texas for us to do the work at about 19-20 feet in the air. Dr. Fennell wanted the ceiling repaired and wanted it done immediately. Over the course of my professional career, I have done work on roofs and at heights but I have never operated a scissor lift (which is different from say a "boom" lift) and I have become leery of heights in my older age for fear of falling. I explained to Mr. Brackens that I did not know how to operate a scissor lift and that I was afraid of the height. Later that day, Mr. Harris called me to his office along with Ms. Bowie and informed me that Mr. Brackens had complained that I was an ongoing discipline problem and that I didn't want to do as told. Mr. Harris informed me that in order to keep my job I needed to get the ceiling fixed as directed.

5. I was present outside the gym when A-1 Rent All delivered the scissor lift to Texas College. I asked the delivery person if A-1 would bring the lift inside the gym and who was going to show us how to use it. The A-1 person informed me that he couldn't bring the lift indoors and that the folks at Texas College knew how to use the lift. A-1 did not offer us training nor did it familiarize us with the lift. The person from A-1 just came and delivered the machine and left.

6. I began doing the gym ceiling work with Michael Johnson on October 21, 2013 as directed by Mr. Brackens and Mr. Harris. ~~We were not trained to be on the lift~~ and we were not supervised. I was nervous the entire time I was up there. We also did not finish that day. I left a bit early that afternoon to attend a Doctor's appointment. The next morning, I arrived at work before Mr. Johnson and began

APPENDIX 49

trying to operate the lift to complete the repairs as instructed. When Mr. Johnson arrived I lowered the lift and brought him up. While in the air, Michael Johnson told me I didn't look good. He also testified to this fact in his deposition. I was present at his deposition. He was correct: I didn't feel right being that high up. Michael suggested that we come down and that I get off the lift. Once he brought the lift down, I went to exit and fell from the top of the platform flat on my back onto the gym floor. The top of the lift platform is still a good three feet off the ground when its all the way down, and I fell straight back with nothing breaking the fall. I don't remember taking the first step down. I wasn't wearing any safety harness and had not been given a hard hat. Michael Johnson was present and witnessed my fall and Steve Barron was also present in the gym when I fell. Michael Johnson has given a statement that it looked like I just "let go". His statement was provided to my lawyer in connection with this case and is attached to my affidavit as Exhibit C. ~~I blacked out when trying to get off the lift. I lost consciousness momentarily and fell from the lift.~~ When I opened my eyes I was on the floor. The stress of the work at that height had me disoriented and dizzy and I was already nervous being that high in the air. All I remember is turning around on the platform, gripping the handrails, and then being on my back. After my fall, I could not move at first and just lay still on the gym floor because I was a little embarrassed. Eventually, I rolled over and rose to my feet. Michael and Steve asked me if I was ok and I just kind of waved them off thinking that I was all right. Of course, I later ended up having to have major surgery ~~because of my injury. My surgeon's letter to my lawyer describing my injury is attached to my affidavit as Exhibit D. I have reviewed this document with my lawyer and I am familiar with my surgeon's opinion. He provided the letter in connection with this case.~~

7. "I was afraid of working on that scissor lift in October because I didn't know how to operate it, hadn't been trained, and was fearful because of my injury and blackouts. ~~I know personally that workers have been injured and killed because of scissor lifts.~~ I would not have gotten on the lift if I had not been specifically instructed to do so by Mr. Brackens and later by Mr. Harris ~~both of whom had knowledge of my blackouts and medical history~~. The only reason I got on the lift is because I was told

to do so and was made to feel as though my job depended on it. I didn't want to do it. If Mr. Brackens had looked at the owner's manual and informed me that a person with blackouts shouldn't be on a lift, I would not have gotten on. Mr. Brackens however did not do this. He did not look at a safety manual, and if he did, he certainly did not inform or warn me that a person in my condition shouldn't be on a scissor lift. ~~There was another instance at Texas College that I am personally familiar with where another employee was asked to do work that he was not trained to do and got hurt. That employee was later fired.~~ I had never had any problems at Texas College in terms of my work and performance evaluations and only began having some difficulty when Mr. Brackens became Superintendent of the Physical Plant. Even then my work evaluations ranked me as either outstanding or very good."

GARRY L. ROLLINS

Sworn to and subscribed before me by **Garry Rollins** on ___February 4___, 2015.

Notary Public in and for
the State of Texas
My commission expires: 6/23/15

Lora Lee Averhart
Notary Public,
State of Texas
Comm. Exp. 06-23-15



Samuel L. Barnett, M.D.
Associate Professor

Department of Neurological Surgery

July 18, 2014


Ernesto Sigmon
**WALKER SIGMON LAW, PLLC**
**Dallas | Tyler | Birmingham**
5872 Old Jacksonville Highway
Suite 624
Tyler, Texas 75703
P 214.395.1546
F 903.944.7496


Dear Mr. Sigmon,

As per your request, I have completed my review of Garry Rollins' medical records. Items reviewed include Emergency Room records dated 10/25/2013, inpatient medical records from 10/26/2013 - 11/11/2013 and 11/15/2013 - 11/20/2013 and an MRI scan of the cervical spine dated 10/25/2013. I personally saw and evaluated Mr. Rollins' on 11/15/2013, 11/25/2013, 12/3/2013, 12/16/2013, 12/30/2013, 1/13/2014, 2/17/2014, 3/17/2014, 5/19/2014 and 6/23/2014 and I have reviewed those records as well.

As an introduction, I am a neurological surgeon and associate professor in the Department of Neurological Surgery at The University of Texas Southwestern Medical Center at Dallas. My undergraduate training was done at Indiana University, Bloomington (1991-1995). I received my medical degree from the University of Cincinnati College of Medicine (1995-1999). My surgical internship was done at the University of Texas Southwestern Medical Center (1999-2000). I completed a neurosurgical residency at the University of Texas Southwestern Medical Center (2000-2005). I received fellowship training in skull base and cerebrovascular neurosurgery at the University of South Florida, Tampa (2005-2006). I was a faculty member at the University of Mississippi School of Medicine for one year (2006-2007) prior to returning to Dallas. Since that time, I have been a faculty member in the Department of Neurological Surgery at The University of Texas Southwestern Medical Center (2007-Present). I am a member of the hospital staffs at Zale Lipshy University Hospital, Parkland Memorial Hospital and the Dallas VA Medical Center. I am board certified by the American Board of Neurological Surgery and I am licensed to practice medicine in Texas and Mississippi. In my current practice, I regularly evaluate and manage patients with traumatic and degenerative spinal conditions.

In briefly summarizing Mr. Rollins' medical records, Mr. Rollins has a history of sarcoidosis, asthma, syncopal episodes and a previous C5-C7 anterior cervical fusion. Mr. Rollins was involved in a fall at work on October 22, 2013. Mr. Rollins was getting off of a lift, fell backwards and hit the back of his head. Over the next several days, he began having progressive problems with ambulation. In

5323 Harry Hines Blvd. / Dallas, Texas 75390-8855 / samuel.barnett@utsouthwestern.edu
Academic: 214-648-0211  Fax: 214-648-0341  /  Clinic: 214-645-2300  Fax: 214-645-2301
www.utsouthwestern.edu

APPENDIX 52

addition, he had significant neck pain. These complaints, as well as a syncopal episode, ultimately prompted a visit to the emergency department at St. Paul Hospital on 10/25/2013. His evaluation included an MRI of the cervical spine which was performed on the same day. I have reviewed this MRI scan which demonstrates multi-level degenerative changes, evidence of prior fusion from C5-C7 and severe spinal stenosis at C4-5. There is some associated abnormal signal within the spinal cord at this level consistent with a spinal cord contusion. Based on these findings, Mr. Rollins was transferred to Zale-Lipshy University Hospital for further care.

On my initial evaluation, I found that he had full strength in his upper extremities and slightly diminished strength in his bilateral lower extremities. He had hyperreflexia in his biceps, triceps, patellar and Achilles reflexes bilaterally. A Hoffman's sign was present bilaterally. Mr. Rollins had decreased sensation to light touch, pinprick, pain and proprioception in his lower extremities and decreased sensation to light touch and pain in his upper extremities. A well-healed anterior neck incision from his prior surgery was noted. Based on the history, physical exam and imaging findings, I diagnosed Mr. Rollins with a spinal cord contusion secondary to an acute herniated disc at C4-5. I recommended a C3-C7 posterior cervical decompression, instrumentation and fusion which he underwent on 10/30/2013. Mr. Rollins was ultimately discharged from the hospital on 11/12/2013

Mr. Rollins was seen in the outpatient clinic on 11/15/2013 and he was found to have a superficial dehiscence of his incision. He was readmitted to the hospital and underwent a wound revision on 11/16/2013. He required home health nursing for wound care until his wound was completely healed by 1/28/2014.

Mr. Rollins returned to my clinic approximately 8 months following his injury on 6/23/2013. He continues to complain of significant neck pain. He also describes significant neuropathic pain in the right arm and shoulder which has responded marginally to medication. On neurologic exam, he is essentially unchanged and continues to have signs of myelopathy. Cervical spine X-rays obtained on 6/23/2013 demonstrate stable alignment and stable positioning of the hardware.

I have carefully reviewed Mr. Rollins' medical record and MRI scans. It is my opinion there is a reasonable medical probability that Mr. Rollins suffered an acute herniated disc at C4-5 and a spinal cord contusion caused by his fall on October 22nd, 2013. There is also a reasonable medical probability that Mr. Rollins will have chronic neck pain and spinal cord dysfunction as a result of the injury. I believe that he will require long-term pain management for these issues.
If you have any additional questions, please feel free to contact me.

Sincerely,

Samuel L. Barnett, MD
Associate Professor

APPENDIX 53

<u>AFFIDAVIT</u>

STATE OF TEXAS     §
DALLAS COUNTY     §

Before me, the undersigned notary, on this day personally appeared **SAMUEL L. BARNETT**, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

1.      "My name is Samuel L. Barnett. I am over 18 years of age, of sound mind, and capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct."

2.      "As an introduction, I am a neurological surgeon and associate professor in the Department of Neurological Surgery at The University of Texas Southwestern Medical Center at Dallas. My undergraduate training was done at Indiana University, Bloomington (1991-1995). I received my medical degree from the University of Cincinnati College of Medicine (1995-1999). My surgical internship was done at the University of Texas Southwestern Medical Center (1999-2000). I completed a neurosurgical residency at the University of Texas Southwestern Medical Center (2000-2005). I received fellowship training in skull base and cerebrovascular neurosurgery at the University of South Florida, Tampa (2005-2006). I was a faculty member at the University of Mississippi School of Medicine for one year (2006-2007) prior to returning to Dallas. Since that time, I have been a faculty member in the Department of Neurological Surgery at The University of Texas Southwestern Medical Center (2007-Present). I am a member of the hospital staffs at Zale Lipshy University Hospital, Parkland Memorial Hospital and the Dallas VA Medical Center. I am board certified by the American Board of Neurological Surgery and I am licensed to practice medicine in Texas and Mississippi. In my current practice, I regularly evaluate and manage patients with traumatic and degenerative spinal conditions."

3.      "I have completed my review of Garry Rollins' medical records. Items reviewed include Emergency Room records dated 10/25/2013, inpatient medical records from 10/26/2013 - 11/11/2013 and 11/15/2013 - 11/20/2013 and an MRI scan of the cervical spine dated 10/25/2013. I personally saw and evaluated Mr. Rollins' on 11/15/2013, 11/25/2013, 12/3/2013, 12/16/2013, 12/30/2013, 1/13/2014, 2/17/2014, 3/17/2014, 5/19/2014 and 6/23/2014 and I have reviewed those records as well."

4.      "In briefly summarizing Mr. Rollins' medical records, Mr. Rollins has a history of sarcoidosis, asthma, syncopal episodes and a previous C5-C7 anterior cervical fusion. Mr. Rollins was involved in a fall at work on October 22, 2013. Mr. Rollins was getting off of a lift, fell backwards and hit the back of his head. Over the next several days, he began having progressive problems with ambulation. In addition, he had significant neck pain. These complaints, as well as a syncopal episode, ultimately prompted a visit to the emergency department at St. Paul Hospital on 10/25/2013. His evaluation included an MRI of the cervical spine which was performed on the same day. I have reviewed this MRI scan that demonstrates multi-level degenerative changes, evidence of prior fusion from C5-C7 and severe spinal

<span style="color:red">APPENDIX 54</span>

Page 4048

stenosis at C4-5. There is some associated abnormal signal within the spinal cord at this level consistent with a spinal cord contusion. Based on these findings, Mr. Rollins was transferred to Zale-Lipshy University Hospital for further care."

5. "On my initial evaluation, I found that he had full strength in his upper extremities and slightly diminished strength in his bilateral lower extremities. He had hyperreflexia in his biceps, triceps, patellar and Achilles reflexes bilaterally. A Hoffman's sign was present bilaterally. Mr. Rollins had decreased sensation to light touch, pinprick, pain and proprioception in his lower extremities and decreased sensation to light touch and pain in his upper extremities. A well-healed anterior neck incision from his prior surgery was noted. Based on the history, physical exam and imaging findings, I diagnosed Mr. Rollins with a spinal cord contusion secondary to an acute herniated disc at C4-5. I recommended a C3-C7 posterior cervical decompression, instrumentation and fusion that he underwent on 10/30/2013. I performed this surgery. Mr. Rollins was ultimately discharged from the hospital on 11/12/2013."

6. "Mr. Rollins was seen in the outpatient clinic on 11/15/2013 and he was found to have a superficial dehiscence of his incision. He was readmitted to the hospital and underwent a wound revision on 11/16/2013. He required home health nursing for wound care until his wound was completely healed by 1/28/2014."

7. "I have carefully reviewed Mr. Rollins' medical record and MRI scans. It is my opinion there is a reasonable degree of medical probability that Mr. Rollins suffered an acute herniated disc at C4-5 and a spinal cord contusion caused by his fall on October 22[nd], 2013. It is also my opinion that to a reasonable degree of medical probability that Mr. Rollins will have chronic neck pain and spinal cord dysfunction as a result of the injury. In my opinion to a reasonable degree of medical probability he will require long-term pain management for these issues."

The facts and opinions stated in it are within my personal knowledge and are true and correct."

SAMUEL L. BARNETT

Sworn to and subscribed before me by **Samuel L. Barnett** on ___Feb. 24___, 2015.

___Jan Aleta Wright___
Notary Public in and for
the State of Texas
My commission expires: ___Feb. 20, 2016___

JAN ALETA WRIGHT
Notary Public, State of Texas
My Commission Expires
February 20, 2016

APPENDIX 55

# AFFIDAVIT – BURT THORPE

APPENDIX 56

APPENDIX 57

CAUSE NO.13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS and<br>CARLA D. ROLLINS | ' | IN THE DISTRICT COURT |
| Plaintiffs, | '<br>' | |
| Vs. | '<br>' | SMITH COUNTY, TEXAS |
| TEXAS COLLEGE and<br>MPF INVESTMENTS, LLC D/B/A<br>"A-1 RENT ALL" | '<br>'<br>' | |
| Defendants, | ' | 7th JUDICIAL DISTRICT |

---

### AFFIDAVIT OF BURT THORPE

---

STATE OF _____ §

_____ COUNTY §

Before me, the undersigned notary, on this day personally appeared **BURT THORPE**, the affiant, whose identity is known to me. After I administered an oath, affiant testified as follows:

1. "I have been retained as an expert witness for the plaintiffs in the above styled case. I have been retained to offer observations, analysis, opinions and testimony about the facts of this case."

2. "I have professional experience with all aspects of aerial lift safety (also known as aerial work platforms ("AWP")) and the safety standards and regulations dealing specifically with scissor lifts. I also have extensive professional experience on general worker safety per OSHA and ANSI. My qualifications as an expert are as follows: I am a certified OSHA "Outreach" instructor; have over 35 years experience overall in the AWP industry; 10 years practical experience running an equipment rental company; and have taught heavy equipment safety for over 20 years as a "qualified person" per the standards and requirements of ANSI/OSHA. I have many professional registrations and certifications and am recognized by the American Society of Safety Engineers ("ASSE") as a Certified Safety Professional. I have written nine texts on safe equipment operation and inspection, including aerial lifts and scissor lifts. I am an active member of the ASSE and the Association of Equipment Management Professionals. I have also read many treatises and documents pertaining to worker safety and AWP safety in

BURT THORPE EXPERT AFFFIDAVIT

1



America and am very familiar with the text of both OSHA and ANSI. My curriculum vita is attached to this affidavit as an Exhibit."

3. "I am available for court appearances, in person or by telephone, to further clarify or explain the opinions and conclusions contained in this affidavit. My opinions in this matter are based on the following information I reviewed:

    a. Plaintiffs' most recent amended Original Petition
    b. Deposition testimony of Roland Brackens and Garry Rollins
    c. Texas College responses to Plaintiffs' Interrogatories
    d. OSHA Federal Regulations:
        29 CFR 1910.27 — Fixed Ladders,
        29 CFR 1910.67 — Vehicle Mounted Elevating and Rotating Work Platforms
        29 CFR 1926.453 — Aerial Lifts, Scaffolds,
        29 CFR 1926.454 — Scaffolds, Training Requirements,
    e. A "Statement of Best Practices of General Training and Familiarization for Aerial Work Platform Equipment" published by ARA, ANSI et. al.
    f. Excerpts from Motions for Summary Judgment by Texas College and MPF Investments, LLC d/b/a A-1 Rent All.
    g. ANSI A92.6 safety standards for scissor lifts (referred to as "Self Propelled Elevated Work Platforms")
    h. The JLG Owner's Manual for model "1930-ES"

4. "In my opinion, Texas College should have trained Garry Rollins on using a scissor lift while in the course and scope of his employment. I base my opinion on my expertise in the OSHA regulations and the statute of the OSH Act. From an OSHA perspective (which requires mandatory compliance by U.S. employers) failing to train an employee on a scissor lift violates the OSHA "general duty" clause. That clause requires an employer to furnish employees a place of employment free from recognized hazards that are likely to cause death or serious harm to employees. Section 1926.454 of OSHA deals specifically with scissor lifts and it requires that an employee be trained to operate a lift. Roland Brackens was Garry Rollins' supervisor at the time he was injured in his fall from the lift. Mr. Brackens testified in his deposition (at p. 18-19) that he did not train Mr. Rollins to use a lift. Mr. Rollins has confirmed this also both in his complaint and in his deposition testimony. Not training Mr. Rollins in this circumstance is an OSHA violation that put him in harm's way right off the bat and significantly increased the likelihood of his injury in connection with the lift. An untrained operator/user of a scissor lift puts himself at risk for injury and those around him if he doesn't understand how to operate the lift and fails to appreciate the risk associated with entering and exiting the lift.

BURT THORPE EXPERT AFFFIDAVIT

2

APPENDIX 58

Page 3404

5. "I have also reviewed the motions for summary judgment and understand the arguments being made by Texas College and the rental company in terms of not having to train Mr. Rollins because climbing off a scissor lift is similar to climbing down a ladder. This is wrong and potentially misleading to a jury. Ladders and scissor lifts are governed by different OSHA sections--the OSHA section pertaining to scissor lifts (i.e. 1926.454) makes no reference to ladders and vice-versa. Without proper expert distinction, this kind of argument can mislead a jury into thinking the two pieces of equipment are somehow interchangeable. In my opinion, this is a dangerous argument. Based on my professional experience as an OSHA instructor and as a safety expert, training would have done two things for Garry Rollins in this case: 1) it would have alerted him to the proper technique to employ when dismounting a scissor lift and 2) would have alerted him to any potential hazards he may have encountered doing so. The other important thing training would have done is inform Mr. Rollins that a physically compromised person is not to be on a scissor lift and that he has recourse if he feels his employer is putting him at risk. These are specific things that I have covered in my safety training seminars with employees--particularly those employees that don't realize that OSHA is designed to help and protect them, not only from the obvious work hazards they may encounter, but also from not understanding that they have recourse if being asked to do work they think they shouldn't."

5. "According to ANSI, the rental company also should have offered to train and/or familiarize the user of the scissor lift in this case in my opinion. I base my opinion on the safety provisions and standards conceived by ANSI and adopted by OSHA as rules and laws. Mr. Brackens testified in his deposition that the rental company showed *him* how to use the scissor lift but not anyone else. Mr. Rollins was the employee actually using the scissor lift and therefore meets the definition of a "user" in ANSI A92.6. Section 6.11.2 of A92.6 requires a lessor to offer a user training or familiarization if asked for by the user. Mr. Rollins testified that he made this request to the rental company but wasn't trained or familiarized with the scissor lift when it was delivered to Texas College. This violates ANSI A92.6 and creates a workplace hazard in my opinion because users subsequently don't have the tools to understand what they are doing nor to safely operate a scissor lift—which by definition is heavy machinery. This is a fundamental safety principle. I have also been asked to offer an opinion on the issue of the owner's manual and the danger that is caused when this document is not included with a scissor lift. Mr. Brackens testified in his deposition that no manual was on board the lift when Garry Rollins and other employees were using it. This is dangerous for a number of reasons. First, it violates ANSI A92.6 section 6.3.1 that specifically requires a manual to go with each scissor lift being rented for use. It also places the user in the precarious situation of not having a detailed reference guide for safe use before, during and after being on the lift. For example, the JLG owner's manual specifically provides

BURT THORPE EXPERT AFFFIDAVIT                                                                    3

APPENDIX 59



that a person losing physical control should not be on a lift. While I am an expert offering expert opinions. I think that this aspect of the case requires only common sense: a manual should have been on board to at least give Mr. Rollins and his supervisors a chance to learn and be sensitive to the risk involved with him going onto, operating, and getting off of a scissor lift. Here again, training would have made the difference: the highlights of the safety precautions in the owner's manual would have and should have been covered prior to Mr. Rollins getting on the lift. Without this information the risk of him being harmed was increased substantially and was something that both the rental company and his employer should have anticipated and prevented. Not having an owner's manual on board with all safety warnings was a clear violation of equipment rental standard best practices as well as established safety principles of OSHA, ANSI the scaffolding association, and the American Renter's Association." The foregoing affirmative opinions contained in this affidavit are based on my years of experience and my personal knowledge based on a thorough review of the facts in this case."

6. I hereby affirm that the foregoing statements in this affidavit are true and correct.

_BURT THORPE_

Sworn to and subscribed before me by Burt Thorpe on _February 1_, 2015.

Notary Public in and for the State of _Puerto Rico_.
My commission expires: _Never_

BURT THORPE EXPERT AFFFIDAVIT

4

# Curriculum Vitae

**BURT THORPE**
**2544 Stoneview Road**
**Orlando, FL 32806**
**407-709-3268**

## CRANE, AERIAL LIFT & EQUIPMENT EXPERT

**EDUCATION:**
Hofstra University – Bachelor of Arts in Liberal Arts (1974)
Emory University  –  Master of Business Administration (1978)

**ADDITIONAL TRAINING:**
OSHA "Outreach" Instructor #500 – Construction
OSHA "Outreach" Instructor #501 – General Industry

**AERIAL LIFT DEALERSHIPS:**
Condor Lift, Calavar Corp.
Mark Lift Industries, Inc.

**CRANE MANUFACTURER TRAINING:**
Harnischfeger Corp. (P&H)
Grove Crane
American Crane Corp.
Columbus-McKinnon

**PROFESSIONAL REGISTRATIONS:**
CSP – Certified Safety Professional – by ASSE
CEM – Certified Equipment Manager – by AEMP
CCO – Certified Crane Operator – Tower Crane & All Mobile Cranes
CCO – Certified Signal Person
CCO – Certified Rigger
CCO – Certified Mobile Crane Inspector
CCI – Certified Crane Inspector – CICB
CCS – Certified Crane Surveyor – Crane Certification Assn of America

**PUBLICATIONS:**
Nine texts on safe equipment operation & inspection, including
mobile, overhead & tower cranes, aerial lifts, bucket trucks,
scissor lifts, excavators, front-end loaders, skid steer loaders,
forklifts, rigging, and one magazine article for trade publication

**ORGANIZATIONS:**
American Society of Civil Engineers  (ASCE)
American Society of Mechanical Engineers  (ASME)
American Society of Safety Engineers  (ASSE)
AGC Construction Safety Group  (AGC)
Association of Equipment Management Professionals (AEMP)
Crane Certification Association of America  (CCAA)
Florida Crane Safety Alliance  (OSHA)

**EMPLOYMENT:**

**1993 -    AmCrane Corp., Orlando, Florida**
**2014        Inspector - CCO Practical Examiner - Trainer**

Safety specialist, specializing in training, CCO certifications and inspections on cranes, aerial lifts, forklifts, excavators, front end loaders, skid steer loaders & other heavy equipment.

Accident reconstruction, investigation & expert witness testimony.

**2009 -    Engineered Training, Inc.          Orlando, Florida**
**2013        Training Manager**

Safety training specialist, specializing in operating and certification on cranes, aerial lifts, forklifts, bucket trucks, excavators, front end loaders, skid steer loaders, concrete pump trucks & other equipment.

Accident investigation, reconstruction & expert witness testimony.

**2007 -    Ray Anthony Int'l, Crane Rental, Orlando, Florida**
**2007        Safety Director, V.P. Special Projects**

Responsible for safety and all CCO training & crane operator certification.  Help establish safety & DOT programs.  Promoted safety awareness throughout the company and its customers.  Reduced losses and maintain compliance.

**1998 -    Hubbard Construction, Inc., Orlando, Florida**
**2003        Crane Specialist**

For this largest road and bridge builder in the Southeast, had state wide responsibility for all cranes, heavy rigging and pile driving, with floating barges, including training, all critical lift supervision, exams, all major lift job planning and all equipment sizing & selection; serving the Equipment Division, job sites, & Estimating Department

**1989 -    North American Crane Bureau, Inc., Orlando, Florida**
**1993        Vice President, Training Manager, Safety Consultant**

For this Orlando crane and equipment consulting company, performed 1 to 5 day crane, rigging, aerial lift and heavy equipment seminars on OSHA compliance, ANSI standards, safety rules, and their actual application to the workplace.

Trained operators, maintenance personnel, safety supervisors, and front line management throughout the United States, while training others to do the same.

Ensured professional instructional standards are met and maintained. Responsible for technical content of all training materials. Authored and edited texts and tests on cranes, aerial lifts & rigging.

Inspected and certified that various cranes and material handling equipment met or exceeded federal, state, and manufacturers' specifications.  Taught federal compliance regulations & industrial standards for crane management, operation and maintenance.

Accident investigation and expert witness testimony.

APPENDIX 62

**1985 –    John Hancock & Portfolio Management, Jacksonville, Fl
1989       Sales and Marketing Executive**

Series 7 Registered Representative, performed personal financial analysis to determine various annuity, investment and insurance product support capabilities.  As a broker produced the office's highest client profitability of 15-20% net profit per quarter.

As a Series 3 Commodity Trading Advisor, designed, programmed and managed a real-time computerized commodity trading programs.

**1974 –    Engineered Equipment, Inc., Jacksonville, Fl
1984       C.M.H., Inc., Fort Lauderdale, Fl
           Service Rental Equipment Corp., Baton Rouge, LA
                Vice President, General Manager**

Responsible for job planning, shop management, and office management for three wholly-owned affiliated subsidiaries.

Their activities included crane rental, aerial lift dealer sales and rentals, concrete pump truck rental & other heavy equipment rental.

Company responsibilities included all office management, all legal, and all accounting through to the consolidated returns of the CPA, all local, state and federal taxes.

Purchased all insurance for the controlled group.
Reduced General Liability insurance rates by well more than half.
Reduced worker's compensation premiums by more than 40%.

Office management responsibilities included all day-to-day operations, sales, scheduling, bidding, and office administration.

Shop responsibilities included operation, maintenance and repair of truck, crawler and tower cranes ranging from 6 ton carry decks to 300 ton crawlers

Other equipment activities included new dealer sales, used sales, leasing, rentals with and without options, repair, inspection and maintenance, operation and rebuild for resale of: aerial lifts, scissor lifts, material hoists, personnel hoists, backhoes, concrete pump trucks and heavy hauling trucks and low-boy trailers to 125 tons.

**1969 –    Engineered Rentals, Inc., Pittsburgh, Pennsylvania
1974       Mobile Crane Operator/Mechanic/Rigger/Driver/Shop help**

Operated and maintained truck, crawler and rough terrain cranes ranging from 14 ton to 150 ton cranes.  Disassembled, transported and assembled equipment interstate and internationally. Inspected and repaired all types of mobile crane lifting equipment.

**TRADES WORKED:**
Millwright, Lowboy Heavy Equipment Truck Driver, Ironworker, Teamster, Crane Operator

APPENDIX 63

## CAUSE NO. 13-3353-A

| | | |
|---|---|---|
| GARRY L. ROLLINS AND | § | IN THE DISTRICT COURT |
| CARLA D. ROLLINS, | § | |
| Plaintiffs, | § | |
| | § | |
| | § | |
| v. | § | SMITH COUNTY, TEXAS |
| | § | |
| TEXAS COLLEGE, CHRISTIAN | § | |
| METHODIST EPISCOPAL CHURCH | § | |
| AND MPF INVESTMENTS, LLC | § | |
| D/B/A "A-1 RENT ALL", | § | |
| Defendants. | § | 7TH DISTRICT COURT |

## DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS COLLEGE'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THE 7TH DISTRICT COURT:

Defendant, Texas College, files these Objections/Motion to Strike Evidence and References in Plaintiffs' Response to Texas College's Motion for Summary Judgment and respectfully shows the Court:

## INTRODUCTION

On January 15, 2015, Texas College filed a Traditional and No-Evidence Motion for Summary Judgment on all causes of action alleged by Plaintiffs. On February 4, 2015, Plaintiffs filed a Response to Texas College's Motion for Summary Judgment. Plaintiffs attach and reference numerous items within their response as summary-judgment evidence. Texas College objects to certain evidence submitted with the response as incompetent and defective, and to certain references within the Response at not supported by competent evidence. The College respectfully requests that the objections stated below be sustained, the objectionable material and references to the same be stricken from the record, and that the objectionable material not be considered by the Court.

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT

PAGE 1 OF 19

APPENDIX 64

Page 3666

## ARGUMENT AND AUTHORITY

Evidence included in response to a motion for summary judgment must be admissible under the rules of evidence. *United Blood Servs. V. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997); *see* TEX. R. CIV. P. 166a(f). Facts must be proven in the same manner or type of evidence that would be admissible at trial. *See* TEX. R. CIV. P. 166a(c). If a party's summary-judgment proof contains evidence that would not be admissible at trial, the appropriate avenue to challenge such is through written objections and requesting that the inadmissible summary-judgment proof be stricken. *See* TEX. R. CIV. P. 166a(f)

### I.     Plaintiffs' Seventh and Eighth Amended Petition

A party cannot rely on factual assertions in its own pleadings as summary-judgment proof. *Laidlaw Waste Sys. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995). Texas College objects to, and requests that the Court strike any reference by Plaintiffs to their amended petitions in the Response, as they are not competent evidence on which Plaintiffs may rely.

### II.    Excerpts from Deposition of Roland Brackens

| Mr. Brackens' Deposition Testimony | Objection(s) |
|---|---|
| Deposition Testimony: 18:4 – 18:25; 22:15 – 23:14; 24:8 – 24:11; 24:23 – 25:6. | Not Qualified to Testify |

| Objectionable Statement in Response | Page Reference |
|---|---|
| Mr. Brackens also testified that OSHA imposes a duty on employers to train employees that are using scissor lifts so that they may recognize "associated work hazards", and that he did not train Mr. Rollins on operating a lift under this supervision at Texas College – per OSHA. | Pg. 16 |

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT                    PAGE 2 OF 19

APPENDIX 65

Page 3667

| | |
|---|---|
| Q: (MR. SIGMON): And if you look at – if you look at subsection (a) of [OSHA] Section 1926.454, it states that, "The employer shall have each employee who performs work while on a scissor lift trained by a person qualified in the subject matter to recognize the hazards associated with the type of set – of scissor lift being used and to understand the procedures to control or minimize those hazards." And you've just testified that that did not take place, correct?<br><br>A. Correct. | Pg. 17 |
| Q. So the rules that we just spoke about, specifically those OSHA examples, those are safety rules, right?<br><br>A. Correct. | Pg. 17 |
| Q. But my question to you, Mr. Brackens, is, you just testified that OSHA section 1926.454 was not followed. It was violated. That rule was broken. No training was given by a competent person to these employees at Texas College on how to operate a scissor lift.<br><br>A. Okay.<br><br>Q. Correct?<br><br>A. Yes, I correct – yes, I did say that. | Pg. 18 |

Mr. Brackens was not qualified by Plaintiffs to testify as an expert on specific OSHA rules or regulations or make any conclusory opinions on same, and made it clear through his testimony that he is not an expert on same. *Brackens dep. 18:8-14.* While he may be familiar generally with OSHA, Plaintiffs have attempted to obtain definitive legal conclusions from Brackens and elicit from him opinion testimony on specific standards. While he has been shown to be knowledgeable and experienced on the mounting, dismounting, and the operation of scissor and boom lifts and other matters addressed in his deposition, OSHA standards and their application to specific workplace items are not among those matters. Texas College objects to

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT                    PAGE 3 OF 19
APPENDIX 66

Page 3668

the specific portions referenced above and requests that this objection be sustained, the incompetent evidence be stricken, and the Court disregard same.

## III.  The JLG Owner's Manual Model 1930-ES

Texas College objects to Plaintiffs' attempted use of a purported JLG Owner's Manual on the basis that Plaintiffs have failed to establish its authenticity or relevance, or lay any proper predicate for the admissibility of same, either through a qualified witness or otherwise.  The purported manual is inadmissible hearsay and not competent as summary-judgment proof.  No exception to the hearsay rules apply to the subject manual filed as an independent document with the Court. Since Plaintiffs are attempting to offer statements within the JLG Owner's Manual to prove the matter asserted, the JLG Owner's Manual itself, and the statements referenced within it, are inadmissible hearsay.

Texas College's objections to the JLG Owner's Manual should be sustained, any reference to the JLG Owner's Manual should stricken, and the JLG Owner's Manual and any reference to it should be disregarded by the Court.  The references within Plaintiffs' response that Texas College requests to be stricken are listed below.

| Objectionable Statement in Response | Page Reference |
|---|---|
| The manufacturer of the lift thinks differently:<br><br>Use extreme caution *when entering* or *leaving platform*.  Ensure that the scissor arm assembly is fully lowered.  Face the machine when entering or leaving the platform.  Always maintain "three point contact" with the machine using two hands and one foot or two feet and one hand at all times during entry and exit. | Page 16 |
| JLG, the manufacturer of the subject lift, also requires that lift operators be trained. | Page 18 |

APPENDIX 67

Page 3669

| | |
|---|---|
| There is developed evidence (affirmed by common sense, and discussed *supra*) that a scissor lift is a piece of machinery that requires extreme caution because of its potential dangers and hazards. | Page 18 |
| The undisputed evidence is that a person in Mr. Rollins condition should not have been operating this type of machinery and that it is incumbent on the employer to recognize these potential hazards | Page 20 |
| The undisputed evidence is that a person in Mr. Rollins condition should not have been on or operating this type of machinery | Page 22 |

## IV.  Affidavit of Garry Rollins

An affidavit attached in response to a motion for summary judgment must contain facts that would be admissible in evidence at trial. TEX. R. CIV. P. 166a(f); *United Blood Servs. v. Longoria*, 938 S.w.2d 29, 30 (Tex. 1997). Set forth below are those portions of Rollins' affidavit and the corresponding references within Plaintiffs' response the College respectfully submits should be stricken, and the supporting grounds. However, the affidavit is so replete with inadmissible hearsay, irrelevant testimony, and sworn statements that fundamentally contradict Rollins' earlier sworn deposition testimony (making it a "Sham Affidavit"), the College respectfully requests in the alternative that it be stricken in its entirety.

A summary judgment affidavit must affirmatively establish the basis for affiant's personal knowledge of the information in the affidavit. TEX. R. CIV. P. 166a(f); *Kerlin v. Arias*, 274 S.W.3d 666, 668 (Tex. 2008). A statement that the affidavit is based on personal knowledge is insufficient. *Kerlin* at 668. Furthermore, Rule 602 of the Texas Rules of Evidence provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT

PAGE 5 OF 19

APPENDIX 68

Page 3670

Only relevant evidence is admissible. TEX. R. EVID. 402. Relevant evidence is evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX. R. EVID. 401.

Hearsay statements in summary judgment affidavits are not competent evidence and should not be considered by the court. *Powell v. Vavro, McDonald & Assocs.*, 136 S.W.3d 762, 765 (Tex. App. – Dallas 2004, no pet.). 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is not admissible evidence "except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 802.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| Mr. Brackens, through RBHR, attempted to get a contract from the school to move several large marble slab counter tops in the Science Building but was unsuccessful and did not get the work because of the price he was quoting. As a result, the work went undone for a time. The school administration became frustrated with Mr. Brackens that the work had not been completed. | Lack of Personal Knowledge<br>Relevance<br>Hearsay |

| Objectionable Reference in Response | Page Reference |
|---|---|
| In fact, Mr. Rollins confirms that the actual job of moving the marble was originally meant to be outsourced, hence Mr. Brackens' effort to win the work contract through his side business, "RBHR". | Pg. 13 |

The foregoing statements in paragraph 2 should be disregarded by the Court as irrelevant to this litigation. They do not establish or make more/less probable the elements Plaintiffs are required to prove for their allegations against Texas College, as this portion does not make it

APPENDIX 69

more/less probable that Texas College owed a duty to Plaintiffs, that Texas College breached an alleged duty owed to Plaintiffs, or that any breach of an alleged duty Texas College owed to Plaintiffs was the producing/proximate cause of Plaintiffs' injuries. Therefore, the foregoing statements and references should be disregarded by the Court and stricken as completely irrelevant.

The foregoing statements in paragraph 2 of Rollins' affidavit, and the reference in Plaintiffs' response, should also be stricken and disregarded by the Court because Rollins has wholly failed to show how he has personal knowledge to testify to same. They are inadmissible hearsay. Rollins simply states them in a conclusory manner. Therefore, Texas College objects to said statements and moves the Court to strike and disregard them.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "(at least 150 lbs)." | Lack of Personal Knowledge, competency, speculative |

This portion within Section 2 of Mr. Rollins' affidavit should be stricken and not considered by the Court because Mr. Rollins lacks personal knowledge or competency to testify to the matters contained therein. Mr. Rollins has in no way demonstrated any knowledge or competency to testify on the weight of the marble slab, much less that it weighs "at least 150 lbs." Rollins' statement constitutes pure speculation. Texas College objects to same and moves the Court to disregard and strike it.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| The medical excuses attached to my affidavit as "Exhibit A" are the excuses that I received personally from my doctors and that I gave to Texas College. | No Predicate<br>Hearsay |

APPENDIX 70

The generic "medical excuses" Mr. Rollins' references in his affidavit and attached as Exhibit A are hearsay for which no exception applies and for which no proper predicate has been laid. Furthermore, said documents provide no reason for the medical visit nor recite any restriction, and are in no way probative of Plaintiffs' claims. Texas College objects to same and moves that the Court disregard and strike them.

| Mr. Rollins' Affidavit | Objection(s) |
| --- | --- |
| We were not trained or instructed on proper lifting techniques or given any direction for performing a safe lift of the size. | Lack of Personal Knowledge |

Rollins has not established in any way that he has personal knowledge as to what training or instruction other employees of Texas College had received. Without elaborating on how this alleged knowledge was acquired, there is insufficient information in the affidavit to establish that Mr. Rollins knew what type of training other Texas College employees received, what instructions on proper lifting techniques other Texas College employees received, or what directions were provided to other Texas College employees. Therefore, Texas College's objection for this portion of Mr. Rollins' affidavit should be sustained, these portions should be stricken, and these portions should not considered by the Court.

| Mr. Rollins' Affidavit | Objection(s) |
| --- | --- |
| "and was diagnosed with experiencing blackouts in addition to full body pain." | Not Qualified as Expert<br>Hearsay |

This portion within Section 2 of Mr. Rollins' affidavit should be stricken and not considered by the Court because Mr. Rollins is not qualified to testify to said matters and the information is hearsay. This is made clear by his reference to the defective exhibit which does

APPENDIX 71

not diagnose or even recite "experiencing blackouts." Mr. Rollins is not competent to testify as to his medical diagnosis, as he is neither a doctor nor designated as an expert in medicine. Therefore, Texas College's objection to this inadmissible embellishment and misstatement in Rollins' affidavit should be sustained, and this portion stricken and not considered by the Court.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "I was also instructed by the doctor to avoid driving. The doctor's note and record attached to my affidavit as Exhibit B was the note that I received from the doctor at Baylor." | Hearsay |

This portion within paragraph 2 of Mr. Rollins' affidavit should be stricken and not considered by the Court because the information is hearsay. Any purported statements made by "the doctor" to Mr. Rollins would be hearsay to which no exception applies. Furthermore, the doctor's note and records attached to Mr. Rollins' affidavit as Exhibit B are hearsay for which no exception applies. Mr. Rollins' sole purpose for including such records is to prove the truth of the matter asserted by Mr. Rollins. Therefore, Texas College's objection for this portion of Mr. Rollins' affidavit and the exhibit referenced should be sustained, this portion and exhibit should be stricken, and this portion and the exhibit referenced disregarded by the Court.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "Mr. Harris and Mr. Brackens removed me from the driving job because they didn't want to endanger students if I was to blackout while behind the wheel." | Lack of Personal Knowledge<br>Hearsay |

| Objectionable Reference in Response | Page Reference |
|---|---|
| Mr. Rollins informed Texas College of these infirmities and was later removed from driving Texas College students to and from campus as a safety precaution. | Pg. 2 |

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT
PAGE 9 OF 19
APPENDIX 72

Page 3674

| "prompting the school to remove him from a driving detail he performed." | Page 19 |

This portion within Section 2 of Mr. Rollins' affidavit, and the references in Plaintiffs' response, should be stricken and not considered by the Court because Mr. Rollins lacks personal knowledge to testify to the matters contained therein. Mr. Rollins has not established in any way that he has personal knowledge as to why he was removed from the driving job. To the contrary, Mr. Rollins is merely advancing speculative self-serving "reasons" and stands in direct contradiction to the testimony of a Texas College employee who testified as to the actual reason and who has been shown to have knowledge. Texas College moves the Court to disregard and strike this portion of Mr. Rollins' affidavit and the references in Plaintiffs' response.

| Mr. Rollins' Affidavit | Objection(s) |
| --- | --- |
| Under Mr. Brackens authority at Texas College there was never an emphasis on safety or training for any of the work we were assigned. While under his supervision and leadership at Texas College, none of the employees were ever sent to any kind of safety training sessions or OSHA workshops. This kind of thing made me and other employees question the school's attitude toward our safety. | Lack of Personal Knowledge<br>Hearsay<br>Conclusory |

This portion within Section 3 of Mr. Rollins' affidavit should be stricken and not considered by the Court. Mr. Rollins has not established that he has personal knowledge as to what type of training sessions or workshops other employees were sent to nor the attitude or feelings of other employees toward Texas College. Rollins offers nothing in his affidavit to establish any personal knowledge as to what other employees informed him, that they did not receive training, that they did not attend any workshops, or how he acquired the other employees' beliefs in regard to the school's attitude toward safety. Without providing such information, Mr. Rollins has failed to establish that he has the requisite personal knowledge

APPENDIX 73

required to be considered competent to testify to such matters and is merely advancing self-serving speculation on the training received and beliefs of other employees. Therefore, Texas College's objection for this portion of Mr. Rollins' affidavit should be sustained, this portion should be stricken, and this portion should not considered by the Court.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "We were not trained to be on the lift." | Lack of Personal Knowledge |

This portion within Section 6 of Mr. Rollins' affidavit should be stricken and not considered by the Court because Mr. Rollins lacks personal knowledge to testify to the matters contained therein. Mr. Rollins has not established in any way that he has personal knowledge as to what type of training other employees received and this conclusory statement is in direct conflict with the testimony of Michael Johnson and Steve Barron, two employees of the College who testified that they were trained to operate a scissor lift. Barron has testified that he was trained by Rollins. Therefore, Texas College's objection to this portion of Mr. Rollins' affidavit should be sustained, and this portion should be stricken, and disregarded by the Court.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "I blacked out when trying to get off the lift. I lost consciousness momentarily and fell from the lift." | "Sham" affidavit |

| Objectionable Reference in Response | Page Reference |
|---|---|
| After coming down from the aerial work, Mr. Rollins lost consciousness as he was exiting the lift's work platform and fell from the top of the platform straight back onto the gym floor. | Page 2 |

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT                    PAGE 11 OF 19
APPENDIX 74

Page 3676

| | |
|---|---|
| "Gary Rollins states both in his affidavit and Amended Petition that he lost consciousness while existing from the lift." | Page 19 |
| "that he lost consciousness existing the lift;" | Page 20 |

Texas College objects to this portion of Rollins' Affidavit or any similar statement in his affidavit, and the corresponding references in Plaintiffs' response, on the basis that it is a "sham" affidavit in that respect. An affidavit that contradicts the affiant's previous deposition testimony without any explanation for the change in testimony and is intended to create a fact issue to defeat summary judgment is considered a "sham" affidavit. *Farroux v. Denny's Restaurants, Inc.*, 962 S.W.2d 108, 111 (Tex. App. – Houston [1st Dist.] 1997, no pet.). Without any explanation as to the change in testimony, the court is to assume that the sole purpose of the affidavit was to avoid summary judgment. *Pando v. Southwest Convenience Stores*, 242 S.W.3d 76, 79 (Tex. App. – Eastland 2007, no pet.). "Sham" affidavits are not competent summary judgment evidence and cannot raise a fact issue. *Id.*

Mr. Rollins testified *multiple* times in his deposition that he did not know if he passed out or lost consciousness. Garry Rollins' Deposition, 141:1 – 141:6; 141:25 – 142:6; 142:15 – 143:1. Despite Mr. Rollins testifying under oath multiple times that he does not know whether he passed out or lost consciousness, he now takes the firm position that he in fact did pass out or lose consciousness. Rollins has reversed himself and now taken this contradictory position, without explanation, in a misguided effort to create a fact issue, where none exists, regarding whether Texas College breached a duty of care by allegedly forcing Mr. Rollins to utilize the scissor lift when it purportedly knew Rollins had an alleged history of "seizures and blackouts."

APPENDIX 75

The affidavit is clearly a sham and the College respectfully submits that it should be disregarded and stricken, or alternatively, the foregoing statements and references should be stricken.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "Of course, I later ended up having to have major surgery because of my injury." | Not Qualified/Incompetent to Testify |

This portion within Section 6 of Mr. Rollins' affidavit should be stricken and not considered by the Court because Mr. Rollins is not qualified to testify to the matter contained therein. An opinion as to the reasons for surgery or medically necessary procedures would require the opinion of a medical expert. Mr. Rollins is not a medical expert and has offered nothing more than a conclusory opinion that it was the <u>alleged</u> injuries he incurred at Texas College's campus that necessitated surgery. Texas College ask that it be disregarded and stricken by the Court.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "My surgeon's letter to my lawyer describing my injury is attached to my affidavit as Exhibit D. I have reviewed this document with my lawyer and I am familiar with my surgeon's opinion. He provided the letter in connection with this case." | Hearsay<br>Not shown to be qualified/competent |

This portion within Section 6 of Mr. Rollins' affidavit should be stricken and not considered by the Court because the information is hearsay. The letter attached to Rollins' affidavit as Exhibit D is incompetent hearsay for which no exception applies. Mr. Rollins' sole purpose for including such records is to prove the truth of the matter asserted by Mr. Rollins. Therefore, Texas College's objection to this portion of Mr. Rollins' affidavit and the exhibit referenced should be sustained, and this portion and the exhibit stricken and disregarded by the Court.

APPENDIX 76

Page 3678

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "I know personally that workers have been injured and killed because of scissor lifts." | Lack of Personal Knowledge<br>Irrelevant<br>Incompetent to testify |

This portion within Section 7 of Mr. Rollins' affidavit should be stricken and not considered by the Court because it is irrelevant hearsay. Mr. Rollins has not established that he has personal knowledge regarding workers who have been injured or killed because of scissor lifts, that he has conducted a survey, or that he is qualified or competent to testify as to such matters. Furthermore, the foregoing statements are irrelevant to this litigation and have no probative value. Texas College objects and moves that they be stricken and disregarded.

| Mr. Rollins' Affidavit | Objection(s) |
|---|---|
| "There was another instance at Texas College that I am personally familiar with where another employee was asked to do work that he was not trained to do and got hurt. That employee was later fired." | Lack of Personal Knowledge<br>Irrelevant |

This portion within Section 7 of Mr. Rollins' affidavit should be stricken and not considered by the Court because Mr. Rollins lacks personal knowledge to testify on same. Mr. Rollins has not established in any way that he has personal knowledge that an employee was asked to do work that he was not trained to do. Instead, he just makes a blanket statement without information explaining when the information was obtained, how the information was obtained, whether he observed the alleged incident, or any other information that would tend to establish that Mr. Rollins had personal knowledge of this occurring.

Furthermore, Rollins' self-serving testimony that the alleged employee "got hurt" because he was instructed to perform work he was not trained to do lacks any demonstration of personal knowledge or competent support. Mr. Rollins has not established how he has personal

APPENDIX 77

knowledge that this is the reason for any alleged injuries sustained by the alleged employee. Without establishing how Mr. Rollins has personal knowledge as to this information, Mr. Rollins' testimony is mere speculation and is inadmissible.

Still further, Mr. Rollins has not established in any way that he has personal knowledge that the particular employee was "fired." Instead, he just makes a conclusory statement without information stating when the information was obtained, how the information was obtained, or any other information that would tend to establish that Mr. Rollins had personal knowledge of the reasoning for this alleged employees' departure from employment. It amounts to pure speculation and hearsay. Finally, it is irrelevant to this litigation. Texas College objects and moves that it be disregarded and stricken.

## V.     Objections to information contained in Plaintiffs' response without evidentiary support

A party must attach evidence that would be admissible in trial in a response to a motion for summary judgment to establish any facts contained therein. *See United Blood Servs. v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997); *see* TEX. R. CIV. P. 166a(f). If a party does not substantiate the allegations made within its response to a Motion for Summary Judgment with admissible summary-judgment proof, the information shall not be considered by the Court. *Id.*

| Objectionable Statement in Response | Objection(s) |
| --- | --- |
| "There was no postings at Texas College pertaining to safe lifting techniques" (Page 13) | No evidentiary support |

Texas College objects to this particular statement included within Plaintiffs' response, as there is no competent summary-judgment evidence before the Court to establish this alleged fact. Texas College requests that its objection to this portion be sustained and not considered by the Court.

APPENDIX 78

| Objectionable Statement in Response | Objection(s) |
|---|---|
| "by refusing Mr. Rollins' request for greater assistance with the marble slab." (Page 13) | No evidentiary support |

Texas College objects to this particular statement included within Plaintiffs' response, as there is no competent summary-judgment evidence in support of such statement. Texas College requests that its objection to no evidentiary support be sustained, and that this portion be stricken and not be considered by the Court.

| Objectionable Statement in Response | Objection(s) |
|---|---|
| "The undisputed facts however, are that the October incident involved a 'scissor lift'—a piece of heavy machinery that is governed by CFR 1926.454 (as a "mobile scaffold") of the Occupational Health and Safety Act ("OSH Act") and the U.S. Department of Labor; and readily acknowledged by virtually everyone in this case as being potentially dangerous if operated by anyone that is untrained or unsupervised." (Pages 15-16) | No evidentiary support |

Texas College objects to this particular statement included within Plaintiffs' response, as there is no competent summary-judgment evidence in support. Therefore, Texas College requests that its objection to same be sustained, and that the unsupported statement be stricken and disregarded by the Court.

| Objectionable Statement in Response | Objection(s) |
|---|---|
| Texas College was aware of Mr. Rollins' previous injuries and then existing physical limits when it ordered him to lift a marble slab in September 2013. (Pages 12-13) | No evidentiary support |
| There is also evidence that Texas College was aware that Mr. Rollins had begun suffering blackouts but commissioned him to use the lift anyway. (Page 19) | No evidentiary support |

APPENDIX 79

The foregoing conclusory references in Plaintiffs' response should be disregarded by the Court because of the lack of any competent evidence to support them. They are simply conclusory allegations without competent evidentiary support. The College moves they be stricken and disregarded.

| Objectionable Statement in Response | Objection(s) |
|---|---|
| "Operating a scissor lift is an activity steeped in regulation and safety warnings and there are multiple statistics quantifying the damage, harm and death resulting from inattention to the machine's potential hazards." (Pages 21-22) | No evidentiary support<br>Hearsay<br>Relevance |

Texas College objects to this particular statement included within Plaintiffs' response, as there is no competent summary-judgment evidence to support the truth of such statement. While Plaintiffs cite to some online statistics, they are not included within Plaintiffs' response, are hearsay, and there is no way for the Court to determine the credibility of such statistics. Therefore, Texas College requests that its objection for this portion be sustained, this portion be stricken from Plaintiffs' response, and this portion not be considered by the Court.

| Objectionable Statement in Response | Objection(s) |
|---|---|
| "nor were there any written instructions posted at the Plant regarding the method or procedure for moving heavy marble slabs" (Page 22) | No evidentiary support |

Texas College objects to this particular statement included within Plaintiffs' response, as there is no competent summary-judgment evidence in support. The College requests that its objection be sustained and the unsupported argument be stricken.

## VI. Objections to Affidavit of Burt Thorpe

Texas College objects to the Affidavit of Burt Thorpe in that Thorpe has not been properly disclosed as an expert witness. "The affidavit of an expert who is not properly designated may not be used as evidence in a summary judgment context. Where the expert's

APPENDIX 80

testimony will be excluded at trial on the merits, it will be excluded from a summary judgment proceeding." *Chau v. Riddle*, 212 S.W.3d 699, 704 (Tex. App. – Houston [1st Dist.] 2006) *rev'd on other grounds*, 254 S.W.3d (Tex. 2008). Texas College incorporates by reference Defendants' Motion to Strike Burt Thorpe and Defendants' Reply to Plaintiffs' Response to the Motion to Strike Burt Thorpe. Texas College re-urges the arguments contained therein and requests that the Court sustain Texas College's objection, and disregard and strike the Thorpe affidavit. Furthermore, as set forth in the College's Reply, Thorpe's affidavit contains conclusory statements, portrayed as opinions, which are based on incomplete underlying evidence and clear misstatements or misinterpretation of underlying facts. And based on references and cites to hearsay with no proper predicate or foundation established.

**WHEREFORE, PREMISES CONSIDERED,** Defendant, Texas College, respectfully requests that the foregoing evidence and statements in Plaintiffs' Response be stricken and disregarded by the Court.

Respectfully submitted,

**Yarbrough Wilcox, PLLC**
100 E. Ferguson, Suite 1015
Tyler, Texas 75702
903-595-3111 office
903-595-0191 fax

*/s/ Dallas W. Tharpe*
**Trey Yarbrough**
Bar No. 22133500
trey@yw-lawfirm.com
**Dallas W. Tharpe**
Bar No. 24052036
dallas@yw-lawfirm.com

**ATTORNEYS FOR TEXAS COLLEGE**

DEFENDANT TEXAS COLLEGE'S OBJECTIONS/MOTION TO STRIKE
EVIDENCE AND REFERENCES IN PLAINTIFFS' RESPONSE TO TEXAS
COLLEGE'S MOTION FOR SUMMARY JUDGMENT                    PAGE **18** OF **19**
APPENDIX 81

Page 3683

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above motion has been served on all

counsel of record in accordance with the Texas Rules of Civil Procedure on February 13, 2015.


/s/ Dallas W. Tharpe
Dallas W. Tharpe

APPENDIX 82

incident. Plaintiffs have produced no evidence that apportions or proves A-1 is responsible for any damages or injury to Plaintiffs.

**Plaintiff Carla Rollins Has No Evidence to Support Her Derivative Claims.**

All of Mrs. Rollins claims against A-1 fail as a matter of law, the loss of consortium claim in Plaintiffs' petition also fails as a matter of law. In addition, Mrs. Rollins' claims fail because she has not produced any competent evidence of damages. The testimony attached from Carla Rollins does not establish that A-1 caused any of the alleged damages she is claiming. Therefore, Plaintiff Carla Rollins' claims against A-1 should be dismissed.

## V.
## OBJECTIONS TO PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE

Summary judgment evidence must be admissible under the rule of evidence.[24] Evidentiary exclusions also apply to summary judgment proceedings as they would at trial.[25] Much if not most of Plaintiffs summary judgment evidence is unauthenticated, hearsay, or otherwise inadmissible, and should be stricken. Facts must be proven in the same manner or type of evidence that would be admissible at trial.[26] If a party's summary-judgment proof contains evidence that would not be admissible at trial, the appropriate avenue to challenge such is through written objections and requesting that the inadmissible summary-judgment proof be stricken.[27]

Texas Rule of Civil Procedure 193.6(a) provides that "[a] party who fails to make ... a discovery response in a timely manner may not introduce in evidence material or information

---

[24] *United Blood v. Longoria*, 938 S.W.2d 29, 30 (Tex. 1997); see TRCP 166a(f).
[25] *Fort Brown Villas II Cond v. Gillenwater*, 285 S.W.3d 879, 882 (Tex. 2009).
[26] *See* TEX. R. CIV. P. 166a(c).
[27] *See* TEX. R. CIV. P. 166a(f).

APPENDIX 83

that was not timely disclosed...."[28] A-1 objects to the repeated use of evidence not disclosed or produced in response to written discovery. As cataloged in A-1's pending Motion to Enforce Order on Written Discovery and for Sanctions and Motion to Strike Burt Thorpe, Plaintiffs' pattern of refusing to comply with the Texas Rules and this Court's Order now results in the automatic exclusion of this evidence.

### 4. Excerpts from the deposition of Mike Frazier

As an initial matter, A-1 objects to the deposition testimony of Mike Frazier as the attached copy d a draft and not a final copy of the deposition. The deponent has not had a chance to read and sign the deposition pursuant to the Texas Rules of Civil Procedure. A-1 further objects to the following testimony:

Question at 59:10 – Form Objection. Plaintiffs' counsel summarizes and misstates what has been read from the document.

Questions beginning at 60:21 – Form Objection. Plaintiffs' counsel improperly misstates what testimony from other witnesses has been in this case and then sets up improper hypothetical's based on an inaccurate representation of what the previous testimony from other witnesses had been. Intentionally misleading and vague.

Questions beginning at 61:4 - 14 – Form Objection. Plaintiffs' counsel improperly misstates what testimony from other witnesses has been in this case and then sets up improper hypothetical's based on an inaccurate representation of what the previous testimony from other witnesses had been. Intentionally misleading and vague.

Questions beginning at 62:4– Form Objection. Vague. Misquotes prior testimony to elicit a misleading response.

### 6. The JLG Owner's Manual Model 1930-ES (excerpts).

A-1 first objects to this document because it was not disclosed or produced in written discovery pursuant to Texas Rule of Civil Procedure 193.6(a) and is therefore subject to

---

[28] Tex.R. Civ. P. 193.6(a).

APPENDIX 84

mandatory exclusion. A-1 further objects to Plaintiffs' attempted use of a purported JLG Owner's Manual on the basis that Plaintiffs have failed to establish its authenticity or relevance, or lay any proper predicate for the admissibility of same, either through a qualified witness or otherwise. The purported manual is inadmissible hearsay and not competent as summary-judgment proof. No exception to the hearsay rules apply to the subject manual filed as an independent document with the Court. Since Plaintiffs are attempting to offer statements within the JLG Owner's Manual to prove the matter asserted, the complete "JLG Owner's Manual" itself, and the statements referenced within it, are inadmissible hearsay.

A-1's objections to the JLG Owner's Manual should be sustained, any reference to the JLG Owner's Manual should be excluded in total, and the JLG Owner's Manual and any reference to it should be disregarded by the Court for all purposes.

7.    **Affidavit of Garry Rollins dated February 3rd, 2015 and attached Exhibits.**

An affidavit attached in response to a motion for summary judgment must contain facts that would be admissible in evidence at trial.[29] The affidavit is so replete with inadmissible hearsay, irrelevant testimony, and sworn statements that fundamentally contradict Rollins' earlier sworn deposition testimony (making it a "Sham Affidavit"), A-1 respectfully requests that it be stricken in its entirety. In the alternative, A-1's summary judgment motion sets out in detail the repeated questions to Mr. Rollins and his repeated answers that he does not know how he fell. If his affidavit is not excluded in its entirety, the statements that directly contradict his prior sworn testimony should be excluded.

---

[29] TEX. R. CIV. P. 166a(f); *United Blood Servs. v. Longoria*, 938 S.w.2d 29, 30 (Tex. 1997).

APPENDIX 85

Hearsay statements in summary judgment affidavits are not competent evidence and should not be considered by the court.[30] 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is not admissible evidence "except as provided by statute or these rules or by other rules prescribed pursuant to statutory authority." TEX. R. EVID. 802. Rollins statements regarding any statements made by A-1 employees is purely hearsay and should be excluded as evidence. Further, Garry Rollins sworn interrogatory answer served in January 2015 states:

**INTERROGATORY NO. 18:** If You or your attorneys have any knowledge, either directly or indirectly, of any statement or admission of any kind made by MPF or anyone acting on their behalf regarding the incident, this lawsuit or your injuries that might be relevant to this lawsuit, please describe the statement and/or admission and identify who made the statement or admission and when it occurred.

**ANSWER:** At present, none; this is what we are hoping to discover during depositions.

Plaintiff's affidavit contradicts his sworn interrogatory answer and such contradictory statements, in addition to being hearsay, regarding any statements made by A-1 employees should be excluded.

Finally, the letter from Plaintiff's surgeon Dr. Barnett attached as an exhibit to the affidavit is inadmissible hearsay. Plaintiff is not capable of proving this letter up in any way and can certainly not provide a basis for the opinions contained therein. The letter and the opinions contained are hearsay without any applicable exception and must be excluded.

---

[30] *Powell v. Vavro, McDonald & Assocs.*, 136 S.W.3d 762, 765 (Tex. App. – Dallas 2004, no pet.).

APPENDIX 86

### 9. Affidavit of Ken Yerrington dated September 23rd, 2014.

A-1 moves to strike the affidavit of Ken Yerrington as a whole and specifically to the statement that "Mr. Rollins did not operate our sky lift jack that day..." as a conclusory statement that fails to provide a factual basis for the conclusion. Further, A-1 moves to strike the affidavit of Ken Yerrington based on the clarifying affidavit of Ken Yerrington and his description of the circumstances surrounding ther original affidavit and his clarification that he was not present at the gym at all times and therefore could not make any statements as to what occurred when he was not there.

### 10. Texas College's Answers to Interrogatories.

Plaintiffs improperly attempt to use Texas College's answers to interrogatories against A-1. Interrogatory answers "may be used only against the party answering the interrogatories."[31] Specifically, a party's answers to interrogatories **cannot** be used as evidence against a codefendant.[32] Accordingly, A-1 moves the Court to strike Texas College's interrogatory responses as they are improper and incompetent summary judgment evidence against A-1.

### 11. ANSI A92.6.

Plaintiffs attach a document purported to be ANSI standards without even attempting to authenticate or otherwise show why this document is in any way relevant or admissible evidence. A-1 first objects to this document because it was not disclosed or produced in written discovery pursuant to Texas Rule of Civil Procedure 193.6(a) and is therefore subject to mandatory

---

[31] *Hanssen v. Our Redeemer Lutheran Church*, 938 S.W.2d 85, 95 (Tex.App.—Dallas 1997, writ denied) (opinion on rehearing); *Nebgen v. Minnesota Mining & Mfg. Co.*, 898 S.W.2d 363, 366 (Tex.App.—San Antonio 1995, writ denied).
[32] *Buck v. Blum*, 130 S.W.3d 285, 290 (Tex.App.—Houston [14 Dist.],2004).

APPENDIX 87

exclusion. Further, this document is hearsay and is not certified, authenticated or otherwise competent, admissible summary-judgment evidence of any type. Evidence that is not properly authenticated is not competent summary-judgment evidence. *See Blanche v. First Nationwide Mortg. Corp.*, 74 S.W.3d 444, 451-52 (Tex. App.-Dallas 2002, no pet.).

**12.    Affidavit of Burt Thorpe.**

A-1 objects to the Affidavit of Burt Thorpe in that Thorpe has not been properly disclosed as an expert witness. "The affidavit of an expert who is not properly designated may not be used as evidence in a summary judgment context. Where the expert's testimony will be excluded at trial on the merits, it will be excluded from a summary judgment proceeding."[33] A-1 incorporates by reference Defendants' Motion to Strike Burt Thorpe and Defendants' Reply to Plaintiffs' Response to the Motion to Strike Burt Thorpe. A-1 re-urges the arguments contained therein and requests that the Court sustain A-1's objection, and disregard and strike the Thorpe affidavit in total. Furthermore, as set forth in A-1's, Thorpe's affidavit contains conclusory statements, portrayed as opinions, which are based on incomplete underlying evidence and clear misstatements or misinterpretation of underlying facts. And based on references and cites to hearsay with no proper predicate or foundation established.

A-1 further objects to the opinions and conclusions of Burt Thorpe due to the complete failure to disclose in response to disclosures or interrogatories or to produce the following documents that for the basis of his opinions:

d. OSHA Federal Regulations:
29 CFR 1910.27- Fixed Ladders,

---

[33] *Chau v. Riddle*, 212 S.W.3d 699, 704 (Tex. App. – Houston [1st Dist.] 2006) rev'd on other grounds, 254 S.W.3d (Tex. 2008).

APPENDIX 88

29 CFR 1910.67 - Vehicle Mounted Elevating and Rotating Work Platforms
29 CFR 1926.453- Aerial Lifts. Scaffolds,
29 CFR 1926.454 - Scaffolds, Training Requirements.
e. A "Statement of Best Practices of General Training and Familiarization for Aerial Work Platform Equipment" published by ARA, ANSI et. al.
g. ANSI A92.6 safety standards for scissor lifts (referred to as "Self Propelled Elevated Work Platforms")
h. The JLG Owner's Manual for model "1930-ES"

A-1 objects to all opinions and statements from Burt Thorpe for the reason that these documents were not disclosed or produced in written discovery pursuant to Texas Rule of Civil Procedure 193.6(a) and is therefore subject to mandatory exclusion. Burt Thorpe has no personal knowledge so his affidavit is otherwise conclusory and is not competent summary judgment evidence.

A-1 specifically objects to Paragraph Number 5 for the reasons it is filled with opinions based on the undisclosed documents referenced above and is also replete with legal conclusions. A-1 also objects to the "summary" of witness testimony as it impermissible hearsay along with being misleading. A-1 specifically objects to the statements regarding the owner's manual as Burt Thorpe has not personal knowledge of the events and he specifically misleads the Court with his conclusion that Brackens testified that there definitely was no manual on board the lift. For the many reasons above, Burt Thorpe's affidavit should be excluded in its entirety. At a minimum, the Court should exclude paragraph number 5 from evidence in this matter.

14. **Goodwin v. Bluffton College, 2004-Ohio-2223, CASE NUMBER 10337, 04-LW-1747 (3rd).**

A-1 objects to and moves to exclude this legal opinion from Ohio as wholly irrelevant and is not competent summary judgment evidence of any type.

APPENDIX 89

15. **"Statement of Best Practices of General Training and Familiarization for Aerial Work Platform Equipment", February 2010**

A-1 first objects to this document because it was not disclosed or produced in written discovery pursuant to Texas Rule of Civil Procedure 193.6(a) and is therefore subject to mandatory exclusion. Further, this document is irrelevant hearsay and is not certified, authenticated or otherwise competent, admissible summary-judgment evidence of any type. No attempt was made to identify this document or submit this document in admissible form. Evidence that is not properly authenticated is not competent summary-judgment evidence.[34] A-1's objections to this document should be sustained, any reference to it should excluded in total and any reference to it should be disregarded by the Court for all purposes.

## VIII.
## PRAYER

Plaintiffs have failed to allege any claim or cause of action for which damages are recoverable against A-1 as a matter of law. Finally, Plaintiffs have no evidence to support one or more of the elements of each of their claims against A-1. For the foregoing reasons, Defendant A-1 requests that this Court sustain all objections to Plaintiffs' improper summary judgment evidence, dismiss all claims against A-1 and Defendant also prays for such other and further relief, at law or in equity, to which it may be justly entitled.

---

[34] *See Blanche v. First Nationwide Mortg. Corp.*, 74 S.W.3d 444, 451-52 (Tex. App.-Dallas 2002, no pet.).

DEFENDANT MPF INVESTMENTS, LLC D/B/A A-1 RENT                                    Page 25
ALL'S REPLY TO PLAINTIFFS' RESPONSE TO TRADITIONAL
AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT AND
OBJECTIONS TO PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE

APPENDIX 90

Respectfully submitted,

**MARTIN, DISIERE, JEFFERSON & WISDOM, L.L.P.**

By: */s/ Ryan K. Geddie*
    Todd M. Lonergan
    State Bar No. 12513700
    Mark J. Dyer
    State Bar No. 06317500
    Ryan K. Geddie
    State Bar No. 24055541
    Tollway Plaza One
    16000 N. Dallas Parkway, Suite 800
    Dallas, Texas 75248
    Telephone:    (214) 420-5500
    Facsimile:    (214) 420-5501
    lonergan@mdjwlaw.com
    dyer@mdjwlaw.com
    geddie@mdjwlaw.com

**ATTORNEYS FOR DEFENDANT MPF
INVESTMENTS, LLC d/b/a "A-1 RENT ALL"**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above pleading has been served via e-service pursuant to Texas Rules of Civil Procedure 21(a) on this the 13th day of February 2015 to:

Ernesto D. Sigmon
Law Offices of Ernesto D. Sigmon
416 West Saulnier Street
Houston, Texas 77019

Trey Yarbrough
Yarbrough Wilcox Gunter, PLLC
100 East Ferguson, Suite 1015
Tyler, Texas 75702

                                      */s/Ryan K. Geddie*
                                        Ryan K. Geddie

DEFENDANT MPF INVESTMENTS, LLC D/B/A A-1 RENT
ALL'S REPLY TO PLAINTIFFS' RESPONSE TO TRADITIONAL
AND NO-EVIDENCE MOTION FOR SUMMARY JUDGMENT AND
OBJECTIONS TO PLAINTIFFS' SUMMARY JUDGMENT EVIDENCE

Page 26

APPENDIX 91

CAUSE NO. 13-3353-A

GARRY L. ROLLINS and        ) IN THE DISTRICT COURT
CARLA D. ROLLINS            )
                            )
            Plaintiffs      )
                            )
VS.                         ) SMITH COUNTY, TEXAS
                            )
TEXAS COLLEGE, CHRISTIAN    )
METHODIST EPISCOPAL         )
CHURCH, MPF INVESTMENTS,    )
LLC, d/b/a "A-1 RENT ALL"   )
                            )
            Defendants      ) 7th JUDICIAL DISTRICT

-----------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

GARRY L. ROLLINS

JULY 7, 2014

-----------------------------------------

**EXHIBIT A**

        ORAL AND VIDEOTAPED DEPOSITION OF GARRY L. ROLLINS,
produced as a witness at the instance of the DEFENDANTS,
and duly sworn, was taken in the above-styled and
numbered cause on July 7, 2014, from 8:44 a.m. to 3:31
p.m., before Jan Newman Carter, CSR in and for the State
of Texas, reported by machine shorthand, at the law
offices of Martin Walker, PC, 121 N. Spring Avenue,
Tyler, Texas, pursuant to the Texas Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

is that true?

A.   No, they did not.

Q.   Okay.  And I'm going to -- we've been referring to it as September 14th, I'm just going to refer to that as the September accident; is that fair?

MR. SIGMON:  Object to the form.

Q.   (BY MR. GEDDIE)  I'll say September 14th incident then.  If I say September 14th incident, will you know what I'm referring to?

A.   Yes.

Q.   All right.  Mr. Rollins, what is your current e-mail address?

A.   What's my current e-mail address?

Q.   Yes, sir.

A.   garryrollins341@yahoo.com.

Q.   And is that the same one that you were using in September and October of 2013?

A.   I might have used my wife's, I'm not a hundred percent sure.

Q.   Okay.  And I'll really just get to the point, did you e-mail any of your friends or co-workers anything about this accident or your injury?

A.   My answer to that is I can't e-mail anybody anything because I can't read.

Q.   Okay.

Electronically signed by Jan Newman Carter (601-015-560-8388)                6f66a6c-f0e2-4e79-a615-092a552304d

APPENDIX 98

A. And in order to e-mail somebody, you got to be able to read to spell. So, my answer to that is no.

Q. Okay. Understood. But you do have an e-mail address that you just gave me.

A. Yes.

Q. And does typically your wife help you e-mail back and forth --

A. My wife never e-mailed anybody.

Q. Okay. So, I assume by virtue of what you just testified to, would it be true to say that you're not able to read any operator manuals for any of the equipment that you use in your job.

A. No, I can't read them.

Q. So, in your roughly 20 years of experience in the maintenance field, I assume you've used lots of different types of power equipment and things like that.

MR. SIGMON: Object to the form.

A. I've never used any heavy equipment in maintenance that I've done.

Q. (BY MR. GEDDIE) Have you used handheld equipment?

A. Drills, saws, yes.

Q. Grinders, that sort of thing?

A. Yes.

Q. And all those times you used that, you were

Electronically signed by Jan Newman Carter (601-015-560-8388)      6f66a8c-2042-4a75-8615-da2a552304d
APPENDIX 94

never able to read any of the operator manuals; is that true?

A. No.

Q. In those instances, did you rely on the people that you worked for to train you on how to use those tools?

A. Yes, I did.

Q. All right. Mr. Rollins, your residence is in DeSoto, Texas; is that true?

A. Yes, sir.

Q. Is that Dallas County?

A. Yes.

Q. Okay. Since October of 2013, have you made any trips outside of Dallas County other than to be here today?

A. Yes.

Q. Okay. And where have you gone?

A. San Antonio.

Q. Approximately when did you go to San Antonio?

A. Did you say partially?

Q. Approximately when did you go?

A. Oh, I don't know, maybe two or three months ago, I'm not just accurate.

Q. And what were you doing in San Antonio?

A. Seeing a doctor.

Electronically signed by Jan Newman Carter (601-015-560-8388)     6f66f8ae-f0e2-4e75-ab15-da2a552304d

APPENDIX 95

465 S.W.3d 193
Supreme Court of Texas.

Randy **Austin**, Appellant,

v.

**Kroger** Texas, L.P., Appellee

No. 14–0216    |    Argued December 9, 2014    |    Opinion delivered: June 12, 2015

**Synopsis**

**Background:** Employee filed suit against nonsubscribing employer for injuries sustained in slip and fall while cleaning oily liquid spill in employer's restrooms, based on claims for negligence, gross negligence, and premises liability. Upon removal, the United States District Court for the Northern District of Texas, 2012 WL 2795674, entered summary judgment for employer, and employee appealed. The Court of Appeals, 731 F.3d 418, affirmed grant of summary judgment on negligence claims, but reversed summary judgment on premises liability claims, and certified question seeking clarification of Texas premises liability law.

**Holdings:** The Supreme Court, Boyd, J., held that:

[1] generally, an employer does not have a duty to warn employees of **dangers** that are open and obvious or already known to the employee, overruling *Sears, Roebuck & Co. v. Robinson*, 154 Tex. 336, 280 S.W.2d 238;

[2] "criminal activity" exception to general "no duty" rule applied if risk resulted from third party's criminal conduct for which employer should have anticipated that harm would occur, despite employee's knowledge of risks;

[3] exception to general "no duty" rule applied if it was necessary for employee to use dangerous premises and employer should have anticipated that employee was unable to take measures to avoid risk, despite awareness of risk;

[4] in event either exception to "no duty" rule applied, Texas Workers' Compensation Act prevented nonsubscribing employer from relying on employee's awareness of risk as defense;

[5] employer's specific instruction for employee to clean up oily liquid spill in restrooms was not basis for creating third exception to general "no duty" rule; and

[6] employee did not have to show that employer engaged in contemporaneously negligent activity in order to show that employer breached duty to provide employee with necessary instrumentalities to perform job.

Certified question answered.

West Headnotes (30)

**[1]    Labor and Employment**
☞ **Dangers** or defects known to employee
**Labor and Employment**
☞ Obvious **dangers**

Neither the obviousness of a **danger** nor an employee's awareness of it eliminates an employer's duty to provide a safe workplace; that duty always exists.

Cases that cite this headnote

**[2]    Negligence**
☞ Who are invitees

An "invitee", for the purposes of establishing a landowner's duty of care, is one who enters the property of another with the owner's knowledge and for the mutual benefit of both.

Cases that cite this headnote

**[3]    Labor and Employment**
☞ Nature and Scope of Duty Owed by Employer

While an employer's liability for an employee's injury may differ from that of other landowners due to the statutory waiver of its defenses, its premises-liability duty is the same as that owed by landowners to invitees generally. Tex. Labor Code Ann. § 406.033(a).

Cases that cite this headnote

**[4]    Negligence**

    Care required in general

A landowner has a duty to exercise reasonable care to make the premises safe for invitees, and the landowner can satisfy this duty by eliminating the dangerous condition or by mitigating the condition so that it is no longer unreasonably dangerous.

Cases that cite this headnote

**[5]    Labor and Employment**

    Dangers or defects known to employee

**Labor and Employment**

    Obvious dangers

Generally, an employer does not have a duty to warn employees of dangers that are open and obvious or already known to the employee; overruling *Sears, Roebuck & Co. v. Robinson*, 154 Tex. 336, 280 S.W.2d 238.

Cases that cite this headnote

**[6]    Negligence**

    Care required in general

Ordinarily, the landowner need not both make reasonably safe and warn invitees about an unreasonably dangerous condition of the property, and the landowner can satisfy its duty to the invitee by providing an adequate warning even if the unreasonably dangerous condition remains.

1 Cases that cite this headnote

**[7]    Negligence**

    Care required in general

A landowner's duty to invitees is not absolute.

Cases that cite this headnote

**[8]    Negligence**

    Reasonable or ordinary care in general

A landowner's premises-liability duties, like its negligence duties, are limited to a duty to exercise ordinary, reasonable care.

2 Cases that cite this headnote

**[9]    Negligence**

    Reasonable or ordinary care in general

In the premises liability context, a landowner has no duty to take safety measures beyond those that an ordinary, reasonable landowner would take.

Cases that cite this headnote

**[10]    Labor and Employment**

    Dangers from extraneous sources

"Criminal activity" exception to general rule that employer owed no duty to warn employee of unreasonably dangerous condition of property that was open and obvious applied, so as to impose liability on employer for employee's injury, if risk resulted from third party's criminal conduct for which employer should have anticipated that harm would occur, despite employee's knowledge of risks.

Cases that cite this headnote

**[11]    Negligence**

    Duty to warn

**Negligence**

    Protection against acts of third persons generally

An exception to the general rule that a landowner has no duty to warn an invitee of unreasonably dangerous conditions that are obvious or known to the invitee, known as the "criminal activity" exception, applies in cases involving dangers resulting from a third party's criminal conduct in which the landowner should have anticipated that the harm would occur, despite the invitee's knowledge of the risks; in such cases, the invitee's appreciation of the danger remains relevant to the landowner's proportionate-responsibility defenses, but it does not relieve the landowner of its duty to take reasonable steps to make the premises safe.

Cases that cite this headnote

**[12]    Negligence**

☛ Duty to warn

**Negligence**

☛ Care required in general

An exception to the general rule that a landowner owes an invitee no duty to warn of an unreasonable dangerous condition that is open and obvious, known as the "necessary use" exception, arises when the facts demonstrate that (1) it was necessary that the invitee use the unreasonably dangerous premises, and (2) the landowner should have anticipated that the invitee was unable to avoid the unreasonable risks despite the invitee's awareness of them. Restatement (Second) of Torts § 361.

Cases that cite this headnote

**[13]** **Negligence**

☛ Buildings and structures

One's conduct after he is possessed of full knowledge of a dangerous condition, under the circumstances, may be justified or deemed negligent depending upon such things as the plaintiff's status, the nature of the structure, the urgency or lack of it for attempting to reach a destination, the availability of an alternative, one's familiarity or lack of it, the degree and seriousness of the **danger**, the availability of aid from others, the kind and extent of a warning, and the precautions taken under the circumstances by the plaintiff.

Cases that cite this headnote

**[14]** **Negligence**

☛ Open and obvious **dangers**

Not every open and obvious condition of **danger** on the land precludes recovery.

Cases that cite this headnote

**[15]** **Negligence**

☛ Duty to warn

**Negligence**

☛ Care required in general

When the necessary-use exception to the general rule that a landowner owes no duty to warn an

invitee of an unreasonably dangerous condition that is open and obvious applies, the invitee's awareness of the risk does not relieve the landowner's duty to make the premises safe, but it remains relevant to the issue of proportionate responsibility, unless that defense is legally unavailable. Restatement (Second) of Torts § 361.

Cases that cite this headnote

**[16]** **Negligence**

☛ Duty as question of fact or law generally

Whether a duty exists is a question of law for the court, and if no duty exists, a jury cannot impose a duty anyway.

Cases that cite this headnote

**[17]** **Negligence**

☛ As Grounds for Apportionment; Comparative Negligence Doctrine

**Negligence**

☛ Effect of comparative negligence

**Negligence**

☛ Effect of others' fault; comparative negligence

**Negligence**

☛ Assumption of risk

Although the common law affirmative defenses of assumption of the risk and contributory negligence no longer exist under Texas law, the underlying concepts remain relevant under Texas's proportionate-responsibility statute; in other words, although these are no longer affirmative defenses that act as an absolute bar to recovery, they remain defensive issues on which defendants, not plaintiffs, bear the burden of proof. Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

Cases that cite this headnote

**[18]** **Labor and Employment**

☛ **Dangers** or defects known to employee

**Labor and Employment**

☛ Obvious **dangers**

APPENDIX 98   3

**Workers' Compensation**

&#128273; Defenses; Abrogation or Modification of Common-Law Defenses

An exception to the general rule that an employer owes no duty to warn or train employees with respect to **dangers** that are commonly known or already appreciated by the employee exists, and a non-subscribing employer owes such a duty, despite the obviousness or employee's appreciation of a **danger**, because, despite the awareness of the **danger**, it is necessary that the employee use the dangerous premises and the employer should anticipate that the employee is unable to take measures to avoid the risk; in such cases, the employer cannot rely on the fact that the risk was obvious and known to the employee to argue that the employee bears some portion of the responsibility for his own injuries, because the Texas Workers' Compensation Act waives those defenses. Tex. Labor Code Ann. § 406.033(a); Restatement (Second) of Torts § 361.

Cases that cite this headnote

[19] **Labor and Employment**

&#128273; **Dangers** or defects known to employee

**Workers' Compensation**

&#128273; Defenses; Abrogation or Modification of Common-Law Defenses

**Workers' Compensation**

&#128273; Reduction of damages for contributory negligence; comparative negligence

Although an employee's awareness of an unreasonable risk may be relevant to the defenses of contributory negligence and the assumption of risk under the proportionate responsibility statute, the general rule that an employer owes no duty to warn or train employees with respect to **dangers** that are commonly known or already appreciated by the employee may permit an employer to avoid liability despite the waiver of those defenses under the Texas Workers' Compensation Act; however, it does so not by undermining the Legislature's prerogative to determine when defenses may or may not apply, but by fulfilling the court's role to determine when a party owes a legal duty to begin with.

Tex. Labor Code Ann. § 406.033(a); Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

Cases that cite this headnote

[20] **Workers' Compensation**

&#128273; Defenses; Abrogation or Modification of Common-Law Defenses

**Workers' Compensation**

&#128273; Reduction of damages for contributory negligence; comparative negligence

The Texas Workers' Compensation Act's waiver of an employer's defenses to liability under the proportionate responsibility statute prohibits a nonsubscribing employer from relying on an employee's assumption of the risk or contributory negligence. Tex. Labor Code Ann. § 406.033(a)(1), (2); Tex. Civ. Prac. & Rem. Code Ann. § 33.001.

Cases that cite this headnote

[21] **Workers' Compensation**

&#128273; Defenses; Abrogation or Modification of Common-Law Defenses

In cases in which the criminal-activity or necessary-use exceptions to the general rule that an employer owes no duty to warn or train employees with respect to **dangers** that are commonly known or already appreciated by the employee apply, and thus, the employer has a duty to the employee despite the employee's awareness of the risk, the Texas Workers' Compensation Act will prevent the employer from relying on the employee's awareness of the risk as a defense to the employee's claims. Tex. Labor Code Ann. § 406.033(a)(1), (2); Tex. Civ. Prac. & Rem. Code Ann. § 33.001; Restatement (Second) of Torts § 361.

Cases that cite this headnote

[22] **Labor and Employment**

&#128273; **Dangers** or defects known to employee

**Labor and Employment**

&#128273; Obvious **dangers**

Nonsubscribing employer's specific instruction for employee to clean up oily liquid spill

in restrooms of employer's store was not basis for creating exception to general rule that employer owed no duty to protect or warn employee against unreasonably dangerous premises condition that was open and obvious or otherwise known to employee.

Cases that cite this headnote

**[23]    Labor and Employment**
     Working Conditions and Methods of Performing Work

When an employee's injury results from performing the same character of work that employees in that position have always done, an employer is not liable if there is no evidence that the work is unusually precarious.

Cases that cite this headnote

**[24]    Labor and Employment**
     Kind of Equipment

Employee did not have to show that nonsubscribing employer engaged in contemporaneously negligent activity in order to show that employer breached duty to provide employee with necessary instrumentalities to perform job of cleaning up oily liquid spill in restrooms of employer's store, in action against employer for injuries sustained in slip-and-fall while cleaning spill.

Cases that cite this headnote

**[25]    Negligence**
     Nature

**Negligence**
     Care required in general

In a typical premises-liability case, the landowner owes the invitee two duties: a duty to keep the premises reasonably safe and a duty not to injure the invitee through contemporaneous negligent activity; thus, when a claim does not result from contemporaneous activity, the invitee has no negligent-activity claim, and his claim sounds exclusively in premises-liability.

2 Cases that cite this headnote

**[26]    Labor and Employment**
     Existence of Duty on Part of Employer

**Labor and Employment**
     Nature and scope of duty owed by employer

When the landowner is also an employer and the invitee is also its employee, this relationship may give rise to additional duties, such as a duty to provide necessary equipment, training, or supervision.

2 Cases that cite this headnote

**[27]    Negligence**
     Nature

**Negligence**
     Concurrent causes

When an injury arises from a premises condition, it is often the case that any resulting claim sounds exclusively in premises liability, but that is not necessarily the case, because an injury can have more than one proximate cause.

Cases that cite this headnote

**[28]    Labor and Employment**
     Kind of Equipment

Contemporaneous negligent activity of an employer is not an element of an employee's claim based on the employer's failure to provide the employee with the necessary instrumentalities to perform his job; to the contrary, an instrumentalities claim may be founded on nonfeasance or misfeasance, neither of which is particularly likely to occur contemporaneously with a resulting injury to the employee.

1 Cases that cite this headnote

**[29]    Labor and Employment**
     Kind of Equipment

Because contemporaneous negligent activity by the employer is not necessary to an injured employee's claim that the employer failed to

provide the employee with the necessary and safe instrumentalities to perform the job, the absence of contemporaneous activity does not necessarily bar an instrumentalities claim.

3 Cases that cite this headnote

**[30]**    **Labor and Employment**
   🔑 Nature and scope of duty owed by employer

   **Labor and Employment**
   🔑 Kind of Equipment

Only an employer that has control over the premises where the employee is injured has a premises-liability duty to the employee, but the duty to provide necessary and safe instrumentalities to perform the job applies to employers generally.

2 Cases that cite this headnote

**\*197** ON CERTIFIED QUESTION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**Attorneys and Law Firms**

Matthew Joseph Kita, Attorney at Law, Dallas, for Appellant Randy Austin.

Donna C. Peavler, Bryan Kyle Briscoe, The Peavler Group, P.C., Grapevine, Mike A. Hatchell, Locke Lord LLP, Austin, Dale Wainwright, Bracewell & Giuliani, LLP, Austin, Charles R. 'Skip' Watson Jr., Locke Lord LLP, Austin, for Appellee Kroger Texas, L.P.

Deborah J. Race, Ireland Carroll & Kelley, P.C., Tyler, for Amicus Curiae Brookshire Grocery Co., Daryl Flood, Inc. and Quiktrip Corporation.

**\*198** Brian A. Sheguit, The Bassett Firm, Dallas, for Amicus Curiae Mission Petroleum Carriers, Inc.

Harold McCall Jr., San Antonio, Javier Espinoza, The Espinoza Law Firm, PLLC, San Antonio, for Amicus Curiae San Antonio Trial Lawyers Association.

Peter M. Kelly, Kelly, Durham & Pittard, L.L.P., Houston, for Amicus Curiae Texas Trial Lawyers Association.

**Opinion**

Justice Boyd delivered the opinion of the Court, in which Justice Johnson, Justice Guzman, Justice Lehrmann, and Justice Devine joined, and in which Chief Justice Hecht, Justice Green, Justice Willett, and Justice Brown joined except as to Part IV.

Texas employers have a duty to exercise reasonable care to provide their employees with a safe place to work. Like all others who own or operate land, employers generally may fulfill their premises-liability duties to invitees either by eliminating any unreasonably dangerous condition or by adequately warning of the risks. In this case, the employer, which had opted out of the Texas workers' compensation system, sought to eliminate the **danger**, but the employee who was responsible for the task was himself injured while doing so. The employer could not have eliminated the **danger** without assigning the task to an employee, and the employee concedes that he was fully aware of the risks. Addressing a certified question from the United States Court of Appeals for the Fifth Circuit,[1] we clarify that, under Texas law, (1) subject to two limited exceptions, an employer generally does not have a duty to warn or protect its employees from unreasonably dangerous premises conditions that are open and obvious or known to the employee; and (2) under this general rule, the Texas Workers' Compensation Act's (TWCA) waiver of a nonsubscribing employer's common law defenses does not eliminate an employee's burden of proving that the employer owed him a duty as an element of a premises liability claim. We also conclude that contemporaneous negligent activity by the employer is not necessary to an employee's instrumentalities claim.

**I.**

**Background**

Randy Austin fell while mopping a restroom floor at the Kroger store where he worked in Mesquite, Texas. An oily liquid had leaked through the store's ventilation ducts after another Kroger employee power-washed the store's condenser units, creating spills in both the men's and women's restrooms. Consistent with Austin's duties as a self-described "floor clean-up person," Austin's supervisor directed him to clean the spills. Kroger's safety handbook recommends that employees clean spills using a "Spill Magic" system

that involves a powdery absorbent product, a broom, and a dustpan. According to the handbook, using this system reduces the likelihood of a slip-and-fall by 25%. Contrary to the handbook's instruction to store managers, however, the system was not available at the store that day. Austin thus attempted to clean the liquid with a mop. Austin successfully cleaned the women's room and then moved to the men's room, where the brownish liquid covered about 80% of the floor. Recognizing the danger that the slippery liquid presented, he placed "wet floor" signs around the area and carefully took "baby steps" as he moved throughout the spill. **\*199** After successfully cleaning 30% to 40% of the spill, Austin slipped in the remaining liquid and fell, fracturing his femur and dislocating his hip. As a result, he spent nine months in the hospital and underwent six surgeries, leaving his left leg two inches shorter than his right.

Austin's employer, Kroger Texas L.P., had elected not to subscribe to the Texas workers' compensation system.[2] Austin sued Kroger in state court, asserting claims for negligence, gross negligence, and premises liability. In support of his negligence claim, Austin alleged that Kroger had engaged in negligent activities[3] and had failed to provide a "necessary instrumentality"—specifically, the Spill Magic system.[4] Kroger removed the case to federal district court, which granted Kroger's motion for summary judgment on all of Austin's claims. The Fifth Circuit Court of Appeals affirmed as to Austin's negligent activity[5] and gross negligence[6] claims, but reversed and remanded the necessary-instrumentalities claim because the district court had "failed to consider whether ... [that theory] is sufficient to support a stand-alone ordinary negligence claim." 746 F.3d at 197. As to Austin's premises-liability claim, the Fifth Circuit found that the "nature and scope" of an employer's duty to provide its employees with a safe workplace is "arguably unclear" under Texas law "when an employee is aware of the hazard or risk at issue." *Id*. at 199. Concluding that "[i]t is best to leave the resolution of these matters to the good judgment of the highest state court," the Fifth Circuit certified the following question:

> Pursuant to Texas law, including § 406.033(a)(1)–(3) of the Texas Labor Code, can an employee recover against a non-subscribing employer for an injury caused by a premises defect of which he was fully aware but that his job duties required him to remedy?

Put differently, does the employee's awareness of the defect eliminate the employer's duty to maintain a safe workplace?

*Id*. at 204.

## II.

### The Parties' Arguments

The parties' arguments in this case reflect the significance of characterizing the question as involving Kroger's "duty" to its employees. Outside of the employment context, a landowner[7] sued for premises **\*200** liability may rely on an invitee's awareness of the dangerous condition as evidence of the invitee's own negligence and proportionate responsibility, as a defense to the invitee's claims. *See* TEX. CIV. PRAC. & REM. CODEE §§ 33.001–.017 (proportionate responsibility statute). And an employer that elects to subscribe to the Texas workers' compensation system will not face the kinds of claims that Austin has asserted in this case, because the TWCA provides the employee's exclusive remedies. *See* TEX. LAB. CODE § 406.033(a); *In re Crawford & Co.,* 458 S.W.3d 920, 923–26 (Tex.2015); *Tex. Mut. Ins. Co. v. Ruttiger,* 381 S.W.3d 430 (Tex.2012). But an employer that opts out of the workers' compensation system, as Kroger has done here, is prohibited from asserting the employee's negligence or assumption of the risk as a defense. TEX. LAB. CODE § 406.033(a) (providing that, in an action against a nonsubscribing employer, "it is not a defense that: (1) the employee was guilty of contributory negligence; (2) the employee assumed the risk of injury or death; or (3) the injury or death was caused by the negligence of a fellow employee"). If Austin's awareness and assumption of the risks are relevant here, they can be relevant only to the question of whether Kroger owed Austin a duty at all. If Kroger owed Austin a duty, its breach of that duty would result in liability for all of Austin's damages, regardless of Austin's awareness of the risks or any negligence on Austin's part.

Kroger argues that this Court's recent "trilogy" of employer-employee tort cases confirms that an employer has no duty to warn or protect employees against "hazards that are commonly known or already appreciated by the employee." *See Brookshire Grocery Co. v. Goss,* 262 S.W.3d 793, 794 (Tex.2008) (holding employer owed no duty to employee injured while stepping over cart in store's cooler); *Jack in*

*the Box, Inc. v. Skiles,* 221 S.W.3d 566, 568–69 (Tex.2007) (holding employer owed no duty to employee injured while climbing over broken lift gate to unload truck); *Kroger Co. v. Elwood,* 197 S.W.3d 793, 795 (Tex.2006) (holding employer owed no duty to employee injured when he placed his hand in car doorjamb while loading customer's groceries into car in sloped parking lot). Because the risk of slipping and falling on a wet floor is commonly known and Austin admitted that he was aware of the wet floor and appreciated the risk, Kroger asserts that it had no duty to protect or warn Austin against that risk. Kroger further argues that this Court's opinions in *Elwood, Skiles,* and *Goss* demonstrate that, although the TWCA waives a nonsubscribing employer's defenses, it does not relieve the employee of the burden of proving that the employer owed a duty.

Austin contends that Kroger is relying on the old "no-duty rule," which this Court abolished in the employment-law context sixty years ago, *see Sears, Roebuck & Co. v. Robinson,* 154 Tex. 336, 280 S.W.2d 238 (1955), and in all landowner-invitee cases nearly forty years ago, *see Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex.1978). Under *Robinson* and *Parker,* Austin contends, his awareness of the dangerous condition does not affect Kroger's legal duty. Instead, his awareness can be relevant only to whether he was negligent and thus to his proportionate responsibility, which the TWCA prohibits Kroger from raising as a defense. Thus, according to Austin, Kroger cannot rely on Austin's awareness of the danger at all.

**\*201** Reviewing the parties' arguments, the Fifth Circuit concluded that the cases on which the parties rely represent "arguably conflicting Texas Supreme Court precedent." 746 F.3d at 197. We accepted the certified question as an opportunity to provide greater certainty in this important area of the law. Reviewing this Court's precedents, we endeavor to clarify where helpful and resolve apparent conflicts where needed. We do so mindful that our decisions regarding common law duties involve "complex considerations of public policy including 'social, economic, and political questions and their application to the facts at hand.' " *Nabors Drilling, U.S.A., Inc. v. Escoto,* 288 S.W.3d 401, 410 (Tex.2009) (quoting *Humble Sand & Gravel, Inc. v. Gomez,* 146 S.W.3d 170, 182 (Tex.2004)).

### III.

### Defining the Premises–Liability Duty

**[1]** We begin by noting that the Fifth Circuit's alternative iteration of its certified question asks, "[D]oes the employee's awareness of the defect eliminate[s] the employer's duty to maintain a safe workplace?" The answer to that question is "no." As Kroger concedes, neither the obviousness of a danger nor an employee's awareness of it "eliminates" an employer's duty to "provide a safe workplace." That duty always exists, but the question here is whether that duty includes a more specific duty to warn or protect employees against obvious or known hazards. We therefore begin by addressing the specific duties that comprise an employer's duty to provide a safe workplace in the context of premises-liability claims. We conclude that, with two notable exceptions, an employer's premises-liability duty to its employee includes only the duty to protect or warn the employee against concealed hazards of which the employer is aware, or reasonably should have been aware, but the employee is not. We then discuss how these principles operate in light of the TWCA's waiver of defenses and our abolition of the no-duty rule in *Robinson* and *Parker*.

### A. The Duty to Warn

We endeavor here to answer three questions: (1) whether an employer's premises liability to employees differs from other landowners' premises liability to invitees; (2) whether a landowner's duty to invitees is a duty to "make safe," or a duty to "warn," or a duty to "make safe *or* warn"; and (3) whether an invitee's knowledge of a dangerous condition goes to the "duty" element of the plaintiff's case or to the defendant's proportionate-responsibility defenses or to both, especially in light of the TWCA's waiver of defenses. We conclude that (1) employers owe employees the same premises-liability duty that other landowners owe to their invitees; (2) in most cases, the landowner's premises-liability duty is to either make safe or warn invitees of concealed dangers of which the landowner is or should be aware but the invitee is not; and (3) in most cases, a landowner owes no duty to protect an invitee against a dangerous condition that is open and obvious or known to the invitee, and the TWCA's waiver of defenses does not relieve a plaintiff of the burden of proving that the defendant owed a duty.

### 1. Employers and Other Landowners

[2] We first clarify and confirm that, generally,[8] an employer has the same **\*202** premises-liability duty to its employees as other landowners have to invitees on their premises. An invitee is "one who enters the property of another 'with the owner's knowledge and for the mutual benefit of both.' " *Motel 6 G.P., Inc. v. Lopez,* 929 S.W.2d 1, 3 (Tex.1996) (quoting *Rosas v. Buddies Food Store,* 518 S.W.2d 534, 536 (Tex.1975)). Employees working at their employers' premises fit this description, and this Court has stated that an employer's duty to make its premises reasonably safe for employees is "in all material respects ... identical" to a landowner's duty to make its premises reasonably safe for invitees. *Robinson,* 280 S.W.2d at 240; *see also Hernandez v. Heldenfels,* 374 S.W.2d 196, 197 (Tex.1963) (holding that employee was invitee, rather than licensee, while working at his employer's premises). As mentioned, the Court abolished the no-duty rule only for employer-employee cases in *Robinson,* 280 S.W.2d at 240, but later did the same for all other premises-liability cases in *Parker,* 565 S.W.2d at 512. Other than that brief rift, the Court has treated employers as having the same premises-liability duties as all other landowners, and we confirm that approach today.

[3] In answering the Fifth Circuit's certified question, we thus consider the premises-liability duties of landowners to invitees generally. The certified question's reference to "a nonsubcribing employer" and to the TWCA's waiver of a nonsubscriber's defenses, therefore, has no bearing on our analysis of an employer's duty. While an employer's *liability* may differ from that of other landowners due to the statutory waiver of its defenses, *see* **Kroger** *Co. v. Keng,* 23 S.W.3d 347, 352 (Tex.2000), its premises-liability *duty* is the same as that owed by landowners to invitees generally.

## 2. The Duty to Make Safe or Warn

[4] At different times, this Court has described a landowner's premises-liability duty to invitees as a duty to make reasonably safe,[9] a duty to warn,[10] or a duty to make safe *or* warn.[11] While potentially confusing, these descriptions are not at odds with each other. A landowner has a duty to exercise reasonable care to make the premises safe for invitees. Obviously, the landowner can satisfy this duty by eliminating the dangerous condition or by mitigating the condition so that it is no longer unreasonably dangerous. *See State v. Williams,* 940 S.W.2d 583, 584 (Tex.1996). But the Court has repeatedly recognized that, in most cases, the landowner can also satisfy its duty by providing an adequate warning of the **danger**. *See, e.g., Escoto,* 288 S.W.3d at

412; *Goss,* 262 S.W.3d at 794; *Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 216 (Tex.2008); *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007); *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 295 (Tex.2004). The Court has struggled to characterize the rule, however, in cases in which the landowner's provision of a warning or the invitee's knowledge of the risk was not **\*203** sufficient to make the premises reasonably safe. Today we clarify that these cases present discrete exceptions to the general rule.

### a. The General Rule

[5] [6] Applying the general rule, the Court has repeatedly described a landowner's duty as a duty to make safe or warn against any concealed, unreasonably dangerous conditions of which the landowner is, or reasonably should be, aware but the invitee is not. *See, e.g., Escoto,* 288 S.W.3d at 412; *Goss,* 262 S.W.3d at 794; *Moritz,* 257 S.W.3d at 216; *Islas,* 228 S.W.3d at 651; *Khan,* 138 S.W.3d at 295. Ordinarily, the landowner need not do both, and can satisfy its duty by providing an adequate warning even if the unreasonably dangerous condition remains. *See Williams,* 940 S.W.2d at 584 (holding that landowner "had a duty to warn or make safe, but not both"); *see also TXI Operations, L.P. v. Perry,* 278 S.W.3d 763, 765 (Tex.2009) (observing that defendant could have satisfied its duty by either repairing pothole or providing adequate warning sign). This general rule is consistent with the reasons for imposing a duty on landowners in the first place. The landowner is typically in a better position than the invitee to be aware of hidden hazards on the premises, so the law mandates that the landowner take precautions to protect invitees against such hazards, to the extent the landowner is or should be aware of them. *See Shell Chem. Co. v. Lamb,* 493 S.W.2d 742, 747 (Tex.1973) (discussing landowner's "superior position to know of or discover hidden dangerous conditions on his premises"); *see also* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 51 cmt. t (2012) (addressing landowner's "superior knowledge of the dangerous condition").

When the condition is open and obvious or known to the invitee, however, the landowner is not in a better position to discover it. When invitees are aware of dangerous premises conditions—whether because the **danger** is obvious or because the landowner provided an adequate warning—the condition will, in most cases, no longer pose an unreasonable risk because the law presumes that invitees

will take reasonable measures to protect themselves against known risks, which may include a decision not to accept the invitation to enter onto the landowner's premises. *See, e.g.,* RESTATEMENT (THIRD) OF TORTS: LIAB. FOR PHYSICAL & EMOTIONAL HARM § 51 cmt. a (2012) (observing that reasonable care "only requires attending to the foreseeable risks in light of the then-extant environment, including foreseeable precautions by others"); RESTATEMENT (SECOND) OF TORTSS § 343 cmt. b (1965) (observing that landowner must "give such warning that the [invitee] may decide intelligently whether or not to accept the invitation, or may protect himself against the **danger** if he does accept it"). This is why the Court has typically characterized the landowner's duty as a duty to make safe or warn of unreasonably dangerous conditions that are not open and obvious or otherwise known to the invitee. *See, e.g., Escoto,* 288 S.W.3d at 412; *Goss,* 262 S.W.3d at 794; *Moritz,* 257 S.W.3d at 216; *Islas,* 228 S.W.3d at 651; *Khan,* 138 S.W.3d at 295.

 **[7]** **[8]** **[9]** This general rule is also consistent with the Court's recognition that a landowner's duty to invitees is not absolute. A landowner "is not an insurer of [a] visitor's safety." *Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 769 (Tex.2010) (quoting RESTATEMENT (SECOND) OF TORTS § 344 cmt. f). Instead, a landowner's premises-liability duties, like its negligence duties, are limited to a duty to exercise ordinary, reasonable care. **\*204** *Elwood,* 197 S.W.3d at 794 ("An employer has a duty to use ordinary care in providing a safe workplace.... However, an employer is not an insurer of its employees' safety.").[12] Thus, a defendant has "no duty" to take safety measures beyond those that an ordinary, reasonable landowner would take. What a reasonable landowner would do is often a jury question, but sometimes it is not. The Court has recognized that, in most circumstances, a landowner who provides an adequate warning acts reasonably as a matter of law, and since there is no need to warn against obvious or known **dangers**, a landowner generally has no duty to warn of hazards that are open and obvious or known to the invitee. *See, e.g., Goss,* 262 S.W.3d at 795; *Moritz,* 257 S.W.3d at 218; *Islas,* 228 S.W.3d at 651; *Skiles,* 221 S.W.3d at 568–69; *Elwood,* 197 S.W.3d at 795; *Khan,* 138 S.W.3d at 295; *Coastal Marine Serv. of Tex., Inc. v. Lawrence,* 988 S.W.2d 223, 225 (Tex.1999).

### b. Exceptions to the General Rule

We use the qualifiers "generally," "ordinarily," and "in most cases" while discussing the general rule because the Court has struggled at times with cases in which it concluded that the provision of a warning or the obvious nature of the **danger** was not sufficient to make the premises reasonably safe as a matter of law. *See, e.g., Del Lago,* 307 S.W.3d at 774 (stating that "[i]n some circumstances, no warning can suffice as reasonably prudent action to reduce or remove an unreasonable risk"). Thus, in some cases, the Court held that an otherwise "adequate" warning or an invitee's knowledge of the **danger** was not sufficient to discharge the landowner's duty. *See Parker,* 565 S.W.2d at 512; *Robinson,* 280 S.W.2d at 240. But in most cases, the Court has continued to apply the general rule. *See Goss,* 262 S.W.3d at 795; *Skiles,* 221 S.W.3d at 568–69; *Elwood,* 197 S.W.3d at 795. This has resulted in the "arguable conflict in Texas law" that led the Fifth Circuit to certify its question to us in this case. 746 F.3d at 204.

Today we reaffirm the general rule while clarifying and confirming the existence of two exceptions that the Court has recognized when the landowner's provision of an otherwise adequate warning is legally insufficient to make the premises reasonably safe. The first exception may arise when a dangerous condition results from the foreseeable criminal activity of third parties. We will refer to this as the criminal-activity exception. The second exception may arise when the invitee necessarily must use the unreasonably dangerous premises, and despite the invitee's awareness and appreciation of the **dangers**, the invitee is incapable of taking precautions that will adequately reduce the risk. We will refer to this as the necessary-use exception. In cases involving these exceptions, we have held that the obviousness of the **danger** and the invitee's appreciation of it may be relevant to a landowner's defense based on the invitee's proportionate responsibility, but they do not relieve the landowner of its duty to make the premises reasonably safe.

### (1) The Criminal–Activity Exception

 **[10]** The seminal case in which this Court defined a landowner's duty with regard to protecting invitees against third **\*205** parties' criminal activities is *Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749 (Tex.1998). In that case, a tenant sued her apartment complex after she was sexually assaulted in her apartment, asserting that the complex's inadequate security was a proximate cause of her assault. *Id.* at 751. After holding that the claims sounded in premises liability rather than negligent activity, *id.*

at 753, the Court described the contours of the specific duty a landowner owes with respect to third-party criminal acts:

> As a rule, "a person has no legal duty to protect another from the criminal acts of a third person." An exception is that "[o]ne who controls ... premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." ...
>
> ....
>
> ... A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable.

*Id.* at 756 (quoting *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996)). In addressing this duty, the Court did not consider or mention the obviousness or the plaintiff's awareness of the alleged risk, or whether the landowner could fulfill its duty by providing an adequate warning. *See id.* Nor did the Court do so when describing the Timberwalk duty in cases that followed it. *See, e.g., W. Invs., Inc. v. Urena,* 162 S.W.3d 547 (Tex.2005);[13] *Mellon Mortg. Co. v. Holder,* 5 S.W.3d 654 (Tex.1999).[14]

More recently, when the plaintiff in *Del Lago* argued that unreasonably dangerous conditions resulting from inadequate security at a bar proximately caused his injuries when a fight broke out, the Court again applied the *Timberwalk* duty:

> Generally, a premises owner has no duty to protect invitees from criminal acts by third parties. We have recognized an exception when the owner knows or has reason to know of a risk of harm to invitees that is unreasonable and foreseeable....
>
> ....
>
> ... We hold that Del Lago had a duty to protect Smith because Del Lago had actual and direct knowledge that a violent brawl was imminent between drunk, belligerent patrons and had ample time and means to defuse the situation.

*Del Lago,* 307 S.W.3d at 767–69.

The Court rejected the resort owner's argument that it had no duty to protect the plaintiff from the risks because the danger was as obvious and known to the plaintiff as it was to the resort owner. *Id.* at 772. In doing so, the Court

stated that the resort's position would "revive the doctrine of voluntary assumption of the risk as a complete bar to recovery" and would "revive the no-duty rule" by holding "as a matter of law that an invitee's decision not **\*206** to remove himself from a known and dangerous premises condition bars any recovery against the landowner." *Id.* at 772–73. This language at least arguably indicates that the Court was applying a general rule when it refused to hold that the plaintiff's knowledge of the risks eliminated the landowner's duty to make the premises reasonably safe. But the Court expressly clarified that it was not announcing a general rule. *Id.* at 770 ("We do not announce a general rule today."). Instead, the Court made it clear that its decision was based on the fact that the plaintiff's awareness of the risk was not sufficient in that case to enable him to avoid the harm. Specifically, in response to the dissent's reliance on section 343A(1) of the Restatement (Second) of Torts, which posits that a landowner cannot be liable for harm resulting from "known or obvious" conditions, the Court pointed out section 343A concludes by saying "unless the [landowner] should anticipate the harm despite such knowledge or obviousness." *Id.* at 774. Finding that this language "anticipate[s] today's uncommon facts," the Court concluded that the resort "may still be liable" because it "had reason to expect harm notwithstanding [the plaintiff's] awareness of the risk." *Id.* The Court thus expressly confirmed that its "narrow and fact-specific" holding applied only when the landowner "should anticipate the harm despite such knowledge or obviousness," and that it was "not hold[ing] today that a landowner can never avoid liability as a matter of law in cases of open and obvious dangers." *Id.*

 **[11]** Clarifying the arguable conflict in the Court's precedents, we hold that *Del Lago* represents an exception to the general rule that a landowner has no duty to warn an invitee of unreasonably dangerous conditions that are obvious or known to the invitee, which exception applies in cases involving dangers resulting from a third party's criminal conduct in which the landowner should have anticipated that the harm would occur despite the invitee's knowledge of the risks. In such cases, the invitee's appreciation of the danger remains relevant to the landowner's proportionate-responsibility defenses, *see Del Lago,* 307 S.W.3d at 772–73, but it does not relieve the landowner of its duty to take reasonable steps to make the premises safe. *See Eagle Trucking Co. v. Tex. Bitulithic Co.,* 612 S.W.2d 503, 507 (Tex.1981).

### (2) The Necessary–Use Exception

A second exception to the general rule arises from the Court's decision in *Parker,* which predates the Court's later decisions restating and applying the general rule. In *Parker,* the plaintiff fell while descending an improperly lighted staircase in a common area that she had to use to exit her sister's apartment. 565 S.W.2d at 513. Because the plaintiff was aware of the darkness and the **dangers** it presented, she took measures to mitigate the risks by having her sister hold a flashlight to illuminate the stairs and by taking careful steps while holding on to the handrail. *Id.* at 514. Nevertheless, because the stairs included narrow, unevenly distributed steps and turned such that the flashlight could not illuminate all the way down, the measures were insufficient and the plaintiff fell. *Id.* The Court adopted in that case the specific and narrow duty recognized in sections 360 and 361 of the Restatement (Second) of Torts. *Id.* at 515–16. Under section 361,

> [a] possessor of land who leases a part thereof and retains in his own control any other part which is necessary to the safe use of the leased part, is subject to liability to his lessee and others lawfully upon the land with the consent of the lessee or a sublessee for physical harm caused by a dangerous condition upon **\*207** that part of the land retained in the lessor's control, if the lessor by the exercise of reasonable care (a) could have discovered the condition and the risk involved, and (b) could have made the condition safe.

*Id.* at 515 (quoting RESTATEMENT (SECOND) OF TORTS § 361).

In addition, however, the Court abolished the "no-duty rule" in all landowner-invitee cases, using language that is difficult to construe as anything other than the adoption of a new general rule. *Id.* at 517 ("We now expressly abolish the so-called no-duty concept in this case and ... 'henceforth in the trial of all actions based on negligence....' ") (quoting *Farley v. M M Cattle Co.*, 529 S.W.2d 751, 758 (Tex.1975)). The Court enumerated its reasons for doing so, including its observations that (1) the no-duty rule "has contributed confusion which has defied the efforts of our best scholars at explanation and application"; (2) the Court, "based on

logic, has already undermined the no-duty rule" due to "[t]he inextricable mixing" of a defendant's duty and "a plaintiff's burden to negate his own knowledge and appreciation" with "voluntary assumption of risk"; (3) "[t]he legislature by its adoption in 1973 of the comparative negligence statute evidenced a clear policy purpose to apportion negligence according to the fault of the actors"; and (4) "[t]he no-duty doctrine is so elusive that precedent is non-predictive and unhelpful." *Id.* at 517–18. The Court thus concluded that "[a] plaintiff's knowledge, whether it is derived from a warning or from the facts, even if the facts display the **danger** openly and obviously, is a matter that bears upon his own negligence; it should not affect the defendant's duty." *Id.* at 521.

[12] [13] As we have mentioned, despite this rather clear language, the Court has since repeatedly restated and applied the general no-duty rule in the landowner-invitee context, without overruling the decision in *Parker*. *See, e.g., Escoto,* 288 S.W.3d at 412; *Goss,* 262 S.W.3d at 794; *Moritz,* 257 S.W.3d at 216; *Islas,* 228 S.W.3d at 651; *Khan,* 138 S.W.3d at 295. To the extent that these decisions conflict with *Parker,* we think the better approach is to follow our more recent precedent and recognize the *Parker* rule as an exception that applies when the facts demonstrate that (1) it was necessary that the invitee use the unreasonably dangerous premises and (2) the landowner should have anticipated that the invitee was unable to avoid the unreasonable risks despite the invitee's awareness of them. As the Court observed in Parker:

> One's conduct after he is possessed of full knowledge, under the circumstances may be justified or deemed negligent depending upon such things as the plaintiff's status, the nature of the structure, the urgency or lack of it for attempting to reach a destination, the availability of an alternative, one's familiarity or lack of it with the way, the degree and seriousness of the **danger**, the availability of aid from others, the nature and degree of the darkness, the kind and extent of a warning, and the precautions taken under the circumstances by a plaintiff in walking down the passageway.

565 S.W.2d at 520. Although the *Parker* Court concluded that these "are matters which bear upon 'the reasonableness of an actor's conduct in confronting a risk ... under principles of

contributory negligence,' " *id.* (quoting *Farley,* 529 S.W.2d at 758), the Court's subsequent decisions have repeatedly recognized that, despite *Parker,* a landowner generally has no duty to protect or warn an invitee against unreasonable <mark>dangers</mark> that are open and obvious or otherwise known to the invitee.

 [14]    [15]    **\*208** Resolving the Court's "arguably conflicting ... precedent," 746 F.3d at 197, we hold that *Parker* represents a second exception to the general rule. Although, as the *Parker* Court noted, "not every 'open and obvious' condition of <mark>danger</mark> ... precludes recovery," 565 S.W.2d at 520, the Court's more recent decisions confirm that some do, as a matter of law. Although "[d]anger is relative, and a person of ordinary care may incur some hazards," *id.* the Court's more-recently reaffirmed general rule confirms that landowners have no duty to protect or warn such persons when they are aware of the risks and could have avoided them. We thus reaffirm the general rule, but retain *Parker* as an example of an exception that recognizes a landowner's duty to make its premises safe when, despite an awareness of the risks, it is necessary that the invitee use the dangerous premises and the landowner should have anticipated that the invitee is unable to take measures to avoid the risk. When this necessary-use exception applies, like the criminal-activity exception, the plaintiff's awareness of the risk does not relieve the landowner's duty to make the premises safe, but it remains relevant to the issue of proportionate responsibility unless that defense is legally unavailable. *Id.* at 520–21.

**3.** *Robinson* **and the TWCA's waiver of defenses**
This is not the first time we have attempted to clarify and resolve the apparent conflict between *Robinson, Parker,* and our more recent decisions upholding the general rule. Here, <mark>Austin</mark> argues that it cannot be that <mark>Kroger</mark> owes him "no duty" with respect to the slip-and-fall risk because this Court has abolished the "no-duty rule." *See Del Lago,* 307 S.W.3d at 772; *Parker,* 565 S.W.2d at 514–15; *Robinson,* 280 S.W.2d at 241–42. We previously rejected this argument, however, and attempted to clarify our precedent on multiple occasions. *See, e.g., Moritz,* 257 S.W.3d at 216–18; *Dixon v. Van Waters & Rogers,* 682 S.W.2d 533, 533–34 (Tex.1984). We attempt to provide further clarification here, especially as it relates to *Robinson* and the TWCA's defense waivers, and we do so by beginning with a more thorough discussion of *Parker, Del Lago,* and the "no-duty rule."

### a. *Parker* and *Del Lago*

The Court's abolition of the no-duty rule in *Parker* was aimed at correcting a common misapplication of the burdens of proof in premises-liability cases. Some confusion had arisen because, while plaintiffs bear the burden of proving the existence of a duty, certain "no duty" arguments bleed into defensive issues—such as assumption of the risk and contributory negligence—on which defendants bear the burden of proof. *See Moritz,* 257 S.W.3d at 216–18; *Dixon,* 682 S.W.2d at 533–34; *McKee v. Patterson,* 153 Tex. 517, 271 S.W.2d 391, 393 (1954), *abrogated by Parker,* 565 S.W.2d at 516–19. It was this confusion that led the Court to adopt the no-duty rule:

> There are two legal theories, wholly aside from the plaintiff's own negligence, for denying liability in a suit against an owner or occupier of land brought by an invitee for injuries growing out of open and obvious <mark>dangers</mark> thereon. One rests on the judicial concept that there is no breach of any duty the landowner owes to his invitees. The other arises out of the doctrine of volenti non fit injuria —voluntary encountering of risk— which is regarded as a defense to all negligence actions.... The failure of counsel to segregate and separately preserve all of these questions in pleadings in the trial courts and in briefs in the appellate courts, thereby offering the appellate **\*209** courts no alternative except to decide the cases before them on the questions presented, and the tendency of the appellate courts to group them in analyzing the evidence, or to seek the most obvious and simplest solution, has led to much confusion in the decided cases. In greatly similar fact situations some are decided on the basis of no breach of duty by the defendant, some on the basis of voluntary encountering of risk by the plaintiff, some on the basis of the contributory negligence of the

plaintiff, and some on the basis of two or more of these factors without distinction between them. This has led to what appears to be conflicting results.

*McKee,* 271 S.W.2d at 393.

Further contributing to the confusion was the common law's treatment of assumption of the risk and contributory negligence as absolute bars to recovery. *See id.*; *Dugger v. Arredondo,* 408 S.W.3d 825, 830 (Tex.2013). Whether the obviousness of a risk meant that the defendant owed no duty or that the plaintiff had assumed the risk or that the plaintiff bore some responsibility for his injury, the result was the same: the plaintiff could not recover at all. This made it difficult for Texas courts to distinguish between these three concepts, *see Parker,* 565 S.W.2d at 516, and resulted in an "oddity that had uniquely developed in Texas," the placing of an absolute burden on the plaintiff "to negate his own knowledge and his own appreciation of a **danger**" as part of his case-in-chief. *Moritz,* 257 S.W.3d at 216 (quoting *Dixon,* 682 S.W.2d at 533).

 [16]  It is this "oddity" that the Court has referred to as the no-duty rule—a rule that required plaintiffs to negate their own knowledge of the risk in all premises-liability cases, regardless of whether that fact was relevant to the existence of a duty or to defenses like assumption of the risk and contributory negligence. *See id.*; *see also Parker,* 565 S.W.2d at 517. When the Court abrogated the no-duty rule, it ensured that the burden of proving these affirmative defenses remained on defendants, but it did not relieve plaintiffs of the burden to prove the existence of a duty as an element of the plaintiff's claim. *See Moritz,* 257 S.W.3d at 216; *Dixon,* 682 S.W.2d at 533; *Parker,* 565 S.W.2d at 516–17. As the Court has twice clarified:

> The rule [in *Parker*] that the plaintiff does not have the burden to obtain findings that disprove his own fault does not, however, mean that a plaintiff is excused from proving the defendant had a duty and breached it. *A plaintiff does not have the burden to prove and obtain findings that he lacked knowledge and appreciation of a **danger**; he must, however, prove the defendant had a duty and breached it.*

*Moritz,* 257 S.W.3d at 216 (quoting *Dixon,* 682 S.W.2d at 533–34). Whether "a duty exists is a question of law for the court," and if no duty exists, "a jury cannot impose a duty anyway on the theory that Parker abolished all no-duty defenses." *Id.* at 217.[15]

 [17]  Although the common law affirmative defenses of assumption of the risk[16] and contributory negligence no longer **\*210** exist under Texas law, the underlying concepts remain relevant under Texas's proportionate-responsibility statute. *See Del Lago,* 307 S.W.3d at 772 (discussing replacement of contributory negligence by proportionate-responsibility statute).[17] The same facts that tended to prove assumption of the risk or contributory negligence may now be used to diminish a plaintiff's recovery by demonstrating that the plaintiff bore some portion of the responsibility for his own injuries, or even to preclude the plaintiff from recovering at all by demonstrating that the plaintiff bore more than 50% of the responsibility for his own injuries. *See* TEX. CIV. PRAC. & REM. CODE §§ 33.001, .003. In other words, although these are no longer affirmative defenses that act as an absolute bar to recovery, they remain defensive issues on which defendants, not plaintiffs, bear the burden of proof.

### b. *Robinson*

Even before the Court abolished the no-duty rule in *Parker,* the Court rejected it in nonsubscriber employment cases in *Robinson,* 280 S.W.2d at 239–40. But *Robinson*'s rejection of the no-duty rule did more than *Parker*'s because the TWCA prohibits nonsubscribing employers from relying on defenses like assumption of the risk, contributory negligence, or proportionate responsibility. TEX. LAB. CODE § 406.033(a). Thus, while the abolition of the no-duty rule in other tort actions meant only that the burden of proving these defensive issues shifted back to defendants, the abolition of the no-duty rule in nonsubscribing-employer cases meant that, once the plaintiff proved a duty, the defendant could not rely on the plaintiff's awareness of the **danger** at all. *See Robinson,* 280 S.W.2d at 239–40.

 [18]  Just as *Parker*'s abolition of the no-duty rule should not impact typical premises-liability cases where the landowner's only duty is to warn of concealed **dangers**, *Robinson*'s abolition of the no-duty rule should not impact typical nonsubscribing-employer cases where the employer owes no duty to warn or train employees with respect to **dangers**

WestlawNext© © 2015 Thomson Reuters. No claim to original U.S. Government Works.

that are commonly known or already appreciated by the employee. *See Escoto,* 288 S.W.3d at 413; *Goss,* 262 S.W.3d at 794– 95; *Skiles,* 221 S.W.3d at 568; *Elwood,* 197 S.W.3d at 794–95. Instead, the Court's abolition of the no-duty rule should play a role only when an exception to the general rule applies—that is, when the nonsubscribing employer owes a duty despite the obviousness or employee's appreciation of a <mark>danger</mark> because, despite the awareness of the <mark>danger</mark>, it is necessary that the employee use the dangerous premises and the employer should anticipate that the employee is unable to take measures to avoid the risk. In such cases, the employer cannot rely on the fact that the risk was obvious and known to the employee to argue that the employee bears some portion of the responsibility for his own injuries, because the TWCA waives those defenses. *Compare Del Lago,* 307 S.W.3d at 772–73; *Parker,* 565 S.W.2d at 520, with TEX. LAB. CODE § 406.033(a); *Keng,* 23 S.W.3d at 352.

**\*211** In rejecting the no-duty rule for nonsubscribing-employer cases, the *Robinson* Court at least arguably rejected the principle that an employer does not have a duty to warn employees of open and obvious hazards. 280 S.W.2d at 239–40. The Court observed that in the landowner-invitee field of law, "[t]he rule is well settled that the owner of premises is not required to keep them safe for invitees in so far as open, obvious and known defects or conditions are concerned," but declined to apply that concept to suits between an employer and employee. *Id.* at 240. The Court then rejected the employer's argument in that case that it had no duty to protect the employee from or warn him of a large pool of oil on the floor, even though the record established that the spill was open and obvious, that the employee had seen and failed to report the spill to anyone else, and that the employee recognized that the oil made the floor slippery. *Id.* at 239–40. In the sixty years since *Robinson,* however, this Court has never held that an employer has a duty to warn employees of open and obvious <mark>dangers</mark> or relied on *Robinson* for that proposition.[18] Instead, the Court has repeatedly held that an employer does not have a duty to warn employees of <mark>dangers</mark> that are open and obvious or already known to the employee.[19] To resolve this apparent conflict, we expressly reaffirm the Court's more recent **\*212** holdings, and we overrule *Robinson* to the extent it conflicts with those holdings and with our recognition of the criminal-activity and necessary-use exceptions in this case.

### c. The TWCA

**[19]** As discussed above, the TWCA prohibits nonsubscribing employers from raising the defenses of contributory negligence and assumption of the risk, which are now subsumed under the proportionate-responsibility statute. TEX. LAB. CODE § 406.033(a)(1), (2); *Keng,* 23 S.W.3d at 349–52. Although an employee's awareness of an unreasonable risk may be relevant to such defenses, the Court's general rule that we confirm today may permit an employer to avoid liability despite the TWCA's waiver of those defenses. It does so, however, not by undermining the Legislature's prerogative to determine when defenses may or may not apply, but by fulfilling this Court's role to determine when a party owes a legal duty to begin with. *See Moritz,* 257 S.W.3d at 217 ("Whether ... a duty exists is a question of law for the court; it is not for the jury to decide under comparative negligence or anything else.").

**[20]** **[21]** Moreover, the general rule does not render the statutory waiver ineffective for at least two reasons. First, landowners may assert an invitee's negligence based on conduct other than the invitee's awareness of the risk, and the TWCA's waiver prohibits a nonsubscribing employer from relying on any such conduct to do so. *See Keng,* 23 S.W.3d at 351–52. Second, in cases in which the criminal-activity or necessary-use exceptions apply, and thus the employer has a duty to the employee despite the employee's awareness of the risk, the TWCA will prevent the employer from relying on the employee's awareness of the risk as a defense to the employee's claims. In *Parker* and *Del Lago,* the defendants were not the plaintiffs' employers, and thus they were able to rely on the plaintiffs' appreciation of the <mark>dangers</mark> to argue that the plaintiff bore some portion of the responsibility for his or her injuries. *Parker,* 565 S.W.2d at 520–21; *Del Lago,* 307 S.W.3d at 773–74. But if the defendant in a case that meets the criminal-activity or necessary-use exception is the plaintiff's nonsubscribing employer,[20] the TWCA would prohibit that defense. *See Keng,* 23 S.W.3d at 351–52.

Although the TWCA's waiver of defenses is intended to encourage employers to subscribe to the workers' compensation system, the TWCA does not create an "especially punitive litigation regime for non-subscribing employers." *Tex. W. Oaks Hosp., LP v. Williams,* 371 S.W.3d 171, 192 (Tex.2012). Absent intentional misconduct, employees still must prove all the elements of a common law negligence claim to prevail against nonsubscribing employers. *See* TEX. LAB. CODE § 406.033(d); *Tex. W. Oaks,* 371 S.W.3d at 187. "In other words," as the Fifth Circuit observed in this case, TWCA "section 406.033(a)(1)–

(3) may limit an employer's defenses, but it does not eliminate an employee's **\*213** burden to establish his common law claim." 746 F.3d at 198 (citing *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 565 (5th Cir.2010); *Tex. W. Oaks*, 371 S.W.3d at 187). This burden, of course, includes the burden to prove that a defendant had a duty to the plaintiff, which is the issue that our general rule and exceptions address.

### B. No new exception

 **[22]** Having clarified the general rule that an employer or landowner owes no duty to protect or warn an employee or invitee against unreasonably dangerous premises conditions that are open and obvious or otherwise known to the employee or invitee, and the criminal-activity and necessary-use exceptions that preserve that duty under limited circumstances, we now address Austin's argument that we should recognize a new exception in this case. Specifically, Austin asserts that we should recognize a distinct duty in cases where an employee is injured while performing a task that the employer specifically assigned to the employee. We decline to do so.

Both *Parker* and *Del Lago* indicated that there may be circumstances in which invitees may reasonably be expected to choose to encounter a dangerous condition despite their knowledge and appreciation of the risk. In *Parker,* the Court quoted a comment from the Second Restatement stating that a landlord's duty with respect to common areas

> is not always satisfied by warning the lessee or others of the dangerous condition, and ... knowledge of such persons of the danger will not always prevent their recovery. Where, for example, the entrance to an apartment house is dangerously defective, and there is no other available entrance, the third person may be expected to use it notwithstanding any warning, or even his own knowledge of the danger.

565 S.W.2d at 515 (quoting RESTATEMENT (SECOND) OF TORTS § 360 cmt. c). This example encapsulated the facts of *Parker,* where the invitee had no other means to exit the second-story apartment except by the dangerous staircase. *See id*. at 514. And in *Del Lago,* the Court stated that section 343A(1) of the Second Restatement "bars liability when an invitee is aware of the dangerous condition, ... 'unless the

possessor should anticipate the harm despite such knowledge or obviousness,' " and "[t]hat caveat seems to capture today's narrow and fact-specific holding." *Del Lago,* 307 S.W.3d at 774 (quoting RESTATEMENT (SECOND) OF TORTS § 343A(1)).

Austin contends that the same reasoning should apply here, and that it would apply regardless of whether the Court employed an objective or subjective standard for evaluating the reasonableness of his conduct, because "it was objectively reasonable for an employee in his situation to attempt to perform his assigned task, notwithstanding the obvious dangers posed by th[e] condition" of the floor. Essentially, Austin argues that it was reasonable for him to undertake the risk of slipping in the oily liquid because, although he was aware of the risk, he undertook it at the instruction of his employer rather than by purely voluntary choice. While this argument has some appeal, we are not persuaded for several reasons.

First, Texas law treats Austin's encounter with the spill as voluntary in nature, even though it was part of his work duties. *See McKee,* 271 S.W.2d at 396 (exploring historical underpinning of this rule). If we created an exception to the general rule that employers owe no premises-liability duty with respect to open and obvious conditions *unless* the employee encountered the condition as part of his work duties, the exception would swallow the rule. Moreover, the employees in *Goss, Skiles,* and *Elwood* were engaged in their work duties at the time of their injuries. **\*214** Austin argues that those cases are distinguishable because the behavior that led to the employees' injuries was risky and unnecessary to performance of the assigned task. *See Goss,* 262 S.W.3d at 794 (hitting shin on three-foot-tall cart while walking in warehouse); *Skiles,* 221 S.W.3d at 567 (climbing over nonfunctioning lift gate); *Elwood,* 197 S.W.3d at 794 (putting hand in car doorjamb while loading groceries). But we see nothing exceedingly risky about walking in the vicinity of a grocery cooler. *See Goss,* 262 S.W.3d at 794.[21] And it is not clear that the employee in *Skiles* could have accomplished his assigned task of unloading the truck without climbing over the broken lift gate. 221 S.W.3d at 567. He could have simply declined to unload the truck at that time, but an employee always has the option to decline to perform an assigned task and incur the consequences of that decision. *See McKee,* 271 S.W.2d at 396.

 **[23]** Second, Austin's proposed exception is not compatible with our precedent that "when an employee's injury results

from performing the same character of work that employees in that position have always done, an employer is not liable if there is no evidence that the work is unusually precarious." *Elwood,* 197 S.W.3d at 795 (citing *Werner v. Colwell,* 909 S.W.2d 866, 869 (Tex.1995), which cites *Great Atl. & Pac. Tea Co. v. Evans,* 142 Tex. 1, 175 S.W.2d 249, 251 (1943)). It is undisputed that mopping up spills is the same character of work that Austin—as the store's self-described "floor clean-up person"—and other employees in his position have always done.

Third, the most efficient way for employers like Kroger to eliminate a dangerous condition like the spill in this case is to have a trained employee clean it, and it is the public policy in Texas to encourage them to do so. *See, e.g., Tex. Trunk Ry. Co. v. Ayres,* 83 Tex. 268, 18 S.W. 684, 685–86 (1892). For example, because public policy encourages landowners to remedy potentially dangerous conditions on their property, we have prohibited plaintiffs from relying on evidence that a defendant made repairs or otherwise remediated a dangerous condition on its property after the plaintiff's injury as proof of the defendant's negligence, observing that a defendant would be discouraged from making repairs "if it must do so at its peril." *Id.* at 686 (discussing predecessor to TEX. R. EVID. 407(a)). Imposing liability on employers for injuries to employees caused by open and obvious **dangers** knowingly encountered by the employee in the ordinary course of employment would discourage employers from retaining employees to perform the kinds of repair and janitorial work necessary to maintain their premises in a reasonably safe condition. Because landowners generally are not liable to non-employees for open and obvious premises conditions, *see Moritz,* 257 S.W.3d at 215, making landowners liable to employees for such conditions directly disincentivizes employers from hiring employees to remedy such conditions. We thus decline to recognize the new exception that Austin proposes.

## IV.

### Austin's Necessary–Instrumentalities Claim

 [24]  As noted above, in addition to his premises-liability claim, Austin alleged **\*215** that Kroger negligently caused his fall by engaging in negligent activities and by negligently failing to provide a "necessary instrumentality," namely, the Spill Magic system that Kroger's employee handbook required be available at the store. The Fifth Circuit affirmed the district court's summary judgment for Kroger on Austin's negligent-activities claim, agreeing with the district court's holding that Austin's injury arose from a premises condition rather than any contemporaneous activity by Kroger, and that Austin "cannot pursue *both* a negligent activity and a premises defect theory of recovery based on the same injury." 746 F.3d at 197. The Fifth Circuit remanded Austin's necessary-instrumentalities claim, however, because the district court had "failed to consider whether ... [that theory] is sufficient to support a stand-alone ordinary negligence claim." *Id.*

The Fifth Circuit's certified question only addresses Austin's premises-liability claim, and for that reason some Justices would not reach Austin's necessary-instrumentalities claim. But Kroger asks us to reach the instrumentalities claim, asserting that the claim fails as a matter of law for several reasons. We decline to decide the merits of Austin's instrumentalities claim, but in the interest of judicial efficiency we will address one of Kroger's arguments, which touches on the relationship between the instrumentalities claim and the premises-liability claim. Specifically, Kroger argues that the instrumentalities claim must fail for the same reason the negligent-activities claim must fail: because a condition of the premises, rather than any of Kroger's contemporaneous activities, caused Austin's fall, his claim sounds exclusively in premises liability, and he can only recover on that claim or not at all. We do not agree.

 [25]  In a typical premises-liability case, the landowner owes the invitee two duties: a duty to keep the premises reasonably safe and a duty not to injure the invitee through contemporaneous negligent activity. *See, e.g., State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006) (distinguishing a negligent-activity claim, which "result[s] from a contemporaneous activity," from a premises-defect claim, which "is based on the property itself being unsafe"); *Keetch v. Kroger Co.,* 845 S.W.2d 262, 265 (Tex.1992) (holding that trial court did not err in submitting only premises-liability claim when injury arose from pool of water that employee had created at least thirty minutes before accident). Thus, when a claim does not result from contemporaneous activity, the invitee has no negligent-activity claim, and his claim sounds exclusively in premises-liability. *See Shumake,* 199 S.W.3d at 284; *Keetch,* 845 S.W.2d at 265.

 [26]  But when the landowner is also an employer and the invitee is also its employee, this additional relationship may

give rise to additional duties, such as a duty to provide necessary equipment, training, or supervision. *See Moritz,* 257 S.W.3d at 215 & n. 15; *Islas,* 228 S.W.3d at 651–52 & n. 10; *Farley,* 529 S.W.2d at 754. **Austin's** instrumentalities claim invokes one of these additional duties: the duty to furnish reasonably safe equipment necessary for performance of the job. *See In re Macy's Tex., Inc.,* 291 S.W.3d 418, 420 (Tex.2009); *Escoto,* 288 S.W.3d at 412; *Moritz,* 257 S.W.3d at 215; *Farley,* 529 S.W.2d at 754. We have addressed the interaction between premises-liability claims and negligent-activity claims on several occasions. *See, e.g., Del Lago,* 307 S.W.3d 776; *Shumake,* 199 S.W.3d at 284; *Keetch,* 845 S.W.2d at 264. But we have never addressed the interaction between premises-liability claims and an employer's ***216** other general negligence duties. We do so now.

 **[27]**  When an injury arises from a premises condition, it is often the case that any resulting claim sounds exclusively in premises liability, but that is not necessarily the case. An injury can have more than one proximate cause. *Del Lago,* 307 S.W.3d at 774; *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 784 (Tex.2001). The fact that **Austin** alleged that a condition of the premises proximately caused his injury does not preclude his allegation that **Kroger's** negligent failure to provide the Spill Magic system also caused his injury. If the only relationship between **Austin** and **Kroger** were that of landowner–invitee, the alleged facts could only give rise to a premises-liability claim. Because the failure to provide the Spill Magic system is nonfeasance, and not contemporaneous negligent activity, it could not give rise to a negligent-activity claim.[22]  *See Del Lago,* 307 S.W.3d at 776 (distinguishing between allegations of "nonfeasance," or the failure to act, and allegations of misfeasance, or improper actions).

 **[28]**    **[29]** As **Austin's** employer, **Kroger** owed **Austin** duties in addition to its premises-liability duty and its duty not to engage in negligent activities, including the duty to provide **Austin** with necessary instrumentalities. *See Moritz,* 257 S.W.3d at 215 & n. 15; *Islas,* 228 S.W.3d at 651–52 & n. 10; *Farley,* 529 S.W.2d at 754. Contemporaneous negligent activity is not an element of an instrumentalities claim. *See Farley,* 529 S.W.2d at 756–57. To the contrary, an instrumentalities claim may be founded on nonfeasance or misfeasance, neither of which is particularly likely to occur contemporaneously with a resulting injury to the employee. *Compare Martinez,* 515 S.W.2d at 265 (failure to provide adequate equipment), *with Farley,* 529 S.W.2d at 757 (provision of unsuitable horse); *cf. Del Lago,* 307 S.W.3d at 776 (discussing misfeasance and nonfeasance). Because

contemporaneous negligent activity is not necessary to an instrumentalities claim, the absence of contemporaneous activity does not necessarily bar an instrumentalities claim.[23]

 **[30]**  To hold otherwise would create disparate treatment of employees' instrumentalities claims depending on whether the employer owned or operated the premises where the employee worked. Only an employer that has control over the premises where the employee is injured has a premises-liability duty to the employee, but the duty to provide necessary and safe instrumentalities applies to employers generally. *See Moritz,* 257 S.W.3d at 215; *Islas,* 228 S.W.3d at 651–52 & n. 10; *Farley,* 529 S.W.2d at 754. If we were to adopt the rule **Kroger** advocates, employees injured on their employers' premises by the employer's failure to provide necessary and safe equipment would have to try their claims under a premises-liability theory of recovery, while employees injured on premises not owned by their employers would have to prosecute the same breach of duty under a general negligence theory of recovery—two different claims with different elements of proof. *Compare Henkel v. Norman,* 441 S.W.3d 249, 251–52 (Tex.2014) ("To prevail on a premises liability claim against a property owner, an ***217** injured invitee must establish four elements: (1) the property owner had actual or constructive knowledge of the condition causing the injury; (2) the condition posed an unreasonable risk of harm; (3) the property owner failed to take reasonable care to reduce or eliminate the risk; and (4) the property owner's failure to use reasonable care to reduce or eliminate the risk was the proximate cause of injuries to the invitee."), *with Elwood,* 197 S.W.3d at 794 ("To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach."). We see no reason why employees injured by a breach of the same duty should have to prove different elements to recover. We therefore reject **Kroger's** argument that its lack of any negligent activity contemporaneous with **Austin's** fall defeats **Austin's** instrumentalities claim as a matter of law.

## V.

### Answer

For the reasons we have explained, we provide the following answer to the Fifth Circuit's certified question: Under Texas law, an employee generally cannot "recover against a nonsubscribing employer for an injury caused by a premises

defect of which he was fully aware but that his job duties required him to remedy." As is the case with landowners and invitees generally, employers have a duty to maintain their premises in a reasonably safe condition for their employees, but they will ordinarily satisfy their duty as a matter of law by providing an adequate warning of concealed **dangers** of which they are or should be aware but which are not known to the employee. "The employee's awareness of the defect" does not "eliminate the employer's duty to maintain a safe workplace," but with respect to premises conditions, that duty is ordinarily satisfied by warning the employee of concealed, unknown **dangers**; the duty to maintain a reasonably safe workplace generally does not obligate an employer to eliminate or warn of dangerous conditions that are open and obvious or otherwise known to the employee. Exceptions to this general rule may apply in premises liability cases involving third-party criminal activity or a necessary use of the premises. If an exception applies, the employer may owe a duty to protect the employee from the unreasonably dangerous condition despite the employee's awareness of the **danger**, and the TWCA will prohibit a nonsubscribing employer from raising defenses based on the employee's awareness.

### All Citations

465 S.W.3d 193, 165 Lab.Cas. P 61,602, 58 Tex. Sup. Ct. J. 1154

### Footnotes

1    746 F.3d 191 (5th Cir.2014) (per curiam); *see* TEX. CONST. Art. V, § 3–c(a) ("The supreme court [has] jurisdiction to answer questions of state law certified from a federal appellate court."); TEX. R. APP. P. 58 (certified questions of law).

2    *See* TEX. LAB. CODE § 406.002 (providing that "an employer may elect to obtain workers' compensation insurance coverage" and thus be "subject to" the Texas Workers' Compensation Act).

3    *See, e.g., State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006) ( "A negligent activity claim requires that the claimant's injury result from a contemporaneous activity itself rather than from a condition created on the premises by the activity.").

4    *See, e.g., Farley v. M M Cattle Co.,* 529 S.W.2d 751, 754 (Tex.1975) ("It is well established that an employer has certain nondelegable and continuous duties to his employees," including "the duty to furnish reasonably safe instrumentalities with which employees are to work.").

5    The district court held, and the Fifth Circuit agreed, that **Austin's** injury arose from a premises condition rather than any contemporaneous activity by **Kroger**, and **Austin** "cannot pursue *both* a negligent activity and a premises defect theory of recovery based on the same injury." 746 F.3d at 196–97.

6    The Fifth Circuit agreed with the district court's holding that "no reasonable juror could conclude that **Kroger** was consciously indifferent to the safety of its employees, or that [**Austin**] faced an extreme risk in performing a job he had done safely for years." *Id.* at 196 n. 2.

7    A premises-liability duty may apply to the owner of the premises or to another party who operates or exercises control over the premises. *See, e.g., Gen. Elec. Co. v. Moritz,* 257 S.W.3d 211, 215 (Tex.2008). We use the term "landowner" in this opinion to refer to all such parties.

8    We use the term "generally" here to acknowledge circumstances in which an employee may not be an "invitee" on the employer's premises. For example, if an employee, acting outside the scope of employment, enters the employer's premises without the employer's knowledge and not for their mutual benefit, the employee might be a licensee or even a trespasser. We need not decide that issue here.

9    *E.g., Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 771 (Tex.2010); *TXI Operations, L.P. v. Perry,* 278 S.W.3d 763, 764 (Tex.2009); *Werner v. Colwell,* 909 S.W.2d 866, 869 (Tex.1995).

10   *E.g., Escoto,* 288 S.W.3d at 412; *Goss,* 262 S.W.3d at 794; *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007); *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 295 (Tex.2004).

11   *E.g., Henkel v. Norman,* 441 S.W.3d 249, 252 (Tex.2014); *TXI,* 278 S.W.3d at 765; *State v. Williams,* 940 S.W.2d 583, 584 (Tex.1996).

12   *See also Wal–Mart Stores, Inc. v. Reece,* 81 S.W.3d 812, 814 (Tex.2002) (stating that landowner owed invitee "a duty to exercise reasonable care to protect her from dangerous conditions in the store that were known or reasonably discoverable, but it was not an insurer of her safety"); *Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996) ("An employer is not an insurer of its employees' safety at work; however, an employer does have a duty to use ordinary care in providing a safe work place.").

In *Urena,* we recognized that the facts of that case—tenant-on-tenant crime as opposed to crimes committed against tenants by nonresidents—might require a different duty analysis than that used in *Timberwalk,* but we did not reach that issue because, even assuming a duty existed, the plaintiff presented no evidence of causation. 162 S.W.3d at 551 n. 2.

In *Holder,* we restated the duty rule from *Timberwalk*: "With regard to criminal acts of third parties, property owners owe a duty to those who may be harmed by the criminal acts only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable." 5 S.W.3d at 655. But we also noted that, in most cases, "the foreseeability analysis will be shaped by determining whether the plaintiff was an invitee, a licensee, or a trespasser." *Id.* We did not have to determine the plaintiff's status in that case because the plaintiff "was an unforeseeable victim regardless of her status." *Id.*

In *TXI,* the Court did not refute this construction of *Parker,* which is consistent with the Court's explanations in *Moritz* and *Dixon,* but instead "assume[d] that a duty to warn exist[ed]" because the defendant did "not attempt to argue that it owed no duty," and argued instead that it satisfied its duty by providing an adequate warning. *TXI,* 278 S.W.3d at 765.

The common law assumption-of-the-risk doctrine we refer to here involves implied assumptions of risk and not express, contractual assumption of the risk or statutory assumption-of-the-risk defenses. *See, e.g.,* TEX. CIV. PRAC. & REM. CODEE § 93.001.

*See also Dugger,* 408 S.W.3d at 832 ("Proportionate responsibility abrogated former common law doctrines that barred a plaintiff's recovery because of the plaintiff's conduct—like assumption of the risk, imminent peril, and last clear chance—in favor of submission of a question on proportionate responsibility."); TEX. CIV. PRAC. & REM. CODE E §§ 33.001–.017 (proportionate-responsibility statute).

This Court has cited *Robinson* on seven occasions. *See Lawrence v. CDB Servs., Inc.,* 44 S.W.3d 544, 549 (Tex.2001); *Werner,* 909 S.W.2d at 868; *Hernandez v. City of Fort Worth,* 617 S.W.2d 923, 925 (Tex.1981); *Leadon v. Kimbrough Bros. Lumber Co.,* 484 S.W.2d 567, 568 (Tex.1972); *Royal Indem. Co. v. Dennis,* 410 S.W.2d 185, 187 (Tex.1966); *Tarver v. Tarver,* 394 S.W.2d 780, 782 (Tex.1965); *Halepeska v. Callihan Interests, Inc.,* 371 S.W.2d 368, 377 (Tex.1963), *abrogated by Parker,* 565 S.W.2d at 516. On three of those occasions, the Court cited *Robinson* for an error-preservation issue rather than the holding on the merits of the case. *See Hernandez,* 617 S.W.2d at 925; *Dennis,* 410 S.W.2d at 187; *Tarver,* 394 S.W.2d at 782. On four occasions the Court cited *Robinson* for merits-based holdings. *See Lawrence,* 44 S.W.3d at 549; *Werner,* 909 S.W.2d at 868; *Leadon,* 484 S.W.2d at 568–69; *Halepeska,* 371 S.W.2d at 377. One such case, *Halepeska,* was not an employer-employee case, and was later abrogated by *Parker. Halepeska,* 371 S.W.2d at 377. *Leadon* did not involve an argument that the **danger** at issue was open and obvious or known to the employee; instead, the issue was whether the employer had a duty to hire someone to watch for falling limbs while the employee performed his logging work. 484 S.W.2d at 568–69. In *Werner,* the Court cited *Robinson* for the general principle that an employee cannot recover on a negligence claim against a nonsubscribing employer without proving that the employer was negligent. *Werner,* 909 S.W.2d at 868 (holding that there was no evidence of the negligence alleged). And in *Lawrence,* which was later superseded in part by statute, *see* TEX. LAB. CODE § 406.033(e), we cited *Robinson,* among numerous other cases, only for the proposition that the Workers' Compensation Act did not bar all possible defenses to liability a nonsubscribing employer might have. *Lawrence,* 44 S.W.3d at 549.

*See Escoto,* 288 S.W.3d at 412–13 ("[T]he employer 'owes no duty to warn of hazards that are commonly known or already appreciated by the employee.' ... Likewise, we do not impose a duty to train employees regarding the commonly-known **dangers** of driving while fatigued."); *Goss,* 262 S.W.3d at 794 ("The threshold question here is one of duty, as we have held that an employer 'owes no duty to warn of hazards that are commonly known or already appreciated by the employee.' "); *Skiles,* 221 S.W.3d at 568 ("[W]hile the duty of ordinary care generally requires an employer to 'warn an employee of the hazards of employment and provide needed safety or equipment or assistance,' the employer 'owes no duty to warn of hazards that are commonly known or already appreciated by the employee.' "); *Elwood,* 197 S.W.3d at 795 ("[Employer] had no duty to warn [employee] of a **danger** known to all and no obligation to provide training or equipment to dissuade an employee from using a vehicle doorjamb for leverage.").

Some courts of appeals have applied *Timberwalk* in employer–employee premises-liability cases. *See, e.g., Barton v. Whataburger, Inc.,* 276 S.W.3d 456, 462 (Tex.App.–Houston [1st Dist.] 2008, pet. denied); *Gibbs v. ShuttleKing, Inc.,* 162 S.W.3d 603, 610 (Tex.App.–El Paso 2005, pet. denied); *Allen v. Connolly,* 158 S.W.3d 61, 65 (Tex.App.–Houston [14th Dist.] 2005, no pet.). We have never expressly held that *Timberwalk* governs an employer's duty to employees with respect to third-party criminal activity on the premises, and that issue is not presented here. We have held, and hold again here, that at least in general, an employer's premises-liability duty to employees is the same as other landowners' premises-liability duties to other invitees. *See, e.g., Hernandez,* 374 S.W.2d at 197.

In *Goss,* the employee had to "maneuver around a 'lowboy' loading cart" to retrieve items from a deli cooler. 262 S.W.3d at 794. "She successfully stepped over the cart and entered the cooler. After she retrieved what she needed, she turned

around to leave the cooler and hit her shin on the lowboy, causing her to reach out for a shelf to prevent herself from falling. In doing so, she injured her back." *Id.*

22 We do not decide here whether a single injury could give rise to both a premises-liability claim and a negligent-activity claim if both the condition of the premises and the contemporary activities of the premises owner proximately cause the injury.

23 We do not decide which, if any, of the limitations on an employer's premises-liability duty may also apply to its instrumentalities duty.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** [Duncan v. First Texas Homes,](#) Tex.App.-Fort Worth, February 12, 2015

197 S.W.3d 793
Supreme Court of Texas.

THE KROGER CO., Petitioner,

v.

Billy ELWOOD, Respondent.

No. 04–1133. | May 12, 2006.
| Rehearing Denied Sept. 1, 2006.

**Synopsis**

**Background:** Grocery store employee brought negligence action against grocery store for injuries sustained when customer slammed car door on employee's hand while he was loading groceries into her car. The 18th Judicial District Court, Johnson County, [John E. Neill,](#) J., entered judgment on jury's verdict in favor of employee, and employer appealed. The Court of Appeals affirmed.

**[Holding:]** On petition for review, the Supreme Court held that grocery store had no duty to warn employee of danger of placing hand on doorjamb of customer's vehicle while loading groceries.

Reversed and rendered.

West Headnotes (10)

**[1]** **Labor and Employment**
 Duty to Warn

**Labor and Employment**
 Dangers or Defects Known to Employee

Grocery store had no duty to warn store employee of danger of placing hand on vehicle doorjamb and one foot on grocery cart to prevent it from rolling on sloped parking lot while loading groceries into customer's vehicle, or to provide grocery carts with wheel locks or additional personnel to assist with loading groceries into vehicles, and thus, employee could

not recover for injuries sustained when customer slammed car door on employee's hand; no evidence was presented indicating that loading groceries on sloped portion of store's parking lot was unusually dangerous, that other courtesy clerks had suffered similar injuries, that job required special training, or that carts with wheel locks were necessary to safely load vehicles, and employee admitted he knew it was dangerous to place hand on vehicle doorjamb.

9 Cases that cite this headnote

**[2]** **Workers' Compensation**
 Instructions

Nonsubscribers to workers' compensation are not entitled to a contributory negligence instruction in an employee's action for work-related injuries.

Cases that cite this headnote

**[3]** **Negligence**
 Elements in General

To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach.

76 Cases that cite this headnote

**[4]** **Negligence**
 Necessity and Existence of Duty

**Negligence**
 Duty as Question of Fact or Law Generally

Whether a duty exists is a threshold inquiry and a question of law in a negligence action; liability cannot be imposed if no duty exists.

28 Cases that cite this headnote

**[5]** **Labor and Employment**
 Nature and Scope of Duty Owed by Employer

An employer has a duty to use ordinary care in providing a safe workplace.

14 Cases that cite this headnote

**[6]**   **Labor and Employment**
    👉 Nature and Scope of Duty Owed by Employer

    **Labor and Employment**
      👉 Kind of Equipment

    **Labor and Employment**
      👉 Duty to Warn

An employer has a duty to warn an employee of the hazards of employment and provide needed safety equipment or assistance.

25 Cases that cite this headnote

**[7]**   **Labor and Employment**
    👉 Liability as Insurer; Relationship to Workers' Compensation

An employer is not an insurer of its employees' safety.

5 Cases that cite this headnote

**[8]**   **Labor and Employment**
    👉 Dangers or Defects Known to Employee

An employer owes no duty to warn an employee of hazards that are commonly known or already appreciated by the employee.

24 Cases that cite this headnote

**[9]**   **Labor and Employment**
    👉 Nature and Scope of Duty Owed by Employer

    **Labor and Employment**
      👉 Kind of Equipment

An employer has no duty to provide to its employees equipment or assistance that is unnecessary to the job's safe performance.

11 Cases that cite this headnote

**[10]**  **Labor and Employment**
    👉 Working Conditions and Methods of Performing Work

When an employee's injury results from performing the same character of work that employees in that position have always done, an employer is not liable if there is no evidence that the work is unusually precarious.

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*794** Brian J. Brandstetter, Brackett & Ellis, P.C., Fort Worth, for Petitioner.

Rodney R. Elkins, Rodney R. Elkins & Co., Dallas, for Respondent.

**Opinion**

PER CURIAM.

Billy Elwood, a courtesy clerk at a Kroger grocery store, was injured when a customer shut her vehicle door on his hand while he was transferring items from a grocery cart to the vehicle. Elwood had placed one hand in the vehicle's doorjamb, and one foot on the cart, to keep the cart from rolling down a slope in Kroger's parking lot. In the trial court, a jury found Kroger liable for Elwood's injuries; the court of appeals affirmed the judgment. Because Kroger had no duty to warn Elwood not to place his hand in a doorjamb, and there is no evidence that additional equipment or assistance were needed to perform Elwood's job safely, we reverse and render judgment for Kroger.

**[1]**   Kroger is a nonsubscriber to workers' compensation; therefore, to recover damages Elwood must establish that Kroger's negligence proximately caused his injuries. *See Werner v. Colwell,* 909 S.W.2d 866, 868 (Tex.1995). Elwood alleges that Kroger provided inadequate training on how to maneuver carts on a sloped parking lot, never advised that he should take a second clerk with him to the sloped portion of the lot, and provided no explanation on how to avoid injury when loading groceries into customers' vehicles. Elwood also alleges that, even though Kroger was aware that customers' vehicles were often damaged by rolling carts in the sloped parking area, it never provided carts with locking wheels or wheel blocks.

**[2]**   A jury found Kroger liable for Elwood's injuries, but also determined that Elwood was forty percent negligent. The trial court reduced Elwood's judgment accordingly. A divided court of appeals affirmed the verdict, holding it was supported by factually and legally sufficient evidence. 2004

WL 2567069. Because nonsubscribers are not entitled to a contributory negligence instruction, the court of appeals reformed the judgment and awarded Elwood one hundred percent of the damages. 2004 WL 2567069 (citing *Kroger Co. v. Keng,* 23 S.W.3d 347, 352 (Tex.2000)). Kroger now petitions for review, arguing that there is no evidence to support the jury's verdict.

 [3]  [4]  To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach. *Werner,* 909 S.W.2d at 869 (citing *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987)). Whether a duty exists is a threshold inquiry and a question of law; liability cannot be imposed if no duty exists. *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998).

 [5]  [6]  [7]  [8]  [9]  [10]  An employer has a duty to use ordinary care in providing a safe workplace. *Farley v. M M Cattle Co.,* 529 S.W.2d 751, 754 (Tex.1975). It must, for example, warn an employee of the hazards of employment and provide needed safety equipment or assistance. *Id.* However, an employer is not an insurer of its employees' safety. *Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996); *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 21 (Tex.1993). It owes no duty to warn of hazards that are commonly known or already appreciated by the employee. *See Nat'l Convenience* **\*795** *Stores, Inc. v. Matherne,* 987 S.W.2d 145, 149 (Tex.App.—Houston [14th Dist.] 1999, no pet.). It has no duty to provide equipment or assistance that is unnecessary to the job's safe performance. *See Allsup's Convenience Stores, Inc. v. Warren,* 934 S.W.2d 433, 438 (Tex.App.—Amarillo 1996, writ denied). And, when an employee's injury results from performing the same character of work that employees in that position have always done, an employer is not liable if there is no evidence that the work is unusually precarious. *Werner,* 909 S.W.2d at 869 (citing

*Great Atl. & Pac. Tea Co. v. Evans,* 142 Tex. 1, 175 S.W.2d 249, 251 (1943)).

In this case, there is no evidence that loading groceries on the sloped portion of Kroger's parking lot is an unusually dangerous job, nor is there evidence that other courtesy clerks sustained similar injuries while loading groceries on the sloped lot. Indeed, loading purchases into vehicles is a task performed regularly—without any special training or assistance—by customers throughout the grocery and retail industry. While there is evidence that grocery carts had rolled into vehicles due to the parking lot's slope and may have posed a foreseeable risk of damage to customers' vehicles, this is no evidence that the slope posed a foreseeable risk of injury to Kroger's employees. Elwood presented no evidence that his job required specialized training. *See Nat'l Convenience Stores,* 987 S.W.2d at 149. Elwood testified that, prior to working at Kroger, he knew it was dangerous to place his hand in a vehicle's doorjamb. Moreover, there is no evidence that carts with wheel locks or additional personnel were necessary to safely load groceries. *See Allsup's Convenience Stores,* 934 S.W.2d at 438.

Kroger had no duty to warn Elwood of a danger known to all and no obligation to provide training or equipment to dissuade an employee from using a vehicle doorjamb for leverage. Employers are not insurers of their employees. *See Leitch,* 935 S.W.2d at 117; *Exxon Corp.,* 867 S.W.2d at 21. Accordingly, without hearing oral argument, we reverse the court of appeals' judgment and render judgment for Kroger. *See* TEX. R. APP. P. 59.1, 60.2(c).

**All Citations**

197 S.W.3d 793, 49 Tex. Sup. Ct. J. 623

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 4594098
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

Court of Appeals of Texas,
Houston (14th Dist.).

The Kroger Company, Appellant
v.
Christopher Milanes, Appellee

NO. 14–13–00873–CV    |
Opinion filed July 30, 2015

**Synopsis**
**Background:** Journeyman filed suit against employer that
was not subscriber of workers' compensation insurance for
negligence arising out of amputation of several fingers while
using bone-in band saw to cut meat. Following jury trial,
the 129th District Court, Harris County, entered judgment on
jury's verdict for journeyman, and denied employer's motion
for new trial. Employer appealed.

**Holdings:** The Court of Appeals, J. Brett Busby, J., held that:

[1] employer owed employee duties arising out of employer-
employee relationship, in addition to premises liability duties,
and thus, was subject to liability in negligence for breach of
those duties;

[2] employer's breach of duty to provide adequate
maintenance for band saw was proximate cause of
journeyman's injuries;

[3] employer's breach of its duty to provide safety regulations
to journeymen and other meat cutters on safe operation of
band saw was proximate cause of journeyman's injuries;

[4] evidence supported award of $151,744 in damages for lost
earning capacity;

[5] fact that photographs of bone-in band saw that journeyman
was using at time of accident were taken months after accident

had no bearing on relevance as fair and accurate depictions
of saw at issue;

[6] video recordings of operable and inoperable bone-in band
saws were relevant;

[7] video and photographic evidence were not subject to
exclusion based on employer's unsubstantiated claim that they
were illegally obtained; and

[8] trial court's alleged failure to timely investigate and
respond to juror's report to bailiff about jury misconduct
during deliberations did not warrant new trial.

Affirmed.

West Headnotes (38)

**[1]** **Trial**
    Matters of law in general
**Trial**
    Form and Language
The parties have the right to be judged by a jury
properly instructed in the law; therefore, the goal
is to submit to the jury the issues for decision
logically, simply, clearly, fairly, correctly, and
completely. Tex. R. Civ. P. 278.

Cases that cite this headnote

**[2]** **Trial**
    Authority to instruct jury in general
Trial courts enjoy broad discretion with respect
to jury instructions, so long as the charge is
legally correct. Tex. R. Civ. P. 278.

Cases that cite this headnote

**[3]** **Labor and Employment**
    Nature and scope of duty owed by employer
Employer that elected not to subscribe
to workers' compensation insurance owed
employee duties arising out of employer-
employee relationship, in addition to premises
liability duties, and thus, was subject to liability

in negligence for breach of those duties, specifically, duty to provide employee with safe place to work, duty to train employee in safe use and handling of band saw, and duty to provide safety regulations related to employee's job as journeyman meat cutter, which resulted in employee suffering amputation of several fingers during operation of band saw while cutting meat. Tex. Labor Code Ann. § 406.033(d).

1 Cases that cite this headnote

**[4]     Workers' Compensation**
     Election by Employer

The Texas Workers' Compensation Act permits private Texas employers to elect whether to subscribe to workers' compensation insurance. Tex. Labor Code Ann. § 406.002(a).

Cases that cite this headnote

**[5]     Workers' Compensation**
     Injuries arising in course of employment in general

**Workers' Compensation**
     Exclusiveness of Remedies Afforded by Acts

If an employer elects to subscribe to workers' compensation insurance, then its employees generally are prohibited from suing it and must instead pursue their claims through an administrative agency, and in that administrative proceeding, employees need prove only that they were injured in the course and scope of their employment. Tex. Labor Code Ann. § 401.001 et seq.

Cases that cite this headnote

**[6]     Workers' Compensation**
     Defenses; Abrogation or Modification of Common-Law Defenses

**Workers' Compensation**
     Negligence of Employer as Essential to Recovery

**Workers' Compensation**
     Presumptions and burden of proof

If an employer elects to be a non-subscriber to workers' compensation insurance, then it is subject to suits at common law for damages, to which it can raise only limited defenses, and in that situation, an employee injured on the job must file suit and prove the elements of a common law negligence claim. Tex. Labor Code Ann. § 406.033(d).

Cases that cite this headnote

**[7]     Negligence**
     Elements in general

To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach.

Cases that cite this headnote

**[8]     Labor and Employment**
     Nature and scope of duty owed by employer

Among the duties that an employer owes to an employee are to (1) furnish a reasonably safe place to work, (2) warn employees of hazards of their employment that are not commonly known or already appreciated, (3) supervise employees' activities, (4) hire competent co-employees, (5) furnish reasonably safe instrumentalities with which to work, and (6) provide safety regulations.

1 Cases that cite this headnote

**[9]     Labor and Employment**
     Nature and scope of duty owed by employer

An employer must train employees in the safe use and handling of products and equipment used in and around an employer's premises or facilities.

Cases that cite this headnote

**[10]     Labor and Employment**
     Nature and Scope of Duty Owed by Employer

An employer must exercise ordinary care, based on standard negligence principles, in carrying out the duties owed to its employees.

Cases that cite this headnote

**[11]  Courts**

👉 Highest appellate court

Changing higher-court precedent is not the function of an intermediate court of appeals.

Cases that cite this headnote

**[12]  Negligence**

👉 Elements in general

To prevail on a negligence claim, a plaintiff must prove not only that the defendant breached a duty, but also that he sustained damages proximately caused by that breach.

Cases that cite this headnote

**[13]  Negligence**

👉 Necessity of causation

**Negligence**

👉 Foreseeability

Proximate cause consists of two elements: cause in fact and foreseeability.

Cases that cite this headnote

**[14]  Negligence**

👉 'But-for' causation; act without which event would not have occurred

**Negligence**

👉 Substantial factor

**Negligence**

👉 Failure to Act; Omissions

"Cause in fact," as an element of proximate cause, means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred.

Cases that cite this headnote

**[15]  Negligence**

👉 Remoteness and attenuation; mere condition or occasion

Cause in fact, as an element of proximate cause, is not shown if the defendant's conduct did no more than furnish a condition that made the injury possible.

Cases that cite this headnote

**[16]  Negligence**

👉 Foreseeability

"Foreseeability," as an element of proximate cause, requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission.

Cases that cite this headnote

**[17]  Negligence**

👉 In general; degrees of proof

**Negligence**

👉 Direct or circumstantial evidence

"Cause in fact" and foreseeability, as elements of proximate cause, cannot be established by mere conjecture, guess, or speculation; however, proximate cause may be established by direct or circumstantial evidence and the reasonable inferences drawn from that evidence.

Cases that cite this headnote

**[18]  Labor and Employment**

👉 Weight and sufficiency of evidence

Evidence supported finding that employer's breach of its duty to provide adequate maintenance for band saw used by journeyman to cut meat was proximate cause of amputation of several of journeyman's fingers, in action against employer that did not subscribe to workers' compensation insurance; employee charged with maintaining and repairing saw was not certified to do so by saw manufacturer, other meat cutter frequently attempted to repair saw, contrary to employer's policy that only thing meat cutter should do to band saw was to change dull blade, blade guard was inoperable and not used at all, loud noise indicated improper blade tension, which could cause blade to bind into meat and cause meat to roll, several employees testified that blade would often pop

off and that blades would dull very quickly, indicating that something was "very wrong" with saw, journeyman testified that blade was dull on day of injury, that he had repeatedly reported issues with saw to management, that no action was taken, and that, although he had discretion to change out blade when he deemed it necessary, management had instructed him to be conservative in using blades, as there was financial incentive for those managers to come under budget. Tex. Labor Code Ann. § 406.033(d).

Cases that cite this headnote

**[19]    Labor and Employment**
      Weight and sufficiency of evidence

Evidence supported finding that employer's breach of its duty to provide safety regulations to journeymen and other meat cutters on safe operation of band saw used to cut meat was proximate cause of journeyman's injuries from amputation of several fingers while using saw, in action against employer that did not subscribe to workers' compensation insurance; employee testified that he was not even aware of existence of blade guard and was not using it on day of injury, it was common practice of meat cutters to not use blade guard, managers were aware of this practice but chose to do nothing about it, mechanical engineering experts for both journeyman and employer testified that band saw should not be used without blade guard, and journeyman's expert explained that accident would not have occurred, if blade guard had been used as required by operator's manual. Tex. Labor Code Ann. § 406.033(d).

Cases that cite this headnote

**[20]    Damages**
      Arm, hand, wrist, and shoulder injuries

**Evidence**
      Damages

Evidence supported award of $151,744 in damages for lost earning capacity, in journeyman's negligence action against employer that did not subscribe to workers'

compensation insurance, arising out of amputation of three of journeyman's fingers while using band saw to cut meat; employer began pressuring journeyman to return to work as early as four weeks after accident and unsuccessful surgery to replace fingers, journeyman was right-handed and he lost fingers from his right hand, he was returned to work in close proximity to band saws, despite doctor's concern that he should not be required to work around saws, he was initially returned to work on light duty but was fired for alleged insubordination after he refused to perform activity due to condition of his hand and informed manager of that fact, he was unable to satisfactorily perform work in two other jobs involving manual labor, and there was no challenge to journeyman's expert economist quantifying journeyman's loss of past and future earning capacity. Tex. Labor Code Ann. § 406.033(d).

Cases that cite this headnote

**[21]    Damages**
      Impairment of earning capacity

Loss or impairment of earning capacity is a recognized element of damages in a personal injury case.

Cases that cite this headnote

**[22]    Damages**
      Necessity of proof as to damages in general

The plaintiff has the burden of proving loss of earning capacity as an element of damages in a personal injury case.

Cases that cite this headnote

**[23]    Damages**
      Impairment of earning capacity

The measure of damages for lost earning capacity in a negligence case is the plaintiff's diminished earning power or earning capacity, in the past or future, directly resulting from the injuries sustained in the accident.

Cases that cite this headnote

**[24]** **Damages**

    Impairment of earning capacity

To support an award of damages for lost earning capacity, the plaintiff generally must introduce evidence from which a jury may reasonably measure in monetary terms his earning capacity prior to injury.

Cases that cite this headnote

**[25]** **Damages**

    Impairment of earning capacity

Specific proof of actual earnings and income are evidence of lost earning capacity.

Cases that cite this headnote

**[26]** **Trial**

    Admission of evidence in general

**Trial**

    Exclusion of improper evidence

The decision to admit or exclude evidence lies within the sound discretion of the trial court.

Cases that cite this headnote

**[27]** **Appeal and Error**

    Rulings as to Evidence in General

A party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in rendition of an improper judgment, which usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted.

Cases that cite this headnote

**[28]** **Evidence**

    Relevancy in general

Facts existing both before and after an event in controversy may be relevant to establishing the cause of that event. Tex. R. Evid. 402.

Cases that cite this headnote

**[29]** **Evidence**

    Photographs in general

Generally, pictures or photographs relevant to any issue in a case are admissible.

Cases that cite this headnote

**[30]** **Evidence**

    Photographs in general

**Evidence**

    Motion pictures

When a photograph or video portrays facts relevant to an issue, it is admissible if verified by a witness as being a correct representation of the facts.

Cases that cite this headnote

**[31]** **Evidence**

    Photographs and other pictures; sound records and pictures

When a photograph or video portraying facts relevant to an issue, the witness through whom the photograph or video is introduced must know the object involved and be able to state that the photograph or video correctly represents it.

Cases that cite this headnote

**[32]** **Evidence**

    Photographs in general

The fact that the scene or the object portrayed in a photograph or video offered into evidence has changed since the time of the event in question in the litigation does not prevent the admission of the photograph or video into evidence if the changes are explained in such a manner that the photograph or video will help the jury in understanding the nature of the condition at the time of the event at issue.

Cases that cite this headnote

**[33]** **Evidence**

☞ Determination of question of admissibility

A dispute as to the accuracy of some part of the photograph or video usually goes only to the weight of the evidence, not to its admissibility.

Cases that cite this headnote

**[34]  Evidence**

☞ Determination of question of admissibility

Fact that photographs of bone-in band saw that journeyman was using to cut meat at time of accident were taken months after accident had no bearing on relevance of photographs as fair and accurate depiction of saw, in negligence action against employer. Tex. R. Evid. 402.

Cases that cite this headnote

**[35]  Workers' Compensation**

☞ Admissibility of evidence

Video recording of bone-in band saw used to cut meat that was making loud noise when turned on, together with videos of saw that did not make such noise when running, and of non-operational saw for which blade had popped off were relevant, in journeyman's negligence action against employer that did not subscribe to workers' compensation insurance, arising out of amputation of several fingers on journeyman's right hand while using saw to cut meat; journeyman testified that saw he was using at time of accident was making loud noise similar to saw in video, and journeyman was heard in video of inoperable band saw saying "once again, the saw is broken on the same day they said they fixed it," and videos were offered to prove that employer breached its duties to train journeyman and meat cutters on proper use of saw and to maintain equipment used by employees to perform job duties. Tex. Labor Code Ann. § 406.033(d); Tex. R. Evid. 402.

Cases that cite this headnote

**[36]  Evidence**

☞ Evidence wrongfully obtained

Video recordings and photographs of bone-in band saw used by journeyman to cut meat at time of accident and of operable band saw, which were offered to show employer's breach of duties to provide journeymen and meat cutters with training on safe use of band saw and to maintain saws in safe and operable condition, were not subject to exclusion in trial on journeyman's negligence action against employer that did not subscribe to workers' compensation insurance arising out of amputation of several fingers while using saw, based on employer's claim that videos and photographs were taken illegally, absent any showing that journeyman had committed crimes of criminal trespass or improper photography or visual recording at time videos were recorded and photographs were taken. Tex. Labor Code Ann. § 406.033(d); Tex. Civ. Prac. & Rem. Code Ann. § 123.002; Tex. Crim. Proc. Code Ann. art. 38.23; Tex. Penal Code Ann. §§ 21.15, 30.05.

Cases that cite this headnote

**[37]  New Trial**

☞ Misconduct of or affecting jurors

Trial court's alleged failure to timely investigate and respond to juror's report to bailiff about jury misconduct during deliberations, specifically, that attorney member of jury was offering his own definition of legal phrases and words based on his own experience and that another juror contributed her own thoughts based on her experience as legal assistant, did not warrant new trial in journeyman's action against employer for negligence arising out of work-related amputation of fingers while using band saw to cut meat, where alleged misconduct did not involve outside influence brought to bear on jury, and thus, juror was prohibited from testifying about deliberations. Tex. R. Civ. P. 327(b); Tex. R. Evid. 606.

Cases that cite this headnote

**[38]  Appeal and Error**

☞ Remarks and conduct of judge

To reverse a judgment on the basis of judicial misconduct, a reviewing court must conclude both that judicial impropriety occurred and that the complaining party suffered harm.

Cases that cite this headnote

On Appeal from the 129th District Court, Harris County, Texas, Trial Court Cause No. 2011–44685

**Attorneys and Law Firms**

Chance McMillan, Jason A. Gibson, Peter Michael Kelly, for Christopher Milanes.

Brock C. Akers, for the Kroger Company.

Panel consists of Justices Jamison, Busby, and Brown.

## OPINION

J. Brett Busby, Justice

**\*1** Appellant, The Kroger Company, a non-subscriber to workers' compensation insurance, appeals from a final judgment in favor of appellee Christopher Milanes, a Kroger employee who was seriously injured while cutting meat. In its first two issues, Kroger contends the trial court erred when it submitted Milanes's claim to the jury on a general negligence theory rather than a premises liability theory. We overrule these issues because (1) the Supreme Court of Texas has held that a non-subscriber employer in Texas owes continuous, non-delegable duties to its employees separate and distinct from those owed to an invitee on the premises; and (2) Milanes alleged, and legally sufficient evidence showed, that Kroger breached those duties.

Kroger asserts in its third and fourth issues that the evidence is legally and factually insufficient to support the jury's findings that Kroger's negligence proximately caused Milanes's injury and that he suffered past and future loss of earning capacity as a result of the injury. We overrule these issues because the record on appeal contains legally and factually sufficient evidence of both proximate cause and loss of earning capacity.

In its fifth issue, Kroger contends that the trial court abused its discretion when it admitted irrelevant photographs and videos that it argues were taken illegally. We overrule this issue because the photographs and videos were relevant, Milanes took them while legally on Kroger's premises, and Kroger has not shown that he violated any law while doing so. Finally,

Kroger argues in its sixth issue that the trial court abused its discretion when it failed to intervene to remedy alleged juror misconduct. We overrule this issue because, even if we assume the trial court had a duty to intervene and failed to do so, Kroger has not established that it was harmed as a result. We therefore affirm the trial court's judgment.

## BACKGROUND

### A. Kroger hires Milanes and trains him as a journeyman meat cutter.

Milanes applied for a job at Kroger in 2007. Milanes went through a one-day orientation before he started work. According to Milanes, the orientation did not involve safety training but instead covered the advantages of joining the union. Once Milanes started working for Kroger, he was assigned to work in the meat department as a clerk. After he had been working for about a month, Kroger promoted Milanes to apprentice meat cutter. Milanes then moved from store to store before eventually being assigned to the Post Oak Kroger in 2009.

As an apprentice meat cutter, Milanes received on-the-job training from a journeyman, or more experienced, meat cutter. Journeyman meat cutters were supposed to train apprentices on the proper operation of the store's meat-cutting equipment, including the Biro brand bone-in band saw at issue in this appeal. The journeyman meat cutter was also expected to train the apprentice in the safety measures that needed to be taken while using that equipment. Milanes eventually became a journeyman meat cutter.

**\*2** Milanes testified that he received a great deal of his meat-cutting training from Matt Anderson, a journeyman meat cutter at the Kroger store in Montrose. While Milanes testified that he believed Anderson did a good job training him, he also testified that he was not taught by anyone at Kroger to use the band saw blade guard, which both the saw manufacturer and the Occupational Safety and Health Administration (OSHA) require to be used at all times while cutting meat with the saw.[1] Indeed, Milanes testified that he was not even aware that the bone-in band saw had a blade guard; instead, he was taught the blade guard was a guide used to line the meat up prior to cutting. As a result, Milanes never used the blade guard. Milanes also testified that he was never given Kroger's Meat and Seafood Department Safety Manual or the Biro band saw's operator's manual. Milanes further testified that the bone-in saw manufacturer's warning labels were not on

the Post Oak Kroger's saw during the time he worked at the store.

## B. Problems with Kroger's bone-in band saw were reported prior to the injury.

Milanes and other meat cutters experienced problems with the bone-in saw prior to Milanes's injury. Milanes testified that before he was injured, he reported to Kroger management: (1) the saw squealing loudly; (2) the blades dulling very quickly, often within thirty or forty minutes of the blade being changed; (3) the saw frequently catching the meat and sucking it into the blade; (4) the saw being off-balance and shaking frequently; (5) the blade wobbling; and (6) the presence of a lip on the saw table that frequently snagged the meat. Milanes testified that if he told Adam Bell, another journeyman meat cutter who also served as a relief meat market manager, about a problem, Bell would start tinkering with the saw in an effort to fix the problem. Milanes saw Bell doing maintenance on the saw at least twice a week.

With respect to the saw blade dulling quickly, Milanes admitted he had the discretion to change the blade whenever he believed it was necessary. He went on to explain, however, that Kroger management had asked the meat cutters to be sparing with the blades and to make them last. The evidence also revealed that there was a financial incentive for managers to come in under budget. Milanes recounted an episode in which he had used so many blades on the bone-in saw that the store's supply was exhausted, thereby angering management.

In addition to Milanes, several other Kroger meat cutters testified during the trial regarding the pre-accident condition of the saw and Kroger's handling of maintenance issues. These witnesses included William Quinones, Michael Barnes, and Bell. Quinones still worked as a Kroger meat cutter at the time of trial. Kroger had terminated Bames prior to trial for alleged dishonesty. Bell, as mentioned above, was a meat cutter and assistant meat market manager at the Post Oak Kroger. All three testified that there were frequent problems with the bone-in saw.

Among the problems Quinones reported to Kroger management were (1) the blade tension was not right; (2) the blade would occasionally pop off of the saw; (3) the saw table was wobbly; and (4) the blade dulled quickly, requiring frequent blade changes. According to Quinones, management could not get the problems with the saw fixed before Milanes's injury. Quinones also explained that a band saw making a loud squealing noise can indicate that there is a problem

with the saw's blade tension. He went on to explain that if the tension is off, it can make the blade dull more quickly. Quinones explained that a dull blade can cause the meat to jerk or suck the operator's hand into the blade.

Like Milanes, Quinones testified that he had never seen the operator's manual for the bone-in saw and management never told him that he had to read it before operating the saw. Quinones also confirmed that there were no warning signs or labels on the bone-in saw. Quinones never observed inspectors performing regular maintenance on the saw. Instead, Kroger maintenance personnel only came out when a problem was reported. Quinones testified that he was not a trained maintenance person for the bone-in saw, but Kroger expected him to perform maintenance on the saw. Quinones admitted that he had adjusted the tension on the blade and that he had also seen Bell working on the saw.

**\*3** Barnes confirmed many of the problems mentioned by Milanes and Quinones. Barnes testified that he saw Bell adjusting the tension on the blade and that Bell would grab pliers and attempt to fix any problem reported to him. Bames also agreed with Quinones that there was no regular maintenance program for the store's band saws.

Bell testified that he experienced the blade popping off the saw prior to Milanes's injury. He went on to explain that, in his experience, the blade coming off a band saw was caused by either (1) an accumulation of bone dust and "goop" clogging the blade scrapers;[2] or (2) the blade tension not being set properly. Bell also testified that when a band saw makes a loud noise, it means something is wrong with the saw. Bell further testified that he had never seen a complete list of steps on how to clean the bone-in saw nor had he seen the operator's manual for the saw.

Bell admitted that he was not certified by the saw manufacturer to do maintenance on the saw. Bell testified that, as a journeyman meat cutter, he could change the saw's blade and also adjust the tension of the blade but was not authorized to do more than that. According to Bell, he took the saw apart to clean it, not perform maintenance on it. After he was shown a photograph that appeared to show him working on the bone-in saw, Bell explained that a Kroger maintenance person had told him that there was a nut on the saw that if it became loose, it could cause the blade to get out of adjustment and possibly even pop off. Bell explained that he was attempting to adjust that nut when the photograph was

taken. Bell then denied that he was doing anything improper when the photograph was taken.

Bell testified that he did not recall any particular problems with the bone-in saw prior to Milanes's injury. In Bell's opinion, there would have to be something very wrong with a band saw for the blades to dull within thirty to forty minutes of being changed. Bell went on to state that dull blades make it more likely that the meat will jump while being cut. Bell also did not recall any feedback from Kroger management about changing saw blades too frequently or any request to keep costs down by not changing the blades out as often as a meat cutter believed necessary.

### C. Milanes is seriously injured while cutting meat with the saw.

At the time of his injury, Milanes had nearly completed his eight-hour shift. Milanes testified that even though it was the end of his shift, he was not tired and was attending to the task of cutting meat just as closely as he had been at the beginning of his shift. Milanes also testified that he had the meat seated properly on the saw table prior to the injury. Milanes observed that the blade seemed pretty dull, but he decided not to change the blade. According to Milanes, the saw was making a loud noise that evening, and the table was still wobbly. Milanes also noticed that the lip was still present on the saw table. Milanes did not report any of these problems to management that evening because he had reported them previously and the problems were not addressed.

 **\*4** Milanes was cutting a slab of meat into individual steaks and was about three-fourths of the way through the slab. Milanes is right-handed, and he estimated that his right hand was about six inches from the blade before the accident occurred. According to Milanes, the accident happened so fast that he did not see exactly what happened. Milanes testified that he believed the dull blade caused the meat to jump, or flip over, pulling the fingers of his right hand into the blade.

The saw blade amputated parts of three fingers from Milanes's right hand. Milanes was taken to the hospital, where he underwent surgery to reattach the severed fingers. The surgery was unsuccessful. Milanes later underwent two additional surgeries to cover exposed bone. After the surgeries, Milanes underwent extensive physical therapy and testified that he continued to experience a great deal of pain in the areas of the amputations. Milanes also testified that he experienced the phantom sensation that his fingers were still

there. At the time of trial, Milanes was still experiencing pain severe enough that he had to take pain medication frequently.

Milanes reported that the loss of his fingers had adversely impacted his ability to participate in physical activities such as rock climbing, basketball, football, dodge ball, running with his dog, and lifting weights at the gym. The injury also affected his ability to drive his standard transmission car. Milanes reported that he was unemployed at the time of trial. Milanes testified that he had tried two different jobs after he was terminated by Kroger, but he had been unsuccessful because both jobs required manual dexterity. Milanes also testified that all of his prior job experience had involved manual labor, and he could no longer do that type of work.

Milanes offered evidence that after the accident, he experienced severe anxiety, depression, insomnia, as well as nightmares about cutting off his fingers. Milanes twice went to the hospital thinking he was experiencing a heart attack. Doctors diagnosed both episodes as anxiety attacks, not heart attacks. Milanes also experienced feelings of anger because the meat department personnel had complained that the bone-in saw was not working properly prior to his injury. Milanes eventually went to see a psychologist. Once Milanes returned to work at the Post Oak Kroger, he experienced anxiety when he was around the meat saws. Milanes's psychologist recommended that he be kept away from the saws while he was working.

### D. Milanes returns to work on light duty and Kroger terminates his employment.

Milanes was earning $16.69 per hour when he was injured. He returned to work several months after the accident at that same wage. Milanes was initially placed on light duty in the meat department when he returned to work. Milanes testified that he had no specific job duties while on light duty and frequently spent his time doing little more than talking to customers. Kroger began asking Milanes to resume cutting meat about a month after he returned to work but while he was still on light duty. Kroger made this request even though Milanes's doctors had ordered that he not be required to cut meat at that point in time. Kroger asked Milanes to return to meat cutting several times.

Milanes was to return to full duty with no restrictions on October 21, 2011. The day before, Bell, as he was leaving work, instructed Milanes to clean the meat department cooler. Milanes explained that an industrial hose and scalding hot water were used to clean the meat department cooler and

saws. Milanes picked up the hose and noticed that it had a leak. Milanes also saw that a new hose was laying nearby, so he called the store manager, William Underwood, and asked if Underwood could send someone to change out the hoses. Underwood told Milanes to do it himself. Milanes testified that he responded: "[C]an we have somebody else? And he said, no. And before I could say anything else, he started yelling and saying it's not a light duty issue. Anything—I didn't even say that. And I said, well, it is kind of a light duty issue. And he said I'll be back there in a minute." Milanes testified that he did not believe the task of changing out the hoses was within his job duties at that point in time. Milanes explained that he was still on light duty, his hand was still hurting a great deal, and changing out the hose required the person to use pliers and a wrench, tasks he did not think he should do while his hand was still hurting.

**\*5** When Underwood arrived, he asked Milanes why he could not change out the hose. Milanes responded that he was not going to do it. Milanes testified that he did not want to say in front of other employees that he was physically unable to change out the hose, but that Underwood was aware he was still on light duty. When Milanes continued to refuse to change out the hose, Underwood terminated him for insubordination. Milanes admitted that he never told Underwood in front of other people that he was physically unable to perform the task of changing out the hose.

### E. Mechanical engineering experts testify regarding saw operation and maintenance and the cause of Milanes's injury.

At trial, mechanical engineer John Ryan testified on behalf of Milanes. According to Ryan, OSHA standards require an employer to provide a safe workplace. OSHA also has a general machine guarding standard that requires any hazardous point of operation to be guarded. Additionally, OSHA had specific standards for the operation of band saws such as the bone-in saw at issue in this case. OSHA, according to Ryan, has three primary concerns with the operation of band saws. First, OSHA requires that each band saw have an operational blade guard. Second, OSHA emphasizes that a band saw's blade tension must be properly set. Finally, OSHA requires employers to have a training program in place so that employees learn how to operate a band saw safely. Ryan explained that blade tension is important for the safe operation of band saws because if the tension is not set correctly, the blade can pop off the saw.

Ryan obtained a copy of the operator's manual for the type of bone-in saw used at the Post Oak Kroger. The manual states that the saw's blade guard must be kept within one-half inch of the meat being cut. According to Ryan, if the blade guard is adjusted to within one-half inch of the meat, and the meat suddenly jumps or rolls, the guard will prevent the operator's hand from contacting the blade. The manual also requires that all warning labels be kept on the saw and replaced promptly if any come off. The manual also provides that if the saw is not working properly, it should be taken out of service until it can be repaired.

Ryan inspected the bone-in saw approximately one year after Milanes's injury. Ryan discovered that most of the saw's warning labels were missing.[3] Ryan also found the blade guard inoperable. He concluded the guard was frozen in position as a result of the accumulation of either rust or "goop" generated by the sawing of meat. The blade guard finally moved when he applied fifty pounds of pressure. Ryan went on to testify that the guard remained very difficult to move even after he broke it free.

Ryan took several videos during his inspection. One video showed Bell cutting meat on the bone-in saw. Ryan observed that Bell did not use the blade guard while cutting the meat and that the guard was at least four inches above the level of the meat throughout the video.

Ryan opined that if the bone-in saw's blade guard was not operational on the day of Milanes's injury, the saw should not have been in service. Ryan then opined that if the saw had been taken out of service, Milanes would not have been injured. He went on to opine that if Kroger had followed OSHA's standards and the requirements set forth in the operator's manual, Milanes also would not have been injured.

Ryan examined the saw's blade tension during his inspection. Ryan found numerous scratch marks on the inside of the saw housing. Ryan explained that the scratch marks indicate the blade had popped off repeatedly and hit the metal housing. Ryan opined that this type of contact with the metal housing can dull the blade.

**\*6** Ryan then explained that improper blade tension can also cause a wandering cut. According to Ryan, when a blade is under-tensioned, it can cause the blade's cutting path to wander, which can lead to force being applied to the meat sideways. This in turn increases the possibility that the saw will bind in the meat or the bone, causing the meat to be

thrown or to roll. Ryan added that this possibility increases if the blade is also dull. Ryan calculated how much force this saw would apply to an operator's hand and found it reasonable that the saw could cause the meat to roll.

Ryan next addressed the loud screeching sound the bone-in saw exhibited. Ryan opined that the noise was created by the blade rubbing at high speed against something, possibly the blade scrapers. Blade scrapers are designed to remove meat and other debris from the blade to keep the blade clean and operational. Ryan testified that if the blade is rubbing against one of the blade scrapers, it can cause the blade to dull at a faster rate than normal.

Finally, Ryan discussed Kroger's maintenance records for the bone-in saw. Ryan asked to review all maintenance records for the saw. The first maintenance record he received from Kroger was dated six days after Milanes's injury. Ryan also saw other post-injury records but he never received any maintenance records pre-dating the injury. Both Underwood, the Post Oak Kroger store manager, and the primary Kroger employee charged with maintenance on the saw, Brent Nixon, confirmed the lack of any pre-injury maintenance records for the bone-in saw. Neither could explain the lack of records.

Milanes called Kroger's mechanical engineering expert, Thomas Grubbs, to testily as an adverse witness. Grubbs inspected the bone-in saw two years after Milanes's injury. According to Grubbs, a band saw's primary safeguard for operator safety is an adjustable blade guard. The blade guard on the bone-in saw was not operational when he inspected it, however. Grubbs testified that a band saw should not be operated if the blade guard is in the raised position.

Grubbs also testified regarding the importance of the manufacturer's manual for the saw. Grubbs stated that anyone operating a band saw should read the operator's manual first. He then testified that it is an employer's duty to train employees who will use a band saw based on the operator's manual. Grubbs testified that he believed the operator's manual for a band saw should be followed. He then opined that anyone not adequately trained on the operation of a band saw should not use it. Grubbs also opined that it was important for an employer using band saws to have written safety policies and procedures in place. Grubbs explained that written safety policies are important so employees know what they are supposed to do, and if they have questions, they know where to find the answers.

Grubbs next covered the importance of a regular inspection and maintenance program for band saws. Grubbs testified it is vital for an employer to have this type of program in place because it ensures that the band saws are properly maintained. Grubbs agreed that it was Kroger's responsibility to keep the bone-in saw in good working order. Grubbs also opined that an important part of an inspection and maintenance program is having properly trained and qualified personnel performing the inspections and maintenance on a band saw.

Grubbs testified again during Kroger's case. Grubbs discovered during his investigation that it was the Kroger meat cutters' habit not to use the blade guard. Grubbs then opined that because a piece of meat may vary in its height, it would be unrealistic, and ridiculous, to expect the meat cutters to adjust the blade guard to within one half inch of the top of the meat before each cut. Grubbs then opined that the blade guard, even if it was nonoperational, was not a factor in Milanes's accident. Finally, Grubbs testified that during his inspection of the bone-in saw, he did not see any defects that would explain Milanes's accident.

### F. Kroger employees testify regarding saw operation and maintenance.

*7 Kroger presented the testimony of several employees during the trial. Underwood, the top manager at the Post Oak Kroger, was one of them. Underwood initially testified regarding Kroger's policies and procedures. When he was shown Kroger's Meat/Seafood Department Safety Manual, Underwood could not locate the band saw maintenance and inspection program. Underwood then admitted that he did not know for sure whether Kroger had a written policy regarding inspection and maintenance of those saws. According to Underwood, only Kroger maintenance personnel should work on the band saws. Expanding on that, Underwood testified that the only thing meat cutters are authorized to do to the saws is change the blades. If anything else needs attention, the meat cutter should notify store management, who would then call in a service person.

Underwood denied being personally aware of any pre-injury safety complaints about the bone-in saw, including complaints about the saw's blades dulling too fast. Underwood explained that he was not the only manager at the store and the complaints could have been addressed to another manager. Underwood then testified that there should be a record of any maintenance or repairs performed on the store's saws. Underwood was unable to explain why there

were no maintenance records for the bone-in saw predating Milanes's injury.

Matthew Anderson is a journeyman meat cutter and Kroger meat market manager. Anderson worked at the Post Oak Kroger about a year before Milanes's accident and therefore had no knowledge of the bone-in saw's condition on the day of Milanes's injury. Among other subjects, Anderson testified about cutting meat with a band saw. According to Anderson, a blade coming off the saw is not uncommon. Anderson had also experienced meat jumping or rolling. He explained that meat jumping is unpredictable but certain circumstances, such as dull blades, increase the possibility it will happen. Anderson testified that for a blade to dull in thirty to forty minutes, "the saw would have to be so out of whack, [he did not] even see how you could use it." Anderson testified that if a band saw is making a loud noise, it is a sign that it needs maintenance or repair.

Anderson also testified regarding Kroger's policies and procedures regarding band saws. He admitted that he was never shown the operator's manual for the bone-in saw and did not know whether Kroger has a policy prohibiting workers from operating a meat saw without a blade guard in place. Anderson went on that when he trained people to operate a meat saw, he told them to use the blade guard and adjust it above the meat for safety reasons. He then admitted, however, that he would see people cutting meat without using the blade guard.

Javier Duran was the meat market manager for the Post Oak Kroger when Milanes's injury occurred. Duran testified that he was taught to use the blade guard during his training. Duran then admitted that the blade guard was not really used by the meat cutters at the Post Oak Kroger but was just left in the same position. Duran denied that Milanes ever complained to him about the bone-in saw not working properly or about the blades dulling too fast. He also denied telling Milanes to be conservative when changing blades. Duran admitted that meat jumps occasionally while it is being cut. According to Duran, meat jumping is generally unpredictable, but dull blades make it more likely to occur. Duran went on to explain that a meat cutter should change the blade before it gets so dull that it will lead to meat jumping.

Brent Nixon was the primary Kroger facility engineer responsible for maintenance at the Post Oak Kroger at the time Milanes was injured. Nixon's duties included maintenance on the Biro band saw even though he had not been certified by Biro to perform maintenance on Biro saws. Nixon denied being aware of any problems with the bone-in saw before the accident. He also did not recall Milanes telling him that the bone-in saw needed repairs that were not being made. Nixon also had no explanation for the lack of repair and maintenance records predating Milanes's injury. Nixon insisted that maintenance was done on the bone-in saw prior to Milanes's injury and that there were records of that work.

**\*8** Nixon was the facility engineer sent by Kroger to investigate the band saw several days after Milanes was injured. Nixon testified that he checked all aspects of the saw thoroughly, and as a final check he turned the saw on and then beat the moving band saw blade with a broom to "make sure [the blade was] not going to come off." Nixon reported that the only problem his investigation revealed was the lip on the cutting table, which he repaired. Nixon testified he was unable to find anything that would explain the accident.

## G. The trial court signs a final judgment based on the jury's verdict in favor of Milanes.

At the conclusion of the evidence, the trial court proposed to submit the case to the jury on an ordinary negligence theory. Kroger objected to the trial court's proposed jury charge and argued the case should be submitted to the jury on a premises liability theory. The trial court overruled Kroger's objection and rejected its proposed premises liability question. The jury subsequently found Kroger liable and awarded Milanes damages totaling $1,093,440.89. The trial court, after crediting Kroger for the amount of medical expenses and wages it had already paid, signed a final judgment awarding Milanes $1,016,809.10 plus pre-judgment and post-judgment interest. This appeal followed.

## ANALYSIS

### I. The jury was properly charged on a negligence theory of liability.

Kroger argues in its first two issues that the trial court erred when it submitted the case to the jury under a negligence theory of liability. According to Kroger, it is "well-settled that to state a general negligence claim [against a landowner], there must be affirmative contemporaneous conduct by the owner at the time of the incident which led to the plaintiff's injury." Kroger contends that regardless of the theory of liability Milanes pled, Texas law and the evidence introduced at trial established that the only duty it owed Milanes was

that of a premises owner. As a result, Kroger argues Milanes was limited to a premises liability theory of recovery. Given that Milanes did not submit such a theory to the jury, Kroger concludes it is entitled to a take-nothing judgment. We disagree because under supreme court precedent, Kroger also owed Milanes duties of care as his employer.

### A. Standard of review

 **[1]** **[2]** A trial court must submit in its charge to the jury all questions, instructions, and definitions that are raised by the pleadings and the evidence. *See* Tex. R. Civ. P. 278; *E.I. DuPont de Nemours & Co. v. Roye,* 447 S.W.3d 48, 56 (Tex.App.–Houston [14th Dist.] 2014, pet. dism'd) (citing *Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663–64 (Tex.1999)). The parties have the right to be judged by a jury properly instructed in the law. *Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000). The goal therefore, is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely. *Roye,* 447 S.W.3d at 56. To achieve this goal, trial courts enjoy broad discretion so long as the charge is legally correct. *Id.* We review whether a challenged portion of a jury charge is legally correct using a de novo standard of review. *Id.* (citing *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 525 (Tex.2002)). In making this determination, we examine the allegations and proof introduced at trial. *Oncor Electric Delivery Co., LLC v. Murillo,* 449 S.W.3d 583, 592 (Tex.App.–Houston [1st Dist.] 2014, pet. filed) (en banc).

### B. The pleadings and evidence support the trial court's submission of the negligence theory rather than a premises theory.

 **\*9** **[3]** **[4]** **[5]** The Texas Workers' Compensation Act permits private Texas employers to elect whether to subscribe to workers' compensation insurance. *Tex. W. Oaks Hosp., L.P. v. Williams,* 371 S.W.3d 171, 186 (Tex.2012) (citing Tex. Lab. Code Ann. § 406.002(a) (West 2015)). If an employer elects to subscribe, then its employees generally are prohibited from suing it and must instead pursue their claims through an administrative agency. *Id.* In that administrative proceeding, employees need prove only that they were injured in the course and scope of their employment. *Id.*

 **[6]** **[7]** If an employer elects to be a non-subscriber to workers' compensation insurance, as Kroger has, then it is subject to suits at common law for damages, to which it can raise only limited defenses. *Id.* In that situation, an employee injured on the job must file suit and "prove the elements of a common law negligence claim." *Id.* (citing Tex. Lab. Code Ann. § 406.033(d)); *Amigos Meat Distributors, L.P. v. Elizondo,* No. 01–10–00867–CV, 2011 WL 5026227, at \*2 (Tex.App.–Houston [1st Dist.] Oct. 20, 2011, no pet) (mem.op.). To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach. *Austin v. Kroger Texas, L.P.,* No. 14–0216, —— S.W.3d ——, ——, 2015 WL 3641066, at \*12 (Tex. June 12, 2015); *Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex.2006).

 **[8]** **[9]** **[10]** The supreme court has held that employers in Texas owe certain continuous, non-delegable duties to their employees. *Farley v. MM Cattle Co.,* 529 S.W.2d 751, 754 (Tex.1975) (abrogated on other grounds by *Parker v. Highland Park, Inc.,* 565 S.W.2d 512 (Tex.1978)); *see Austin,* —— S.W.3d at ——, 2015 WL 3641066, at \*15 (stating that employer may owe duties to employee in addition to those a landowner owes an invitee, including duties to train and supervise). Among these are the duties to (1) furnish a reasonably safe place to work, (2) warn employees of hazards of their employment that are not commonly known or already appreciated, (3) supervise employees' activities, (4) hire competent co-employees, (5) furnish reasonably safe instrumentalities with which to work, and (6) provide safety regulations. *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 652 & n. 10 (Tex.2007); *Farley,* 529 S.W.2d at 754. An employer must also train employees in the safe use and handling of products and equipment used in and around an employer's premises or facilities. *Austin,* —— S.W.3d at ——, 2015 WL 3641066, at \*15; *Aleman v. Ben E. Keith Co.,* 227 S.W.3d 304, 311 (Tex.App.–Houston [1st Dist.] 2007, no pet.). An employer must exercise ordinary care, based on standard negligence principles, in carrying out these duties. *Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996); *Werner v. Colwell,* 909 S.W.2d 866, 869 (Tex.1995); *see Elwood,* 197 S.W.3d at 794 ("An employer has a duty to use ordinary care in providing a safe workplace.").

Milanes alleged and presented evidence during trial that Kroger breached some of these duties. This evidence includes, but is not limited to: the failure to provide reasonably safe equipment or instrumentalities necessary for the performance of Milanes's job; the failure to provide safety regulations related to Milanes's work; and the failure to instruct or train employees in the safe use and handling of equipment—specifically, the Biro band saw. *See Austin,* —— S.W.3d at ——, 2015 WL 3641066, at \*15. Milanes testified that he was never provided the operator's manual for

the Biro saw and he was not trained to use the adjustable blade guard on the saw while cutting meat. In fact, he testified he was not even aware that the saw was equipped with a blade guard at all. In addition, both expert witnesses testified that the band saw should not be operated when the blade guard is not used or operational. The evidence also includes testimony from several witnesses that, prior to Milanes's injury: (1) the bone-in saw had an inoperable blade guard; (2) the saw was experiencing continuing problems such as rapidly dulling blades and improper blade tension; and (3) Kroger was unable to fix the problems yet did not take the saw out of operation. Because Milanes pled and introduced legally sufficient evidence demonstrating Kroger negligently breached duties it owed to him as an employee, we conclude that the trial court did not err when it submitted the negligence theory of liability to the jury. *See id.* ——, 2015 WL 3641066, at *16 ("We therefore reject Kroger's argument that its lack of any negligent activity contemporaneous with [the plaintiff's injury] defeats [the plaintiff's] instrumentalities claim as a matter of law."); *see also Amigos Meat Distributors, L.P.,* 2011 WL 5026227, at *3 (affirming judgment signed after jury found non-subscribing employer negligent based on evidence that employer failed to provide operator's manual for Biro band saw to employee meat cutter and also failed to train employee adequately on safe operation of saw).

**\*10** **[11]** The cases that Kroger cites in urging that its only duty to Milanes was that of a premises owner do not change this analysis. Most of Kroger's cases are distinguishable because they did not involve the employer/employee relationship.[4] The remainder of Kroger's cases involved employees injured by a premises condition or by conduct of a third party, neither of which is at issue.[5] Thus, as Kroger conceded at oral argument, none of these cases control the outcome here.[6]

The supreme court recently confirmed that, "[a]s [plaintiff's] employer, Kroger owed [him] duties in addition to its premises-liability duty and its duty not to engage in negligent activities, including the duty to provide [the plaintiff] with necessary instrumentalities." *Austin,* —— S.W.3d at ——, 2015 WL 3641066, at *15. We therefore overrule Kroger's first two issues on appeal.

**II. Milanes introduced legally and factually sufficient evidence that Kroger's negligence proximately caused Milanes's injuries and that he suffered lost earning capacity as a result of those injuries.**

In its third issue, Kroger attacks the legal and factual sufficiency of the evidence of causation. In its fourth issue, Kroger contends Milanes introduced legally and factually insufficient evidence that his earning capacity was negatively impacted by his injury. We address each contention in turn.

**A. Standard of review**

**\*11** When an appellant attacks the legal sufficiency of an adverse finding on an issue on which it did not have the burden of proof, the appellant must demonstrate on appeal that there is no evidence to support the adverse finding. *Univ. Gen. Hosp., L.P. v. Prexus Health Consultants, LLC,* 403 S.W.3d 547, 550 (Tex.App.–Houston [14th Dist.] 2013, no pet.). In conducting a legal sufficiency review, we must consider the evidence in the light most favorable to the appealed finding and indulge every reasonable inference that supports it. *Id.* at 550–51 (citing *City of Keller v. Wilson,* 168 S.W.3d 802, 821–22 (Tex.2005)). The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the decision under review. *Id.* at 551. This Court must credit favorable evidence if a reasonable trier of fact could, and disregard contrary evidence unless a reasonable trier of fact could not. *Id.* The trier of fact is the sole judge of the witnesses' credibility and the weight to be given their testimony. *Id.*

This Court may sustain a legal sufficiency (or no evidence) issue only if the record reveals one of the following: (1) the complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *Id.* Evidence that is so weak as to do no more than create a mere surmise or suspicion that the fact exists is less than a scintilla. *Id.*

In reviewing the factual sufficiency of the evidence, we must examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Ellis,* 971 S.W.2d at 407; *Barnhart v. Morales,* 459 S.W.3d 733, 745 (Tex.App.–Houston [14th Dist.] 2015, no pet.). The amount of evidence

necessary to affirm is far less than the amount necessary to reverse a judgment. *Barnhart,* 459 S.W.3d at 745. This Court is not a factfinder. *Id.* (citing *Ellis,* 971 S.W.2d at 407). Instead, the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Id.* We may not, therefore, pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would also support a different result. *Id.* If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict; we need not do so when affirming a jury's verdict. *Id.* (citing *Gonzalez v. McAllen Med. Ctr., Inc.,* 195 S.W.3d 680, 681 (Tex.2006) (per curiam)).

## B. Sufficient evidence supports the jury's finding that Kroger's negligence proximately caused Milanes's injury.

 [12]     [13]    To prevail on a negligence claim, a plaintiff must prove not only that the defendant breached a duty, but also that he sustained damages proximately caused by that breach. *Torres v. Tessier,* 231 S.W.3d 60, 63 (Tex.App.–Houston [14th Dist.] 2007, no pet.)(citing *D. Houston, Inc. v. Love,* 92 S.W.3d 450, 454 (Tex.2002)). Proximate cause consists of two elements: cause in fact and foreseeability. *Del Lago Partners, Inc.,* 307 S.W.3d at 774.

 [14]     [15]     [16]     [17]    Cause in fact means that the defendant's act or omission was a substantial factor in bringing about the injury, which would not otherwise have occurred. *Western Investments, Inc. v. Urena,* 162 S.W.3d 547, 551 (Tex.2005). Cause in fact is not shown if the defendant's conduct did no more than furnish a condition that made the injury possible. *Id.* The second element of proximate cause, foreseeability, requires that a person of ordinary intelligence should have anticipated the danger created by the negligent act or omission. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995). These elements cannot be established by mere conjecture, guess, or speculation. *Id.* at 477. Proximate cause may, however, be established by direct or circumstantial evidence and the reasonable inferences drawn from that evidence. *Pilgrim's Pride Corp. v. Smoak,* 134 S.W.3d 880, 889 (Tex.App.–Texarkana 2004, pet. denied) (citing *McClure v. Allied Stores of Texas, Inc.,* 608 S.W.2d 901, 903 (Tex.1980)).

 **\*12**   [18]    As detailed in the background section, Milanes introduced evidence that Kroger failed to maintain the Biro band saw properly. This includes evidence that Brent Nixon,

the primary Kroger employee charged with maintaining and repairing the store's bone-in band saw, was not certified by the saw's manufacturer. The jury also heard evidence that Bell, a meat cutter and relief meat market manager, frequently attempted to repair the saw when employees reported problems to him despite Kroger's stated policy that the only thing meat cutters should do to a band saw was change out a dull blade. Other evidence of improper maintenance includes the lack of maintenance records and the meat cutters' testimony that problems with the saw were reported but never fixed.

Evidence of improper maintenance also included that the blade guard on the saw was inoperable and a loud noise emanated from the saw. Witnesses testified the noise could be caused by the blade hitting the blade scrapers or by incorrect blade tension. Numerous witnesses testified that improper blade tension was a frequent problem encountered while using the bone-in saw. Ryan, Milanes's mechanical engineering expert, testified that improper blade tension can cause a wandering cut, increasing the possibility that the blade will bind in the meat and cause the meat to roll.

Evidence showed that if the tension on the blade is incorrect, it can cause the blade to pop off, resulting in the blade hitting the metal saw housing. Witnesses testified that they had experienced the blade popping off this saw, as confirmed by scratch marks on the inside of the housing. Ryan testified that frequent contact with the metal saw housing results in the rapid dulling of the saw's blade. Witnesses also testified that the bone-in saw's blade dulled at a very rapid rate, often within thirty to forty minutes of putting on a new blade. Kroger witnesses confirmed that if the blades were dulling at such a fast pace, something was very wrong with the saw.

Every meat cutter who testified during the trial agreed that meat sometimes jumps or rolls when it is being cut, and that it is normally unpredictable when jumping or rolling will happen. Several testified, however, that the probability of meat jumping or rolling increases when the saw's blade is dull. Milanes himself testified he reported to Kroger management that the saw was frequently catching the meat and sucking it into the blade. He also testified that he noticed the blade was dull the day of his injury. Although Milanes had the discretion to change out a dull blade when he deemed it necessary, he testified that he was encouraged by store managers to be conservative when using blades and that there was a financial incentive for those managers to come in under budget.[7]

**[19]** Apart from improper maintenance and problems with blade tension and dulling, there was also evidence that Kroger failed to provide safety regulations and train Milanes and other employees properly on the safe operation of the Biro band saw—particularly that the blade guard should be used at all times. Milanes testified that he was not even aware of the existence of a blade guard and was not using it on the day of his injury. There was also evidence that (1) it was the common practice of Kroger's meat cutters to not use the blade guard, and (2) Kroger managers were aware of this practice but chose to do nothing about it. Both expert witnesses testified that a band saw should not be used without the blade guard. Ryan explained that the accident would not have occurred, and Milanes would not have been injured, if the blade guard had been used as required by the operator's manual.

**\*13** For these reasons, we conclude there is legally and factually sufficient evidence that Kroger's breach of the duties to provide safe equipment and safety regulations and to train employees in the safe use of equipment proximately caused Milanes's injury. We overrule Kroger's third issue on appeal.

### C. Sufficient evidence shows that Milanes lost earning capacity as a result of his injury.

**[20]** In its third issue, Kroger contends Milanes presented legally and factually insufficient evidence of lost earning capacity resulting from the amputation of three fingers on his dominant right hand while he was cutting meat with Kroger's bone-in saw. In making this argument, Kroger points out that Milanes returned to work at the same Kroger store following his injury at the same rate of pay. It goes on to argue that the only reason he lost this job was the result of his own insubordination, and thus there is no evidence of lost earning capacity as a result of his injury. Kroger makes no other argument about the insufficiency of the evidence supporting the jury's award of $151,744 in damages for lost earning capacity.

**[21]** **[22]** **[23]** **[24]** **[25]** Loss or impairment of earning capacity is a recognized element of damages in a personal injury case. *Strauss v. Cont'l Airlines, Inc.*, 67 S.W.3d 428, 435 (Tex.App.–Houston [14th Dist.] 2002, no pet.). Earning capacity has been defined as the ability and the fitness to work in gainful employment for any type of compensation, including salary, commissions, and other benefits. *Id.* at 435 n. 2. The plaintiff has the burden of proving loss of earning capacity. *Id.* The measure of this type of damage is the plaintiff's diminished earning power or earning capacity, in the past or future, directly resulting from the injuries sustained in the accident. *Id.* To support an award of damages for lost earning capacity, the plaintiff generally must introduce evidence from which a jury may reasonably measure in monetary terms his earning capacity prior to injury. *Id.* at 435–436. Specific proof of actual earnings and income are evidence of lost earning capacity. *Id.* at 436.

The jury heard evidence regarding Kroger's treatment of Milanes after his injury. This includes testimony that as soon as four weeks after his accident, Kroger began pressuring Milanes to return to work. The record also contains evidence that once Milanes returned, he was put back to work in the meat department in close proximity to the department's band saws despite his doctors' concerns that he should not be required to work around the bone-in saw. The jury also heard Underwood's testimony that Milanes could possibly transfer out of the meat department, but his pay rate would be different if he did so. There was also evidence that once Milanes returned to work on light duty, he had no specific job duties, but instead did little more than talk to customers.

The jury heard the testimony addressing Milanes's termination, including Underwood's testimony that Milanes was fired for insubordination when he refused to carry out an order to change the meat department hose. They also heard Milanes's testimony that he was still on light duty and experiencing pain in his right hand at that time. Although Milanes admitted that he did not tell Underwood that he was physically incapable of doing the task, he did tell Underwood that his refusal was a light duty issue. As the trier of fact and sole judge of the credibility of the witnesses, the jury could have disbelieved Underwood's testimony that Milanes was fired for insubordination, believed that Milanes refused to change out the hose due to the condition of his injured hand and sufficiently informed Underwood of that fact, and found that the termination was related to Milanes's injury. Kroger has not briefed any challenge to Milanes's testimony regarding his post-termination inability to secure other long-term employment due to his injury, nor has it challenged the testimony of Milanes's expert economist quantifying Milanes's loss of past and future earning capacity.[8]

**\*14** We hold there is legally and factually sufficient evidence supporting the jury's finding that Milanes's loss of earning capacity resulted from his work-related injury. We overrule Kroger's fourth issue on appeal.

APPENDIX 135 16

**III. The trial court did not abuse its discretion when it admitted Milanes's post-accident photographs and videos into evidence.**

Kroger asserts in its fifth issue that the trial court abused its discretion when it admitted into evidence five photographs (Plaintiff's Exhibits 5, 6, and 7) and three videos (Plaintiff's Exhibits 10, 12, and 13) taken by Milanes after he returned to work.[9] According to Kroger, the trial court should have excluded the photographs and videos because they were taken illegally and also because they were not relevant given that all were taken after the accident.

**A. Standard of review**

 **[26]**   The decision to admit or exclude evidence lies within the sound discretion of the trial court. *Bay Area Healthcare Grp., Ltd. v. McShane,* 239 S.W.3d 231, 234 (Tex.2007). A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Barnhart,* 459 S.W.3d at 742 (citing *Bowie Mem'l Hosp. v. Wright,* 79 S.W.3d 48, 52 (Tex.2002)). When reviewing matters committed to the trial court's discretion, a reviewing court may not substitute its own judgment for that of the trial court. *Id.* Thus, the question is not whether this court would have admitted the evidence. Rather, an appellate court will uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling, even if that ground was not raised in the trial court. *Id.* Therefore, we examine all bases for the trial court's decision that are suggested by the record or urged by the parties. *Id.*

 **[27]**   A party seeking to reverse a judgment based on evidentiary error must prove that the error probably resulted in rendition of an improper judgment, which usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted. *Id.* To determine whether evidentiary error probably resulted in the rendition of an improper judgment, an appellate court reviews the entire record. *Id.* (citing *Interstate Northborough P'ship v. State,* 66 S.W.3d 213, 220 (Tex.2001)).

**B. Kroger has not shown an abuse of discretion in admitting the challenged photographs and videos.**

Kroger makes two separate arguments in its fifth issue. First, it asserts that the challenged photographs and videos should have been excluded because they were obtained by illegal means. Second, Kroger contends the photographs and videos were not relevant because they were taken months after

Milanes was injured. We address Kroger's second contention first.

***1. The challenged photographs and videos were relevant.***
 **\*15**   **[28]**   Relevant evidence is evidence that has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Relevant evidence is generally admissible, irrelevant evidence is generally inadmissible. *Id.* at 402. Facts existing both before and after an event in controversy may be relevant to establishing the cause of that event. *City of Houston v. Leach,* 819 S.W.2d 185, 191 (Tex.App.–Houston [14th Dist.] 1991, no writ).

 **[29]**    **[30]**    **[31]**    **[32]**    **[33]** Generally, pictures or photographs relevant to any issue in a case are admissible. *Huckaby v. A.G. Perry & Sons, Inc.,* 20 S.W.3d 194, 209 (Tex.App.–Texarkana 2000, pet. denied). When a photograph or video portrays facts relevant to an issue, it is admissible if verified by a witness as being a correct representation of the facts. *Cheek v. Zalta,* 693 S.W.2d 632, 635 (Tex.App.–Houston [14th Dist.] 1985, no writ). The verifying witness must know the object involved and be able to state that the photograph or video correctly represents it. *Id.* The fact that the scene or the object portrayed in the photograph or video has changed since the time of the event in question in the litigation does not prevent the admission of the photograph or video into evidence if the changes are explained in such a manner that the photograph or video will help the jury in understanding the nature of the condition at the time of the event at issue. *Id.* Indeed, the parties' experts inspected the saw well after Milanes took the challenged photos and videos, and photos and videos from expert Ryan's inspection were also introduced into evidence. A dispute as to the accuracy of some part of the photograph or video usually goes only to the weight of the evidence, not to its admissibility. *See id.*; *see also Garza v. Cole,* 753 S.W.2d 245 247 (Tex.App.–Houston [14th Dist.] 1987, writ ref'd n.r.e.) (stating that conditions shown in video need not be identical to those at time of event in question for video to be admissible into evidence).

 **[34]**   Plaintiff's Exhibit 5 is a photograph of the Post Oak Kroger's bone-in saw wrapped in clear plastic. Plaintiff's Exhibit 6 contains three photographs of the blade cleaners on the same bone-in saw. William Quintero, a journeyman meat cutter at the Post Oak Kroger, testified that these photographs fairly and accurately depicted the bone-in saw Milanes was using. Plaintiff's Exhibit 7 is another photograph of the Post

Oak Kroger's bone-in saw. Milanes testified that he took the photograph and that it fairly and accurately depicted the bone-in saw he used. Because witnesses testified that the challenged photographs accurately depicted the bone-in saw, we conclude that the trial court did not abuse its discretion when it overruled Kroger's relevance objections and admitted Exhibits 5, 6, and 7 into evidence. *SeeCheek,* 693 S.W.2d at 635.

 **[35]**   Plaintiff's Exhibit 10 is a 28–second video showing the bone-in saw running with a loud noise emanating from it. Milanes testified that Exhibit 10 portrayed the bone-in saw and that the noise heard on the video was the same as the noise the saw was making when he was injured. Plaintiff's Exhibit 12 is another brief video. Milanes, who took the video, testified that it showed a boneless band saw at the Post Oak Kroger, which was running correctly. The saw shown in Exhibit 12 did not emit a loud noise while it was running. Plaintiff's Exhibit 13 is a 14–second video of a non-operational bone-in saw at the Post Oak Kroger. The video shows that the blade had popped off the saw. On the video, Milanes says: "once again the saw is broken in the same day they said they fixed it." Milanes testified that the videos portrayed the same circumstances that were present before he was injured and they would be helpful to the jury during his testimony. We conclude that the trial court did not abuse its discretion when it overruled Kroger's relevance objections and admitted the three videos into evidence. *SeeCheek,* 693 S.W.2d at 635.

### 2. The challenged photographs and videos were not illegally obtained.

 **\*16**   **[36]**   Kroger also objected to the admission of the photographs and videos based on its contention that they were all taken illegally. Kroger cites no authority supporting its position. *Cf.*Tex. Civ. Prac. & Rem. Code Ann. § 123.002 (West 2011) (creating a civil cause of action against a person who intercepts another person's communication); Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005) (providing that no evidence obtained in violation of either the constitution or laws of the United States or the State of Texas "shall be admitted in evidence against the accused on the trial of any criminal case."). Further, we find nothing in the record to suggest that Milanes committed either the offense of criminal trespass, Tex. Penal Code Ann. § 30.05 (West Supp.2014), or the offense of improper photography or visual recording. *Id*. § 21.15 (West 2011). We hold that the trial court did not abuse its discretion when it overruled Kroger's "illegally

obtained" objection and admitted the challenged photographs and videos into evidence. Having rejected each argument raised by Kroger in its fifth issue, we overrule that issue.

### IV. Kroger has not shown that it was harmed by the trial court's alleged failure to intervene to remedy perceived juror misconduct.

 **[37]**   In its sixth issue, Kroger contends the trial court abused its discretion when it refused to grant Kroger a new trial based on the allegation that the trial court failed to intervene timely to correct potential juror misconduct. We conclude Kroger is not entitled to a new trial because it has not demonstrated it was harmed as a result of any alleged failure to intervene by the trial court.

Kroger's motion for new trial attached an affidavit from one of the jurors in the case. In the affidavit, the complaining juror stated that after the jury began its deliberations, she came to believe that some other members of the jury were violating instructions contained in the court's charge. The complaining juror alleged that, during the jury's deliberations, an attorney member of the jury offered his own definitions of legal phrases and words derived from his own personal experience as an attorney. The complaining juror also alleged that a second juror contributed her thoughts based on her personal experience as a legal assistant. The complaining juror did not allege that any outside influence was brought to bear on the jurors during their deliberations. The complaining juror stated that she asked, through the bailiff, to speak with the trial judge about her concerns; however, the trial judge did not speak with the juror during the remainder of the jury's deliberations.

The jury reached and delivered its 10–2 verdict in favor of Milanes. The complaining juror, believing that the misconduct she perceived had impacted the jury's verdict, alleged that she again asked to speak with the trial judge. According to the complaining juror, the trial judge was in court at the time, and the juror was told she could wait until he was finished to speak with him. The complaining juror decided to leave the courthouse before the trial judge was able to speak with her, however.

During the hearing on Kroger's motion for new trial, the trial judge stated that he had addressed with the parties a prior complaint made by this juror following jury selection, but that he was not provided notice of the juror's alleged request during deliberations. The trial judge found the juror's allegations not credible and denied the motion for new trial.

 **[38]**  Kroger argues it is entitled to a new trial based on judicial misconduct: specifically, the trial court's failure to investigate the complaining juror's allegations that members of the jury had violated the trial court's instructions during their deliberations. To reverse a judgment on the basis of judicial misconduct, a reviewing court must conclude both that judicial impropriety occurred and that the complaining party suffered harm. *SeeSilcott v. Oglesby,* 721 S.W.2d 290, 293 (Tex.1986); *Markowitz v. Markowitz,* 118 S.W.3d 82, 86 (Tex.App.–Houston [14th Dist.] 2003, pet. denied). Because we conclude that Kroger has not shown it was harmed as a result of the trial court's alleged failure to intervene to correct the perceived juror misconduct, we need not decide whether any judicial impropriety occurred, and we therefore express no view on that issue.

 **\*17**  Given that the complaining juror's allegations did not involve outside influence, Kroger's attempt to show harm through an examination of the jury's discussions during its deliberations is prohibited by both Rule 327(b) of the Texas Rules of Civil Procedure and Rule 606 of the Texas Rules of Evidence. *See*Tex. R. Civ. P. 327(b) ("A juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent or dissent from the verdict concerning his mental processes in connection therewith, except that a juror may testily whether any outside influence was improperly brought to bear upon any juror."); Tex. R. Evid. 606(b)

(prohibiting a juror from testifying about jury's deliberations unless allegation involves outside influence). Kroger admits there was no outside influence brought to bear on the jury.

Instead, Kroger argues that certain jurors violated the trial court's instructions during the jury's internal deliberations. To substantiate this claim, Kroger offers only the affidavit testimony of a member of the jury regarding deliberations —evidence that Kroger is prohibited from using. [10]  *See id*. Because we (like the trial court) cannot consider the only evidence offered by Kroger to establish it was harmed by the judge's alleged misconduct in failing to address the jurors' perceived violations during deliberations, we conclude Kroger has failed to show harm. *Golden Eagle Archery, Inc. v. Jackson,* 24 S.W.3d 362, 370 (Tex.2000) (holding that rules prevent juror from testifying that jury discussed improper matters during deliberations). Thus, the trial court did not abuse its discretion in denying Kroger's motion for new trial. We overrule Kroger's sixth issue.

### CONCLUSION

Having overruled each of the issues Kroger raised in this appeal, we affirm the trial court's judgment.

### All Citations

--- S.W.3d ----, 2015 WL 4594098

### Footnotes

1  Milanes testified that he did not learn that the band saw was equipped with a blade guard until after his injury. Evidence showed that a meat cutter was required to keep the blade guard set to one-half inch above the level of the meat being cut at all times.

2  There are two sets of blade scrapers on the bone-in saw, one above the cutting table and one below. Each set consists of two pieces of metal attached to the saw housing, one on either side of the revolving blade. The blade scrapers are designed to remove from the blade material created by the cutting of the meat. Bell admitted that the blade scrapers had never been changed during his time at the Post Oak Kroger.

3  Ryan explained that he found a couple of warnings still attached to the motor.

4  *See, e.g.,Del Lago Partners, Inc. v. Smith,* 307 S.W.3d 762, 767 (Tex.2010) (involving suit filed by hotel guest, not employee); *In re Texas Dept. of Transp.,* 218 S.W.3d 74, 75 (Tex.2007) (involving lawsuit against State of Texas arising out of car wreck); *Clayton W. Williams, Jr., Inc. v. Olivo,* 952 S.W.2d 523, 526 (Tex.1997) ("In this case, we consider the liability of a general contractor and its on-site representative for injuries to an independent contractor's employee."); *Dallas Market Center Development, Co. v. Liedeker,* 958 S.W.2d 382, 383 (Tex.1997) (concerning lawsuit filed by delivery person injured while loading flowers onto hotel's elevator) (overruled on other grounds by*Torrington Co. v. Stutzman,* 46 S.W.3d 829 (Tex.2000)); *Keetch v. The Kroger Co.,* 845 S.W.2d 262, 263 (Tex.1992) (customer, not employee, filed suit for injury sustained on defendant's premises); *Foodtown v. Tanguma,* No. 01–11–00047–CV, slip op. at 2 (Tex.App.–Houston [1st Dist.] Dec. 22, 2011, no pet.)(same).

APPENDIX 138 19

5    *See, e.g.,Sears, Roebuck & Co. v. Robinson,* 154 Tex. 336, 280 S.W.2d 238, 240 (Tex.1955) (employee injured by premises condition rather than instrumentality) (overruled by*Austin v. Kroger Texas, L.P.,* No. 14–0216, ––– S.W.3d ––––, ––––, 2015 WL 3641066, at *12 (Tex. June 12, 2015)); *Barton v. Whataburger, Inc.,* 276 S.W.3d 456, 466–67 (Tex.App.–Houston [1st Dist.] 2008, pet. denied) (plaintiff-employee victimized by third-party criminal act on employer's premises); *Allen v. Connolly,* 158 S.W.3d 61, 63 (Tex.App.–Houston [14th Dist.] 2005, no pet.)(same).

6    During oral argument, Kroger was unable to identify a case dictating the outcome it seeks in its first issue. Kroger instead asked this Court to change the law. This we cannot do because changing higher-court precedent is not the function of an intermediate court of appeals. *SeeDeutsch v. Hoover, Bax & Slovacek, L.L.P.,* 97 S.W.3d 179, 195 (Tex.App.–Houston [14th Dist.] 2002, no pet.)("we must follow the Texas Supreme Court's expressions of the law and leave changes in the application of common-law rules to that higher authority"); *see alsoEntergy Gulf States, Inc. v. Summers,* 282 S.W.3d 433, 476 (Tex.2009) (Willet, J., concurring) ("Judges have no authority to second-guess the myriad policy judgments codified in the Workers' Compensation Act").

7    A non-subscribing employer may not assert any negligence by an employee as a defense. *See*Tex. Lab. Code Ann. § 406.033(a) (West 2015).

8    Milanes testified regarding his desire to work, his inability to do manual-labor jobs like those he had been trained to perform, and his departure from a job pulling parts at a warehouse because he kept dropping the parts. His expert, Dr. Donald Huddle, testified regarding Milanes's loss of his Kroger salary ($16.69 per hour) and benefits up to the time of trial. He also testified regarding the present value of the salary and benefits Milanes would lose over his expected future work life, assuming that Milanes would be able to find employment at a lower salary. The jury awarded approximately the amount Dr. Huddle calculated for past lost earning capacity, and less than half of the lowest amount he calculated for future lost earning capacity.

9    In a letter brief filed following oral argument, Kroger identified a sixth photograph, Plaintiff's Exhibit 8, as a photograph it was challenging the admission of on appeal. Kroger did not, however, object to the admission of Exhibit 8 during trial. Kroger therefore has not preserved its complaint regarding the admission of this photograph for appellate review. Tex.R.App. P. 33.1; *Grace Interest, L.L.C. v. Wallis State Bank,* 431 S.W.3d 110, 122 (Tex.App.–Houston [14th Dist.] 2013, pet. denied).

10    Of course, the juror's allegation that she asked the bailiff for an opportunity to speak to the trial judge about her concerns regarding deliberations is not itself evidence of matter occurring during deliberations, though the trial judge found her allegations not credible. Yet even if we assumed for the sake of argument that the request was made and the trial court should have pursued it, the court would have learned no more than the allegations in the juror's affidavit regarding what occurred in deliberations, which "cannot form the basis of a motion for new trial." *In re Zimmer, Inc.,* 451 S.W.3d 893, 897 n. 1 (Tex.App.–Dallas 2014, orig. proceeding).

---

**End of Document**      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

983 S.W.2d 757
Court of Appeals of Texas,
Beaumont.

Martha LAWRENCE, et al., Appellants,
v.
COASTAL MARINE SERVICE
OF TEXAS, INC., Appellee.

No. 09–96–110CV. | Submitted Oct. 2, 1997. | Decided Dec. 31, 1997. | Ordered Published Feb. 9, 1999.

Survivors of independent contractor's employee, who was killed in a crane accident, brought negligence and premises liability suit against crane owner and contractor. The 136th District Court, Jefferson County, Milton Gunn Shuffield, J., directed partial verdict against survivors on premises liability claim, and entered judgment on jury verdict against survivors on negligence claim. Survivors appealed. The Court of Appeals, Ron Carr, J. (Assigned), held that: (1) question of whether crane owner in fact retained control over the crane was for the jury, but (2) jury instruction on negligence was not an improper comment on the weight of the evidence or an advisement to the jury of the effect of a prior ruling for the owner on a premises liability claim.

Reversed and remanded in part, and affirmed in part.

West Headnotes (18)

**[1]** **Trial**
👈 "No" Evidence; Total Failure of Proof
Party is entitled to a directed verdict only when there is no evidence to support a material issue.

Cases that cite this headnote

**[2]** **Trial**
👈 Inferences from Evidence
Trial court should direct a verdict only when reasonable minds can draw only one conclusion from the evidence.

Cases that cite this headnote

**[3]** **Appeal and Error**
👈 Effect of Evidence and Inferences Therefrom on Direction of Verdict
In reviewing a directed verdict, appellate court must consider all evidence in the light most favorable to the party against whom the verdict was directed, disregarding all contrary evidence and inferences.

1 Cases that cite this headnote

**[4]** **Appeal and Error**
👈 Appeal from Ruling on Motion to Direct Verdict
In reviewing a directed verdict, appellate court must determine if there is any probative evidence to raise a fact issue.

Cases that cite this headnote

**[5]** **Appeal and Error**
👈 Appeal from Ruling on Motion to Direct Verdict
Directed verdict will be held improper if there is any evidence in the record of probative force on any theory of recovery.

Cases that cite this headnote

**[6]** **Negligence**
👈 Reasonably Safe or Unreasonably Dangerous Conditions
Generally, a premises owner has a duty to use reasonable care to keep the premises under his control in a safe condition.

Cases that cite this headnote

**[7]** **Negligence**
👈 Persons Working on Property
If a premises owner retains/hires an independent contractor to perform a specific task on the premises, the independent contractor will then owe a duty to use reasonable care to keep the premises under his control in a safe condition.

Cases that cite this headnote

**[8]    Negligence**
  ☛ *Persons Working on Property*

General rule is that an owner or occupier does not have a duty to see that an independent contractor performs work in a safe manner.

Cases that cite this headnote

**[9]    Negligence**
  ☛ *Persons Working on Property*

Premises owner may be liable when it retains the right to control some part of independent contractor's work, but fails to exercise the retained control with reasonable care; control, or the right to control, when resting with the owner, is paramount to recovery.

Cases that cite this headnote

**[10]    Negligence**
  ☛ *Persons Working on Property*

For premises owner to be liable for failure to exercise with reasonable care retained control over work of independent contractor, right of control must be more than a general right to order the work to start or stop, to inspect progress or receive reports, but rather, right of control must extend to the specific area of operation where the plaintiff's injury allegedly took place; general right to control the entire operation is not enough.

Cases that cite this headnote

**[11]    Negligence**
  ☛ *Liabilities Relating to Construction, Demolition and Repair*

Question of whether crane owner in fact retained control over the crane, its operations, movements, and conditions under which it could operate was for the jury in premises liability suit by survivors of independent contractor's employee, who was killed in a crane accident on the crane owner's premises; record affirmatively reflected that contractor's employees would have followed owner's direction and instructions

regarding the crane if given by owner, from which it could be inferred that their course of business dealings gave owner premises control.

Cases that cite this headnote

**[12]    Negligence**
  ☛ *Accidents and Injuries in General*

Fact that crane owner did not exercise its alleged control over independent contractor, whose employee was killed in a crane accident, did not release owner from premises liability regarding the employee's death; independent contractor's employees relied on owner to provide good crane, and owner had responsibility to ensure safe and suitable crane and had basic duty to make premises safe for its invitees, which included duty to warn of dangerous conditions and hidden defect.

Cases that cite this headnote

**[13]    Trial**
  ☛ *Personal Injuries in General*

Jury instruction that, any negligence or gross negligence of crane owner regarding death of independent contractor's employee in crane accident had to "relate to the crane in question as the [crane owner] was not subject to any OSHA regulations as they pertain to the premises or safe operation of the project. Further, [owner] had no duty to see that [independent contractor] or its employees performed the work in a safe fashion," was not an improper comment on the weight of the evidence; nothing in the instructions suggested that the regulations were inapplicable to the owner, to the extent the regulations applied to the crane itself.

Cases that cite this headnote

**[14]    Negligence**
  ☛ *Miscellaneous Particular Cases*
**Trial**
  ☛ *Personal Injuries in General*

Jury instruction that, any negligence or gross negligence of crane owner regarding death of independent contractor's employee in crane

accident had to "relate to the crane in question as the [crane owner] was not subject to any OSHA regulations as they pertain to the premises or safe operation of the project. Further, [owner] had no duty to see that [independent contractor] or its employees performed the work in a safe fashion," did not improperly advise the jury of the effect of the trial court's prior ruling granting owner's motion for partial directed verdict on premises liability claim.

Cases that cite this headnote

**[15]** **Trial**
⚷ Definition or Explanation of Terms

Trial court must submit explanatory instructions and definitions that will assist the jury in rendering a verdict.

Cases that cite this headnote

**[16]** **Trial**
⚷ Authority to Instruct Jury in General
**Trial**
⚷ Definition of Terms

Trial court has wide discretion to determine the sufficiency of definitions and instructions.

Cases that cite this headnote

**[17]** **Trial**
⚷ Opinion or Belief of Judge as to Facts

To be an improper direct comment on the weight of the evidence, a jury instruction must suggest to the jury the trial judge's opinion.

Cases that cite this headnote

**[18]** **Appeal and Error**
⚷ Invading Province of Jury

Survivors of independent contractor's employee, who was killed in a crane accident, failed to show that jury rendered an improper verdict as a result of a jury instruction challenged as an improper comment on the weight of the evidence and as an advisement to the jury of the effect of a prior ruling for the owner on a premises liability claim;

jury was instructed that any negligence or gross negligence of owner had to relate to the crane because the owner was not subject to OSHA regulations as they pertained to the premises or safe operation of the project, and that the owner had no duty to see that the contractor's employees performed the work safely. Rules App.Proc., Rule 81(b)(1) (Repealed).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*759** Tommy L. Yeates, Moore, Landrey, Garth, Jones, Burmeister & Hulett, Beaumont, Richard G. Lewis, Boneau & Lewis, Port Arthur, Ed W. Barton, Orange, for appellant.

Thomas W. Duesler, Harris, Lively & Duesler, Beaumont, Robert J. Killeen, Jr., McAlpine, Peuler, Cozad & Davie, Houston, Thomas C. Fitzhuge, III, Fitzhugh & Thompson, Houston, for appellee.

Before BURGESS, STOVER and CARR,[*] JJ.

## OPINION

RON CARR, Justice (Assigned).

This is an appeal of a take-nothing judgment in a negligence and premises liability case brought by appellants after the death of John Ray Lawrence as the result of an accident on a crane owned by appellee, Coastal Marine Service of Texas, Inc. [Coastal], which occurred while Lawrence was working for Coastal's independent contractor, H.W. Campbell Construction Company [Campbell] on Coastal's premises.

The case proceeded to trial against Campbell and Coastal after the trial court directed a partial verdict against appellants on the premises liability issue. The jury returned an adverse verdict on the negligence issue and a take-nothing judgment was entered.

Appellants now bring this appeal [1] with five (5) points of error contending that the trial court erred (1) in granting Coastal's partial directed verdict [points of error one through

three]; and, (2) by committing charge error [points four and five].

### The Accident

The record reflects that at the time of the accident Coastal's crane was being used by Campbell's employees to offload skids on Coastal's property. After the skids were removed, the boon was moved to the rear of the crane by the operator, at which time Lawrence's head was crushed resulting in his death. There was no barricading system to prevent access by Lawrence to the rear "pinch point" area. This rear pinch point area was not readily apparent to the operator in that the crane had no mirrors and the operator had to step out of his cab to see this blind spot, nor did the crane have an operator's manual in the cab.

### Premises Liability

Appellants' first three (3) points of error contend collectively that the trial court erred in granting Coastal's partial directed verdict on the premises liability issue because there is some evidence that Coastal in fact retained control over the crane in that the record affirmatively reflects that Campbell employees would have followed Coastal's direction and instructions regarding the crane if given by Coastal. We agree.

### Directed Verdict Review

[1] [2] [3] [4] [5] A party is entitled to a directed verdict only when there is no evidence to support a material issue. *Corbin v. Safeway Stores, Inc.,* 648 S.W.2d 292, 295 (Tex.1983). The trial court should direct a verdict only when reasonable minds can draw only one conclusion from the evidence. *Vance v. My Apartment Steak House,* 677 S.W.2d 480, 483 (Tex.1984). In reviewing a directed verdict, we must consider all evidence in the light most favorable to the party against whom the verdict was directed, disregarding all contrary evidence and inferences. *Porterfield v. Brinegar,* 719 S.W.2d 558, 559 (Tex.1986). The appellate court must determine if there is any probative evidence to raise a fact issue. *Id.* A directed verdict will be held improper if there is any evidence in the record of probative force on any theory of recovery. *Jones v.Tarrant Utility Co.,* 638 S.W.2d 862, 865 (Tex.1982).

### Duty

[6] [7] Generally, a premises owner has a duty to use reasonable care to keep the premises under his control in a safe condition. **\*760** *Redinger v. Living, Inc.,* 689 S.W.2d 415, 417 (Tex.1985). However, if a premises owner retains/ hires an independent contractor to perform a specific task on the premises, the independent contractor will then owe a duty to use reasonable care to keep the premises under his control in a safe condition. *Id.* It is undisputed that at all times material, Lawrence and his employer Campbell were independent contractors of Coastal.

[8] The general rule is that an owner or occupier does not have a duty to see that an independent contractor performs work in a safe manner. *Id.* Coastal can presume that an independent contractor, such as Campbell, will take proper care and precautions to assure the safety of its own employees. *Agricultural Warehouse, Inc. v. Uvalle,* 759 S.W.2d 691, 695 (Tex.App.—Dallas 1988), *writ denied per curiam,* 779 S.W.2d 68 (Tex.1989).

[9] [10] An exception to this rule exists when an employer or general contractor retains control over the work performed by an independent contractor. Therefore, a premises owner, such as Coastal, may be liable when it retains the right to control some part of the independent contractor's work, but fails to exercise the retained control with reasonable care. *Redinger,* 689 S.W.2d at 418. Control, or the right to control, when resting with the landowner, then, is paramount to recovery. *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 20 (Tex.1987). In this instance, the right of control must be more than a general right to order the work to start or stop, to inspect progress or receive reports. *Redinger,* 689 S.W.2d at 418. The right of control must extend to the specific area of operation where the plaintiff's injury allegedly took place. A general right to control the entire operation is not enough. *Exxon Corp. v. Tidwell,* 867 S.W.2d 19, 23 (Tex.1993).

In this case, it is undisputed that at the time of the accident, Lawrence was an employee of Campbell; Campbell was an independent contractor of Coastal; and, that Coastal was the owner of the unsafe crane, which is the premises in question.

### The Evidence

**[11]** Robert Phillips was Campbell's supervisor at the site and at the time of Lawrence's death. He testified he would have complied with any instructions from Coastal regarding movement of the crane. Campbell historically provided labor services for Coastal on Coastal's property. Phillips relied on Coastal to provide a good crane. He would have put a barricade tape around the danger area if Coastal had wanted him to, and, he would have done whatever he had been ordered to do by anybody at Coastal and he knew he was to do so at the time period that the death occurred.

Mr. Melvin was an employee and the human resources manager of Campbell at the time of Lawrence's death. Solari acknowledged there was absolutely no question in his mind that if Mr. Lyday, the President of Coastal, had asked him to have Phillips move the crane, that he would have complied; or if Mr. Lyday had asked him to not use the crane until it had been inspected or brought up to industry standards with all the manuals on board, etc., that he would have complied as well; that the safe operation of cranes and instructions related thereto are important to the workmen and despite this he had not even seen the operator's manual until after Lawrence's death; that Mr. Lyday came to the yard in September of 1994 and that he came there after the fatality; and, that had Mr. Lyday come out before the fatality and requested that the crane be moved, that it would have been moved.

Campbell's expert, Jimmy Wiethorn, was a professional engineer with experience in operating cranes. He testified that the crane was ragged, old, had seen quite an extensive life, and was pretty well beat up. He testified that the outrigger controls to the crane had been disengaged or removed from inside the cabin, the acceleration pedal had been disconnected, the brake installed below the console did not operate, the gas throttle did not operate, there was no operator's manual present, and, that the operator's manual that should have been in the crane contained specific instructions to avoid moving the crane until all personnel are clear.

**\*761** Wiethorn further testified that there was no load chart to comply with the American National Standards Institute (ANSI) within the crane. The operator's manual was required by OSHA and ANSI to be kept in the cab at all times. According to Wiethorn, OSHA and ANSI standards applied to this particular crane and Coastal could have easily provided the people who worked with the crane with the pertinent OSHA standards regarding its operation. He testified that proper operation of a crane calls for the operator to be thoroughly conversant with the crane's operating manual,

which the crane operator could not have done in this case because it was not present in the cab. Wiethorn also opined that the crane was not properly maintained in that it had numerous problems, including a throttle that did not operate properly, it ran at a constant speed that could not be adjusted, the boom angle indicator was defective, a brake did not operate, outrigger controls had been taken out, and various other problems. Wiethorn admitted that Coastal, the owner, had the responsibility to have some type of inspection procedure set up to make sure a safe and suitable crane was provided to those who would use it on the premises. OSHA requires barricades in this particular setting. He opined that barricades are customary with both old and new cranes and it does not take much to make a barricade system even for old cranes. He admitted that the cost of barricade tape is nominal and basically less than a penny a foot. He testified that this is something Coastal could have kept on a permanent basis is the cab for the purpose of warning someone. Had Wiethorn inspected the crane, he would have recommended that a portable barricade travel with the crane.

### *Conclusion*

**[12]** Viewing the above evidence in the light most favorable to appellants, we conclude the above evidence is some evidence of probative force that raises a fact issue regarding Coastal's right to control the crane, its operations, movements, and conditions under which it could operate while it was in Campbell's possession. The retention of the right to direct or to forbid the manner in which something is done suffices. *Redinger* 689 S.W.2d at 418. The employees relied on Coastal to provide a good crane. Coastal had a responsibility to ensure a safe and suitable crane and had the basic duty to make the premises safe for its invitees. *Smith v. Henger,* 148 Tex. 456, 226 S.W.2d 425, 431 (1950). This includes the duty to warn of dangerous conditions and hidden defects. *Id.* In *Abalos v. Oil Development Co. of Texas,* 544 S.W.2d 627 (Tex.1976): the Supreme Court differentiated those cases in which the defendant did not create the dangerous condition. In *Abalos*, [2] the Supreme Court stated that although an owner does not have a duty to see that an independent contractor performs work in a safe manner, the rule is inapplicable "if a party negligently creates a dangerous situation, it then becomes his duty to do something about it ..." *Id.* at 633. Since the employees would have acquiesced to Coastal's right to direct the operations of the crane, it is fair to infer that their course of business dealings gave Coastal premises control. The fact that Coastal did not exercise the control does not release it from

liability. *O'Neill v. Startex,* 715 S.W.2d 802, 805 (Tex.App.—Austin 1986, no writ).

Appellants' points of error one through three are sustained. Judgment is reversed and remanded as to appellants' premises liability claim.

### *Alleged Charge Error*

[13] The trial court submitted the following instruction preceding Question No. 1:

> In determining the negligence or gross negligence, if any, of Coastal Marine Services of Texas, Inc., you are instructed that such negligence or gross negligence must relate to the crane in question as the premises owner, Coastal Marine Service of Texas, Inc. was not subject to any OSHA regulations as they pertain to the premises or safe operation of the project. Further, as the premises owner, Coastal Marine Service of Texas, Inc. had no duty to see that the H.W. Campbell Construction **\*762** Company or its employees performed the work in a safe fashion.

Appellants' points of error four and five collectively contend that the trial court erred in submitting the above instruction because it improperly commented on the weight of the evidence [point four] and advised the jury of the effect of its prior ruling on Coastal's motion for partial directed verdict [point five]. We disagree.

Campbell's expert testified that certain OSHA standards apply to the crane itself.

We first conclude the instruction, as submitted, was not an improper comment on the weight of the evidence. The instruction did not advise the jury that OSHA regulations do not apply to Coastal with regard to the crane and its operation. The instruction is clear, in specifically instructing the jury that any negligence on the part of Coastal must relate to the crane in question. The second sentence of the instruction simply stated that Coastal was not subject to any OSHA regulations "as they pertain to the premises or safe operation

of the project." There is nothing in the Court's instructions to suggest that OSHA regulations were inapplicable to Coastal, to the extent the regulations applied to the crane itself.

[14] Appellants next contend that because Coastal was a premises owner, the instruction somehow advised the jury of the effect of the trial court's prior ruling granting Coastal's motion for partial directed verdict, as stated above. We disagree with appellants' argument that the instruction effectively instructs the jury that Coastal is not subject to any OSHA standards and that the jury should not consider OSHA standards and the experts' testimony based thereon.

[15] [16] [17] A trial court must submit explanatory instructions and definitions that will assist the jury in rendering a verdict. *Wichita County, Texas v. Hart,* 917 S.W.2d 779, 783–84 (Tex.1996). This is exactly what was done in the case at bar. Additionally, the trial court has wide discretion to determine the sufficiency of definitions and instructions. *Plainsman Trading Co. v. Crews,* 898 S.W.2d 786, 791 (Tex.1995). Although an instruction might incidentally comment on the evidence, the Court's charge is not objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence when it is properly a part of an instruction or definition. TEX.R. CIV. P. 277. To be a direct comment on the weight of the evidence, the jury instruction must suggest to the jury the trial judge's opinion. *Texas Employers Ins. Ass'n v. Duree,* 798 S.W.2d 406, 412 (Tex.App.—Fort Worth 1990, writ denied). The instruction preceding Question No. 1 given the jury by the trial court gave no indication to the jury of any opinion of the trial court regarding the facts of the case and therefore, it was proper.

[18] Furthermore, appellants have not shown that the submission of this instruction caused the jury to render an improper verdict. TEX.R.APP. P. 81(b)(1). This is especially true in light of the fact that the appellants vigorously argued the applicability of OSHA standards to the crane itself during closing arguments.

Appellants' fourth and fifth points of error are denied. Judgment is affirmed as to appellants' negligence claim.

JUDGMENT IS REVERSED AND REMANDED IN PART AND AFFIRMED IN PART.

### All Citations

983 S.W.2d 757

## Footnotes

| | |
|---|---|
| \* | The Honorable Ron Carr, sitting by assignment pursuant to TEX. GOV'T CODE ANN . § 74.003(b) (Vernon 1988). |
| 1 | After perfecting appeal, Campbell was dismissed from this appeal. |
| 2 | *Redinger* relies on *Abalos* to support its holding at 418. |

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.